# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

---

AKO BURRELL,

      Plaintiff,

                                 6:24-CV-1169

-v.-                                (DNH/MJK)

TIA VAN WINKLER,
N. PEZDEK, D. TRAGLIA,
LAPORTE, D. BEKTIC, BONK
and STATE OF NEW YORK
DOCCS,

      Defendants.

---

AKO BURRELL, Plaintiff, pro se

MITCHELL J. KATZ, U.S. Magistrate Judge

TO THE HONORABLE DAVID N. HURD, U.S. District Judge:

## ORDER AND REPORT-RECOMMENDATION

Plaintiff commenced this action on September 25, 2024 by filing a complaint (Dkt. No. 1) together with a motion for leave to proceed in forma pauperis (Dkt. Nos. 2, 6). The Clerk has sent to the court for review the complaint brought pursuant to 42 U.S.C. § 1983 as well as the IFP Application.

I.    **IFP Application**

Plaintiff's IFP application declares that he is unable to pay the filing fee. (Dkt. No. 2). After reviewing plaintiff's application, this court finds that he is financially eligible for IFP status.

However, in addition to determining whether plaintiff meets the financial criteria to proceed IFP, the court must also consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss the case at any time if the court determines that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. *See* 28 U.S.C. § 1915 (e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact. *See Neitzke v. Williams*, 490 U.S. 319, 325 (1989), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and 28 U.S.C. § 1915. Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources. *See Neitzke*, 490 U.S. at 327; *see also Harkins v. Eldredge*, 505 F.2d 802, 804 (8th Cir. 1974). Although the court has a duty to show liberality toward pro se litigants and must use extreme caution in ordering *sua sponte* dismissal of a pro se complaint before the adverse party has been served and has had an opportunity to respond, the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. *See Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d

Cir. 2000) (finding that a district court may dismiss a frivolous complaint *sua sponte* even when plaintiff has paid the filing fee).

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555).

In addition, Fed. R. Civ. P. 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Although Rule 8 does not require detailed factual allegations, it does "demand[] more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Houston v. Collerman*, No. 9:16-CV-1009 (BKS/ATB), 2016 WL 6267968, at *2 (N.D.N.Y. Oct. 26, 2016) (quoting *Ashcroft*, 556 U.S. at 678). A pleading that contains allegations that "'are so vague as to fail to give the defendants adequate notice of the claims against them' is subject to dismissal." *Id.* (citing *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009)).

## II.  **Complaint**

The complaint alleges violations of plaintiff's civil rights pursuant to 42 U.S.C. §§ 1983 and 1988. (Dkt. No. 1) (Complaint ("Compl.")). Plaintiff asserts that the court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1334(3), and 1343(4). (*Id.* at ¶ 3).

3

Plaintiff alleges that on June 21, 2024 while traveling from Wende Correctional Facility to Utica, New York, he received a telephone call directing him to report to parole by 2:00 p.m. that day. (*Id.* at ¶ 14). When he arrived at the parole office, plaintiff alleges that he was informed by defendant Van Winkler that he would have to live at a local shelter, and not with his mother, Patricia Campbell.  (*Id.* at ¶¶ 15, 16). Plaintiff was also advised that he would have to wear a GPS monitor because of threats he made to correction officers, parole officers, and their families while incarcerated. (*Id.* at ¶ 16).

On the evening of June 21, 2024, defendant Van Winkler, together with eleven parole officers, arrived at plaintiff's mother's residence, and they searched her home, "destroying property" in the process. (*Id.* at ¶¶ 17, 18, 19). Upon arrival, the complaint alleges that defendant Van Winkler "covered the ring doorbell with her finger [and] refused to identify herself." (*Id.* at ¶ 18).

On or about June 26, 2024, plaintiff alleges he was informed that his GPS monitor was not working and that it needed to be replaced. (*Id.* at ¶ 20). At that time, defendants Pezdek, Pelligrino and LaPorte entered defendant Van Winkler's office and informed plaintiff that the New York State Attorney General's office advised of outstanding lawsuits pending against multiple DOCCS employees. (*Id.* at ¶ 20). Defendants Pezdek, Pelligrino and Van Winkler specifically mentioned actions pending against Sheriff Maciol, Officer Gerhardt, and Officer Cacoppla. (*Id.* at ¶ 21). Defendants Pezdek, Pelligrino and Van Winkler informed plaintiff that the GPS bracelet would be removed if the pending actions against Officers Gerhardt and Cacoppla were dismissed. (*Id.*). In response, plaintiff stated that he thought the GPS

4

monitor was required "over some threats." (*Id.* at ¶ 22). Defendant Van Winkler advised plaintiff that defendant Bonk "wrote a report of threats" that was the basis for the GPS monitor, but that it would be removed if the claims against various officers were dismissed. (*Id.* at ¶ 22). Plaintiff refused to dismiss the pending actions, and defendant Pelligrino placed the GPS monitor on plaintiff's leg so tightly that he could "hardly walk." (*Id.* at ¶ 23). Defendants Pelligrino and Van Winkler refused plaintiff's request to loosen the GPS bracelet. (*Id.*).

The complaint further alleges that on or about August 6, 2024, plaintiff informed defendant Van Winkler that he was changing his address and would be living with Shauniece Turner. (*Id.* at ¶ 29). In response, defendant Van Winkler "grabbed plaintiff['s] face and gave him a kiss on the mouth." (*Id.*). Plaintiff "jerked" backwards "surprise[d]" by defendant Van Winkler's advance. (*Id.*). Defendant Van Winkler also stated that "you [plaintiff] deal with all the wrong women you never look me in the eye, I'm the girl you need. I picked your file." (*Id.* at ¶ 30). Defendant Van Winkler sat on plaintiff's lap and proceeded to fondle and squeeze his penis. (*Id.*). Plaintiff pushed defendant Van Winkler away. (*Id.*). Defendant Van Winkler responded that "now you['re] getting violated, you['re] going to regret that." (*Id.*).

According to the complaint, when plaintiff was informed that he was "receiving a violation for a GPS failure to charge" he stated, "you keep giving me defective chargers." (*Id.* at ¶ 31). In the presence of defendant Pezdek, defendant Van Winkler stated "[i]t's []part of the plan you'll be back in jail soon." (*Id.*). The complaint further alleges that when plaintiff asked defendant Van Winkler whether the probation

violation was a result of "that other shit from earlier," she responded that everything would be fine if plaintiff lived at the shelter and not with other women. (*Id.* at ¶ 32). Plaintiff further alleges that defendants Pezdek and Van Winkler denied his request for the "directive for the GPS monitoring," and directed him to leave the probation office or be arrested for trespassing. (*Id.* at ¶ 33).

On September 3, 2024, plaintiff alleges that he reported to parole and informed defendant Van Winkler that he could not be late for a job interview that morning. (*Id.* at ¶ 34). Defendants Traglia and Bektic detained plaintiff in a holding room and placed him in handcuffs and shackles. (*Id.*). Once detained, defendants Van Winkler and LaPorte strip searched plaintiff, looking for contraband. (*Id.* at ¶ 35). Once the strip search was completed, the complaint alleges that defendant Traglia broke the GPS charger and allowed plaintiff to leave the parole building. (*Id.*).

On September 4, 2024, defendant Van Winkler directed plaintiff to report to parole to replace the broken GPS charger. (*Id.*). Plaintiff informed defendant Van Winkler that he was in New York City for a job interview and requested that his mother meet defendant Van Winkler to exchange the GPS charger, which his mother failed to do. (*Id.*). Plaintiff missed the next bus to Utica. (*Id.*). Instead, plaintiff alleges that he reported to the parole office in Manhattan where the Senior Parole Officer contacted defendant Pezdek, who denied knowing plaintiff. (*Id.* at ¶ 36).

On or about September 6, 2024, plaintiff alleges that he was struck by a vehicle on his way to Penn Station. (*Id.* at ¶ 37). Plaintiff was transported to Harlem Hospital, but left because of the wait time. (*Id.*). In the interim, plaintiff lost his cell phone. (*Id.*).

6

Plaintiff boarded the next bus to Utica, New York and upon his arrival, proceeded to a hospital where he was diagnosed with a pinched nerve, rib contusion, and knee contusion. (*Id.* at ¶ 38). Plaintiff alleges that he asked his mother to inform defendant Van Winkler of his return to Utica, that he sustained injuries from an accident, that he lost his cell phone, and that he needed a new GPS charger. (*Id.* at ¶ 39). Plaintiff alleges that his mother failed to do so. (*Id.*).

According to the complaint, plaintiff's fiancée, a licensed nurse practitioner, "ordered" plaintiff to stay at her home while he recovered from his accident. (*Id.* at ¶ 40). Plaintiff then alleges that defendant Van Winkler and a parole task force entered his fiancée's home and "escorted plaintiff to a court." (*Id.*). Defendant Van Winkler informed plaintiff that he had an "absconding warrant." (*Id.* at ¶¶ 40, 41). Defendant Van Winkler "insisted" that plaintiff remain in custody because he was allegedly "30 minutes late to a preliminary hearing for her retaliation violation [from] 08/06/2024." (*Id.* at ¶ 41).

Without specifying a date, the complaint alleges that plaintiff was contacted by a "client" who was incarcerated at Midstate Correctional Facility about representing him at a Tier III hearing. (*Id.* at ¶ 25). The complaint alleges that the incarcerated individual "made a deposit" in connection with the representation. (*Id.*). According to the complaint, defendants Van Winkler, Pozdek, and LaPorte informed plaintiff that he was not "legally a paralegal" and could not represent the incarcerated individual. (*Id.* at ¶ 26).

Plaintiff seeks compensatory damages in the amount of $150,000,00.00 and punitive damages in the amount of $20,000,000.00. (Compl. at pg. 15).[1]

## III.  Eleventh Amendment

The court recommends that plaintiff's claims under Section 1983 against DOCCS, as well as his claims for damages against the individual defendants in their official capacities, be dismissed with prejudice pursuant to the Eleventh Amendment. "[A]s a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogate[d] the states' Eleventh Amendment immunity . . . ." *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009) (alteration in original) (quotation marks and citation omitted). "[T]he immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state." *Id*. (citation omitted). DOCCS is a state agency for purposes of the Eleventh Amendment. *See Simmons v. Gowanda Corr. Facility*, No. 13-CV-647, 2013 WL 3340646, at *2 (W.D.N.Y. July 1, 2013); *see also Jackson v. Johnson*, 985 F.Supp. 422, 426 (S.D.N.Y. 1997). Moreover, plaintiff's claims against the defendants in their official capacities are construed as claims against New York State, and are also barred by Eleventh Amendment immunity. *See Drawhorne v. Aloise*, 23-CV-1278 (TJM/TWD), 2023 WL 8188396, at *3 (N.D.N.Y. Nov. 27, 2023). This immunity

---

[1] Page references are to those assigned by the CM/ECF system.

8

shields states from claims for money damages, injunctive relief, and retrospective declaratory relief. *See Green v. Mansour*, 474 U.S. 64, 72-74 (1985).[2]

## IV. <u>Fifth Amendment</u>

The court recommends that plaintiff's Fifth Amendment claims against the defendants in their individual capacities be dismissed with prejudice, and without leave to amend. It is well settled that the Fifth Amendment Due Process Clause applies only to the federal government, and not to state or municipal governments. *See Dusenbery v. United States*, 534 U.S. 161, 167, (2002) ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without due process of law."); *see also Poe v. Ullman*, 367 U.S. 497, 540 (1961) (explaining that prohibitions "against the deprivation of life, liberty or property without due process of law" set forth in Fourteenth Amendment are applicable to state government and same prohibitions in Fifth Amendment are applicable to "the Federal Government"); *Robinson v. Wright,* No. 5:21-CV-1098 (TJM/ML), 2022 WL 2663369, at *3 (N.D.N.Y. Jul. 11, 2022) (plaintiff's Fifth Amendment claims dismissed where no allegations made against any federal official); *Ambrose v. City of New York*, 623 F. Supp. 2d 454, 466-67 (S.D.N.Y. 2009) (holding that any due process claim "against the

---

[2] The court is mindful of the United States Supreme Court's decision *Ex parte Young*, 209 U.S. 123, 155-56 (908), where the Court held that "individuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action." Here, there are no allegations in the complaint that would invoke the exception to the immunity doctrine provided for in *Ex parte Young*.

City is properly brought under the Fourteenth Amendment, not the Fifth Amendment");
*Mitchell v. Home*, 377 F. Supp. 2d 361, 372-73 (S.D.N.Y. 2005) ("The Fifth Amendment's Due Process Clause protects citizens against only federal government actors, not State officials. Any due process rights plaintiff enjoys as against state government officials … arise solely from the Fourteenth Amendment due process clause." (internal citations omitted)).

The complaint does not allege that any federal official violated plaintiff's Fifth Amendment due process rights. Rather, all of plaintiff's allegations are against state officials. Accordingly, plaintiff's due process claims, if any, may only be brought under the Fourteenth Amendment, not the Fifth Amendment. *See Dusenbery*, 534 U.S. at 167 (explaining that Fifth Amendment does not apply to State officials).

**V.    <u>Fourteenth Amendment</u>**

**A.    Legal Standard**

The Fourteenth Amendment provides that a state may not deprive a person of liberty or property "without due process of law." U.S. Const. amend. XIV. The Due Process Clause contains both a procedural and substantive component. Procedural due process claims concern the "adequacy of the procedure provided by [a] governmental body for the protection of liberty or property rights of an individual." *Sanchez v. Univ. of Connecticut Health Care*, 292 F. Supp. 2d 385, 397 (D. Conn. 2003) (citation omitted). To successfully state a claim under section 1983 for denial of procedural due process, a plaintiff must show that he or she 1) possessed an actual liberty or property interest, and 2) was deprived of that interest without being afforded sufficient process.

*See Shakur v. Selsky*, 391 F.3d 106, 118 (2d Cir. 2004); *see also Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000) (citations omitted).

In addition to its governance over fair process, the Fourteenth Amendment "cover[s] a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them." *Hurd v. Fredenburgh*, No. 19-3482, 2021 WL 96886, at *7 (2d Cir. Jan. 12, 2021) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 840, (1998) (internal quotation marks and citations omitted)). "Substantive due process rights safeguard persons against the government's exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Id*. (quoting *Southerland v. City of New York*, 680 F.3d 127, 151 (2d Cir. 2012) (internal quotation marks and citation omitted).

### B.    Analysis

Here, the complaint plausibly alleges that defendants Van Winkler, LaPorte, Pezdek, and Pelligrino, in their individual capacities, violated plaintiff's Fourteenth Amendment  rights when they arbitrarily imposed and/or enforced a GPS monitoring requirement in connection with plaintiff's parole. Whether the justification for placing plaintiff on GPS monitoring because of threats he made while incarcerated (against correctional officials, parole officers and their families) (Compl. at ¶¶ 16, 22) or because of claims he filed against various correctional officials (Compl. at ¶¶ 21, 22) was arbitrary cannot, and will not, be decided by the court at this early juncture. For that reason, the court recommends that plaintiff be permitted to pursue his due process claim challenging the GPS monitoring imposed by these defendants beyond the court's initial

review.  In doing so, the court renders no opinion as to whether plaintiff can withstand a properly filed dispositive motion as to these claims.

Last, the complaint should be dismissed without prejudice and with leave to amend as to defendant Bonk regarding any Fourteenth Amendment claims, as it is devoid of any allegations giving rise to such a claim against this defendant.

## VI.    <u>Eighth Amendment</u>

The court recommends that plaintiff's Eighth Amendment claims for cruel and unusual punishment be dismissed with prejudice, and without leave to amend, against the defendants in their individual capacities. Although the Second Circuit has not definitively addressed the issue, a parolee's claim that he was subjected to excessive force during an arrest for a parole violation arises under the Fourth Amendment, not the Eighth Amendment. *See Rushion v. NYS Div. of Parole*, No. 13-CV-4277, 2016 WL 5255812, at *4 (E.D.N.Y. Sept. 21, 2016) ("Allegations by a parolee that he was subjected to excessive force while being arrested by his parole officer for a parole violation are analyzed under the Fourth Amendment."); *see also Rivera v. Madan*, No. 10-CV-4136, 2013 WL 4860116, at *8 (S.D.N.Y. Sept. 12, 2013) ("The Fourth Amendment applies to an excessive force claim brought by a parolee in connection with some new offense or violation parole officers believed had been committed." (alteration omitted) (internal quotation marks omitted)); *Turner v. White*, 443 F. Supp. 2d 288, 294 (E.D.N.Y. 2005). "The rationale is straightforward: when officers use force against a parolee they suspect of violating the conditions of his parole, they are effecting a 'seizure' of the parolee for committing a new offense, not a 'punishment' for

committing the crime for which he was convicted." *Cox v. Fischer,* 248 F. Supp. 3d

471, 479 (S.D.N.Y. Mar. 31, 2017) (quoting U.S. Const. amends IV, VIII).

**VII.**  **Fourth Amendment**

    **A.**  **Legal Standard**

        **i.**  **Unreasonable Search and Seizure**

    The Fourth Amendment protects people from "unreasonable searches and

seizures." U.S. Const. amend. IV. "Whether a search is reasonable 'is determined by

assessing, on the one hand, the degree to which it intrudes upon an individual's privacy

and, on the other, the degree to which it is needed for the promotion of legitimate

government interests.'" *United States v. Massey*, 461 F.3d 177, 178 (2d Cir. 2006)

(quoting *Samson v. California*, 547 U.S. 843, 848, (2006)). "Courts must consider the

scope of the particular intrusion, the manner in which it is conducted, the justification

for initiating it, and the place in which it is conducted." *Bell v. Wolfish*, 441 U.S. 520,

559 (1979) (citations omitted). "Courts must 'examin[e] the totality of the

circumstances' surrounding the search, which includes Plaintiff's status as a parolee,"

*Rivera v. Madan*, No. 10-CV-4136, 2013 WL 4860116, at *4 (S.D.N.Y. Sept. 12, 2013)

(citations omitted), as parolees "have severely diminished expectations of privacy by

virtue of their status alone." *Samson*, 547 U.S. at 852; *see also Massey*, 461 U.S. at 179

("A parolee's reasonable expectations of privacy are less than those of ordinary

citizens" (citations omitted)). "While parolees possess diminished Fourth Amendment

protections, and the precise scope of the protections they retain is uncertain, a parolee

still enjoys a level of Fourth Amendment protection that is greater than the de minimis

Fourth Amendment protection that incarcerated inmates retain." *Rivera*, 2013 WL 4860116, at \*5 (citing *Hope v. Goines*, No. 00-CV- 3476, 2002 WL 2003201, at \*3 (E.D.N.Y. Aug. 8, 2002)) (internal quotation marks omitted).

The Second Circuit addressed the standard applicable to the search of a parolee by a parole officer in *United States v. Braggs*, 5 F.4th 183 (2d Cir. 2021). In *Braggs*, the Second Circuit noted the distinction between the Supreme Court's decision in *Samson*, which involved the search of a parolee by a police officer, and the situation presented in *Braggs*, where a parolee was searched by a parole officer. *Id.* at 187-88; *see also Samson*, 547 U.S. at 857 ("[T]he Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee."). The court noted that although it had "continued to abide by the Special Needs standard for parole searches, the trial courts in this Circuit have at times misunderstood the Supreme Court's decision in *Samson* . . . as undermining our Special Needs jurisprudence." *Braggs*, 5 F.4th at 187. Under the Special Needs Doctrine, "a parole officer may search a parolee so long as the search is reasonably related to the performance of the officer's duties[.]" *Id.* at 184; *see also Id.* at 188 ("[a]pplying the Special Needs Doctrine, we conclude that the search of Braggs's house was reasonably related to the performance of the DOCCS officers' duties and therefore constitutionally permissible," and "[b]ecause a search undertaken by a parole officer of a parolee to detect parole violations is reasonably related to the parole officer's duties, such a search is permissible under the Special Needs framework and accordingly comports with the Fourth Amendment." (alterations, citations, and quotations omitted)); *see also United States v. Lambus*, 897 F.3d 368, 403 (2d Cir.

14

2018) ("New York law authorizes a parole officer to search a parolee's home or person, without a search warrant, if the search is 'rationally and reasonably related to the performance of his duty as a parole officer.' ") (quoting *People v. Huntley*, 43 N.Y.2d 175, 179, 401 N.Y.S.2d 31, 371 N.E.2d 794 (1977)); *United States v. Grimes,* 225 F.3d 254, 258, 259 n.4 (2d Cir. 2000) (explaining that "parole justifies some departure from traditional Fourth Amendment standards" and "a search of a parolee is permissible so long as it is reasonably related to the parole officer's duties").

### ii. Excessive Force

The consensus among the district courts in this Circuit strongly favors the application of Fourth Amendment principles to a parolee's excessive force claim. *See, e.g.*, *Horace v. Gibbs*, No. 14-CV-655S, 2017 WL 4344435, at *4 (W.D.N.Y. Sept. 29, 2017) ("Although Horace identifies the Eighth Amendment as the source of his excessive force claim, it in fact arises under the Fourth Amendment, because the excessive force is alleged to have occurred during a parolee's arrest for a parole violation." (collecting cases) ); *Cox v. Fischer*, 248 F. Supp. 3d 471, 479 (S.D.N.Y. 2017) ("As several courts have recognized, a parolee's claim that he was subjected to excessive force in the course of an arrest for a parole violation arises under the Fourth Amendment, not the Eighth Amendment." (collecting cases)); *Towsley v. Frank*, No. 5:09-CV-23, 2010 WL 5394837, at *5 (D. Vt. Dec. 28, 2010) (noting that "the weight of authority, including decisions from district courts in the Second Circuit, favors applying the Fourth Amendment standard" to excessive force claims brought by a parolee);

*Turner,* 443 F.Supp.2d at 296 (noting that "[t]he status of a parolee who seeks to bring claims of excessive force against his parole officer is unsettled in this Circuit," but stating that those cases that "have held that constitutional claims by parolees are governed by an Eighth and Fourteenth Amendment analysis . . . appear to be contrary to the approach followed by district courts in this Circuit" (citing cases) ).

Pursuant to this standard, three elements must be objectively examined to determine whether excessive force was used for Fourth Amendment violations: "(1) the need for the application of force; (2) the relationship between that need and the amount of force that was used; and (3) the extent of the injury inflicted." *Graham v. Connor,* 490 U.S. 386, 390, 397 (1989). The "extent of intrusion on the suspect's rights" must be balanced against the "importance of governmental interests." *Tennessee v. Garner,* 471 U.S. 1, 8 (1985). The standard for excessive force under the Fourth Amendment is not a demanding one. *See, e.g., Castro v. Cnty. of Nassau,* 739 F. Supp. 2d 153, 176 (E.D.N.Y. 2010) (plaintiff's testimony that handcuffs "left imprints on his wrists and caused his wrists to become 'red and sore,' " was sufficient); *Sforza v. City of New York*, No. 07-CV-6122, 2009 WL 857496, at *15 (S.D.N.Y. Mar. 31, 2009) ("bruising and other nonpermanent injuries are sufficient" to prevail in an excessive force claim). "It is the *force used*, not the injuries caused, which must be determined to be *de minimis* as a matter of law." *Campbell v. City of New York*, No. 06-CV-5743, 2010 WL 2720589, at *8 (S.D.N.Y. June 30, 2010); *see also Pulliam v. Lilly*, No. 07-CV-1243, 2010 WL

16

935383, at \*4 (E.D.N.Y. Mar. 11, 2010) ("[T]he record is devoid of any evidence reflecting a reason for the use of any force during the interrogation, i.e., that plaintiff was acting aggressively or otherwise posed a threat to the officers during the interrogation. Accordingly, the use of more than *de minimis* force, if even that, under the circumstances presented here, would not be objectively reasonable."); *Yang Feng Zhao v. City of New York*, 656 F. Supp. 2d 375, 391 (S.D.N.Y. 2009) (holding that during interrogation at police precinct, where there is "no reason for any use of force," then "any force is potentially illegitimate").

### B.    Analysis

Liberally construed, the complaint plausibly alleges violations of plaintiff's Fourth Amendment rights. Specifically, plaintiff alleges that upon reporting to the parole office, defendants Traglia and Bektic placed him in "handcuffs and shackles," and that defendants Van Winkler and LaPorte "stripped searched him and anally penetrated him." (Compl. at ¶¶ 34, 35). Plaintiff was informed that the basis for his search was that he "might" have come to the parole office with drugs to take into the jail, but also alleges that the defendants' conduct was, in fact, an effort to make plaintiff late to his job interview. *Id.* To the extent that plaintiff pleads the strip/body cavity search was conducted for reasons that are arbitrary, capricious, or harassing, the court recommends that plaintiff's fourth amendment claims as against defendants Traglia, Bektic, Van Winkler, and LaPorte survive *sua sponte* review.  *See Ficklin v. Rusinko,*

17

6:18-CV-6310, 2020 WL 5513812, at *6 (W.D.N.Y. Sept. 14, 2020). In so ruling, the court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

As to the GPS monitor, the complaint alleges that "Pelligrino applied the bracelet so tight," plaintiff could "hardly walk." (Compl. at ¶ 23). Plaintiff further states that Van Winkler and Pelligrino applied the GPS monitor "so tight it caused no blood circulation, laceration, bruising and swelling[,]" and that after plaintiff informed the defendants of his injury, the defendants stated, "drop those lawsuits nigger." (*Id.* at ¶ 52). On these facts, the court recommends that that plaintiff's claims for violations of his Fourth Amendment rights against defendants Van Winkler and Pelligrino survive *sua sponte* review. In so ruling, the court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

Plaintiff has also alleged a series of sexually harassing conduct by the defendant Van Winkler. Specifically, plaintiff alleges that defendant Van Winkler grabbed plaintiff's face and kissed him. (Compl. at ¶ 29). The complaint further alleges that defendant Van Winkler "fondled" and "squeezed" plaintiff's penis. (Compl. at ¶ 30). On these facts, the court recommends that that plaintiff's claims for violations of his Fourth Amendment rights against defendant Van Winkler survive *sua sponte* review. In so ruling, the court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

18

The court further recommends that any Fourth Amendment claims against defendants Bonk and Pezdek be dismissed, without prejudice and with leave to amend, as the complaint is devoid of any allegations against them giving rise to a Fourth Amendment claim.

## VIII.  <u>First Amendment</u>

### A.    Legal Standard

It is well settled that an inmate has a constitutional right under the First Amendment to file grievances, and prison officials may not retaliate against an inmate for exercising that right. *See Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).  The same holds true with respect to the filing of a federal lawsuit. *See Colombo v. O'Connell*, 310 F.3d 115, 118 (2d Cir. 2002); *Everitt v. DeMarco*, 704 F. Supp. 2d 122, 132 (D. Conn. Mar. 30, 2010) ("It is well-established that the filing of a lawsuit . . . is constitutionally protected by the First Amendment."). The Second Circuit has held that retaliation against a prisoner for pursuing a grievance violates the right to petition the government for the redress of grievances and is actionable under Section 1983. *See Graham*, 89 F.3d at 80; *see also Franco v. Kelly*, 854 F.2d 584, 590 (2d Cir. 1988) (citations omitted). This rule has been applied to parolees as well. *See McCloud v. Kane*, 491 F.Supp.2d 312 (E.D.N.Y. Jun. 4, 2007) (citing *United States v. Polito*, 583 F.2d 48, 54 (2d Cir. 1978)) ("Parole is not freedom. A parolee is a convicted criminal who has been sentenced to a term of imprisonment and who has been allowed to serve a portion of that term outside prison walls.").

**B.    Analysis**

The complaint plausibly alleges that defendants Van Winkler, Pezdek, Pelligrino, and LaPorte retaliated against plaintiff for having filed various grievances, PREA claims, and lawsuits while incarcerated. Accordingly, the court recommends that plaintiff's First Amendment claims against these defendants survive *sua sponte* review and that a response be required. Plaintiff's First Amendment claims against defendant Bonk, however, should be dismissed without prejudice, as the complaint is devoid of any allegations against him having participated in the alleged retaliatory behavior, beyond having authored a report.

Further, the court recommends that plaintiff's claims arising from the denial of his "right" (Compl. at ¶ 50) to "litigate at Tier III hearings, provide legal assistance to incarcerated individuals and conduct legal visits as a paralegal to correctional facilities" (Compl. at ¶ 50) be dismissed without prejudice. "[W]hile prisoners have a constitutional right of access to the courts, they do not have a constitutional right to assist other inmates in petitioning the courts." *Miller v. Loughren*, No. 9:99-CV-2068 (HGM/RFT), 2003 U.S. Dist. LEXIS 7093, at *20 (N.D.N.Y. Jan. 21, 2003), *report recommendation approved in part and rejected in part,* 258 F.Supp.2d 61 (Apr. 23, 2003) (citing *Shaw v. Murphy*, 532 U.S. 223, 231 (2001) (a prisoner possesses no First Amendment right to provide legal assistance to other prisoners)); *see also Smith v. Maschner*, 899 F.2d 940, 950 (10th Cir. 1990) (no constitutional right to assist other inmates with legal claims). While there is no independent right to provide legal assistance to other inmates, "prison officials may not prevent such assistance or retaliate

20

for providing such assistance where no reasonable alternatives are available." *See Loughren*, 2003 U.S. Dist. LEXIS 7093 (quoting *Gibbs v. Hopkins*, 10 F.3d 373, 378 (6th Cir. 1993). Absent from plaintiff's complaint are any allegations that no alternatives were available to the incarcerated individual that plaintiff sought to help.

## IX. __Opportunity To Amend__

Generally, before the court dismisses a pro se complaint or any part of the complaint *sua sponte*, the court should afford the plaintiff the opportunity to amend at least once; however, leave to re-plead may be denied where any amendment would be futile. *See Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). Futility is present when the problem with plaintiff's causes of action is substantive such that better pleading will not cure it. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation omitted).

The court will recommend that application of the Eleventh Amendment warrants dismissal of the complaint with prejudice and without leave to amend against DOCCS and the defendants in their official capacities.

The court will also recommend that plaintiff's claims under the Fifth Amendment and Eighth Amendment be dismissed with prejudice and without leave to amend, as they are futile. *See Ruffolo,* 987 F.2d at 131.

The court will further recommend that the following claims survive *sua sponte* review, and require a response from the defendants:

1.     Plaintiff's Fourteenth Amendment due process claims against defendants Van Winkler, LaPorte, Pezdek, and Pelligrino; and

21

2.      Plaintiff's Fourth Amendment excessive force/unreasonable search and seizure claims against defendants Traglia, Bektic, Van Winkler, LaPorte, and Pelligrino; and

3.      Plaintiff's First Amendment retaliation claims against defendants Van Winkler, Pezdek, Pelligrino, and LaPorte **except** for any claims arising from arising from the denial of his "right" (Compl. at ¶ 50) to "litigate at Tier III hearings, provide legal assistance to incarcerated individuals and conduct legal visits as a paralegal to correctional facilities" (Compl. at ¶ 50).

The court otherwise recommends that the remainder of plaintiff's complaint be dismissed without prejudice.

   **WHEREFORE**, based on the findings above, it is

   **ORDERED**, that plaintiff's motion to proceed IFP (Dkt. No. 2) is **GRANTED**,[3] and it is

   **RECOMMENDED**, that the district court **DISMISS** plaintiff's claims against defendant DOCCS and the individual defendants in their official capacities **WITH PREJUDICE AND WITHOUT LEAVE TO AMEND**, and it is

   **RECOMMENDED**, that the district court **DISMISS** plaintiff's Fifth Amendment and Eighth Amendment claims **WITH PREJUDICE and WITHOUT LEAVE TO AMEND**, as they are futile, and it is

   **RECOMMENDED,** that the following claims survive the court's initial review and require a response from the named defendants:

1.      Plaintiff's Fourteenth Amendment due process claims against defendants Van Winkler, LaPorte, Pezdek, and Pelligrino; and

---

[3] The court notes that, although plaintiff's application to proceed IFP has been granted, plaintiff will still be required to pay fees that they may incur in the future regarding this action, including, but not limited to, copying and/or witness fees.

2.    Plaintiff's Fourth Amendment excessive force/unreasonable search and seizure claims against defendants Traglia, Bektic, Van Winkler, LaPorte, and Pelligrino; and

3.    Plaintiff's First Amendment retaliation claims against defendants Van Winkler, Pezdek, Pelligrino, and LaPorte **except** for any claims arising from the denial of his "right" (Compl. at ¶ 50) to "litigate at Tier III hearings, provide legal assistance to incarcerated individuals and conduct legal visits as a paralegal to correctional facilities" (Compl. at ¶ 50); and it is

**RECOMMENDED,** that the remainder of the claims set forth in plaintiff's complaint be dismissed without prejudice, and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Order and Report-Recommendation on plaintiff by regular mail.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Hum. Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: October 30, 2024

Mitchell J. Katz
U.S. Magistrate Judge

Case 6:24-cv-01169-DNH-MJK    Document 5    Filed 10/30/24    Page 24 of 141

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

2016 WL 6267968
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Eddie HOUSTON, Plaintiff,

v.

COLLERMAN, et. al., Defendants.

9:16-CV-1009 (BKS/ATB)
|
Signed 10/26/2016

**Attorneys and Law Firms**

EDDIE HOUSTON, 08-A-3122, Mid-State Correctional Facility, P.O. Box 2500, Marcy, New York 13403, Plaintiff, pro se.

**AMENDED DECISION AND ORDER** [1]

[1]    On October 20, 2016, the Court issued a Decision and Order upon initial review of plaintiff's complaint. Dkt. No. 4. This Amended Decision and Order is issued to correct clerical errors in the Conclusion of the Order.

BRENDA K. SANNES, United States District Judge

**I. Introduction**

 **\*1**  The Clerk has sent to the Court for review a civil rights action filed by pro se plaintiff Eddie Houston. Dkt. No. 1 ("Compl."). Plaintiff has not paid the statutory filing fee for this action and seeks leave to proceed in forma pauperis. Dkt. No. 2 ("IFP Application").

**II. IFP Application**

"28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged." *Cash v. Bernstein*, No. 09-CV-1922, 2010 W L 5185047, at \*1 (S.D.N.Y. Oct. 26, 2010). Upon review of plaintiff's IFP Application, the Court finds that plaintiff has demonstrated sufficient economic need and filed the inmate authorization form required in the Northern District of New York. Plaintiff's IFP application (Dkt. No. 2) is granted. [2]

[2]    Section 1915(g) prohibits a prisoner from proceeding in forma pauperis where, absent a showing of "imminent danger of serious physical injury," a prisoner has filed three or more actions or appeals that were subsequently dismissed as frivolous, malicious, or failing to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(g). Based upon the Court's review of plaintiff's litigation history on the Federal Judiciary's Public Access to Court Electronic Records ("PACER") Service, it does not appear that plaintiff has accumulated three strikes for purposes of 28 U.S.C. § 1915(g).

**III. Initial Screening**

Having found that plaintiff meets the financial criteria for commencing this action in forma pauperis, and because plaintiff seeks relief from an officer or employee of a governmental entity, the Court must consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. §§ 1915(e) and 1915A. Section 1915(e) of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed in forma pauperis, "the court shall dismiss the case at any time if the court determines that – ... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). [3]

[3]    To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

Similarly, under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir. 1999) (per curiam) (noting that Section 1915A applies to all actions brought by prisoners against government officials even when plaintiff paid the filing fee).

 **\*2**  Additionally, when reviewing a complaint, the Court may also look to the Federal Rules of Civil Procedure. Rule 8 of

Case 6:24-cv-01169-DNH-MJK    Document 5    Filed 10/30/24    Page 25 of 141

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

the Federal Rules of Civil Procedure provides that a pleading which sets forth a claim for relief shall contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2). The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Hudson v. Artuz*, No. 95 CIV. 4768, 1998 WL 832708, at *1 (S.D.N.Y. Nov. 30, 1998) (quoting *Powell v. Marine Midland Bank*, No. 95-CV-0063 (TJM), 162 F.R.D. 15, 16 (N.D.N.Y. June 23, 1995) (other citations omitted)).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* Thus, a pleading that contains only allegations which "are so vague as to fail to give the defendants adequate notice of the claims against them" is subject to dismissal. *Sheehy v. Brown*, 335 Fed.Appx. 102, 104 (2d Cir. 2009).

## IV. Summary of the Complaint [4]

[4]    Plaintiff annexed exhibits to the complaint. Dkt. No. 1-1. To the extent that the exhibits are relevant to the incidents described in the complaint, the Court will consider the complaint as well as any documents attached as exhibits. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference).

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, which establishes a cause of action for " 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *German v. Fed. Home Loan Mortgage Corp.*, 885 F. Supp. 537, 573 (S.D.N.Y. 1995) (citing *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983)) (footnote omitted); *see also Myers v. Wollowitz*, No. 6:95-CV-0272 (TJM/RWS), 1995 WL 236245, at *2 (N.D.N.Y. Apr. 10, 1995) (stating that "§ 1983 is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights." (citation omitted)). "Section 1983 itself creates no substantive rights, [but] ... only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted). The Court will construe the allegations in plaintiff's complaint with the utmost leniency. *See, e.g., Haines v. Kerner*, 404 U.S. 519, 521 (1972) (holding that a pro se litigant's complaint is to be held "to less stringent standards than formal pleadings drafted by lawyers.").

*3 Plaintiff, an inmate currently being held at Mid-State Correctional Facility ("Mid-State C.F."), asserts claims arising out of his confinement in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). The incidents that form the foundation for this complaint occurred while plaintiff was confined at Elmira Correctional Facility ("Elmira C.F."). *See* Compl., *generally*. On July 13, 2013, plaintiff filed a grievance claiming that defendants Officer Copestick ("Copestick") and Officer Schieber ("Schieber") harassed him, on more than one occasion, about his medication. *See id.* at 6; *see* Dkt. No. 1-1 at 3-5. On August 5, 2013, after an investigation into the allegations, the Superintendent of Elmira C.F. denied plaintiff's grievance. *See* Dkt. No. 1-1 at 5.

On September 30, 2013, plaintiff was on his way to the masjid to participate in Ramadan when he was stopped by Copestick and Schieber and directed to the wall for a pat-frisk. *See* Compl. at 5. While plaintiff's hands were on the wall, Schieber "violently kicked" his legs from underneath him. *See id.* Schieber "stomped" on plaintiff's ankles while Copestick attempted to choke plaintiff. *See id.* During the assault, the officers yelled racial slurs. *See id.* Defendant Sergeant Collerman ("Collerman") watched the officers beat plaintiff. *See* Compl. at 5. As a result of the attack, plaintiff's eyeglasses were broken, his ankle was swollen, and he could not walk. *See id.* at 5, 9.

At approximately 5:00 p.m., plaintiff received medical treatment for complaints of pain in his right big toe and swelling in his right foot. *See* Dkt. No. 1-1 at 19. Plaintiff

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968
Case 6:24-cv-01169-DNH-MJK    Document 5    Filed 10/30/24    Page 26 of 141

received Motrin and was advised to follow with sick call requests, if needed. *See id.* A "use of force/inmate injury" report was compiled. [5] *See id.* At approximately 7:15 p.m., plaintiff, a diabetic, told a medical provider that he had not received his daily "medication." *See id.* The provider ordered various medications to be delivered to plaintiff on a daily basis. *See id.*

[5]    The Use of Force report was not annexed as an exhibit to the complaint.

On October 1, 2013, plaintiff received a misbehavior report charging him with assault on staff and with refusing a direct order and search. [6] *See* Compl. at 5. On the same day, plaintiff was placed in confinement in the Special Housing Unit ("SHU"). *See* Dkt. No. 1-1 at 19. On October 3, 2013, plaintiff attended a Hearing regarding the misbehavior report. [7] *See* Dkt. No. 1-1 at 10. On November 3, 2013, plaintiff received a copy of the hearing disposition dismissing all charges. *See* Dkt. No. 1-1 at 11; Dkt. No. 1 at 5.

[6]    The name of the officer who served the misbehavior report is not clearly legible on the Hearing Disposition annexed as an exhibit. *See* Dkt. No. 1-1 at 10. Plaintiff does not allege that Copestick, Schieber, or Collerman delivered the report. The disposition form indicates that the charges were reported by Schieber. *Id.* The misbehavior report was not annexed as an exhibit to the complaint.

[7]    The officer who presided over the hearing was a Captain at Elmira C.F. However, the name of the hearing officer is not clearly legible. *See* Dkt. No. 1-1 at 10-11.

On November 3, 2013, plaintiff was released from the SHU. *See* Compl. at 5. While plaintiff was in the SHU, he was unable to participate in Ramadan, denied religious meals, denied parole, and excluded from mental health programs. *See id.*

Construed liberally, the complaint contains the following claims: (1) Copestick and Schieber violated plaintiff's Eighth Amendment rights with use of excessive force (Fifth, Fifteenth, Twentieth, and Twenty-Second Causes of Action); (2) Collerman failed to protect plaintiff from the assault in violation of plaintiff's Eighth Amendment rights (Fifteenth Cause of Action); (3) defendants were deliberately indifferent to plaintiff's serious medical needs in violation of the Eighth Amendment (Sixth, Seventh, and Fifteenth Causes of Action); (4) Copestick and Schieber retaliated against plaintiff in violation of plaintiff's First Amendment rights (Twenty-First Cause of Action); (5) plaintiff's First Amendment rights to religious freedom were violated (Fourth Cause of Action); (6) plaintiff's Fourteenth Amendment rights to due process and equal protection were violated (First, Second, Third, Sixth, Sixteenth, and Eighteenth Causes of Action); (7) defendants failed to investigate plaintiff's complaints and follow grievance procedures (Tenth and Thirteenth Causes of Action); (8) perjury claims against officers who filed the misbehavior report (Eleventh and Seventeenth Causes of Action); and (9) supervisory claims against DOCCS (Eighth, Ninth, Twelfth, Fourteenth, Nineteenth, Twenty-Third, Twenty-Fourth, Twenty-Fifth, and Twenty Sixth Causes of Action). *See* Compl., *generally.* Plaintiff seeks compensatory damages, injunctive relief, and criminal charges against defendants (Eleventh and Seventeenth Causes of Action). *See* Compl. at 9-13.

## V. Analysis

### A. Eleventh Amendment

**\*4**  The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana,* 134 U.S. 1, 10-21 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984). Eleventh Amendment immunity is lost only if Congress unequivocally abrogates states' immunity or a state expressly consents to suit. *Gollomp v. Spitzer,* 568 F.3d 355, 365-66 (2d Cir. 2009). It is well-settled that Congress did not abrogate states' immunity through 42 U.S.C. § 1983, *see Quern v. Jordan,* 440 U.S. 332, 343-45 (1979), and that New York State has not waived its immunity from suit on the claims asserted in plaintiff's complaint. *See generally Trotman v. Palisades Interstate Park Comm'n,* 557 F.2d 35, 38-40 (2d Cir. 1977); *Dawkins v. State of New York,* No. 93-CV-1298 (RSP/GJD), 1996 W L 156764 at \*2 (N.D.N.Y. 1996).

Here, insofar as plaintiff seeks an award of money damages pursuant to Section 1983 against DOCCS, those claims are

Case 6:24-cv-01169-DNH-MJK    Document 5    Filed 10/30/24    Page 27 of 141
Houston v. Collerman, Not Reported in Fed. Supp. (2016)
2016 WL 6267968

dismissed as plaintiff seeks relief from a defendant immune from suit under section 1983. *See LeGrand v. Evan,* 702 F.2d 415, 417 (2d Cir. 1983); *see Meehan v. Kenville,* 555 Fed.Appx. 116 (2d Cir. 2014); *see Simmons v. Gowanda Corr. Facility,* No. 13-CV-0647, 2013 WL 3340646, at *1 (W.D.N.Y. July 1, 2013) ("the New York State Department of Corrections and [the named correctional facility] enjoy the same Eleventh Amendment immunity from suit in federal court as enjoyed by the state itself") (quoting *Posr. v. Court Officer Shield No. 207,* 180 F.3d 409, 411 (2d Cir. 1999)).

### B. Eighth Amendment

### 1. Excessive Force Claims

The Eighth Amendment protects prisoners from "cruel and unusual punishment" at the hands of prison officials. *Wilson v. Seiter,* 501 U.S. 294, 296-97 (1991); *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). The Eighth Amendment's prohibition against cruel and unusual punishment encompasses the use of excessive force against an inmate, who must prove two components: (1) subjectively, that the defendant acted wantonly and in bad faith, and (2) objectively, that the defendant's actions violated "contemporary standards of decency." *Blyden v. Mancusi,* 186 F.3d 252, 262-63 (2d Cir. 1999) (internal quotations omitted) (citing *Hudson v. McMillian,* 503 U.S. 1, 8 (1992)). The key inquiry into a claim of excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson,* 503 U.S. at 7 (citing *Whitley v. Albers,* 475 U.S. 312, 321-22 (1986)); *see also Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir. 1973); *see also Wilkins v. Gaddy,* 559 U.S. 34, 37 (2010) (per curiam) ("[t]he Supreme Court has emphasized that the nature of the force applied is the core judicial inquiry in excessive force cases—not whether a certain quantum of injury was sustained."). "Accordingly, when considering the subjective element of the governing Eighth Amendment test, a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness." *Wynter v. Ramey,* No. 11-CV-0257 (DNH/DEP), 2013 W L 5465343, at *5 (N.D.N.Y. Sept. 30, 2013) (citations omitted).

Plaintiff has identified the time, location and individuals involved in the alleged assault. Thus, the Court finds that plaintiff's Eighth Amendment excessive force claims against Copestick and Schieber survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment.

### 2. Failure To Intervene

**\*5** The failure of corrections officers to employ reasonable measures to protect an inmate from violence by others may rise to the level of an Eighth Amendment violation. *See Ayers v. Coughlin,* 780 F.2d 205, 209 (2d Cir. 1985). Moreover, allegations that an officer failed to intervene and prevent assaults are sufficient to state an Eighth Amendment failure to protect claim. *See Rogers v. Artus,* No. 13-CV-21, 2013 WL 5175570, at *3 (W.D.N.Y. Sept. 11, 2013). To establish liability under a failure to intervene theory, a plaintiff must prove the use of excessive force by someone other than the individual and that the defendant under consideration: 1) possessed actual knowledge of the use by another of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *Curley v. Vill. of Suffern,* 268 F.3d 65, 72 (2d Cir. 2001). In order to succeed on a claim of failure to protect, the inmate "must establish both that a substantial risk to his safety actually existed and that the offending [defendant] knew of and consciously disregarded that risk." *Walsh v. Goord,* No. 07-CV-0246, 2007 WL 1572146, at *9 (W.D.N.Y. May 23, 2007) (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1970)). In addition, a failure-to-protect claim requires a showing that prison officials acted with "deliberate indifference" to the inmate's safety. *Morales v. New York State Dep't of Corr.,* 842 F.2d 27, 30 (2d Cir. 1988).

At this early stage of the proceeding, plaintiff has alleged enough to require a response from Collerman to plaintiff's claim that he failed to protect plaintiff from the assault by Copestick and Schieber. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment.

### 3. Deliberate Indifference to Serious Medical Needs

To state an Eighth Amendment claim for medical indifference, a plaintiff must allege that the defendant was deliberately indifferent to a serious medical need. *See Farmer v. Brennan,* 511 U.S. 825, 834 (1994). The objective component of an Eighth Amendment deliberate indifference

Case 6:24-cv-01169-DNH-MJK   Document 5   Filed 10/30/24   Page 28 of 141

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

medical claim "requires that the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)) (internal quotation marks omitted). Under the subjective element, medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong*, 143 F. 3d 698, 703 (2d Cir. 1998) (quoting *Hathaway*, 99 F.3d at 553). "Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). To assert a claim for deliberate indifference, an inmate must allege that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer*, 511 U.S. at 837; *Chance*, 143 F.3d at 702. The inmate must also demonstrate that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer*, 511 U.S. at 835. An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle*, 429 U.S. at 105-06.

In this instance, even assuming plaintiff's injuries were sufficiently serious, plaintiff must allege facts to demonstrate that defendants acted with a sufficiently culpable state of mind. *See Hathaway*, 99 F.3d at 553. Plaintiff claims that his medical treatment was inadequate because his ankle was not x-rayed until he was transferred to "his next facility," two months after the alleged incident. *See* Compl. at 10. "When the basis of a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (citing *Chance*, 143 F.3d at 702). "Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, this Court has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a 'life-threatening and fast-degenerating' condition for three days; or delayed major surgery for over two years." *Demata*

*v. New York State Corr. Dep't of Health Servs.*, 198 F.3d 233 (2d Cir. 1999) (internal citations omitted).

**\*6** Here, the complaint is void of any facts establishing that any defendant deliberately delayed plaintiff's medical treatment. On the day of the alleged attack, plaintiff received medical attention and prescription medication. *See* Dkt. No. 1-1 at 19. Plaintiff was treated on three other occasions in October 2013 for foot pain before undergoing x-rays on November 14, 2013. Dkt. No. 1-1 at 20-21. During those visits, plaintiff received ice packs, Motrin, and refused Ibuprofen. See id. Plaintiff does not allege that his condition deteriorated during that time. *See Rodriguez v. City of New York*, 802 F.Supp. 477, 482 (S.D.N.Y. 2011) (finding that the plaintiff did not establish that his condition worsened as a result of a delay between his request and receipt of medical attention). Plaintiff does not allege that he sought and was refused medical treatment during this two month time period. *See Kee v. Hasty*, No. 01 Civ. 2123, 2004 W L 807071, at \*29 (S.D.N.Y. April 14, 2004) (holding that the plaintiff's Eighth Amendment claims were overly conclusory because the inmate failed to specify the dates on which he was denied proper treatment, the nature of his needs on those dates, and the nature of the treatment that was purportedly denied by the defendants). The complaint lacks any facts to plausibly suggest that any defendant knew of the severity of plaintiff's injury and the risk posed by any delay in his treatment.

Plaintiff, a diabetic, also claims that he was unable to read or see for over one year because his eye glasses were not replaced until over a year after the assault. *See* Compl. at 10. The complaint does not contain any facts suggesting that plaintiff made any complaints or sick call requests to any defendant related to his eyeglasses. Plaintiff also failed to assert facts suggesting that he made any defendant "aware of the serious harm could occur" if he was not provided with his glasses. *See Myrie v. Calvo/Calvoba*, 591 F.Supp.2d 620, 628 (S.D.N.Y. 2008) (holding that the complaint did not suggest that any defendant was deliberately indifferent to the plaintiff's vision problems).

Plaintiff's Eighth Amendment allegations are also subject to dismissal based upon the failure to plead personal involvement on the part of any defendant. It is well settled in this Circuit that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). Thus, "a Section 1983

Case 6:24-cv-01169-DNH-MJK    Document 5    Filed 10/30/24    Page 29 of 141

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* No. 04-CV-7263, 2008 W L 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir. 1986)) (other citation omitted). The complaint lacks any facts suggesting that Copestick, Schieber, or Collerman were involved in plaintiff's medical treatment or refused to allow plaintiff to receive medical attention. In the absence of factual allegations sufficient to plausibly suggest that any defendant was personally involved, the complaint fails to state a cognizable claim against him. Consequently, plaintiff's Eighth Amendment claims for deliberate indifference to plaintiff's medical needs are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim.

### C. First Amendment

#### 1. Retaliation

Plaintiff alleges that Copestick and Schieber assaulted him in retaliation for plaintiff's grievance against them. *See* Compl. at 6,13. To state a claim of retaliation under the First Amendment, a plaintiff must allege facts plausibly suggesting the following: (1) the speech or conduct at issue was "protected;" (2) the defendants took "adverse action" against the plaintiff – namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the defendant's decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir. 2004) (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir. 2001)). The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official – even those otherwise not rising to the level of a constitutional violation – can be characterized as a constitutionally proscribed retaliatory act." *Dawes,* 239 F.3d at 491, *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir. 1983)); *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir. 1988).

**\*7** It is well-settled that filing a grievance is constitutionally protected conduct. *Johnson v. Eggersdorf,* 8 Fed.Appx. 140, 144 (2d Cir. 2001); *Graham v. R.J. Henderson,* 89 F.3d 75, 80 (2d Cir. 1996). A plaintiff can establish a causal connection that suggests retaliatory intent by showing that his protected activity was close in time to the complained-of adverse action. *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir. 2001) (citations omitted). While there is no "bright line" defining the limits of the temporal relationship, courts in the Circuit have held that an adverse action taken within three months after a protected activity can reasonably be perceived as retaliatory. *See Gorman-Bakos v. Cornell Coop. Extn. of Schenectady Cty.,* 252 F.3d 545, 554 (2d Cir. 2001); *see also Ashok v. Barnhart,* No. 01-CV-1311, 289 F.Supp.2d 305, 314 (E.D.N.Y. Oct. 30, 2003) (the interval between a protected activity and an adverse action that results in a finding of retaliation is generally no more than several months).

At this juncture, the Court finds that plaintiff's retaliation claims against Copestick and Schieber survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment.

#### 2. Religious Claims

Plaintiff alleges that the defendants violated his religious rights because he was unable to participate in Ramadan and denied his religious meals as a direct result of the false misbehavior report. Dkt. No. 1 at 5-6.

Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause. *See Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir. 2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). "Balanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, [however,] are the interests of prison officials charged with complex duties arising from administration of the penal system." *Id.* (citing *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir. 1990)). To state a First Amendment Free Exercise claim, a plaintiff must allege that (1) the practice asserted is religious in the person's scheme of beliefs, and that the belief is sincerely held; (2) the challenged practice of the prison officials infringes upon the religious belief; and (3) the challenged practice of the prison officials furthers some legitimate penological objective. *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

1988) (citations omitted). A prisoner "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin v. Goord*, 467 F.3d 263, 274–75 (2d Cir. 2006) (citing *Ford*, 352 F.3d at 591). [8] A religious belief is "sincerely held" when the plaintiff subjectively, sincerely holds a particular belief that is religious in nature. *Ford*, 352 F.3d at 590. A prisoner's sincerely held religious belief is "substantially burdened" where "the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly v. Coughlin*, 76 F.3d 468, 476–77 (2d Cir. 1996). Once a plaintiff establishes that a sincerely held religious belief has been substantially burdened, "[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Salahuddin*, 467 F.3d at 275 (quoting *Ford*, 352 F.3d at 595) (punctuation omitted).

[8]    The Second Circuit has yet to decide whether the "substantial burden" test survived the Supreme Court's decision in *Emp't Div. v. Smith*, 494 U.S. 872, 887 (1990), in which the Court suggested that application of the test "puts courts in 'the unacceptable business of evaluating the relative merits of differing religious claims.' " *Ford*, 352 F.3d at 592 (quoting *Emp't Div.*, 494 U.S. at 887); *see also Williams v. Does*, 639 Fed.Appx. 55, 56 (2d Cir. May 6, 2016) ("We have not yet decided whether a prisoner asserting a free-exercise claim must, as a threshold requirement, show that the disputed conduct substantially burdened his sincerely held religious beliefs."); *Holland v. Goord*, 758 F.3d 215, 220-21 (2d Cir. 2014) (declining to decide whether a prisoner must show, as a threshold matter, that the defendants' conduct substantially burdened his sincerely held religious beliefs in connection with a First Amendment free exercise claim). In the absence of any controlling precedent to the contrary, I have applied the substantial-burden test in this matter.

**\*8**  In this case, plaintiff has not alleged who issued the misbehavior report and it is not attached to the complaint. An inmate "has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schneider*, 105 F.3d 857, 862 (2d Cir. 1997). While a false misbehavior report may give rise to a claim under § 1983 "when done in retaliation for the exercise of a

constitutional right," *Willey v. Kirkpatrick*, 801 F.3d 51, 63 (2d Cir. 2015), here there is no such allegation. While the deprivation of religious meals in SHU may be sufficient to state a claim, *see Williams v. Does*, 639 Fed.Appx. 55, 56 (2d Cir. 2016); *Skates v. Shusda*, No. 9:14-CV-1092 (TJM/DEP), 2016 WL 3882530, at **4-5 (N.D.N.Y. May 31, 2016), here there is no indication that the defendants had any personal involvement in that conduct. The allegations, without more, fail to plausibly suggest that any defendant burdened plaintiff's right to freely practice his religion. Thus, plaintiff's First Amendment claims against are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

**D. Fourteenth Amendment**

**1. Equal Protection/Discrimination**

Plaintiff claims that the September 30, 2013 assault was racially motivated. *See* Compl. at 6, 12. "When verbal harassment and simultaneous physical abuse ... are considered together, [courts] have little doubt concluding that plaintiff's allegations [are] sufficient to state a § 1983 claim for discrimination on the basis of race." *Cole v. Fischer*, 379 Fed.Appx. 40, 43 (2d Cir. 2010). "Under the Fourteenth Amendment's Equal Protection clause, a plaintiff may be able to recover for a physical assault that would not meet the objective threshold for Eighth Amendment excessive force claims, if the defendant's conduct was motivated by racial or religious discrimination." *Bhuiyan v. Wright*, No. 9:06-CV-409 ATB, 2011 WL 1870235, at \*9 (N.D.N.Y. May 13, 2011) (citation omitted).

At this juncture, plaintiff has sufficiently plead a Fourteenth Amendment equal protection claim to warrant a response from Copestick and Schieber. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment.

**2. Due Process**

Plaintiff claims that defendants violated his due process rights when they failed to replace plaintiff's eyeglasses. *See* Compl. at 10. Plaintiff also asserts that his Fourteenth Amendment rights were violated because he was improperly confined to the SHU without a hearing as a result of a

Case 6:24-cv-01169-DNH-MJK    Document 5    Filed 10/30/24    Page 31 of 141

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

false misbehavior report. *See id.* at 10. During his SHU confinement, was allegedly unable to participate in Ramadan, denied his religious meals, denied parole, and excluded from mental health programs. *See id.*

### a. Property Claim

The Supreme Court has held that the negligent or intentional deprivation of prisoner's property may not be the basis for constitutional claims if sufficient post deprivation remedies are available to address the claim. *Hudson v. Palmer,* 468 U.S. 517, 531 (1984) (citing *Parratt v. Taylor,* 451 U.S. 527, 541 (1981)); *Davis v. New York,* 311 Fed.Appx. 397, 400 (2d Cir. 2009) (An alleged loss of property, "whether intentional or negligent – will not support a due process claim redressable under § 1983 if 'adequate state post-deprivation remedies are available.' ") (quoting *Hudson,* 468 U.S. 533). "New York in fact affords an adequate post-deprivation remedy in the form of, *inter alia,* a Court of Claims action." *Jackson v. Burke,* 256 F.3d 93, 96 (2d Cir. 2001). Because plaintiff has access to adequate state law remedies, he has not been deprived of property without due process of law and therefore cannot state a claim for relief pursuant to Section 1983. *See Love v. Coughlin,* 714 F.2d 207, 208-09 (2d Cir. 1983) (per curiam); *see also Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 360, 473-74 (S.D.N.Y. 1998) (dismissing the plaintiff's claim that defendants destroyed his eyeglasses in violation of his due process rights). Thus, plaintiff's due process claims related to his eyeglasses are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### b. SHU Confinement

**\*9** To establish a due process claim, plaintiff must establish: "(1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir. 2001) (citation and internal quotation marks omitted). In this case plaintiff alleges that the false misbehavior report resulted in a SHU sentence.[9]

[9]    The complaint contains conflicting factual allegations related to the length of plaintiff's SHU confinement. Plaintiff claims that after "one month of being housed in SHU," he was released. *See*

Compl. at 5. In the Third Cause of Action, plaintiff claims that he served "over 60 days in SHU." *See id.* at 9.

A prisoner "has a liberty interest that is implicated by SHU confinement if it 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *J.S. v. T'Kach,* 714 F.3d 99, 106 (2d Cir. 2013) (quoting *Sandin v. Conner,* 515 U.S. 472, 484, (1995)); *see also Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir. 2004). In making this determination courts are to consider, "among other things, the duration and conditions of confinement." *J.S.,* 714 F.3d at 106; *Davis v. Barrett,* 576 F.3d 129, 133 (2d Cir. 2009). The conditions of confinement are to be considered "in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration." *Davis,* 576 F.3d at 134; *Palmer,* 364 F.3d at 66 n.4.

Although the Second Circuit has "explicitly avoided" creating "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights," the Court has established guidelines. *Palmer,* 364 F.3d at 65. W here the plaintiff is confined for "an intermediate duration –between 101 and 305 days – 'development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required.' " *Id.* (quoting *Colon v. Howard,* 215 F.3d 227, 234 (2d Cir. 2000)). While confinements for less than 101 days "under normal SHU conditions may not implicate a prisoner's liberty interest," such confinements "could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions of *Sealy* or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer,* 364 F.3d at 65; *see Davis,* 576 F.3d at 133.[10]

[10]    The Second Circuit has noted that "[i]n the absence of a detailed factual record, we have affirmed dismissal of due process claims only in cases where the period of time spent in SHU was exceedingly short –less than the 30 days that the *Sandin* plaintiff spent in SHU—and there was no indication that the plaintiff endured unusual SHU conditions." *Palmer,* 364 F.3d at 65-66; *see Davis,* 576 F.3d at 133. Absent allegations in the complaint that the conditions of confinement were in some way

Case 6:24-cv-01169-DNH-MJK    Document 5    Filed 10/30/24    Page 32 of 141

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

atypical, however, many courts in this Circuit have granted motions to dismiss claims by plaintiffs with confinement exceeding thirty days when the plaintiffs failed to allege that the conditions of confinement were in some way atypical. *See, e.g., Acevedo v. Fischer*, No. 12-CV-6866, 2014 WL 5015470 at *15 (S.D.N.Y. Sept. 29, 2014) (citing cases involving confinements of between forty and fifty days which were dismissed for failure to allege a protected liberty interest because there were no allegations of unusual confinement).

**\*10** In this case, the duration of the confinement, 30 to 60 days, "was not long enough to constitute an atypical and significant deprivation by itself," and the Court therefore must "look to the conditions of confinement." *Palmer*, 364 F.3d at 66; *see also Davis*, 576 F.3d at 133. Plaintiff claims that while he was confined in the SHU, he was unable to participate in Ramadan, denied his religious meals, denied parole, and excluded from his mental health program. *See* Compl. at 5, 10; Dkt. No. 1-1 at 1.

It is well established that prisoners do not have a constitutional right to parole. *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979). "Where a state has created a statutory scheme for parole, the Due Process Clause protects prisoners insofar as they 'have a legitimate expectancy of release that is grounded in the state's statutory scheme.' " *Barna v. Travis*, 239 F.3d 169, 170–72 (2d Cir. 2001) (per curiam) (citing *Greenholtz*, 442 U.S. at 11–13). "New York's parole scheme is not one that creates in any prisoner a legitimate expectancy of release." *Barna*, 239 F.3d at 171. Plaintiff has also failed to plead that his inability to participate in mental health programs impacted a protected liberty interest. *See Nieves v. Prack*, No. 6:15-CV-6101, 2016 WL 1165820, at *4 (W.D.N.Y. March 24, 2016) ("[Plaintiff's] claim that his inability ... to participate in various educational, vocational, rehabilitative or self-help programs might have hindered his ability to receive an early parole or release is ... speculative and fails to allege interference with a protected liberty interest.") (citations omitted). Here, the complaint lacks facts establishing when, how many times, and who deprived plaintiff of the right to attend his mental health program. With respect to plaintiff's religious claims, courts have found that the deprivation of communal religious services does not constitute an atypical and significant hardship. *See Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998) (finding that eighteen days in administrative segregation, including loss of exercise and access to religious services, did not constitute atypical and significant hardship); *Holland v.*

*Goord*, No. 05-CV-6295, 2006 WL 1983382, at *7 (W.D.N.Y. July 13, 2006) (holding the inability to attend Muslim services and celebrate the end of Ramadan while confined in the SHU for seventy-seven days is not an atypical hardship).

Even assuming that plaintiff had pled facts sufficient to show that his confinement imposed an atypical and significant hardship, however, and therefore pled the existence of a valid liberty interest, the complaint fails to state a claim based upon the Fourteenth Amendment and due process. It is well settled that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (citing *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986)). In this case, a hearing regarding the charges was held within two days of plaintiff's receipt of the misbehavior report. Plaintiff does not allege that he was denied any procedural due process during that hearing. Moreover, the complaint lacks facts suggesting that any named defendant issued the misbehavior report or presided over the disciplinary hearings. Based upon the aforementioned, plaintiff's Fourteenth Amendment claims are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. *See Livingston v. Kelly*, 561 F.Supp.2d 329, 332 (W.D.N.Y. 2008) (dismissing plaintiff's false-report claims because the plaintiff failed to allege that the disciplinary hearings on the reports did not meet constitutional due process standards).

### E. Failure to Respond to Grievances and Failure to Investigate

**\*11** Plaintiff also claims that his constitutional rights were violated because the facility grievance program is "never followed." *See* Compl. at 11. There is no constitutional right of access to the established inmate grievance program. *Davis v. Buffardi*, No. 9:01-CV-0285 (PAM/GJD), 2005 WL 1174088, at *3 (N.D.N.Y. May 4, 2005) ("[p]articipation in an inmate grievance process is not a constitutionally protected right"); *Shell v. Brzezniak*, 365 F.Supp.2d 362, 369-70 (W.D.N.Y. 2005) ("[i]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim"); *Cancel v. Goord*, No. 00. Civ. 2042, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001) ("inmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983"); *Mimms v. Carr*, No. 09-CV-5740, 2011 WL 2360059, at *10 (E.D.N.Y. June 9, 2011) ("It is well-established that

Case 6:24-cv-01169-DNH-MJK    Document 5    Filed 10/30/24    Page 33 of 141

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

prison grievance procedures do not create a due-process-protected liberty interest.") (citing cases). Simply stated, there is no underlying constitutional obligation to afford an inmate meaningful access to the internal grievance procedure, or to investigate and properly determine any such grievance.

To the extent that plaintiff attempts to assert a separate constitutional claim based upon the Inspector General's failure to investigate, the law is also clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials. *Bernstein v. New York*, 591 F.Supp.2d 448, 460 (S.D.N.Y. 2008) (collecting cases); *Torres v. Mazzuca*, 246 F.Supp.2d 334, 341-42 (S.D.N.Y. 2003) (Prisoners do not have a due process right to a thorough investigation of grievances.); *DeShaney v. Winnebego Soc. Servs.*, 489 U.S. 189, 196 (1989) (The Due Process Clause confers no right to governmental aid, even where that aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual); *Pine v. Seally*, No. 9:09-CV-1198, 2011 W L 856426, at *9 (N.D.N.Y. Feb. 4, 2011) ("the law is ... clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials") (citing *Bernstein*, 591 F.Supp.2d at 460).

In this regard, plaintiff's claims do not involve a constitutional violation and are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### F. Cause of Action for Criminal Charges/Perjury
"New York does not recognize a common law cause of action for [...] perjury." *Harris v. Summers*, No. 5:14-CV-0013 (LEK/DEP), 2014 W L 1340032, at *5 (N.D.N.Y. Apr. 3, 2014) (citing *Carvel v. Ross*, No. 12-CV-0722, 2011 W L 856283, at *12 (S.D.N.Y. Feb. 16, 2011) (dismissing the plaintiff's perjury claim because "there [is] no private right of action" for perjury)). Moreover, plaintiff's claim is not actionable because it is well-settled that a private citizen does not have a constitutional right to bring a criminal complaint against another individual. *Harper v. New York Child Welfare Comm'rs*, No. 3:12-CV-0646 (NAM/DEP), 2012 WL 3115975, at *4 (N.D.N.Y. May 14, 2012) (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)). Consequently, plaintiff's request to charge defendants with "perjury" is dismissed for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b).

### G. Injunctive Relief Against DOCCS
Plaintiff demands injunctive relief directing DOCCS to require "each officer" to wear body cameras to prevent future assaults and other related injunctive relief. *See* Compl. at 10-12. Plaintiff is presently confined at Mid-State C.F. and therefore, plaintiff's request for injunctive relief involving changes to the operation of security at Elmira C.F., is dismissed as moot. *See Edwards v. Horn*, No. 10 Civ. 6194, 2012 WL 760172, at *23 (S.D.N.Y. March 8, 2012) (dismissing the plaintiff's claim for injunctive relief because the plaintiff had been released from prison).

**\*12** Even assuming plaintiff's request is broader and intended to encompass all DOCCS facilities, the request is nonetheless improper and subject to dismissal. The PLRA provides "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of the particular plaintiff." 18 U.S.C. § 3626(a)(1)(A). "[A] proposed order directing the installation of securities cameras – is beyond the narrow scope permitted by the PLRA." *Barrington v. New York*, 806 F.Supp.2d 730, 750 (S.D.N.Y. 2011) (dismissing the plaintiff's request for injunctive relief seeking an order directing Green Haven to install security cameras as overly broad and unnecessary to correct the alleged past violations of his rights). Accordingly, plaintiff's request for injunctive relief is dismissed.

### VI. Conclusion
**ORDERED** that plaintiff's in forma pauperis application (Dkt. No. 2) is **GRANTED**; [11] and it is further

[11]   Plaintiff should note that, although the Court has granted his application to proceed in forma pauperis, he will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

**ORDERED** that the Clerk provide the Superintendent of the facility, designated by plaintiff as his current location, with a copy of plaintiff's authorization form, and notify the official that this action has been filed and that plaintiff is required to pay the entire statutory filing fee of $350.00 pursuant to 28 U.S.C. § 1915; and it is further

**ORDERED** that the Clerk of the Court provide a copy of plaintiff's inmate authorization form to the Financial Deputy of the Clerk's Office; and it is further

Case 6:24-cv-01169-DNH-MJK    Document 5    Filed 10/30/24    Page 34 of 141

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

**ORDERED** that the following claims are **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted: (1) plaintiff's § 1983 claims for monetary damages against DOCCS; (2) constitutional claims based upon the failure to adhere to the grievance policy and investigate; and (3) plaintiff's claims related to perjury and filing criminal charges against defendants; and it is further

**ORDERED** that the following claims are **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted: (1) Eighth Amendment claims against defendants for deliberate indifference to plaintiff's serious medical needs; (2) First Amendment freedom of religion claims; (3) Fourteenth Amendment due process claims; and (4) claims for injunctive relief against DOCCS [12]; and it is further

[12]    If plaintiff wishes to pursue any claim dismissed without prejudice, he is advised to that, if accepted for filing, any amended complaint will entirely replace the original complaint and incorporation of prior claims is not permitted.

**ORDERED** that DOCCS is **DISMISSED** as a defendant herein; and it is further

**ORDERED** that the following claims survive the Court's sua sponte review under 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) and require a response: (1) the Eighth Amendment use of excessive force claims against defendants Copestick and Schieber; (2) the Eighth Amendment failure-to-intervene claim against defendant Collerman; (3) the First Amendment retaliation claims against defendants Copestick and Schieber; and (3) the Fourteenth Amendment equal protection claims against Copestick and Schieber; and it is further

**ORDERED**, that the Clerk shall issue summons and forward them, along with copies of the Complaint, to the United States Marshal for service upon the remaining defendants. The Clerk shall forward a copy of the Summons and Complaint to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**\*13 ORDERED**, that a response to the complaint be filed by the remaining defendants, or their counsel, as provided for in the Federal Rules of Civil Procedure;

**ORDERED**, that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of same was served on all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a proper certificate of service will be stricken from the docket.** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; their failure to do so will result in the dismissal of his action**; and it is further

**ORDERED**, in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009), the Clerk of the Court is directed to provide plaintiff with copies of opinions from Westlaw and the Federal Appendix cited in this Decision and Order; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Decision and Order on plaintiff in accordance with the Local Rules.

Dated: October 26, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 6267968

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 3340646

2013 WL 3340646
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Shaun SIMMONS, Plaintiff,
v.
GOWANDA CORRECTIONAL FACILITY, Defendant.

No. 13–CV–0647Sc.
|
July 1, 2013.

**Attorneys and Law Firms**

Shaun Simmons, Gowanda, NY, pro se.

**DECISION AND ORDER**

RICHARD J. ARCARA, District Judge.

*INTRODUCTION*

**\*1** Plaintiff, Shaun Simmons, an inmate of the Gowanda Correctional Facility, initially filed this *pro se* action seeking relief under 42 U.S.C. § 1983 (Docket No. 1, 6) in the United States District Court for the Southern District of New York and has both requested permission to proceed *in forma pauperis* and filed a signed Authorization (Docket No. 7). Plaintiff claims that on one day, April 18, 2013, he was exposed to asbestos when the windows above his dorm, C–West Two, were being removed. He claims that a construction worker came through the dorm and told everyone to close the windows so they were not exposed to asbestos. Plaintiff has named only the Gowanda Correctional Facility as a defendant. For the reasons discussed below, plaintiff's request to proceed as a poor person is granted and the complaint is dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A.

*DISCUSSION*

Because plaintiff has met the statutory requirements of 28 U.S.C. § 1915(a) and filed an Authorization with respect to this action, plaintiff is granted permission to proceed *in forma pauperis*. Sections 1915(e)(2)(B) and 1915A(a) of 28 U.S.C. require the Court to conduct an initial screening of

this complaint. In evaluating the complaint, the Court must accept as true all of the factual allegations and must draw all inferences in plaintiff's favor. *See Larkin v. Savage,* 318 F.3d 138, 139 (2d Cir.2003) (per curiam); *King v. Simpson,* 189 F.3d 284, 287 (2d Cir.1999). While "a court is obliged to construe [*pro se* ] pleadings liberally, particularly when they allege civil rights violations," *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004), even pleadings submitted *pro se* must meet the notice requirements of Rule 8 of the Federal Rules of Civil Procedure. *Wynder v. McMahon,* 360 F.3d 73 (2d Cir.2004). "Specific facts are not necessary," and the plaintiff "need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal quotation marks and citation omitted). Generally, the Court will afford a *pro se* plaintiff an opportunity to amend or to be heard prior to dismissal "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim." *Abbas v. Dixon,* 480 F.3d 636, 639 (quoting *Gomez v. USAA Federal Savings Bank,* 171 F.3d 794, 796 (2d Cir.1999) (per curiam )).

Plaintiff brings this action pursuant to 42 U.S.C. § 1983. "To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton,* 126 F.3d 400, 405 (2d. Cir.1997) (citing *Eagleston v. Guido,* 41 F.3d 865, 875–76 (2d Cir.1994)). Based on its evaluation of the complaint, the Court finds that plaintiff's claim must be dismissed pursuant to 28 U.S.C. §§ 1915(e) (2)(B)(ii) and 1915A(b) because it fails to state a claim upon which relief may be granted.

**A. PLAINTIFF'S CLAIM**

**\*2** As summarized above, plaintiff's sole claim is that he was exposed to asbestos on one date in April 2013, when a construction crew was removing windows in the dorm unit above his and a member of the construction crew came through his dorm to alert everyone to shut the windows. This claim must be dismissed because the lone defendant, Gowanda Correctional Facility, is not subject to suit and because, even if a proper defendant was sued, the complaint fails to state a claim upon which relief can be granted.

2013 WL 3340646

### 1. Eleventh Amendment

The Eleventh Amendment bars federal court claims against states, absent their consent to such suit or an express statutory waiver of immunity. *See Will v. Mich. Dep't of State Police,* 491 U.S. 58, 66, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 98–100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). The Eleventh Amendment bar extends to agencies and officials sued in their official capacities. *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). "An official arm of the state," such as ((the New York State Department of Corrections and Community Supervision and Gowanda Correctional Facility), "enjoys the same Eleventh Amendment immunity from suit in federal court as is enjoyed by the state itself." *Posr v. Court Officer Shield No. 207,* 180 F.3d 409, 414 (2d Cir.1999). *See also Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.,* 466 F.3d 232, 236 (2d Cir.2006) (Eleventh Amendment immunity extends to "state agents and state instrumentalities that are, effectively, arms of a state.") (internal quotation marks and citations omitted); *Saxon v. Attica Medical Dept.,* 468 F.Supp.2d 480, 484 (W.D.N.Y.2007) (Larimer, D.J.) (claims against Attica Medical Department are barred by Eleventh Amendment immunity). Accordingly, plaintiff's complaint against Gowanda must be dismissed.

### 2. Asbestos Exposure–Eighth Amendment

Various courts have held that an inmate's unwilling exposure to an "unreasonably high concentration of air-borne asbestos particles" may constitute a cognizable claim under the Eighth Amendment. *Pack v. Artuz,* 348 F.Supp.2d 63, 79 (S.D.N.Y.2004) (citing *LaBounty v. Coughlin,* 137 F.3d 68, 72 (2d Cir.1998); *Herman v. Holiday,* 238 F.3d 660, 665 (5th Cir.2001); *Powell v. Lennon,* 914 F.2d 1459, 1463 (11th Cir.1990); *Klos v. Burke,* 1996 WL 77446, *1 (N.D.N.Y. Feb.15, 1996)) "For exposure to airborne asbestos fibers to create a substantial risk of serious harm, however, the intensity and duration of the exposure must both be significant." *Pack,* 348 F.Supp. at 79 (citing *Falise v. American Tobacco Co.,* 94 F.Supp.2d 316, 324 (E.D.N.Y.2000) (noting that development of asbestos-related diseases correlates with the duration and intensity of exposure to asbestos fibers).

Because plaintiff's allegations do not establish that the one-time potential exposure to asbestos created an unreasonable risk of serious harm to his health and safety and that some unnamed prison officials acted with deliberate indifference to that risk, *see Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *see also Pack,* 348 F.Supp.2d at 90, *n. 32* ("Thus the risk resulting from low-level exposure is not unreasonable for purposes of an Eighth Amendment claim, since to violate contemporary standards of decency, the risk must apply to anyone who is subjected to the low level exposure ....) (citing *Helling v. McKinney,* 509 U.S. 25, 35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (plaintiff must also prove that "society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency.")), plaintiff's complaint must be dismissed with prejudice. *See Cuoco v. Moritsugu,* 222 F.3d 99,112 (2d Cir.2000) (an opportunity to replead should be denied as futile where "[t]he problem with [plaintiff's] cause[ ] of action is substantive" such that "[b]etter pleading will not cure it.")

### CONCLUSION

**\*3** Plaintiff has met the statutory requirements of 28 U.S.C. § 1915(a) and filed an Authorization with respect to the filing fee. Accordingly, plaintiffs request to proceed *in forma pauperis* is granted and, for the reasons discussed above, the complaint is dismissed with prejudice pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A. Plaintiff is forewarned that his right to pursue further relief in federal court at public expense will be greatly curtailed if he has three actions or appeals dismissed under the provisions of 28 U.S.C. §§ 1915(e)(2)(B) and 1915A. *See* 28 U.S.C. § 1915(g).

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a) (3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

### ORDER

IT HEREBY IS ORDERED, that plaintiffs request to proceed *in forma pauperis* is granted;

FURTHER, that the complaint is dismissed with prejudice; and

FURTHER, that leave to appeal to the Court of Appeals as a poor person is denied.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 3340646

---

**End of Document**                                   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 8188396

2023 WL 8188396
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kevin DRAWHORNE, Plaintiff,

v.

M. ALOISE et al., Defendants.

6:23-cv-01278-TJM-TWD
|
Signed November 27, 2023

**Attorneys and Law Firms**

KEVIN DRAWHORNE, 23-R-0208, Marcy Correctional
Facility, P.O. Box 3600, Marcy, NY 13403.

**ORDER AND REPORT-RECOMMENDATION**

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge

**I. INTRODUCTION**

*1 The Clerk has sent to the Court for review a complaint
submitted by *pro se* plaintiff Kevin Drawhorne ("Plaintiff")
alleging M. Aloise, Melinda Katz, Commissioner Davis, and
The People of the State of New York violated his civil rights.
(Dkt. No. 1.) Plaintiff, who is currently in the custody of
New York State Department of Corrections and Community
Supervision ("DOCCS") at Marcy Correctional Facility in
Marcy, New York, has not paid the filing fee for this action
and seeks leave to proceed *in forma pauperis* ("IFP"). (Dkt.
No. 2.)

**II. IFP APPLICATION**

"28 U.S.C. § 1915 permits an indigent litigant to commence
an action in a federal court without prepayment of the filing
fee that would ordinarily be charged." *Cash v. Bernstein*,
No. 09-CV-1922, 2010 WL 5185047, at *1 (S.D.N.Y. Oct.
26, 2010). "Although an indigent, incarcerated individual
need not prepay the filing fee at the time of filing, he must
subsequently pay the fee, to the extent he is able to do so,
through periodic withdrawals from his inmate accounts." *Id.*
(citing 28 U.S.C. § 1915(b) and *Harris v. City of New York*,
607 F.3d 18, 21 (2d Cir. 2010)).

Upon review, Plaintiff's IFP application demonstrates
economic need. (Dkt. No. 2.) Because Plaintiff has met the
statutory requirements of 28 U.S.C. § 1915(a) and has filed
the inmate authorization form required in this District, he is
granted permission to proceed IFP. (Dkt. Nos. 2, 3.)

**III. BACKGROUND**

Plaintiff initiated this action against Melinda Katz, M. Aloise,
Commissioner Davis, and The People of the State of New
York on October 13, 2023. (Dkt. No. 1.) The Court takes
judicial notice Melinda Katz is the District Attorney of
Queens County [1] and M. Aloise is a judge in the New York
Supreme Court 11th Judicial District in Queens County, New
York. [2]

[1]    DA Melinda Katz, https://queensda.org/team/da-
       katz/ (last visited Nov. 27, 2023).

[2]    Michael Aloise, BALLOTPEDIA, https://
       ballotpedia.org/Michael_Aloise (last visited Nov.
       27, 2023).

Plaintiff has filed a threadbare complaint devoid of details.
Plaintiff claims on January 5, 2023, Judge Aloise "violated"
his rights "throughout the court proceedings." (Dkt. No. 1
at 4.) He further alleges he was deprived "from [h]aving
good counsel and being full[y] able to cross-examine [his]
defendant(s)." *Id.* Moreover, he "was never able to see [his]
discovery nor attend [his] grand Jury." *Id.* Plaintiff claims
he was "fully coerced" into taking a plea and never given a
chance to create "a good defense." *Id.* According to Plaintiff,
his attorney was "aware of all violations and still never
objected to it." *Id.* Finally, DA Katz "acted out of color
by stating wrongful facts of the case." *Id.* On February 23,
2023, Plaintiff's motions for a hardship hearing and to defer
surcharges were denied. *Id.*

Plaintiff's first claim states on April 4, 2022, DA Katz violated
his Fourteenth, Eighth, and Second Amendment rights by
"not allowing" Plaintiff to testify at the Grand Jury, speak
freely in court, and "not able to make a defense." *Id.* at 5.

*2 Plaintiff's second claim states Judge Aloise would not
allow Plaintiff to obtain new counsel. *Id.* He then states he was
coerced into making a plea, but it is unclear if he is alleging
Judge Aloise, DA Katz, or both coerced him into doing so. *Id.*

Plaintiff's third claim states The People of the State of New
York violated Plaintiff's rights by "not allowing [him] to be

[ ] able to build a defense in his case" that he could "fight." *Id.* Finally, Plaintiff requests $15 million for violations of his constitutional rights, including "due process," "unlawfully imprisonment," "duress," mental anguish, and pain and suffering. *Id.*

## IV. DISCUSSION

### A. Legal Standard

The Court shall dismiss a complaint in a civil action if the Court determines it is frivolous, malicious, fails to state a claim on which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. *See* 28 U.S.C. § 1915(e)(2)(B)(i)-(iii); 28 U.S.C. § 1915A(b)(1)-(2); *see Livingston v. Adirondack Beverage Co.,* 141 F.3d 434, 437 (2d Cir. 1998). The Court must also dismiss a complaint, or portion thereof, when the Court lacks subject matter jurisdiction. *See* Fed. R. Civ. P. 12(h)(3). While the law mandates dismissal on any of these grounds, the Court is obliged to construe *pro se* pleadings liberally, *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest arguments that they *suggest.*" *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474-75 (2d Cir. 2006) (internal quotation marks and citation omitted).

A claim is frivolous when it "lacks an arguable basis either in law or in fact." *Neitzke v. Williams,* 490 U.S. 319, 325 (1989), *abrogated on other grounds Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007); *see also Denton v. Hernandez,* 504 U.S. 25, 33 (1992) (holding "a finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible"); *Livingston,* 141 F.3d at 437 ("[A]n action is 'frivolous' when either: (1) the factual contentions are clearly baseless ... or (2) the claim is based on an indisputably meritless legal theory.").

To survive dismissal for failure to state a claim, a complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). This short and plain statement of the claim must be "plausible on its face." *Twombly,* 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). The statement of the claim must do more than present "an unadorned, the-defendant-harmed-me accusation." *Id.* It must "give the defendant fair notice of what the claim is and the grounds upon which it

rests." *Twombly,* 550 U.S. at 555 (internal quotation marks and citations omitted); *see also* Fed. R. Civ. P. 8(a)(2).

In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir. 1994) (citations omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal,* 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

**\*3** Plaintiff brings this action pursuant to 42 U.S.C. § 1983. (Dkt. No. 1.) "To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. Cty. of Fulton,* 126 F.3d 400, 405 (2d Cir. 1997). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir. 1993).

Moreover, a court should not dismiss a *pro se* complaint "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 (2d Cir. 1999) (citation and internal quotation marks omitted). However, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir. 2000).

### B. The People of the State of New York

To the extent Plaintiff seeks money damages against The People of the State of New York, which the Court construes as claims against the Queens County District Attorney's Office, those claims are barred by the Eleventh Amendment. *See Best v. Brown,* No. 19-CV-3724, 2019 WL 3067118, at *2 (E.D.N.Y. July 12, 2019) (dismissing the plaintiff's claim against the Office of the Queens County District Attorney as barred by the Eleventh Amendment); *see also D'Alessandro v. City of New York,* 713 F. App'x 1, 8 (2d Cir. 2017) ("[I]f a district attorney or an assistant district attorney acts as a prosecutor, she is an agent of the state, and therefore immune from suit in her official capacity."); *Rich v. New*

*York*, No. 21-CV-3835, 2022 WL 992885, at *5 n.4 (S.D.N.Y. Mar. 31, 2022) ("[A]ny claims Plaintiff may raise against the DA Defendants in their 'official capacity' would be precluded by immunity under the Eleventh Amendment."); *Gentry v. New York*, No. 21-CV-0319 (GTS/ML), 2021 WL 3037709, at *6 (N.D.N.Y. June 14, 2021) (recommending dismissal of the plaintiff's claims against the defendant assistant district attorneys in their official capacities—which were effectively claims against the State of New York— as barred by the Eleventh Amendment) *adopted by*, 2021 WL 3032691 (N.D.N.Y. July 19, 2021). Therefore, the Court recommends Plaintiff's Section 1983 claims against The People of the State of New York be dismissed with prejudice pursuant to 28 U.S.C. §§ 1915(e), 1915A.

### C. Commissioner Davis

"The standard set forth in *Twombly* and affirmed in *Iqbal* requires more than mere conclusory statements; rather, it demands sufficient factual allegations against a defendant to reasonably lead to the discovery of illegal conduct." *Johnson v. Gonzalez*, No. 9:14-CV-0745 LEK/CFH, 2015 WL 1179384, at *6 (N.D.N.Y. Mar. 13, 2015) (citing *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555-56). "It is well-settled that 'where the complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to that defendant should be granted.' " *Dove v. Fordham Univ.*, 56 F. Supp. 2d 330, 335 (S.D.N.Y. 1999) (citation omitted).

The Court notes Plaintiff lists Commissioner Davis as a defendant in the caption of his complaint but fails to assert any allegations against him or her. *Id.* at 1, 3; *see Johnson*, 2015 WL 1179384, at *6; *Jaffer v. Chemical Bank*, No. 93-CV-8459, 1994 WL 392260, at *3 (S.D.N.Y. July 26, 1994) (holding "[w]hen a complaint's caption names a defendant but the complaint does not indicate that the named party injured the plaintiff or violated the law, the motion to dismiss must be granted"); *Serrano v. New York State Dep't of Envtl. Conservation*, No. 12-CV-1592, 2013 WL 6816787, at *15 (N.D.N.Y. Dec. 20, 2013) (dismissing the plaintiff's claims against two defendants who were listed as parties in the complaint and in the caption, but not elsewhere in the complaint).

**\*4** Therefore, the undersigned recommends dismissing the claims against Commissioner Davis without prejudice.

### D. DA Katz

To the extent Plaintiff seeks to sue DA Katz, she is likely protected by prosecutorial immunity.[3] Prosecutors are immune from civil suit for damages in their individual capacities for acts committed within the scope of their official duties where the challenged activities are not investigative in nature but, rather, are "intimately associated with the judicial phase of the criminal process." *Simon v. City of New York*, 727 F.3d 167, 171 (2d Cir. 2013) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)) (internal quotation marks omitted); *see Imbler*, 424 U.S. at 431 ("[I]n initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983."). In addition, prosecutors are immune from suit for acts that may be administrative obligations but are "directly connected with the conduct of a trial." *Van de Kamp v. Goldstein*, 555 U.S. 335, 344 (2009).

[3]     While the Court recognizes the issue of venue as it relates to claims against DA Katz and Judge Aloise arising out of Plaintiff's criminal proceedings in Queens, New York, a transfer of those claims would be futile. *See Robinson v. New York State Corr.*, No. 9:19-CV-1437 (DNH/TWD), 2020 WL 1703669, at *3 (N.D.N.Y. Apr. 8, 2020).

In short, absolute prosecutorial immunity covers "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). This includes "the decision to bring charges against a defendant, presenting evidence to a grand jury, and the evaluation of evidence prior to trial." *Moye v. City of New York*, No. 11 Civ. 316, 2012 WL 2569085, at *5 (S.D.N.Y. July 3, 2012) (internal quotation marks and citations omitted). Immunity even extends to the falsification of evidence and the coercion of witnesses, the knowing use of perjured testimony, the deliberate withholding of exculpatory information, the making of false or defamatory statements in judicial proceedings, and conspiring to present false evidence at a criminal trial. *See Taylor v. Kavanagh*, 640 F.2d 450, 452 (2d Cir. 1981); *Imbler*, 424 U.S. at 431 n.34; *Burns v. Reed*, 500 U.S. 478, 490 (1991); *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994).

Moreover, " '[w]hen prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State not the county.' " *Ying Jing Gan v. City of New York*, 996 F.2d 522, 536 (2d Cir. 1993) (quoting *Baez*

*v. Hennessy*, 853 F.2d 73, 77 (2d Cir. 1988), *cert. denied*, 488 U.S. 1014 (1989)); *see also Rich*, 2022 WL 992885, at *5 n.4 ("[A]ny claims Plaintiff may raise against the [District Attorney] Defendants in their 'official capacity' would be precluded by immunity under the Eleventh Amendment."); *Gentry*, 2021 WL 3037709, at *6 (recommending dismissal of the plaintiff's claims against the defendant assistant district attorneys in their official capacities—which were effectively claims against the State of New York—as barred by the Eleventh Amendment).

**\*5** Plaintiff's threadbare allegations in the complaint do not clarify the context of his claims. For instance, Plaintiff complains DA Katz violated his Fourteenth, Eighth, and Second Amendment rights by not allowing him to testify at the Grand Jury, speak freely in court, or make a defense. (Dkt. No. 1 at 3.) He also appears to allege DA Katz coerced him into taking "a Bid." *Id.* Nevertheless, Plaintiff appears to complain DA Katz violated his rights while performing her official duties as a prosecutor. *Simon*, 727 F.3d at 171. Because Plaintiff's allegations against DA Katz relate to non-investigative actions she has taken in her official capacity as a prosecutor, she is entitled to prosecutorial immunity. *Simon*, 727 F.3d at 171; *see, e.g., Matthews v. Cty. of Cayuga*, No. 5:17-CV-1004 (MAD/TWD), 2018 WL 2926272, at *3 (N.D.N.Y. June 8, 2018) (dismissing claims against prosecutor on initial review because of prosecutorial immunity). Thus, Plaintiff's Section 1983 claims against DA Katz fail as a matter of law.

Therefore, the Court recommends that Plaintiff's Section 1983 claims against DA Katz be dismissed with prejudice pursuant to 28 U.S.C. §§ 1915(e), 1915A.

### E. Judge Aloise

To the extent Plaintiff seeks to sue Judge Aloise, judges are immune from suit for damages for any actions taken within the scope of their judicial responsibilities. *Mireles v. Waco*, 502 U.S. 9, 11 (1991). This is true however erroneous an act may have been, and however injurious its consequences were to the plaintiff. *Young v. Selsky*, 41 F.3d 47, 51 (2d Cir. 1994); *see also Stump v. Sparkman*, 435 U.S. 349, 357 (1978) ("A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the clear absence of all jurisdiction."). This immunity applies to state court judges who are sued in federal court pursuant to Section 1983. *Pizzolato v. Baer*, 551 F. Supp. 355, 356 (S.D.N.Y. 1982), *aff'd sub nom. Pizzolato v. City of New York*, 742 F.2d 1430 (2d Cir. 1983).

Generally, "acts arising out of, or related to, individual cases before the judge are considered judicial in nature." *Bliven v. Hunt*, 579 F.3d 204, 210 (2d Cir. 2009). The only two circumstances in which judicial immunity does not apply is when he or she acts "outside" his or her judicial capacity and when the judge takes action that, although judicial in nature, is taken "in absence of jurisdiction." *Mireles*, 502 U.S. at 11-12. Again, while not entirely clear, to the extent Plaintiff complains of any wrongdoing related to a criminal proceeding, Judge Aloise would be entitled to absolute judicial immunity.

Therefore, the Court recommends that Plaintiff's Section 1983 claims against Judge Aloise be dismissed with prejudice pursuant to 28 U.S.C. §§ 1915(e), 1915A.

### V. CONCLUSION

For the reasons stated herein, it is hereby

**ORDERED** that Plaintiff's IFP application [4] (Dkt. No. 2) is **GRANTED**; and it is further

[4]   Plaintiff should note that although his IFP application has been granted, he will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

**RECOMMENDED** that Plaintiff's claims against Commissioner Davis be **DISMISSED WITHOUT PREJUDICE**; and it is further

**RECOMMENDED** that Plaintiff's claims against The People of the State of New York, DA Katz, and Judge Aloise be **DISMISSED WITH PREJUDICE**; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**\*6** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [5] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

2023 WL 8188396

**PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

5      If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation

was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. 6(a)(1)(C).

**All Citations**

Slip Copy, 2023 WL 8188396

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:24-cv-01169-DNH-MJK    Document 5    Filed 10/30/24    Page 43 of 141

Robinson v. Wright, Not Reported in Fed. Supp. (2022)

2022 WL 2663369

2022 WL 2663369
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Christopher E. ROBINSON, Plaintiff,

v.

Michael WRIGHT, New York State Parole
Officer; Matthew Mullen, New York State
Parole Officer; and Tonia Zimmerman,
New York State Parole Officer, Defendants.

5:21-CV-1098 (TJM/ML)
|
Signed July 11, 2022

**Attorneys and Law Firms**

CHRISTOPHER E. ROBINSON, Plaintiff, Pro Se, Cayuga Correctional Facility, Post Office Box 1186, Moravia, New York 13118.

**ORDER and REPORT-RECOMMENDATION**

MIROSLAV LOVRIC, United States Magistrate Judge

**\*1** The Clerk has sent this *pro se* amended complaint filed by Christopher E. Robinson ("Plaintiff") to the Court for review. (Dkt. No. 11.) For the reasons discussed below, I recommend that Plaintiff's Amended Complaint (Dkt. No. 11) be accepted in part for filing and dismissed in part without leave to amend.

## I. BACKGROUND

Construed as liberally [1] as possible, Plaintiff's Amended Complaint alleges that defendants Michael Wright, Matthew Mullen, and Tonia Zimmerman (collectively "Defendants"), who are all New York State parole officers, violated his civil rights by submitting perjured testimony against him. (*See generally* Dkt. No. 11 [Am. Compl.].) More specifically, Plaintiff alleges that on April 29, 2021, during a parole revocation hearing: (1) Defendant Wright testified that (a) Plaintiff was not allowed to possess a smartphone throughout his parole, and (b) his reasoning for requesting a search of Plaintiff's residence was because of law enforcement contact related to a domestic violence incident involving Plaintiff; (2) Defendant Mullen testified that he personally searched Plaintiff's bedroom and found a smartphone under a mattress; and (3) Defendant Zimmerman (a) omitted, while under

oath, where she found alleged contraband while searching Plaintiff's residence, and (b) omitted, while under oath, Officer Delaney when listing the individuals present while searching Plaintiff's residence. (*Id.*)

[1]    The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

Plaintiff alleges that based on Defendants' perjured statements, the parole violations against him were sustained and he has been reincarcerated. (*Id.*) Based on these factual allegations, Plaintiff asserts the following five causes of action: (1) a claim that Plaintiff's right to a fair trial was violated by Defendants pursuant to the Due Process Clause in the Fourteenth Amendment and 42 U.S.C. § 1983; (2) a claim that Plaintiff's right to a fair trial was violated by Defendants pursuant to the Fifth Amendment and 42 U.S.C. § 1983; (3) a claim that Defendant Wright violated Plaintiff's rights in making an arbitrary and capricious decision pursuant to the Fourteenth and Fifth Amendments; (4) a claim of malicious prosecution against Defendants pursuant to the Fifth, Eighth, and Fourteenth Amendments; and (5) a claim of false imprisonment against Defendants pursuant to the Fifth, Eighth, and Fourteenth Amendment. (*Id.*) As relief, Plaintiff seeks $3,000,000.00 in damages against Defendants. (*Id.*)

## II. LEGAL STANDARD GOVERNING INITIAL REVIEW OF A COMPLAINT

"Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2).

**\*2** In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial

Case 6:24-cv-01169-DNH-MJK    Document 5    Filed 10/30/24    Page 44 of 141

Robinson v. Wright, Not Reported in Fed. Supp. (2022)

2022 WL 2663369

experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citation and punctuation omitted).

"In reviewing a complaint ... the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

"[E]xtreme caution should be exercised in ordering sua sponte dismissal of a ... complaint before the adverse party has been served and [the] parties ... have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983). The Court, however, also has an overarching obligation to determine that a claim is not legally frivolous before permitting a plaintiff's complaint to proceed. *See, e.g., Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (holding that a district court may *sua sponte* dismiss a frivolous complaint, notwithstanding the fact that the plaintiff paid the statutory filing fee). "Legal frivolity ... occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint." *Aguilar v. United States*, 99-MC-0304, 99-MC-0408, 1999 WL 1067841, at *2 (D. Conn. Nov. 8, 1999) (quoting *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998)); *see also Neitzke v. Williams*, 490 U.S. 319, 325 (1989) ("[D]ismissal is proper only if the legal theory ... or factual contentions lack an arguable basis."); *Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) ("[T]he decision that a complaint is based on an indisputably meritless legal theory for purposes of dismissal under section 1915(d), may be based upon a defense that appears on the face of the complaint.").

## III. ANALYSIS

In addressing the sufficiency of a plaintiff's complaint, the court must construe his pleadings liberally. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). Having reviewed Plaintiff's Amended Complaint with this principle in mind, I recommend that his claims be accepted in part for filing and dismissed in part without leave to amend.

### A. Section 1983 Claims Against Defendants in Official Capacities

To the extent that Plaintiff's claims are asserted against Defendants in their official capacities, I recommend that they be dismissed for failure to state a claim upon which relief may be granted. Plaintiff seeks only monetary damages, and Defendants—in their official capacities—are immune from suit pursuant to the Eleventh Amendment. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985) ("The Court has held that, absent waiver by the State or valid congressional override, the Eleventh Amendment bars a damages action against a State in federal court. This bar remains in effect when State officials are sued for damages in their official capacity." (internal citations omitted)); *Quern v. Jordan*, 440 U.S. 332, 341 (1979) ("[W]e simply are unwilling to believe, on the basis of such slender 'evidence,' that Congress intended by the general language of § 1983 to override the traditional sovereign immunity of the States."); *Minotti v. Lensink*, 798 F.2d 607, 609 (2d Cir. 1986) ("Using its authority under section 5 of the fourteenth amendment, Congress may abrogate the eleventh amendment in the absence of a waiver by the states, but the civil rights statute 42 U.S.C. § 1983 does not override the eleventh amendment." (internal citations omitted)).

*3 Plaintiff alleges that Defendants are New York State Parole Officers. (Dkt. No. 11 at 2-3.) "Because the New York State [Division of Parole ("DOP")] is an arm of the state, [and] Plaintiff [asserts] claims against.... DOP employees[,] ... the Eleventh Amendment bars any claims for damages against ... [D]efendants in their official capacities." *Kirkland v. New York State Div. of Parole*, 20-CV-8606, 2021 WL 706709, at *3 (S.D.N.Y. Feb. 18, 2021) (citing *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009)).

As a result, I recommend that Plaintiff's claims against Defendants in their official capacities be dismissed because they are immune from suit.

### B. Section 1983 Claims Against Defendants in Individual Capacities

To the extent that Plaintiff asserts claims pursuant to 42 U.S.C. § 1983 against Defendants in their individual capacities, I recommend that his claims pursuant to the Fifth and Eighth Amendments and alleging malicious prosecution and false arrest be dismissed but that Defendants be directed to respond to his claim pursuant to the Fourteenth Amendment.

Robinson v. Wright, Not Reported in Fed. Supp. (2022)

2022 WL 2663369

### 1. Fifth Amendment

The Fifth Amendment Due Process Clause applies only to the federal government, and not to state or municipal governments. *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002) ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without due process of law."); *Poe v. Ullman*, 367 U.S. 497, 540 (1961) (explaining that prohibitions "against the deprivation of life, liberty or property without due process of law" set forth in Fourteenth Amendment are applicable to state government and same prohibitions in Fifth Amendment are applicable to "the Federal Government"); *Ambrose v. City of New York*, 623 F. Supp. 2d 454, 466-67 (S.D.N.Y. 2009) (holding that any due process claim "against the City is properly brought under the Fourteenth Amendment, not the Fifth Amendment"); *Mitchell v. Home*, 377 F. Supp. 2d 361, 372-73 (S.D.N.Y. 2005) ("The Fifth Amendment's Due Process Clause protects citizens against only federal government actors, not State officials. Any due process rights plaintiff enjoys as against state government officials ... arise solely from the Fourteenth Amendment due process clause." (internal citations omitted)).

Plaintiff has not alleged that any federal official violated his Fifth Amendment due process rights. Instead, all of his allegations are against state officials. Thus, Plaintiff's due process claims may only be brought under the Fourteenth Amendment, not the Fifth Amendment. *See Dusenbery*, 534 U.S. at 167 (explaining that Fifth Amendment does not apply to State officials); *Ambrose*, 623 F. Supp. 2d at 466-67 (stating that Fifth Amendment does not apply to city officials).

As a result, I recommend that Plaintiff's Fifth Amendment claim against Defendants is dismissed for failure to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915A(b)(1).

### 2. Eighth Amendment

The Eighth Amendment "protects prisoners from cruel and unusual punishment by prison officials," *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015), whereas the Fifth and Fourteenth Amendments "prohibit the government from depriving any person of life, liberty, or property, without due process of law." *Smalls v. Collins*, 10 F.4th 117, 133 (2d Cir. 2021) (internal quotation marks, citations and alterations omitted). Generally, *pro se* plaintiffs bring Eighth Amendment claims to challenge "excessive force," "denial of adequate medical care," "unconstitutional conditions of confinement unrelated to medical care," and the "failure to protect." *Randle v. Alexander*, 960 F. Supp. 2d 457, 470 (S.D.N.Y. 2013). Though Plaintiff cites the Eighth Amendment, he does not raise issues that are customarily resolved by Eighth Amendment claims; instead, he appears to challenge the lack of "due process of law." (Dkt. No. 11.) Accordingly, Plaintiff's Eighth Amendment claims "relating to [parole revocation] proceedings ... are more properly analyzed as due process violations." *Barclay v. New York*, 477 F. Supp. 2d 546, 555 (N.D.N.Y. 2007) (Hurd, J.).

### 3. Malicious Prosecution/False Imprisonment

**\*4** A plaintiff alleging malicious prosecution and false arrest must demonstrate termination of the proceedings in his favor. *See Henry v. City of New York*, 17-CV-3450, 2021 WL 1648029, at \*4 (S.D.N.Y. Apr. 27, 2021) (citing *Shabazz v. Kailer*, 201 F. Supp. 3d 386, 391 (S.D.N.Y. 2016)) (dismissing the plaintiff's malicious prosecution claim because he did not "secure a favorable termination of the criminal action."); *Aragon v. New York*, 14-CV-9797, 2017 WL 2703562, at \*5 (S.D.N.Y. June 22, 2017) (quoting *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994)) ("Thus, to recover damages for a false imprisonment claim under Section 1983, a prisoner must demonstrate that his conviction 'has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.' ").

Here, Plaintiff alleges that his "parole violations were sustained and [he has] been reincarcerated." (Dkt. No. 11 at 4.) Thus, Plaintiff has not obtained a favorable termination of the underlying proceeding to state a malicious prosecution or false imprisonment claim.

As a result, I recommend that Plaintiff's claims alleging malicious prosecution and false arrest be dismissed for failure to state a claim upon which relief may be granted.

Case 6:24-cv-01169-DNH-MJK    Document 5    Filed 10/30/24    Page 46 of 141
**Robinson v. Wright, Not Reported in Fed. Supp. (2022)**
2022 WL 2663369

#### 4. Fourteenth Amendment

A final parole revocation proceeding is an administrative proceeding held solely to enable parole authorities to determine whether the parolee violated the terms of parole. *People ex rel. Maiello v. New York State Bd. of Parole,* 65 N.Y.2d 145, 147 (N.Y. 1985). Although a parolee facing revocation of release is not entitled to the "full panoply of rights" due to a defendant in a criminal prosecution, the Supreme Court has held that the revocation of parole implicates a liberty interest protected by the Due Process Clause of the Fourteenth Amendment. *Morrisey v. Brewer,* 408 U.S. 471, 482 (1972). Upholding the *Morrisey* decision, a year later the Supreme Court further defined the process required during a preliminary parole revocation hearing. *Gagnon v. Scarpelli,* 411 U.S. 778, 786 (1973). "At the ... hearing, a probationer or parolee is entitled to notice of the alleged violations of probation or parole, an opportunity to appear and to present evidence in his own behalf, a conditional right to confront adverse witnesses, an independent decisionmaker, and a written report of the hearing." *Gagnon,* 411 U.S. at 786 (citing *Morrisey,* 408 U.S. at 487). Furthermore, at the final hearing, individuals are given a more detailed hearing with the minimum requirements including:

> (a) written notice of the claimed violations of (probation or) parole; (b) disclosure to the (probationer or) parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking (probation or) parole.

*Id.* (citing *Morrisey,* 408 U.S. at 489).

Here, Plaintiff alleges that his constitutional rights were violated during his parole revocation hearing based on false statements made by Defendants. Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff,* 537 F.3d at 191, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's Fourteenth Amendment claims against Defendants in their individual capacities.

### IV. OPPORTUNITY TO AMEND

**\*5** Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark,* 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters,* 95-CV-1641, 1997 WL 599355, at \*1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.). [2]

---

[2]     *See also Carris v. First Student, Inc.,* 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007)), *rev'd on other grounds,* 682 F. App'x 30.

**Robinson v. Wright, Not Reported in Fed. Supp. (2022)**

Case 6:24-cv-01169-DNH-MJK    Document 5    Filed 10/30/24    Page 47 of 141

2022 WL 2663369

In this instance, I conclude that any further amendments to Plaintiff's Amended Complaint would be futile. As a result, I recommend that Plaintiff's Amended Complaint be dismissed without leave to amend to the extent that it alleges claims pursuant to 42 U.S.C. § 1983 against Defendants in their (1) official capacities, and (2) individual capacities alleging violations of the Fifth and Eighth Amendments, for malicious prosecution, and for false imprisonment. *See Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 168 (2d Cir. 2003) (quoting *Dluhos v. Floating & Abandoned Vessel, Known as "New York,"* 162 F.3d 63, 69 (2d Cir. 1998)) (finding that the "District Court did not abuse its discretion in denying [the plaintiff] leave to amend the complaint because there was a 'repeated failure to cure deficiencies by amendments previously allowed.' "); *Salinger v. Projectavision, Inc.*, 972 F. Supp. 222, 236 (S.D.N.Y. 1997) ("Three bites at the apple is enough.").

**ACCORDINGLY**, it is respectfully

**RECOMMENDED** that Plaintiff's Amended Complaint (Dkt. No. 11) be **ACCEPTED FOR FILING** with respect to Plaintiff's Fourteenth Amendment due process claim against Defendants in their individual capacities; and it is further respectfully

**RECOMMENDED** that the Court **DISMISS WITHOUT LEAVE TO REPLEAD** Plaintiff's claims (1) against Defendants in their official capacities, and (2) against Defendants in their individual capacities pursuant to the Fifth Amendment, Eighth Amendment, for malicious prosecution, and for false imprisonment, for failure to state a claim upon which relief may be granted and because it seeks monetary relief against Defendants who are immune from such relief pursuant to 28 U.S.C. § 1915(e)(2)(B); and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this report and recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules. [3]

[3]    The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

 **\*6 NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [4] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

[4]    If you are proceeding *pro se* and served with this report and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2022 WL 2663369

---

**End of Document**                      © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 96886

🚩 KeyCite Yellow Flag - Negative Treatment
Declined to Extend by Steele-Warrick v. Microgenics Corporation, E.D.N.Y., April 26, 2023

984 F.3d 1075
United States Court of Appeals, Second Circuit.

Devar HURD, Plaintiff-Appellant,

v.

Stacey FREDENBURGH, in Her

Individual Capacity, Defendant-Appellee.[†]

[†]     The Clerk of the Court is directed to amend the official caption as set forth above.

Docket No. 19-3482
|
August Term 2020
|
Argued: November 18, 2020
|
Decided: January 12, 2021

Synopsis
**Background:** Former prisoner brought action under § 1983 against inmate records coordinator for New York State Department of Corrections and Community Supervision alleging deprivation of his Eighth and Fourteenth Amendment rights due to error in sentencing calculations that caused him to be imprisoned for almost year past date on which New York law mandated his release. The United States District Court for the Eastern District of New York, Kiyo A. Matsumoto, J., 2019 WL 4696364, granted coordinator's motion to dismiss. Prisoner appealed.

**Holdings:** The Court of Appeals, Wesley, Senior Circuit Judge, held that:

[1] prisoner suffered harm of constitutional magnitude under Eighth Amendment;

[2] prisoner had cognizable liberty interest in conditional release for purposes of substantive due process;

[3] coordinator was entitled to qualified immunity on Eighth Amendment claim; and

[4] coordinator was entitled to qualified immunity on substantive due process claim.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for Failure to State a Claim.

West Headnotes (36)

**[1]      Evidence 🔑 Particular Cases**

Court of Appeals would take judicial notice of New York Court of Claims' decision on former prisoner's New York law false imprisonment claim only to establish decision's existence and that Court of Claims made certain factual findings, which was necessary to complete narrative of prisoner's federal action and provide context for defenses set forth by inmate records coordinator for New York State Department of Corrections and Community Supervision, in prisoner's action under § 1983 alleging deprivation of Eighth and Fourteenth Amendment rights due to error in sentencing calculations that caused him to be imprisoned for almost year past date on which New York law mandated his release. U.S. Const. Amends. 8, 14; 42 U.S.C.A. § 1983.

2 Cases that cite this headnote
More cases on this issue

**[2]      Federal Courts 🔑 Pleading**

**Federal Courts 🔑 Immunity**

The Court of Appeals reviews de novo a district court's decision granting a motion to dismiss for failure to state a claim, including on qualified immunity grounds. Fed. R. Civ. P. 12(b)(6).

**[3]      Federal Courts 🔑 Dismissal for failure to state a claim**

In conducting a review of a district court's decision granting a motion to dismiss for failure to state a claim, the Court of Appeals accepts

as true all factual allegations and draws from them all reasonable inferences; but the Court of Appeals is not required to credit conclusory allegations or legal conclusions couched as factual allegations. Fed. R. Civ. P. 12(b)(6).

**[4]**    **Civil Rights**    Government Agencies and Officers

**Civil Rights**    Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

The qualified immunity analysis is guided by two questions, including, first, whether the facts show that the defendants' conduct violated plaintiffs' constitutional rights, and second, whether the right was clearly established at the time of the defendants' actions; a court may address these questions in either order, and, if it answers either question in the negative, qualified immunity attaches.

5 Cases that cite this headnote

**[5]**    **Civil Rights**    Government Agencies and Officers

**Civil Rights**    Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

The two-step procedure in the qualified immunity analysis, i.e., whether the facts show that the defendants' conduct violated plaintiffs' constitutional rights and whether the right was clearly established at the time of the defendants' actions, promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable.

4 Cases that cite this headnote

**[6]**    **Prisons**    Conditional release; community placement

**Sentencing and Punishment**    Confinement beyond term of sentence

Former prisoner, who was imprisoned for almost year past date on which New York law mandated his release due to error in sentencing calculations, suffered harm of constitutional magnitude under Eighth Amendment for purposes of his § 1983 claim; once prisoner met statutory requirements for conditional release, his release was mandatory under state law, New York State Department of Corrections and Community Supervision had no authority to keep prisoner incarcerated past conditional release date for crimes of which he was convicted and sentenced, and, even assuming New York could impose some supervisory conditions following release, prisoner's continued imprisonment was punishment that was neither authorized by law nor justified by any penological interest asserted by New York. U.S. Const. Amend. 8; 42 U.S.C.A. § 1983; N.Y. Penal Law §§ 70.30(2)(b), 70.30(3), 70.40(1)(b); N.Y. Correction Law §§ 600-a, 803(1)(a).

3 Cases that cite this headnote

**[7]**    **Sentencing and Punishment**    Scope of Prohibition

A plaintiff asserting an Eighth Amendment claim pursuant to § 1983 must meet two requirements: first, the alleged deprivation must be, in objective terms, sufficiently serious, and, second, the charged official must act with a sufficiently culpable state of mind. U.S. Const. Amend. 8; 42 U.S.C.A. § 1983.

6 Cases that cite this headnote

**[8]**    **Sentencing and Punishment**    Scope of Prohibition

To satisfy the first requirement for asserting an Eighth Amendment claim under § 1983, i.e., that the alleged deprivation must be, in objective terms, sufficiently serious, a plaintiff must plead a harm of a magnitude that violates a person's Eighth Amendment rights. U.S. Const. Amend. 8; 42 U.S.C.A. § 1983.

4 Cases that cite this headnote

**[9]**    **Sentencing and Punishment** 🗝 Scope of Prohibition

The Eighth Amendment proscribes more than physically barbarous punishments; it prohibits penalties that are grossly disproportionate to the offense, as well as those that transgress today's broad and idealistic concepts of dignity, civilized standards, humanity, and decency. U.S. Const. Amend. 8.

**[10]**    **Sentencing and Punishment** 🗝 Scope of Prohibition

An Eighth Amendment claim is not measured by the punishment alone, for an Eighth Amendment violation typically requires a state of mind that is the equivalent of criminal recklessness. U.S. Const. Amend. 8.

3 Cases that cite this headnote

**[11]**    **Sentencing and Punishment** 🗝 Deliberate indifference in general

The Eighth Amendment standard equivalent to criminal recklessness requires that only the deliberate infliction of punishment, and not an ordinary lack of due care for prisoner interests or safety, lead to liability. U.S. Const. Amend. 8.

2 Cases that cite this headnote

**[12]**    **Sentencing and Punishment** 🗝 Deliberate indifference in general

Under the Eighth Amendment standard equivalent to criminal recklessness, prison officials can be found deliberately indifferent to their own clerical errors on the basis of their refusals to investigate well-founded complaints regarding these errors. U.S. Const. Amend. 8.

4 Cases that cite this headnote

**[13]**    **Sentencing and Punishment** 🗝 Cruelty and unnecessary infliction of pain

The Eighth Amendment prohibits the unnecessary and wanton infliction of pain,

including punishments that are totally without penological justification. U.S. Const. Amend. 8.

3 Cases that cite this headnote

**[14]**    **Sentencing and Punishment** 🗝 Confinement beyond term of sentence

Under the Eighth Amendment, there is no penological justification for incarceration beyond a mandatory release date because any deterrent and retributive purposes served by the inmate's time in jail were fulfilled as of that date. U.S. Const. Amend. 8.

4 Cases that cite this headnote

**[15]**    **Sentencing and Punishment** 🗝 Confinement beyond term of sentence

Next to bodily security, freedom of choice and movement has the highest place in the spectrum of values recognized by the Constitution; for that reason, unauthorized detention of just one day past an inmate's mandatory release date qualifies as a harm of constitutional magnitude under the first prong of the Eighth Amendment analysis. U.S. Const. Amend. 8.

9 Cases that cite this headnote

**[16]**    **Sentencing and Punishment** 🗝 Confinement beyond term of sentence

If a period of prolonged detention results from discretionary decisions made in good faith, mistake, or processing or other administrative delays, as opposed to the deliberate indifference of prison officials, then there is no Eighth Amendment liability under § 1983; the deliberate indifference prong will do most of the work under these and similar circumstances, as the degree to which a harm is unnecessary in the sense of being unjustified by the exigencies of prison administration will affect the state-of-mind requirement a plaintiff must meet to demonstrate that a particular prison official violated the Eighth Amendment. U.S. Const. Amend. 8; 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

**[17]**    **Sentencing and Punishment** 🖝 Confinement beyond term of sentence

On a claim of an Eighth Amendment violation under § 1983, there must be a causal connection between the official's response to the problem and the infliction of the unjustified detention. U.S. Const. Amend. 8; 42 U.S.C.A. § 1983.

**[18]**    **Constitutional Law** 🖝 Discharge and release

**Prisons** 🖝 Conditional release; community placement

Former prisoner, who was imprisoned for almost year past date on which New York law mandated his release due to error in sentencing calculations, had cognizable liberty interest in conditional release for purposes of his substantive due process claim under § 1983; it was of no moment that conditional release was state-created right, and, once prisoner satisfied statutory requirements for conditional release, he had liberty interest in freedom from detention upon his conditional release date, as guaranteed by New York law. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983; N.Y. Penal Law §§ 70.30(2)(b), 70.30(3), 70.40(1)(b); N.Y. Correction Law §§ 600-a, 803(1)(a).

2 Cases that cite this headnote

**[19]**    **Constitutional Law** 🖝 Substantive Due Process in General

The Fourteenth Amendment guarantees more than fair process; it covers a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them. U.S. Const. Amend. 14.

10 Cases that cite this headnote

**[20]**    **Constitutional Law** 🖝 Reasonableness, rationality, and relationship to object

Substantive due process rights safeguard persons against the government's exercise of power without any reasonable justification in the service of a legitimate governmental objective. U.S. Const. Amend. 14.

13 Cases that cite this headnote

**[21]**    **Constitutional Law** 🖝 Rights and interests protected; fundamental rights

The first step in substantive due process analysis is to identify the constitutional right at stake. U.S. Const. Amend. 14.

22 Cases that cite this headnote

**[22]**    **Constitutional Law** 🖝 Egregiousness; "shock the conscience" test

After identifying the constitutional right at stake, a plaintiff claiming a substantive due process violation must demonstrate that the state action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience. U.S. Const. Amend. 14.

38 Cases that cite this headnote

**[23]**    **Constitutional Law** 🖝 Egregiousness; "shock the conscience" test

On a claim of a substantive due process violation, the interference with the plaintiff's protected right must be so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection. U.S. Const. Amend. 14.

35 Cases that cite this headnote

**[24]**    **Constitutional Law** 🖝 Discharge and release

Although there is no right under the Federal Constitution to be conditionally released before the expiration of a valid sentence, that does not establish that state inmates lack a liberty interest in conditional release where the state has created a statutory mechanism providing for mandatory conditional release for eligible inmates; it means only that an inmate has no constitutional right to demand or expect conditional release where the incarcerating authority does not offer such an opportunity under its law.

1 Case that cites this headnote

**[25]    Constitutional Law** 🔑 **Restraint, commitment, and detention**

Because freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action, commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection. U.S. Const. Amend. 14.

4 Cases that cite this headnote

**[26]    Constitutional Law** 🔑 **Restraint, commitment, and detention**

Inmates eligible for mandatory conditional release are not limited to the confines of procedural due process in protecting that right; they also are entitled to substantive due process protection against egregious and arbitrary government interference. U.S. Const. Amend. 14.

6 Cases that cite this headnote

**[27]    Constitutional Law** 🔑 **Rights and interests protected; fundamental rights**

Substantive due process protects rights that are rooted in the principles of ordered liberty. U.S. Const. Amend. 14.

**[28]    Constitutional Law** 🔑 **Rights and interests protected; fundamental rights**

Although many state-created rights are not recognized under the substantive Due Process Clause, state-created rights that trigger core constitutional interests are entitled to its protection; it is the nature of the right, not just its origin, that matters. U.S. Const. Amend. 14.

3 Cases that cite this headnote

**[29]    Prisons** 🔑 **Conditional release; community placement**

Conditional release under New York law is not akin to a state-created right of contract; it is a state-created right of mandatory release from prison, preventing unlawful continued physical restraint.

**[30]    Civil Rights** 🔑 **Prisons, jails, and their officers; parole and probation officers**

It was not clearly established during period of former prisoner's prolonged detention that inmate suffered harm of constitutional magnitude under Eighth Amendment when imprisoned past their mandatory conditional release date and, thus, inmate records coordinator for New York State Department of Corrections and Community Supervision was entitled to qualified immunity in prisoner's action under § 1983 alleging deprivation of Eighth Amendment right due to error in sentencing calculations that caused him to be imprisoned for almost year past date on which New York Law mandated his release; although it was clearly established that New York could not detain prisoner past expiration of his maximum sentence, it was not clearly established that, once his conditional release date was approved, continued detention beyond that date qualified as constitutional harm under Eighth Amendment. U.S. Const. Amend. 8; 42 U.S.C.A. § 1983; N.Y. Penal Law §§ 70.30(2)(b), 70.30(3), 70.40(1)(b); N.Y. Correction Law §§ 600-a, 803(1)(a).

6 Cases that cite this headnote

**[31]    Civil Rights** 🔑 **Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general**

Government actors are entitled to qualified immunity insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

6 Cases that cite this headnote

**[32]**    **Civil Rights** 🔑 Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

Under the qualified immunity analysis, the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

5 Cases that cite this headnote

**[33]**    **Civil Rights** 🔑 Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

The principle of qualified immunity ensures that before they are subjected to suit, officers are on notice their conduct is unlawful.

1 Case that cites this headnote

**[34]**    **Prisons** 🔑 Discharge and release in general

No federal, state, or local authority can keep an inmate detained past the expiration of the sentence imposed on them.

**[35]**    **Civil Rights** 🔑 Prisons, jails, and their officers; parole and probation officers

It was not clearly established during period of former prisoner's prolonged detention that inmate had liberty interest in mandatory conditional release protected by substantive Due Process Clause and, thus, inmate records coordinator for New York State Department of Corrections and Community Supervision was entitled to qualified immunity in prisoner's action under § 1983 alleging deprivation of substantive due process due to error in sentencing calculations that caused him to be imprisoned for almost year past date on which New York Law mandated his release; prisoner admitted that no decision had held that imprisonment past mandatory conditional release date violated Fourteenth Amendment's substantive protections, and prisoner's liberty interest in conditional release did not obviously follow from procedural due process cases on which he relied. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983; N.Y. Penal Law §§ 70.30(2)(b), 70.30(3), 70.40(1)(b); N.Y. Correction Law §§ 600-a, 803(1)(a).

1 Case that cites this headnote

**[36]**    **Constitutional Law** 🔑 Procedural due process in general

**Constitutional Law** 🔑 Substantive Due Process in General

The substantive due process analysis differs from procedural due process; and it is not the case that one must follow from the other. U.S. Const. Amend. 14.

3 Cases that cite this headnote

**\*1080**  Appeal from a judgment of the United States District Court for the Eastern District of New York (Matsumoto, J.)

**Attorneys and Law Firms**

JACOB LOUP (Joel B. Rudin, on the brief), Law Offices of Joel B. Rudin, P.C., New York, NY, for Plaintiff-Appellant.

LINDA FANG, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, Anisha S. Dasgupta, Deputy Solicitor General, on the brief), for Letitia James, Attorney General of the State of New York, New York, NY, for Defendant-Appellee.

Before: WALKER, KATZMANN, WESLEY, Circuit Judges.

**Opinion**

WESLEY, Circuit Judge:

**\*\*1**  Devar Hurd was charged in a single state indictment with nine misdemeanors and one felony, which took three trials to resolve. He remained in local custody throughout the lengthy trial process. Hurd received a sentence specific to each conviction, but those sentences merged into one by operation of New York law. When Hurd was transferred into state custody to serve what became his single felony sentence, his credit for time already served and good behavior entitled him to immediate release. But Hurd was not released from state custody for nearly a year. He contends this prolonged

incarceration violated his rights under the Eighth Amendment and the Fourteenth Amendment's substantive due process clause.

## BACKGROUND [1]

[1]    Except as otherwise noted, these facts are as alleged in Hurd's First Amended Complaint.

Devar Hurd was arrested in July 2013 and indicted for seven counts of misdemeanor criminal contempt in the second **\*1081** degree, one count of misdemeanor stalking in the fourth degree, one count of misdemeanor harassment in the first degree, and one count of felony stalking in the second degree. He was held in the custody of the New York City Department of Correction ("NYCDOC") following his arrest, where he remained during multiple trials on the indictment.

Hurd's first trial in December 2014 ended in a mistrial. At his retrial in October 2015, the jury convicted Hurd of the nine misdemeanor counts; the state court declared a mistrial on the felony. The state court imposed a set of definite sentences for the misdemeanors ranging from 90 days to one year each, to run consecutive to the others, in the custody of NYCDOC. Under New York law, however, because the aggregate term of these definite sentences exceeded two years, Hurd's term of imprisonment on the misdemeanor counts was capped at two years. *See* N.Y. Penal Law § 70.30(2)(b).

Hurd faced another retrial on the felony count in March 2016; the jury convicted him of stalking in the second degree. The state court sentenced Hurd to an indeterminate sentence with a minimum of one-and-one-third years and a maximum of four years, to be served in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Because the state court did not specify the manner in which Hurd's felony sentence was to run, New York law mandated that it would run concurrently with his two-year sentence on the misdemeanors. *See id.* § 70.25(1)(a). Hurd's misdemeanor and felony sentences also merged by operation of New York law. *See id.* § 70.35. Thus, Hurd's maximum sentence on the indictment was four years.

Hurd would not have to serve four full years in prison after his sentence was imposed, however. New York law provides that any sentence "shall be credited with and diminished by the amount of time the person spent in custody prior to the commencement of such sentence as a result of the charge that

culminated in the sentence." *Id.* § 70.30(3). This is known as "jail-time credit." Thus, Hurd was entitled to credit against his maximum four-year "state sentence" for all the time he spent in NYCDOC custody from his arrest in July 2013 to his transfer to DOCCS custody in April 2016.

**\*\*2** New York law also provides for "good-time credit," whereby an inmate "may receive time allowance against the term or maximum term of his or her sentence ... for good behavior ...." N.Y. Corr. Law § 803(1)(a). Once good-time credit is approved, an inmate "*shall*, if he or she so requests, be conditionally released from the institution in which he or she is confined when the total good behavior time allowed to him or her ... is equal to the unserved portion of his or her term, maximum term or aggregate maximum term." N.Y. Penal Law § 70.40(1)(b) (emphasis added). This is known as the inmate's "conditional release date."

The New York Court of Appeals has referred to a conditional release date as "the statutorily mandated release date, calculated by applying both his good behavior time and his jail time, or time served awaiting trial." *Eiseman v. New York*, 70 N.Y.2d 175, 180, 518 N.Y.S.2d 608, 511 N.E.2d 1128 (1987) (Kaye, *J.*) (internal quotation marks and citations omitted). Thus, conditional release under New York law is unlike parole, which is a discretionary decision reserved to the judgment of the parole board. As then-Judge Kaye's explanation suggests, conditional release is a mathematical concept: an inmate will have completed their term of imprisonment when (1) the number of pre- and post-trial custody days served, plus (2) the **\*1082** number of approved days earned for good behavior, equals the inmate's sentence term. By sheer calculation of days, the inmate has satisfied their term of imprisonment, and they are entitled to immediate release from prison.

Hurd was transferred from NYCDOC custody into DOCCS custody in April 2016. Whenever an inmate is transferred from local to state custody, the local jurisdiction must calculate the inmate's jail-time credit and provide DOCCS with a certified record of that credit. *See* N.Y. Corr. Law § 600-a. Accordingly, NYCDOC officials issued a "Jail Time Certification" ("JTC"), confirming that Hurd was entitled to 996 days of jail-time credit against his maximum four-year sentence. DOCCS officials also produced a "Legal Date Computation," indicating Hurd's eligibility for good-time credit of up to one year and four months and jail-time credit of two years, eight months, and 26 days.

Assuming his good-time credit would be approved, the combination of his jail-time credit and good-time credit gave Hurd a conditional release date of March 17, 2016—pre-dating his transfer into DOCCS custody. This conditional release date was reflected on the Legal Date Computation. Thus, at the time of his arrival in state custody, Hurd "was told that he was eligible to be immediately released." J.A. 17. DOCCS approved Hurd's good-time credit on April 19, 2016, at which point he satisfied the statutory requirements entitling him to conditional release.

DOCCS Inmate Records Coordinator Stacey Fredenburgh began to process Hurd's release documents. Hurd's complaint sets out a series of interactions between Fredenburgh and NYCDOC all centered around verifying the correct computation of his local jail-time credit. Without identifying a reason for any animus towards him, Hurd alleges that Fredenburgh and NYCDOC employees—most notably Principal Administrative Associate for NYCDOC's Legal Division, Edwin Felicien—"agreed to reduce Mr. Hurd's jail-time credit so that he would not be released." J.A. 17. Between April and June 2016, Felicien sent Fredenburgh four amended JTCs, each of which reflected a different, and much lower, jail-time credit than the 996 days reflected in the original JTC. It is undisputed that each of these revised JTCs was wrong. The last amended JTC credited Hurd with 508 days of jail-time credit. As a result, DOCCS no longer considered Hurd eligible for conditional release; Hurd remained in prison.

**3 Hurd pursued the official grievance process, filed two notices of claim, and lodged informal letter complaints to prison officials, including Fredenburgh, protesting that he was being held past his conditional release date. Fredenburgh responded in a letter to Hurd, telling him "that she could do nothing to address his concerns and that he must contact 'Rikers Island' " (an apparent reference to NYCDOC). J.A. 19. DOCCS took no other action in response to Hurd's complaints.

Finally, Hurd's counsel contacted NYCDOC's legal department on March 20, 2017. Three days later, NYCDOC sent an amended JTC crediting Hurd with the original 996 days of jail-time credit. DOCCS released Hurd on March 30, 2017—11 months and 11 days after the date on which he was entitled to immediate release.

Hurd filed the instant lawsuit under 42 U.S.C. § 1983 against New York City (the "City"), an NYCDOC employee, and Fredenburgh for violating his rights under the Eighth Amendment and the Fourteenth Amendment's substantive due process clause. Hurd settled with the City defendants. The district court thereafter granted Fredenburgh's motion to dismiss under *1083 Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, holding that the prolonged imprisonment beyond Hurd's mandatory conditional release date was not a cognizable injury under the Eighth and Fourteenth Amendments, and, in the alternative, that Fredenburgh was entitled to qualified immunity.

[1] Hurd also filed a state law false imprisonment claim in New York's Court of Claims. Two weeks after the district court dismissed Hurd's § 1983 complaint, the Court of Claims granted summary judgment for the State, concluding that Fredenburgh acted reasonably considering her state law obligations and that Hurd's prolonged detention was attributable to the City's errors only. [2]

[2]    The parties dispute whether we can (or should) consider the Court of Claims record in resolving this appeal. As discussed below, we need not answer this question. We take judicial notice of that court's decision only to establish its existence and that the court made certain factual findings, which is necessary to complete the narrative of Hurd's federal action and provide context for Fredenburgh's defenses. *See Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (citing *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)). We do not give any effect to those factual findings, nor do we consider them for their truth or use them to support any factual determination (for we make none) in this appeal.

The Court of Claims noted that NYCDOC has the obligation under Penal Law § 600-a to send a JTC to DOCCS when an inmate is transferred from local to state custody. It noted further that the State "is bound by the jail time certifications it receives from local authorities and 'may not add or subtract therefrom.' " Add. 34 (quoting *McLamb v. Fischer*, 70 A.D.3d 1090, 1091, 895 N.Y.S.2d 223 (3d Dep't 2010)); *see also Torres v. Bennett*, 271 A.D.2d 830, 831, 707 N.Y.S.2d 264 (3d Dep't 2000)). Although the State "changed its policy in 2014 to take affirmative steps to review a local commitment order after an inmate is returned to state custody from a local jail," *Torres v. New York*, 149 A.D.3d 1290, 1292 n.*, 52 N.Y.S.3d 152 (3d Dep't 2017), the Court of Claims found

that Fredenburgh's communications with Felicien satisfied the necessary review.

The Court of Claims concluded that, although "Fredenburgh's actions may have resulted in DOCCS receiving incorrect information, ... her actions were reasonable at the time." Add. 35. It reasoned that the City's errors caused Hurd's prolonged detention, and Hurd's proper recourse was against the City, not the State. Hurd did not appeal the decision.

**\*\*4** Hurd did appeal the dismissal of his federal complaint.

### DISCUSSION

**[2]** **[3]** We review *de novo* a district court's decision granting a Rule 12(b)(6) motion, including on qualified immunity grounds. *See Hernandez v. United States*, 939 F.3d 191, 198 (2d Cir. 2019); *Charles W. v. Maul*, 214 F.3d 350, 356 (2d Cir. 2000). In conducting our review, we "accept as true all factual allegations and draw from them all reasonable inferences; but we are not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Hernandez*, 939 F.3d at 198 (citation omitted).

The crux of both of Hurd's constitutional arguments is that "[o]n April 19, 2016, Hurd had enough jail-time credit and approved good-time credit to make his conditional release from prison *mandatory* under state law. However, Fredenburgh worked with an official of [NYCDOC] to reduce Hurd's jail-time credit so that he would not be released on his mandatory **\*1084** conditional release date ...." Appellant Br. 2–3. The district court rejected this theory, determining that neither the Eighth Amendment nor the Fourteenth Amendment's substantive due process clause protects an inmate's right to, or interest in, conditional release under state law. The district court concluded that Hurd failed to plead a violation of his Eighth Amendment rights because "he was released prior to the date his maximum sentence expired," J.A. 39, and that Hurd failed to allege a violation of his Fourteenth Amendment rights because he "has no substantive due process right to conditional release" before the expiration of his maximum sentence, J.A. 51, 54.

**[4]** **[5]** After finding that Hurd failed to state a claim for violations of his Eighth or Fourteenth Amendment rights, the district court concluded in the alternative that Fredenburgh was entitled to qualified immunity. We agree with the district court's latter determination, but we disagree with its

conclusions that Hurd did not plausibly allege harm to either his Eighth or Fourteenth Amendment rights. [3]

3    Our qualified immunity analysis "is guided by two questions: first, whether the facts show that the defendants' conduct violated plaintiffs' constitutional rights, and second, whether the right was clearly established at the time of the defendants' actions." *Golodner v. Berliner*, 770 F.3d 196, 201 (2d Cir. 2014) (internal quotation marks, alteration, and citation omitted). "We may address these questions in either order," and "[i]f we answer either question in the negative, qualified immunity attaches." *Id.* Although it has become the virtual default practice of federal courts considering a qualified immunity defense to assume the constitutional violation in the first question and resolve a case on the clearly established prong, "it is often beneficial" to analyze both prongs of the qualified immunity analysis. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). "[T]he two-step procedure promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable." *Id.* This is such a case.

### I. Eighth Amendment

**\*\*5** **[6]** **[7]** "A plaintiff asserting an Eighth Amendment claim pursuant to 42 U.S.C. § 1983 must meet two requirements. First, the alleged deprivation must be, in objective terms, sufficiently serious. Second, the charged official must act with a sufficiently culpable state of mind." *Francis v. Fiacco*, 942 F.3d 126, 150 (2d Cir. 2019) (internal quotation marks and citations omitted).

**[8]** **[9]** To satisfy the first requirement, a plaintiff must plead "a harm of a magnitude that violates a person's eighth amendment rights." *Calhoun v. N.Y. State Div. of Parole Officers*, 999 F.2d 647, 654 (2d Cir. 1993) (internal quotation marks and citation omitted). "The Eighth Amendment[ ] ... proscribes more than physically barbarous punishments. It prohibits penalties that are grossly disproportionate to the offense, as well as those that transgress today's broad and idealistic concepts of dignity, civilized standards, humanity, and decency." *Hutto v. Finney*, 437 U.S. 678, 685, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) (internal quotation marks, alteration, and citations omitted).

**[10]    [11]    [12]**  The constitutional claim is not measured by the punishment alone, for "an Eighth Amendment violation typically requires a state of mind that is the equivalent of criminal recklessness." *Francis*, 942 F.3d at 150 (internal quotation marks and citation omitted). "This standard requires that only the deliberate infliction of punishment, and not an ordinary lack of due care for prisoner interests or safety, lead to liability." *Id.* (alteration and citation omitted). Under this standard, prison officials can be found "deliberately indifferent to their own clerical errors on the basis of **\*1085** their refusals to investigate well-founded complaints regarding these errors." *Id.* at 151 (internal quotation marks and citations omitted).

**[13]    [14]**  The district court concluded that Hurd failed to allege a harm of constitutional magnitude because he was released before his maximum sentence expired. We disagree. The Eighth Amendment prohibits "the unnecessary and wanton infliction of pain," including punishments that are "totally without penological justification." *Gregg v. Georgia*, 428 U.S. 153, 173, 183, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). There is no penological justification for incarceration beyond a mandatory release date because "any deterrent and retributive purposes served by [the inmate's] time in jail were fulfilled as of that date." *See Sample v. Diecks*, 885 F.2d 1099, 1108 (3d Cir. 1989).

**[15]**  "Next to bodily security, freedom of choice and movement has the highest place in the spectrum of values recognized by our Constitution." *Id.* at 1109. For that reason, unauthorized detention of just one day past an inmate's mandatory release date qualifies as a harm of constitutional magnitude under the first prong of the Eighth Amendment analysis.[4]  Hurd's unauthorized imprisonment for almost one year certainly qualifies under that standard. *See id.* ("Detention for a significant period beyond the term of one's sentence inflicts a harm of a magnitude [recognized under the Eighth Amendment].").

[4]    We acknowledge that, in *Calhoun*, we stated that a "five-day extension of [the plaintiff's] release date did not inflict 'a harm of a magnitude' that violates a person's eighth amendment rights." 999 F.2d at 654. But we did not announce this as a constitutional rule. The single paragraph devoted to the plaintiff's Eighth Amendment claim in *Calhoun* included only a descriptive, rather than normative, discussion of this issue, and we are not bound by

its conclusion in announcing a constitutional rule here.

Indeed, in *Calhoun* we cited to *Sample*, which relied on the deliberate indifference prong as dispositive in cases of unavoidable administrative delay, mistakes, errors, and accidents. *See, e.g.*, *Sample*, 885 F.2d at 1109 ("Because such discretion is necessary to the administration of prisons, an official acting in good faith within that discretion, although in the process perhaps injuring an inmate, has not inflicted a cruel and unusual punishment upon that inmate."). This approach—recognizing a harm of constitutional magnitude whenever an inmate is detained without authorization but finding a constitutional violation only where that harm is deliberately inflicted—avoids the arbitrary task of distinguishing between the permissible and impermissible length of unauthorized detention under the Constitution. Moreover, it reflects the notion that freedom from unlawful restraint is a right so core to our understanding of liberty that suffering even one day of unlawful detention is a harm recognized by the Constitution.

**\*\*6**  It matters not that Hurd was detained past his statutory conditional release date as opposed to the expiration of the maximum sentence imposed on him by the sentencing judge. By using the word "shall," New York chose to make conditional release mandatory upon the approval of good-time credit and the inmate's request for release. *See* N.Y. Penal Law § 70.40(1)(b). It is the mandatory nature of that release, not the label of "conditional" or "maximum," that is dispositive.

In effect, Hurd's conditional release date became the operative date on which his maximum term of imprisonment expired. Once Hurd met the statutory requirements for conditional release, his release from prison was mandatory under state law. Fredenburgh does not dispute that DOCCS had no authority to keep Hurd incarcerated past his conditional release date for the crimes of which he was convicted and sentenced. Even assuming the State could impose some supervisory conditions **\*1086** following Hurd's release,[5] his continued *imprisonment* was a punishment that was neither authorized by law nor justified by any penological interest asserted by the State. *See Sample*, 885 F.2d at 1108. Because the State detained him for over 11 months past the last date on which New York law authorized his imprisonment, Hurd suffered a harm of constitutional

magnitude under the Eighth Amendment. The district court erred in concluding otherwise.

5    New York law provides that inmates granted conditional release "shall be under the supervision of the state department of corrections and community supervision for a period equal to the unserved portion of the [maximum] term," and that "[t]he conditions of release, including those governing post-release supervision, shall be such as may be imposed by the state board of parole in accordance with the provisions of the executive law." N.Y. Penal Law § 70.40(1)(b); *see also* N.Y. Exec. Law § 259-c(2) (granting the state board of parole authority of "determining the conditions of release of the person who may be ... conditionally released"). As noted above, the State's right to impose *some* form of punishment through supervision or other conditions of release (if any) does not justify a punishment of *imprisonment* that is unauthorized by law.

[16]    That does not mean Hurd suffered a violation of his Eighth Amendment rights, however. Nor does it mean an inmate whose release is not processed on their conditional release date is entitled to damages under § 1983. Far from it. If a period of prolonged detention results from discretionary decisions made in good faith, mistake, or processing or other administrative delays, as opposed to the deliberate indifference of prison officials, then there is no Eighth Amendment liability. The deliberate indifference prong will do most of the work under these and similar circumstances, as "[t]he degree to which a harm is 'unnecessary' in the sense of being unjustified by the exigencies of prison administration will affect the state-of-mind requirement a plaintiff must meet to demonstrate that a particular prison official violated the eighth amendment." *Sample*, 885 F.2d at 1109.

To that end, the district court concluded that "Fredenburgh's alleged conduct is troublesome and would certainly satisfy deliberate indifference if not willfulness, as [Hurd] alleges Fredenburgh *agreed* with Felicien to keep [Hurd] incarcerated past his conditional release date." J.A. 57. Fredenburgh argues that collateral estoppel applies here because of the Court of Claims' finding that she acted reasonably under the circumstances, and that Hurd is therefore precluded from arguing that Fredenburgh acted with deliberate indifference.

**7    [17]    Regardless of the Court of Claims' decision, we are skeptical that Fredenburgh—whom Hurd failed to

demonstrate has any authority or duty to change an erroneous JTC from the City—can be deliberately indifferent to any harm suffered because of that error. There must be "a causal connection between the official's response to the problem and the infliction of the unjustified detention," *Sample*, 885 F.2d at 1110, and if Fredenburgh could not do anything about Hurd's prolonged detention as a matter of law, then any deliberate indifference on her part would likely be irrelevant.

For example, in this case, Hurd cites to no authority or factual allegations establishing that Fredenburgh had an obligation under New York law or DOCCS policy to confirm the accuracy of the JTCs she received. Nor is it clear how Fredenburgh would or could have accomplished that, given that Penal Law § 600-a delegates the sole responsibility for certifying jail-time credit to NYCDOC, and the relevant information would be contained within NYCDOC **1087 records regardless. Nor are there any allegations that the prison had "procedures in place calling for [Fredenburgh] to pursue the matter," or that "given ... [Fredenburgh's] job description or the role ... she has assumed in the administration of the prison, [the jail-time credit] calculation problem will not likely be resolved unless ... she addresses it or refers it to others ...." *Id.* Hurd's legal conclusion that Fredenburgh had such a duty or responsibility is not entitled to unquestioned acceptance at the motion to dismiss stage.

We acknowledge that Hurd's allegations do not concern only Fredenburgh's ability to change his jail-time credit but also her alleged conduct in agreeing to create the erroneous JTCs to keep Hurd in prison in the first place. As the district court concluded, such allegations could amount to deliberate indifference. We need not resolve this issue. Nor do we reach the issue of whether the Court of Claims' reasonableness finding has preclusive effect here. Because it was not clearly established that prolonged detention past one's mandatory conditional release date constitutes a harm of constitutional magnitude under the Eighth Amendment, Fredenburgh is entitled to qualified immunity on Hurd's claim. Before addressing that point, however, we turn to Hurd's Fourteenth Amendment argument.

### II. Fourteenth Amendment

[18]    [19]    [20]    The Fourteenth Amendment guarantees "more than fair process"; it "cover[s] a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 840, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (internal quotation marks and

2021 WL 96886

citations omitted). "Substantive due process rights safeguard persons against the government's exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Southerland v. City of New York*, 680 F.3d 127, 151 (2d Cir. 2012) (internal quotation marks and citation omitted).

**[21]    [22]    [23]** "The first step in substantive due process analysis is to identify the constitutional right at stake." *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995). Next, the plaintiff "must demonstrate that the state action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Southerland*, 680 F.3d at 151–52 (internal quotation marks and citation omitted). "The interference with the plaintiff's protected right must be so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection." *Id.* at 152 (internal quotation marks and citation omitted).

**\*\*8** The district court rejected Hurd's substantive due process claim, concluding that he lacked a cognizable liberty interest in conditional release because it is a state-created right. We disagree.

**[24]** The district court reasoned that conditional release "is clearly a state-created right, as the Supreme Court has held that conditional release is not protected by the Constitution." J.A. 51. Although "[t]here is no right under the Federal Constitution to be conditionally released before the expiration of a valid sentence," *Swarthout v. Cooke*, 562 U.S. 216, 220, 131 S.Ct. 859, 178 L.Ed.2d 732 (2011), that does not establish that state inmates lack a liberty interest in conditional release where the state has created a statutory mechanism providing for *mandatory* conditional release for eligible inmates. It means only that an inmate has no constitutional right to demand or expect conditional release where the incarcerating authority **\*1088** does not offer such an opportunity under its law. [6]

[6]
Along these lines, the district court relied on our reaffirmation in *Graziano v. Pataki*, 689 F.3d 110, 114–15 (2d Cir. 2012) (per curiam), that New York inmates lack a liberty interest in parole because New York's parole scheme does not create a legitimate expectation of release. But New York's parole scheme differs from the promise of conditional release. No inmate is entitled to parole; it is a discretionary decision reserved to

the judgment of the parole board. *See id.* at 113–14. *All* state inmates are eligible for conditional release. Unlike parole, where inmates have only a possibility or probability of being granted the chance to complete their sentence outside prison, inmates such as Hurd who satisfy the statutory requirements for conditional release are guaranteed immediate release from prison. That difference creates a legitimate expectation of release, and by extension a liberty interest protected by the due process clause.

**[25]    [26]** Because "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action[,] ... commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Foucha v. Louisiana*, 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) (internal quotation marks and citations omitted); *see also Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004) (noting that individuals have a "protected liberty interest in being free from wrongful, prolonged incarceration"). Inmates eligible for mandatory conditional release are not limited to the confines of procedural due process in protecting that right. *Cf. Swarthout*, 562 U.S. at 220, 131 S.Ct. 859. They also are entitled to substantive due process protection against egregious and arbitrary government interference.

**[27]** Substantive due process protects rights that are rooted in the principles of ordered liberty. Freedom from unlawful restraint is exactly that. Hurd remained in prison for almost one year while the State lacked any authority to further detain him. Because New York's conditional release scheme is mandatory, there is no meaningful difference in Hurd's liberty interest in release from prison at the expiration of his maximum sentence and conditional release when he became entitled to an earlier release date. Once Hurd's good-time credit was approved, the expiration date of his maximum term of imprisonment and his "conditional" release date were one and the same for substantive due process purposes.

**\*\*9    [28]    [29]** It is of no moment that conditional release is a state-created right. Although many state-created rights are not recognized under the substantive due process clause, state-created rights that trigger core constitutional interests are entitled to its protection. *Cf. Local 342, Long Island Pub. Serv. Emps. v. Town Bd. of Town of Huntington*, 31 F.3d 1191, 1196 (2d Cir. 1994) (explaining that the substantive due process clause does not protect "simple, state-law contractual

rights, without more"). It is the nature of the right, not just its origin, that matters. Conditional release under New York law is not akin to a state-created right of contract; it is a state-created right of mandatory release from prison, preventing unlawful continued physical restraint. *Cf. Harrah Indep. Sch. Dist. v. Martin*, 440 U.S. 194, 198, 99 S.Ct. 1062, 59 L.Ed.2d 248 (1979) ("[I]nterest[s] entitled to protection as a matter of substantive due process [must] resembl[e] the individual's freedom of choice with respect to certain basic matters of procreation, marriage, and family life." (internal quotation marks and citation omitted)); *see also Local 342*, 31 F.3d at 1196 (substantive due process protects rights that are "so vital that neither liberty nor justice would exist **\*1089** if they were sacrificed" (internal quotation marks and citation omitted)). That distinction makes all the difference. Once Hurd satisfied the statutory requirements for conditional release, he had a liberty interest in freedom from detention upon his conditional release date, as guaranteed by New York law. [7]

[7]    Although Fredenburgh does not raise the issue, we acknowledge that the Supreme Court cautions against expanding the substantive due process clause where a more specific Amendment provides a source for protection against government conduct. *See, e.g.*, *Lewis*, 523 U.S. at 842, 118 S.Ct. 1708. Our holding does not expand the protection of the Fourteenth Amendment's substantive due process clause, however. We are applying the clause to one of the explicit concepts it exists to protect: liberty from unjustified restraint. *Cf. Davis*, 375 F.3d at 714. Our conclusion that Hurd also alleged a harm of constitutional magnitude under the Eighth Amendment does not deprive him of a liberty interest in his mandatory conditional release.

Fredenburgh's error is considered at the second step of the substantive due process analysis—the nature of the alleged interference with Hurd's liberty interest. Specifically, we must determine whether Fredenburgh's conduct was egregious and shocking to the conscience.

The district court reasoned that, "if true, [Hurd's] allegations that Fredenburgh *intentionally* took actions to keep [Hurd] imprisoned without justification might shock the judicial conscience ...." J.A. 52. Here, too, Fredenburgh argues that collateral estoppel applies because of the Court of Claims' finding that she acted reasonably under the circumstances,

which precludes any finding in this case that her conduct satisfied the high standard for a substantive due process violation. Again, we need not reach this issue, because it was not clearly established that Hurd had a liberty interest in his mandatory conditional release at the time of the sentencing miscalculations.

## III. Clearly Established Law

[30]   [31]   [32]   [33]   "Government actors are entitled to qualified immunity insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 432–33 (2d Cir. 2009) (internal quotation marks and citation omitted). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 433 (citation omitted). "The principle of qualified immunity ensures that before they are subjected to suit, officers are on notice their conduct is unlawful." *Id.* (internal quotation marks and citation omitted).

Fredenburgh is entitled to qualified immunity under this standard. It was not clearly established during the period of Hurd's prolonged detention that an inmate suffers harm of a constitutional magnitude under the Eighth Amendment when they are imprisoned past their mandatory conditional release date, nor was it clearly established that an inmate has a liberty interest in mandatory conditional release protected by the Fourteenth Amendment's substantive due process clause.

**\*\*10** [34]   Hurd nevertheless urges us to find that these rights were clearly established because they follow from existing precedent. For his Eighth Amendment claim, Hurd relies on *Sample*, 885 F.2d 1099, *Calhoun*, 999 F.2d 647, *Sudler v. City of New York*, 689 F.3d 159 (2d Cir. 2012), and *Francis*, 942 F.3d 126. These cases confirm a uniform legal principle that no federal, state, or local authority **\*1090** can keep an inmate detained past the expiration of the sentence imposed on them. But in the qualified immunity analysis, the Supreme Court has admonished that rights should not be defined at a high level of generality and instead must be "particularized to the facts of the case." *White v. Pauly*, ––– U.S. ––––, 137 S. Ct. 548, 552, 196 L.Ed.2d 463 (2017) (internal quotation marks and citation omitted). None of the cases upon which Hurd relies addresses a conditional release scheme, let alone one in which an inmate is entitled to mandatory release prior to the expiration of their maximum sentence. More to the point, none of them confirm that

prolonging an inmate's detention past their conditional release date might violate the inmate's rights under the Eighth Amendment.

*Sample* concerned Pennsylvania inmate Joseph Sample, who was granted bail pending a new trial after his life sentence was vacated on appeal. 885 F.2d at 1102. The senior records officer at a Pittsburgh detention facility was instructed to determine whether Sample could be released; the officer erroneously informed authorities that Sample still had time left on another sentence. *Id.* Sample served nine extra months in prison as a result. *Id.* at 1102–03.

Because of his authority and job responsibilities, the records officer's error rendered him liable under the Eighth Amendment. *Id.* at 1110–12. Specifically, the Third Circuit held that prolonged incarceration past the expiration of a prison sentence constitutes punishment under the Eighth Amendment. *Id.* at 1108. Where there is no penological justification for that incarceration, as determined by the deliberate indifference prong, that punishment is cruel and unusual; and to be liable under § 1983, the officer's deliberate indifference must have caused the prolonged incarceration. *Id.* at 1108–11.

To be sure, *Sample* clearly established that "imprisonment beyond one's term constitutes punishment within the meaning of the eighth amendment." 885 F.2d at 1108. But it did not establish that the Eighth Amendment prohibits imprisonment beyond a mandatory conditional release date that occurs prior to the expiration of the maximum sentence.

*Calhoun* concerned New York inmate Bennie Calhoun, who was sentenced to a maximum term of six years, released on parole, arrested for a parole violation with two months left on the maximum term, and reincarcerated on a finding of probable cause for the parole violation. 999 F.2d at 650. The parole board declared Calhoun a "delinquent," meaning the time between his arrest and reincarceration—in this case, five days—was added to his maximum sentence. *Id.* at 650–51. New York law entitled Calhoun to a final parole revocation hearing to determine his guilt on the parole violation, but his amended maximum sentence expired before this hearing could take place, and Calhoun was administratively discharged. *Id.* He sued based on this prolonged incarceration of five days. *Id.* at 651–52.

We focused on Calhoun's due process claim—that he was sentenced based on a parole violation charge, rather than any

finding of guilt. *Id.* at 652–54. But in a single paragraph, we noted (again, as a descriptive matter) that five extra days in prison does not satisfy the constitutional harm prong of the Eighth Amendment analysis, and even if it did, Calhoun could not show any deliberate indifference and his Eighth Amendment claim failed. *Id.* at 654. We distinguished those five days from the nine months of prolonged detention in *Sample*—long enough to qualify as harm of a constitutional magnitude. *Id.* Thus, at most, *Calhoun* reinforced *Sample*'s holding that unlawful detention past the expiration **\*1091** of a maximum sentence constitutes punishment under the Eighth Amendment. Like *Sample*, *Calhoun* did not touch on conditional release.

**\*\*11** *Sudler* concerned New York inmates who were sentenced to felony state prison terms, released on parole, convicted of misdemeanor parole violations, sentenced to concurrent sentences in City custody for those parole violations, and denied "parole jail-time credit" by prison officials upon their transfer back into state custody to complete their original sentence terms. 689 F.3d at 162–65. By denying the inmates credit for the time served on their misdemeanor parole violations against their felony prison terms, the prison officials effectively imposed consecutive sentences and prolonged the terms of the inmates' sentences, without an order from the sentencing judges.

We held that the prison officials were entitled to qualified immunity because it was not clearly established that an inmate's procedural due process rights are violated when an administrator alters a sentence imposed by the court. *Id.* at 174–77. After introducing the inmates' due process theory, we noted in a footnote that "[w]e have suggested in the past, and other courts within and without this Circuit have held, that detention beyond that authorized by law may violate the Eighth Amendment." *Id.* at 169 n.11. In addition to *Sample*, we cited to *Calhoun* for support, describing the latter decision as "assuming that detention of a prisoner beyond the end of his term could violate the Eighth Amendment in appropriate circumstances, but finding no violation where the unauthorized detention lasted only five days and the plaintiff failed to demonstrate the defendants' deliberate indifference." *Id.* Because no party in *Sudler* raised the issue, however, any Eighth Amendment claim was waived. *Id.* Accordingly, *Sudler* only reinforces the principle established in *Sample* and acknowledged in *Calhoun* that the Eighth Amendment protects against prolonged imprisonment that is not authorized by law. It too did not discuss conditional

release or how conditional release relates to the expiration of a maximum term of imprisonment.

*Francis* concerned New York inmate Byran Francis, who was sentenced in state court to serve time concurrent with a federal sentence yet to be imposed, contrary to New York law. 942 F.3d at 131–35. The subsequently imposed federal sentence was not ordered to run concurrently with the previously imposed state sentence. *Id.* at 132. After Francis commenced his federal sentence, DOCCS officials realized the state court's error, determined of their own accord that Francis's sentences were consecutive, and requested the federal authorities transfer him back to state custody at the completion of his federal sentence, without seeking clarification or providing Francis an opportunity to be heard. *Id.* at 134–36. Upon release from federal custody into state custody, Francis sought resentencing in state court and was released four months later. *Id.* at 136–37.

We held that this violated the Francis's procedural due process rights. *Id.* at 141–45. The officials were entitled to qualified immunity, however, because the specific procedural protections to which we found Francis entitled were not clearly established before that decision. *Id.* at 148–49. By contrast, we declined to reach the merits of Francis's Eighth Amendment claim in determining that the officials were entitled to qualified immunity for any constitutional violation. *Id.* at 149–51.

We acknowledged in *Francis* that "[n]o case establishes that these four months of additional incarceration, although of serious dimension, crossed the threshold of **\*1092** sufficient objective seriousness to constitute cruel and unusual punishment under the Eighth Amendment." *Id.* at 150 (internal quotation marks, alteration, and citation omitted). In doing so, we rejected the inmate's argument that *Haygood v. Younger*, 769 F.2d 1350, 1352–53, 1358 (9th Cir. 1985) (en banc)—where an inmate remained incarcerated for five years due to an erroneous interpretation of state law—and *Sample*, 885 F.2d 1099, clearly foreshadowed a constitutional determination.

**\*\*12** Although these courts hinted at the outcome in this case, our legal conclusion was not manifest. Each case concerns detention beyond an inmate's maximum sentence. Before today, we have never held that an inmate suffers a constitutional harm under the Eighth Amendment when they are detained beyond a statutorily mandated release date, even if that mandatory release date precedes the expiration of the maximum term of their sentence. It was clearly established that New York State could not detain Hurd past the expiration of his maximum sentence, but it was not clearly established that once Hurd's conditional release date was approved, continued detention beyond that date qualifies as a constitutional harm for Eighth Amendment purposes.

**[35]**  As for his substantive due process claim, Hurd admits that no decision has held that imprisonment past a mandatory conditional release date violates the Fourteenth Amendment's substantive protections. He nevertheless argues that "such a conclusion follows inescapably from the procedural due process cases, as a prisoner must have such a right once state officials have actually granted him discretionary early release." Appellant Br. 39.

**[36]**  We disagree. The substantive due process analysis differs from procedural due process; and it is not the case that one must follow from the other. And for the same reasons that our precedents do not dictate the outcome of his Eighth Amendment claim, Hurd's liberty interest in conditional release does not obviously follow from the procedural due process cases upon which Hurd relies.

Fredenburgh is therefore entitled to qualified immunity on Hurd's Eighth and Fourteenth Amendment claims.

### CONCLUSION

For the reasons stated above, we **AFFIRM** the judgment of the district court.

**All Citations**

984 F.3d 1075, 2021 WL 96886

---

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.  15

Rushion v. NYS Division of Parole, Not Reported in Fed. Supp. (2016)

Case 6:24-cv-01169-DNH-MJK    Document 5    Filed 10/30/24    Page 63 of 141

2016 WL 5255812

2016 WL 5255812
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Andre J. RUSHION, Plaintiff,

v.

NYS DIVISION OF PAROLE, administrative hearing officer; Brian Fuller, Parole Officer; John Doe #1, Queens General Nurse; John Doe #2, Queens General Officer; John Doe #3, Queens General Officer; John Doe #4, Queens General Officer, Defendants.

13-CV-4277 (RRM) (LB)
|
Signed 09/21/2016

**Attorneys and Law Firms**

Andre Rushion, E. Elmhurst, NY, pro se.

Neil Shevlin, NYS Attorney General, New York, NY, for Defendants.

**MEMORANDUM AND ORDER**

ROSLYNN R. MAUSKOPF, United States District Judge

**\*1** Plaintiff *pro se* Andre Rushion, an inmate in the custody of the New York State Department of Corrections, filed this 42 U.S.C. § 1983 action on July 16, 2013, alleging multiple federal constitutional and state law violations stemming from an altercation with New York State parole officers and personnel at Queens General Hospital.[1] (*See* Compl. (Doc. No. 3) at 8–14 (ECF pagination).) Currently pending before the Court is defendant Parole Officer ("PO") Brian Fuller's unopposed motion for summary judgment.[2] (First Mot. for Summ. J. (Doc. No. 73).) For the reasons set forth below, Fuller's motion is GRANTED.

[1] This case was originally filed in the U.S. District Court for the Southern District of New York. The case was transferred to this district on July 30, 2013. (Doc. No. 5.)

[2] PO Fuller furnished Rushion by mail with a Local Civil Rule 56.2 Statement, which provided Rushion with the requisite notice that his failure

to oppose PO Fullers' motion could result in the grant of summary judgment against him and the dismissal of his case. (*See* Doc. Nos. 72 (Decl. of Serv.), 74 (Rule 56.2 Statement).) In addition, this Court informed Rushion that if he failed to serve his opposition, PO Fullers' summary judgment motion would be considered unopposed. (9/29/15 Order.) Despite this notice, Rushion did not file any response to PO Fullers' motion for summary judgment.

**BACKGROUND**[3]

[3] The following material facts are taken from PO Fullers' Local Rule 56.1 statement, as well as the exhibits submitted in connection with the motion for summary judgment. *See* Local Rule 56.1(d); *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003). As previously noted, Rushion did not file any opposition or response to the motion, notwithstanding that PO Fuller served Rushion with the requisite notice to a *pro se* litigant under Local Rule 56.2.

In December 2011, Rushion was on parole and under PO Tyrone Conyers' supervision. (Def.'s Statement Pursuant to Rule 56.1 ("56.1 Statement") (Doc. No. 74) at ¶ 3; Conyers Decl. (Doc. No. 76-2) at ¶ 2.) Rushion violated a condition of his parole on December 13, 2011 when his urine tested positive for cocaine and THC in a drug test conducted at the Parole Office, and PO Conyers and his partner, PO Bernisia Mejia, placed Rushion under arrest. (56.1 Statement at ¶¶ 4–5; Conyers Decl. at ¶¶ 3–4; On-Site Drug and Alcohol Test Record (Doc. No. 76-5).) After arresting Rushion, POs Conyers and Mejia handcuffed his hands behind his back and escorted him to a waiting vehicle. (56.1 Statement at ¶ 5; Conyers Decl. at ¶ 4.) Rushion became verbally abusive after he was handcuffed and threatened to kill POs Conyers and Mejia. (56.1 Statement at ¶ 5; Conyers Decl. at ¶ 4.)

As POs Conyers and Mejia placed Rushion in the transport vehicle, Rushion began banging his head on the car door.[4] (56.1 Statement at ¶ 6; Conyers Decl. at ¶ 5; Unusual Incident Report (Doc. No. 76-6) at 2 (ECF pagination).) The officers attempted to move Rushion back into the Parole Office, but Rushion attacked the offices by biting, kicking, and head-butting, and thrashing around, making it difficult to move him. (56.1 Statement at ¶ 6; Conyers Decl. at ¶ 5; Unusual

Rushion v. NYS Division of Parole, Not Reported in Fed. Supp. (2016)

2016 WL 5255812

Incident Report at 2 (ECF pagination).) Rushion continued his physical and verbal assault on the officers once brought back inside the Parole Office, and began attempting to bang his head on the wall. (56.1 Statement at ¶ 8; Conyers Decl. at ¶ 7; Fuller Decl. (Doc. No. 76-3) at ¶ 4; Unusual Incident Report at 2 (ECF pagination).) Several POs, including Fuller, Conyers, and Mejia, then placed restraints on Rushion's feet to control him and the New York Police Department ("NYPD") was called for assistance. [5] (56.1 Statement at ¶¶ 7–8; Conyers Decl. at ¶ 7; Fuller Decl. at ¶ 5; Unusual Incident Report at 2 (ECF pagination).)

[4]    In his complaint, Rushion explains that he "attempted to kill himself by slamming his head through a passenger window." (Compl. at 8 (ECF pagination).)

[5]    Rushion alleges that he was taken from the van back into the Parole Office with "no struggle," and was pushed into a chair where shackles were put on his ankles with "no struggle." (Compl. at 8 (ECF pagination).)

**\*2**  Rushion continued to be combative, even with his hands and feet restrained, and the POs attached his hand and foot restraints to subdue him. [6] (56.1 Statement at ¶ 9; Conyers Decl. at ¶ 8; Fuller Decl. at ¶¶ 6–7.) PO Fuller and other officers moved Rushion down a tiled hallway to a back room of the Parole Office and placed him on the floor. [7] (56.1 Statement at ¶ 9; Conyers Decl. at ¶¶ 8, 10; Fuller Decl. at ¶¶ 7–8; Preston Decl. (Doc. No. 76-1) at ¶ 5 ("the hallway leading to the back room was tiled in December 2011, not carpeted, and that is still the case"), Ex. A (photograph of tiled hallway in Parole Office taken on or about August 4, 2015).) Once the NYPD and Emergency Medical Services ("EMS") arrived, Rushion was transported to Queens Hospital Center due to his excessive agitation and aggressive behavior. (56.1 Statement at ¶¶ 9–10; Conyers Decl. at ¶ 8; Rushion Medical Record (Doc. No. 76-7) at 3 (ECF pagination).)

[6]    At his deposition, Rushion confirmed his statement in his complaint that he was "in no shape form or fashion a threat to [PO Fuller's] safety or any of the other parole officers['] safety." (Compl. at 9 (ECF pagination); Rushion Dep. at 42:13–16.)

[7]    Rushion alleges in the complaint that after shackles were put on his ankles, two officers picked him up, with PO Fuller "pick[ing] up the bottom

portion." (Compl. at 8 (ECF pagination).) He alleges that the officer carrying the "front part" of Rushion's body dropped Rushion after he started wiggling, and PO Fuller proceeded to drag Rushion on a carpet until his stomach was rug burned. (*Id.*) According to Rushion's account, PO Fuller dragged Rushion into a room, put his knees into Rushion's back, and choked Rushion with his hooded sweatshirt. (*Id.*) Fuller states in his declaration that after he brought Rushion to a back room with other officers, he left the area "and had no further involvement with the plaintiff." (Fuller Decl. at ¶¶ 7–8.)

Rushion was placed on a stretcher in the hospital where, according to his recitation of events, he remained for less than thirty minutes before an unidentified nurse came from behind him and broke his wrist by "aggressively" twisting it towards Rushion's right shoulder. [8] (56.1 Statement at ¶ 11; Compl. at 9 (ECF pagination); Rushion Dep. (Doc. No. 76-9) at 58:10–59:7.) Rushion cursed and spit at the nurse. (56.1 Statement at ¶ 11; Compl. at 9 (ECF pagination).) The nurse placed a surgical mask over Rushion's face and pressed his forearm on Rushion's "neck area very very hard and applied pressure while he grabbed the back of [Rushion's] sweatshirt and choked [Rushion] in the same mannerism as Officer Fuller." (56.1 Statement at ¶ 11; Compl. at 9–10 (ECF pagination).) That night at the hospital, Rushion complained of pain in his right rib, right wrist, right hand, and right finger from being subdued earlier in the evening. (56.1 Statement at ¶¶ 12–13; Rushion Medical Record at 5 (ECF pagination).) Medical examination the next day, December 14, 2011, revealed no injuries to Rushion except for a mild abrasion on the back of his right hand. (56.1 Statement at ¶ 14.) X-rays revealed no rib fracture and a possible "small chip fracture" in Rushion's right wrist of indeterminate age. (56.1 Statement at ¶ 15; Rushion Medical Record at 9–10 (ECF pagination).)

[8]    At his deposition, Rushion stated that Fuller broke his wrist at the Parole Office by "putting his knees and putting his weight and pressure on top of the handcuff." (Rushion Dep. at 57:9–17, 70:24–71:16.)

Following Rushion's discharge from the hospital on December 14, 2011, he was transferred to Rikers Island ("Rikers") where he was medically assessed. (56.1 Statement at ¶ 16; Rushion Dep. at 83:19–84:25.) The medical staff at Rikers gave Rushion ice once and painkillers for his wrist,

Case 6:24-cv-01169-DNH-MJK    Document 5    Filed 10/30/24    Page 65 of 141

Rushion v. NYS Division of Parole, Not Reported in Fed. Supp. (2016)

2016 WL 5255812

but did not send him for additional x-rays or testing, did not put his hand in a cast, and did not place him on any kind of activity restriction. (56.1 Statement at ¶ 16; Rushion Dep. at 86:14–16, 88:22–89:21.)

**\*3** On December 22, 2011, a preliminary parole revocation hearing was conducted at the Rikers Island Judicial Center. (56.1 Statement at ¶ 18; Dec. 22, 2011 Hearing Tr. ("Parole Hearing Tr.") (Doc. No. 76-8).) At that hearing, Rushion testified that on December 13, 2011, at the Queens Area I Parole Office, "people put their knees in my back, busted my rib up ... I got rug burns right here — I got lacerations all over my body from them roughing me up." (Parole Hearing Tr. at 11:17–20.)

Rushion commenced the instant action on July 16, 2013, alleging, *inter alia*, that PO Fuller violated Rushion's Eighth Amendment rights when he used excessive force (dragging, choking, and kneeling on Rushion) that resulted in Rushion suffering a rug burn on his stomach and ribs, a broken rib, and rib pain. (Compl. at 8–10 (ECF pagination).) Rushion also alleges that PO Fuller violated his Fourteenth Amendment Equal Protection rights by not adequately protecting Rushion from his own efforts to commit suicide. (*Id.* at 10 (ECF pagination).)

This Court has issued multiple previous Orders in this case. On September 25, 2013, the Court granted Rushion's application to proceed *in forma pauperis*, denied his requests for a preliminary injunction and temporary restraining order, and dismissed *sua sponte* all claims alleged against defendants "Administrative Justice Campbell" and the "Head Supervisor Chairman/Chief Counsel" of the "1ˢᵗ Department Disciplinary Committee." (9/25/13 Mem. & Order (Doc. No. 9).) On February 7, 2014, this action was consolidated with a second civil action, 13-CV-7083, that was transferred from the Southern District of New York. (2/7/14 Mem. & Order (Doc. No. 22).) The Court dismissed Rushion's claims against defendants Deborah Gulley and Karen McQuade on September 15, 2015. (9/15/15 Mem. & Order (Doc. No. 67).) Currently pending before the Court is PO Fuller's motion for summary judgment. (First Mot. for Summ. J.) Despite this Court's order to respond, (9/29/15 Order), Rushion has not filed a response to PO Fuller's motion.

**STANDARD OF REVIEW**

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute and that one party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a genuine issue of material fact exists, the evidence of the nonmovant "is to be believed" and the Court must draw all "justifiable" or reasonable inferences in favor of the non-moving party. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *see also* *Brosseau v. Haugen*, 543 U.S. 194, 195 n.2 (2004). Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*,' " *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (collecting cases). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to [its] case." *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (quoting *Celotex*, 477 U.S. at 322) (internal quotation marks omitted) (alteration in original). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir. 1996) (citing *Anderson*, 477 U.S. at 247–48).

**\*4** In this case, Rushion, who is proceeding *pro se*, did not respond in any fashion to PO Fullers' motion for summary judgment. "Special solicitude" should be afforded *pro se* litigants, like Rushion, when confronted with motions for summary judgment. *See* *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988). Nevertheless, a *pro se* plaintiff is not otherwise relieved from the usual requirements of summary judgment. It is thus settled law that a *pro se* plaintiff, just like a represented one, may not rely solely on his complaint to defeat

Case 6:24-cv-01169-DNH-MJK    Document 5    Filed 10/30/24    Page 66 of 141

Rushion v. NYS Division of Parole, Not Reported in Fed. Supp. (2016)

2016 WL 5255812

a summary judgment motion. *See Champion v. Artuz*, 76 F.3d 483, 485–86 (2d Cir. 1996). If a *pro se* plaintiff fails to oppose a motion for summary judgment, the Court may grant the motion if: (1) the *pro se* plaintiff has received adequate notice that failure to file any opposition may result in dismissal of the case; and (2) the Court is satisfied that "the facts as to which there is no genuine dispute 'show that the moving party is entitled to a judgment as a matter of law.' " *Id.* at 486 (quoting Fed. R. Civ. P. 56(c)).

### DISCUSSION

#### A. Sovereign Immunity

The Eleventh Amendment to the United States Constitution provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. "The reach of the Eleventh Amendment has ... been interpreted to extend beyond the terms of its text to bar suits in federal courts against states, by their own citizens or by foreign sovereigns." *State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 95 (2d Cir. 2007) (quoting *Western Mohegan Tribe & Nation v. Orange Cnty.*, 395 F.3d 18, 20 (2d Cir. 2004)). Thus, absent a state's consent to suit or an express statutory waiver, the Eleventh Amendment bars federal court claims against states. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989). Eleventh Amendment immunity also extends to suits for damages against state officers in their official capacities. *Id.* at 71 ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." (internal citation omitted)); *McNamara v. Kaye*, No. 06–CV–5169 (DLI), 2008 WL 3836024, at *8 (E.D.N.Y. Aug. 13, 2008) ("[L]awsuits against state officers acting [in] their official capacity and lawsuits against state courts are considered to be lawsuits against the state.").

Here, Rushion alleges that PO Fuller was acting in his individual and official capacities when the alleged violations took place. (Compl. at 14 (ECF pagination).) New York State has not waived its immunity and there has been no statutory waiver. *See, e.g., Mamot v. Bd. of Regents*, 367 Fed.Appx. 191, 192 (2d Cir. 2010) ("It is well-established that New York has not consented to § 1983 suits in federal court and that § 1983 was not intended to override a state's sovereign immunity."). Moreover, the Division of Parole is

a state agency entitled to Eleventh Amendment immunity. *See Chapman v. New York*, No. 11–CV–1814 (ENV), 2011 WL 4344209, at *2 (E.D.N.Y Sept. 14, 2011) ("as an agency or arm of the State of New York, the New York State Division of Parole is ... immune from suit under the Eleventh Amendment" (citing *McCloud v. Jackson*, 4 Fed.Appx. 7, 10 (2d Cir. 2001))). Thus, to the extent that Rushion is suing PO Fuller for damages in his official capacity, the claims must be dismissed because PO Fuller is entitled to Eleventh Amendment immunity. See *Will*, 491 U.S. at 71.

#### B. Excessive Force

Allegations by a parolee that he was subjected to excessive force while being arrested by his parole officer for a parole violation are analyzed under the Fourth Amendment. *Turner v. White*, 443 F. Supp. 2d 288, 294–95 (E.D.N.Y. 2005) (applying Fourth Amendment analysis where "the excessive force was allegedly applied by officers in connection not with plaintiff's conviction, but rather with some new offense or violation they believed had been committed"); *see also Rivera v. Madan*, No. 10-CV-4136 (PGG), 2013 WL 4860116, at *8 (S.D.N.Y. Sept. 12, 2013) ("The Fourth Amendment applies to an excessive force claim brought by a parolee in connection with some new offense or violation [parole officers] believed had been committed." (internal quotation marks omitted)). Thus, although Rushion's allegation that PO Fuller used excessive force against him was brought under the Eighth Amendment, the Court construes it as a Fourth Amendment claim.

**\*5** In order to establish that an officer used excessive force in violation of the Fourth Amendment, a plaintiff must demonstrate, "in light of the totality of the circumstances faced by the arresting officer, [that] the amount of force used was objectively [un]reasonable at the time." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 123 (2d Cir. 2004); *see also Batson-Kirk v. City of New York*, No. 07–CV–1950 (KAM), 2009 WL 1505707, at *11 (E.D.N.Y. May 28, 2009) ("To succeed on a Fourth Amendment excessive force claim, a plaintiff must show that the amount of force used was objectively unreasonable." (internal quotation marks omitted)).

Because "[t]he Fourth Amendment test of reasonableness 'is one of objective reasonableness,' " *Bryant v. City of New York*, 404 F.3d 128, 136 (2d Cir. 2005) (quoting *Graham v. Connor*, 490 U.S. 386, 399 (1989)), the inquiry is necessarily "fact specific" and requires a plaintiff to "establish that the government interests at stake [are] outweighed by the

Case 6:24-cv-01169-DNH-MJK   Document 5   Filed 10/30/24   Page 67 of 141

Rushion v. NYS Division of Parole, Not Reported in Fed. Supp. (2016)

2016 WL 5255812

nature and quality of the intrusion on [plaintiff's] Fourth Amendment interests.' " *Amnesty Am.*, 361 F.3d at 123 (quoting *Graham*, 490 U.S. at 396). In balancing these interests, a court must consider, *inter alia*, " 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.' " *Id.* (quoting *Graham*, 490 U.S. at 396). A court must consider the evidence " 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' " *Tracey v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (quoting *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006)). Moreover, courts must "make 'allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.' " *Id.* (quoting *Graham*, 490 U.S. at 397). Nonetheless, the Second Circuit has cautioned that, "[g]iven the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." *Amnesty Am.*, 361 F.3d at 123.

In addition, a "successful excessive force claim under the Fourth Amendment requires the use of force that is serious or harmful, not merely *de minimus*." *Konovalchuk v. Cerminaro*, No. 9:11-CV-1344 (MAD), 2014 WL 272428, at *16 (N.D.N.Y. Jan. 24, 2014); *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004) (finding that "[n]ot every push or shove" is unconstitutionally excessive (internal quotation marks omitted)).

Here, Rushion has submitted "no competent, affirmative evidence to support his allegations," and his "testimony is so replete with inconsistencies and improbabilities that a reasonable jury could not find that excessive force was used against him." *Jeffreys v. Rossi (Jeffreys I)*, 275 F. Supp. 2d 463, 475, 478 (S.D.N.Y. 2003), *aff'd sub nom. Jeffreys v. City of New York (Jeffreys II)*, 426 F.3d 549 (2d Cir. 2005). "[I]t is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage." *Jeffreys II*, 426 F.3d at 554. However, "in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether the jury could reasonably find for the plaintiff, and thus whether there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account." *Id.* (internal quotation marks and citation omitted). "Under these circumstances, the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor." *Id.* PO Fuller has met this burden here.

**\*6** There are many facts in dispute in this case relevant to the excessive force inquiry. However, there is "nothing in the record to support [Rushion's] allegations other than [his] own contradictory ... testimony." *Id.* at 555. Rushion alleges in the complaint that he was taken from the van back into the Parole Office with "no struggle," and was pushed into a chair where shackles were put on his ankles with "no struggle." (Compl. at 8 (ECF pagination).) He contradicted this account at his deposition when he said that he struggled with the POs. (Rushion Dep. at 12:21–13:3 ("Something happened where I ended up on the ground. I think when I started to walk in. I think. Or really when I got to the door. I think that I started struggling, and I think that they took me to the ground.").) Rushion alleges that PO Fuller alone dragged him down the hallway of the Parole Office, while PO Fuller has put forth evidence that he moved Rushion down the hallway with other officers. (Compl. at 8 (ECF pagination); 56.1 Statement at ¶ 9; Conyers Decl. at ¶¶ 8, 10; Fuller Decl. at ¶¶ 7–8.) Rushion alleges that he suffered a rug burn from the carpet in the hallway, while PO Fuller has put forth evidence that the hallway is not carpeted and that medical examination of Rushion on the night of the alleged incident and the day after revealed no rug burn. (Compl. at 8 (ECF pagination); 56.1 Statement at ¶ 14; Preston Decl. at ¶ 5, Ex. A (photograph of tiled hallway in Parole Office leading to back room).) Rushion alleges that PO Fuller broke his rib with his knees while he was in the back room of the Parole Office, but Fuller has submitted medical evidence, including an x-ray, that there was no injury at all to Rushion's ribs, and states that he left the area after carrying Rushion to the back room. (Compl. at 8–9 (ECF pagination); 56.1 Statement at ¶ 15; Rushion Medical Record at 9–10 (ECF pagination); Fuller Decl. at ¶¶ 7–8.) Rushion also alleges that PO Fuller choked him in the back room of the Parole Office, but presents no medical or other evidence to corroborate this claim. (Compl. at 8 (ECF pagination).) In his complaint, Rushion alleged that an unknown nurse broke his wrist in the hospital, but then changed his story at his deposition and claimed that PO Fuller broke his wrist by kneeling on his handcuffs. (Compl. at 9 (ECF pagination); Rushion Dep. At 57:9–17; 70:24–71:16.) Further casting doubt on Rushion's claims, he alleged in his complaint that PO Fuller subjected him to abusive

Case 6:24-cv-01169-DNH-MJK    Document 5    Filed 10/30/24    Page 68 of 141

Rushion v. NYS Division of Parole, Not Reported in Fed. Supp. (2016)

2016 WL 5255812

treatment because Rushion is a Muslim, (Compl. at 8–9 (ECF pagination)), but then explained in his deposition that, "[n]ah[,] ... I exaggerated that." (Rushion Dep. at 41:15–18.) Indeed, Rushion clarified, "[h]e didn't know I was Muslim. I didn't turn Muslim until – I didn't start studying Muslim until after that little confrontation." (*Id.* at 42:4–8.)

Viewing the evidence in the light most favorable to Rushion and drawing all reasonable inferences in his favor, the Court finds that no reasonable jury could credit Rushion's version of events and that there is no genuine issue of fact. *See Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (stating that to defeat summary judgment, nonmoving parties "may not rely on conclusory allegations or unsubstantiated speculation"); *Anderson*, 477 U.S. at 248 (defining a genuine issue of fact as when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Accepting the facts as set forth by PO Fuller, the "totality of the circumstances" demonstrate that PO Fuller acted reasonably in subduing Rushion. As acknowledged by Rushion, he posed a danger to himself at the time of the arrest. (Rushion Dep. at 42:18–20 ("I wasn't doing nothing wrong. All I did is try to bang my head through the window."). PO Fuller has also established that Rushion continued to pose a threat to himself and the arresting and assisting officers even after being handcuffed. [9] (56.1 Statement at ¶¶ 8–9; Conyers Decl. at ¶¶ 7–8; Fuller Decl. at ¶¶ 4, 6–7; Unusual Incident Report at 2 (ECF pagination).) Thus, applying restraints to Rushion's feet, attaching his hand and foot restraints to subdue and calm him, and carrying him to a different location to wait for EMS and the NYPD to arrive was objectively reasonable under the circumstances.

[9]     Indeed, Rushion injured PO Conyers while he was being restrained. (Conyers Decl. at ¶ 9 ("At no point in time did I or any of my colleagues, including PO Brian Fuller, assault the plaintiff or try to choke him. Plaintiff was the one who was verbally and physically assaulting us. In fact, as a result of plaintiff kicking and hitting me, I suffered an injury to my right knee and my right arm[,] wrist and elbow."); Unusual Incident Report (noting that Rushion, while handcuffed, "began kicking several Parole Officers in an attempt to injure these officers" and that Rushion "kicked [Conyers] on [his] right kneecap and during the

pursuing scuffle [PO Conyers'] right arm[,] wrist and elbow [were] hurt").)

In addition, the injuries, if any, attributable to PO Fuller do not rise to level of a Fourth Amendment Violation. To reach this level, injuries must be more than "*de minimus.*" *Konovalchuk*, 2014 WL 272428, at *16. Rushion's only injury that arguably reaches this level is the possible small chip fracture in his wrist that he attributed to the actions of an unidentified nurse in the complaint. (56.1 Statement at ¶ 15; Rushion Medical Record at 9–10 (ECF pagination); Compl. at 9 (ECF pagination).) The injuries that he claimed that PO Fuller inflicted on him – rug burn, rib injury, and choking – are not reflected at all in the medical evidence in the record. Therefore, Rushion has failed to show that he suffered any injuries as a result of PO Fuller's actions.

Because PO Fuller's actions in restraining Rushion on the night of the arrest were objectively reasonable in light of the totality of the circumstances and Rushion has not shown that the level of force used was serious or harmful, PO Fuller is granted summary judgment as to Rushion's excessive force claim.

### C. Equal Protection

**\*7**  In his complaint, Rushion alleges that PO Fuller violated his right to equal protection under the Fourteenth Amendment by not protecting Rushion from himself when he tried to kill himself by slamming his head on the car door. Rushion has failed to raise any issue of material fact as to this claim. The evidence before the Court, which Rushion does not challenge, is that POs Conyers and Mejia escorted Rushion to the transport vehicle and that PO Fuller only began interacting with Rushion when he was back in the Parole Office. Because PO Fuller was not in any manner personally involved with, or even present for, the alleged deprivation of Rushion's constitutional rights under the Fourteenth Amendment, PO Fuller's motion for summary judgment on Rushion's equal protection claim is granted.

### CONCLUSION

In summary, there are no genuine issues of material fact in dispute, and the Court finds that PO Fuller is entitled to judgment as a matter of law. The Court also finds that Rushion has received adequate notice that the failure to file any opposition to PO Fuller's motion might result in the dismissal of this case. Therefore, PO Fuller's motion for

Rushion v. NYS Division of Parole, Not Reported in Fed. Supp. (2016)

2016 WL 5255812

summary judgment is granted and Rushion's claims against PO Fuller are dismissed. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith and *in forma pauperis* status is therefore denied for the purpose of any appeal. *Coppedge v. United States*, 369 U.S. 438, 444–45, (1962).

The Clerk of Court is directed to enter judgment accordingly, mail a copy of the Judgment and this Memorandum and Order to plaintiff *pro se* and to note the mailing on the docket, and close the case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5255812

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Rivera v. Madan, Not Reported in F.Supp.2d (2013)
Case 6:24-cv-01169-DNH-MJK    Document 5    Filed 10/30/24    Page 70 of 141
2013 WL 4860116

2013 WL 4860116
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jesus RIVERA, Plaintiff,
v.
Jorge MADAN, Jarvis Jenkins, Sherry Cheeley,
James Coyne, Dennis Kilcoyne, Andre Mckoy,
Margaret Roberson, and Winston Peart, Defendants.

No. 10 Civ. 4136(PGG).
|
Sept. 12, 2013.

### MEMORANDUM OPINION & ORDER

PAUL G. GARDEPHE, District Judge.

**\*1** This is a Section 1983 case in which Plaintiff Jesus Rivera claims that Defendants—New York State parole officers—subjected him to a body cavity search in violation of the Fourth Amendment. He also alleges that the parole officers subjected him to excessive force after he requested medical attention. Defendants have moved for summary judgment. (Dkt. No. 49) For the reasons set forth below, Defendants' motion will be GRANTED in part and DENIED in part.

### BACKGROUND

Plaintiff was sentenced to five years' imprisonment on October 1, 2003, following his conviction in Supreme Court of the State of New York, New York County, for Assault in the Second Degree. (Def. R. 56.1.Stmt.¶ 1) [1] On April 11, 2008, Rivera began a five-year parole term under the supervision of Defendant Jorge Madan, a Parole Officer in the Bronx IV office of New York State's Division of Parole ("Bronx IV"). [2] (Id.; Pltf. R. 56.1 App., Ex. 1 (Madan Dep.) at 69) Plaintiff's parole conditions mandated that he report to Bronx IV as required, submit to substance abuse testing and counseling, and submit to searches by his parole officer. (Def. R. 56.1 Stmt. ¶ 1)

[1]    To the extent that this Court relies on facts drawn from the parties' Local Rule 56.1 statements, it

has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence. *See Giannullo v. City of New York,* 322 F.3d 139, 140 (2d Cir.2003) ("If the opposing party ... fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).

[2]    In 2009, the Division of Parole was incorporated into the Department of Corrections and Community Supervision ("DOCCS").

### I. *RIVERA'S ARRIVAL AT BRONX IV*

On January 29, 2009, Rivera failed to appear for a regularly scheduled report date with Officer Madan at Bronx IV. (Def. R. 56.1 Stmt. ¶ 3) The next day, Officer Madan contacted Rivera by telephone at the home of his then girlfriend. [3] (*Id.*) Officer Madan instructed Rivera to report to Bronx IV that day. (*Id.*; Pltf. R. 56.1 Stmt. ¶ 3) After Rivera left for the parole office, Officer Madan called Rivera's girlfriend's apartment again to ascertain whether Rivera was on his way to Bronx IV. (Madan Dep. at 83) The girlfriend told Officer Madan that Rivera left her apartment carrying small bags of crack cocaine. (Def. R. 56.1 Stmt. ¶ 4; Pltf. R. 56.1 App., Ex. 5 (Confidential 17)) She also stated that Rivera had told her that if his parole was revoked, he was either going to swallow the bags of drugs or insert them in his rectum in order to smuggle them into Rikers Island. (*Id.*) She further reported to Officer Madan that Rivera was planning on swallowing a razor or inserting it in his rectum. (Def. R. 56.1 Stmt. ¶ 4; Madan Dep. at 83)

[3]    Because—as explained below—Rivera's girlfriend was an informant, Defendants have asked that her identity not be disclosed in public filings pursuant to the law enforcement privilege. *See* Dkt. No. 57.

Rivera arrived at Bronx IV at about noon on January 30, 2009. (Pltf. R. 56.1 Stmt. ¶ 36) Officer Madan did not immediately search or otherwise restrain Rivera. (*Id.*) Instead, he told Plaintiff that he planned to administer a drug test. (Def. R. 56.1 Stmt. ¶ 5) Rivera told Officer Madan that the drug test would be positive, because he had used heroin the day before. (*Id.*; Pltf. R. 56.1 Stmt. ¶ 5) Rivera nevertheless provided a urine sample. (Madan Dep. at 76)

Defendants claim that Rivera was immediately informed that he had violated his parole conditions and was placed in

Rivera v. Madan, Not Reported in F.Supp.2d (2013)

2013 WL 4860116

handcuffs. (Def. R. 56.1 Stmt. ¶ 6) Rivera claims that after he provided a urine sample, he was walked back to Officer Madan's office, unrestrained. (Pltf. Opp. Br. at 4–5 (citing Madan Dep. at 77–78)) According to Rivera, Officer Madan then filled out some paperwork, left Rivera in the office with another parole officer, and went upstairs to speak with his supervisor, Defendant Sherry Cheeley. (*Id.;* Pltf. R. 56.1 Stmt. ¶ 6) When Officer Madan returned to his office, he made several telephone calls to in-patient drug treatment centers to determine whether they had space for Rivera. (Pltf. R. 56.1 Stmt. ¶ 6)

**\*2** While Rivera was sitting in his office, Officer Madan observed Rivera "squirming" in his seat. (Def. R. 56.1 Stmt. ¶ 8)

Officer Madan told Rivera that he could be placed in a residential drug treatment program or the Bellevue Men's Shelter—as an alternative to incarceration—if he agreed to have no further contact with his girlfriend, whom Officer Madan believed had a bad influence on Rivera. (Def. R. 56.1 Stmt. ¶ 6; Pltf. R. 56.1 Stmt. ¶ 6) Rivera told Officer Madan that he would not break off contact with his girlfriend, and for that reason he preferred incarceration to placement in a drug treatment program. (Def. R. 56.1 Stmt. ¶ 7) Rivera then became upset and began "cursing everybody out" and arguing with Officers Madan and Cheeley, insisting that he would continue to see his girlfriend no matter the consequences. (Def. R. 56.1 Stmt. ¶ 11; Pltf. R. 56.1 Stmt. ¶ 11; Pltf. Opp. Br. 5) Rivera admits that he was acting "belligerent." (Pltf. Opp. Br. at 5 (citing Pltf. R. 56.1 App., Ex. 7 (Cheeley Dep.) at 116–18) Rivera claims that only then was he placed in handcuffs— along with leg irons and a waist restraint. (Pltf. 56.1 App., Ex. 3 (Pltf.2011 Dep.) at 53) Once Rivera was restrained, Officer Madan conducted a pat-down search. (Madan Dep. at 97–98) No contraband was discovered. (*Id.* at 98)

Officers Madan, Cheeley, and an unidentified male parole officer then escorted Plaintiff into a rear "holding" room. (Def. R. 56.1 Stmt. ¶ 11) Defendant Jarvis Jenkins, Cheeley's supervisor, ordered Officer Madan to perform a visual inspection of Rivera's rectum. (*Id.* ¶ 14) According to Rivera, the inspection occurred at about 3:30 p.m.—more than three hours after Plaintiff had arrived at Bronx IV. (Pltf. Opp. Br. 5 (citing Pltf. 56.1 App ., Ex. 6 at Parole 14 (May 8, 2009 Memo from Officer Peart)))

## II. *THE BODY CAVITY SEARCH*

The body cavity search was conducted by Defendants Madan, Winston Peart, and Andre McKoy. (Def. R. 56.1 Stmt. ¶ 17) Rivera claims that after he was shackled in leg irons, handcuffs, and waist restraints, these defendants left him in a back room and returned a short time later with their "short sleeves rolled up, their watches off" and "surgical gloves on." (Pltf.2011 Dep. at 53–54, 64) As Officer Madan brought Rivera to the room where the search would be conducted, Rivera was "cursing, screaming, and being uncooperative." (Def. R. 56.1.Stmt.¶ 25) Officer Madan asked for other officers for assistance in bringing Rivera to the search room. (Def. R. 56.1 App., Ex. J (McKoy Dep.) at 57.) Officer McCoy grabbed one of Rivera's arms and Officer Peart grabbed the other. (*Id.*) The officers then brought Rivera to the search room. (Def. R. 56.1 Stmt. ¶ 25)

At the search room, Officer Madan "grabbed [Rivera] by [his] neck, forced [him] to the floor, put [his] face down on the floor, [and] put his knee on [his] neck." (Pltf.2011 Dep. at 67) Officer Madan put "all [his] weight" on Rivera while Officer McKoy grabbed Rivera's neck and arm and forced him to the floor. (*Id.* at 68–69, 75) While Rivera was on the floor, Officers McKoy and Peart grabbed his legs and pulled down his pants and underwear. (*Id.* at 69; Pltf. R. 56.1 App., Ex. 11 (Pltf.2012 Dep.) at 24; Madan Dep. at 101, 105)

**\*3** Rivera claims that one of these officers "put their fingers on [his] rectum on the outer side[,] spread it open" and "looked in [his] anal cavity." (Pltf.2011 Dep. at 67, 71; Madan Dep. 101, 105) No one inserted anything into Rivera's rectum; his genital area was not touched; and "nobody hit [him]" during the search. (Def. R. 56.1 Stmt. ¶ 19; Pltf.2011 Dep. at 71–76) Defendants Jenkins, Cheeley, Dennis Kilcoyne, and Margaret Roberson stood at the doorway and observed the search being performed, but did not intervene. (Pltf.2011 Dep. at 73, Pltf. R. 56.1 App., Ex. 9 (Kilcoyne Dep.) at 49, 50; *Id.,* Ex. 12 (Roberson Dep.) at 54) No contraband was recovered from Rivera during the search. (Def. R. 56.1 Stmt. ¶ 19)

## III. *THE ALLEGED ASSAULT AT BELLEVUE HOSPITAL*

After the body cavity search, Rivera was returned to the holding room. (Def. R. 56.1 Stmt. ¶ 28) He was feeling "homicidal and suicidal" and asked to be taken to Bellevue Hospital ("Bellevue") for psychiatric assistance and medication. (Def. R. 56.1 Stmt. ¶ 28) Officers Madan, Kilcoyne, and Roberson drove Rivera to Bellevue, where they escorted him to Bellevue's psychiatric emergency unit. (Def. R. 56.1 Stmt. ¶ 29) While waiting to speak to a psychiatrist,

Rivera v. Madan, Not Reported in F.Supp.2d (2013)

2013 WL 4860116

Rivera fell asleep. (Pltf.2012 Dep. at 42) A psychiatrist eventually appeared, but Rivera did not respond to the doctor's questions because he was "groggy" and "coming in and out" of consciousness. (Id. at 44; Pltf.2011 Dep. at 86) He was nevertheless given psychiatric clearance by the doctor. (Def. R. 56.1 Stmt. ¶ 30)

While "still groggy," Defendants Madan, Kilcoyne and Roberson "shook [him] wide awake." (Pltf.2012 Dep. at 47) Rivera then requested to see the doctor, and when these defendants refused, Rivera began "screaming for the psychiatrist" while "resisting" and "pulling away" from Officers Kilcoyne and Madan as they escorted him out of the examining area. (Def. R. 56.1 Stmt. ¶ 30) Rivera alleges that —while he was resisting the officers—Officer Madan pushed him violently against the wall and then picked him up and slammed his head to the floor. (Pltf. R. 56.1 Stmt. ¶ 30) Madan and Kilcoyne contend that after Rivera refused to comply with repeated orders to stop resisting them, they placed Rivera against the wall to prevent him from moving, and eventually brought him to the floor when he continued to resist. (Def. R. 56.1 Stmt. ¶ 33) It is undisputed that, as a result of this struggle, Rivera suffered a scalp abrasion and his head began bleeding. (Id. ¶ 34; Pltf. R. 56.1 Stmt. ¶ 34) Rivera's head was treated at Bellevue, and he was then taken to Rikers Island. (Def. R. 56.1 Stmt. ¶ 35; Pltf.2012 Dep. at 55)

**IV.** *PROCEDURAL HISTORY*

Plaintiff, proceeding pro se, filed the Complaint on May 19, 2010. (Dkt. No. 2) On August 11, 2011, Defendants moved for partial summary judgment. (Dkt. No. 18) On September 29, 2011, this Court granted Plaintiff's application for the appointment of *pro bono* counsel. (Dkt. No. 24) Plaintiff's attorneys filed their notices of appearances on October 26, 2011. (Dkt.Nos.25–26) Plaintiff filed an Amended Complaint on December 2, 2011. (Dkt. No. 30) Defendants thereafter withdrew their motion for partial summary judgment. (Dkt. No. 32) Defendants filed their Answer on January 23, 2012. (Dkt. No. 37) Defendants' current motion for summary judgment was filed on September 14, 2012. (Dkt. No. 49)

*DISCUSSION*

**I.** *LEGAL STANDARD*

 **\*4** Summary judgment is appropriate where "there is no genuine dispute as to any material fact" and one party "is entitled to judgment as a matter of law." Fed.R.Civ.P.

56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. County of Nassau,* 524 F.3d 160, 163 (2d Cir.2008).

A court deciding a summary judgment motion must " 'resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.' " *Spinelli v. City of New York,* 579 F.3d 160, 166 (2d Cir.2009) (quoting *Brown v. Henderson,* 257 F.3d 246, 251 (2d Cir.2001)). However, a " 'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.... [M]ere conclusory allegations or denials ... cannot by themselves create a genuine issue of material fact where none would otherwise exist.' " *Hicks v. Baines,* 593 F.3d 159, 166 (2d Cir.2010) (alterations in original) (quoting *Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1456 (2d Cir.1995)).

**II.** *PLAINTIFF'S FOURTH AMENDMENT CLAIMS*

 **A.** *The Body Cavity Search*

Plaintiff alleges that on January 30, 2009, he was subjected to an unjustified body cavity search at Bronx IV in violation of the Fourth Amendment. Defendants argue that this Court should hold as a matter of law that their search of Plaintiff was not more intrusive than necessary to determine whether Plaintiff possessed contraband, and therefore did not violate Plaintiff's Fourth Amendment rights.

 **1.** *Applicable Law*

The Fourth Amendment restrains the government from conducting "unreasonable searches." U.S. Const. amend. IV. Whether a search is reasonable under the Fourth Amendment " 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.' " *United States v. Massey,* 461 F.3d 177, 178 (2d Cir.2006) (quoting *Samson v. California,* 547 U.S. 843, 848, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006)). "Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

Courts must "examin[e] the totality of the circumstances" surrounding the search, which includes the Plaintiff's status

as a parolee. *United States v. Knights,* 534 U.S. 112, 118, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001). "Although no longer physically in prison, the parolee is constructively still a prisoner." *Baker v. Welch,* No. 03 Civ. 2267(JSR)(AJP), 2003 WL 22901051, at *11 (S.D.N.Y. Dec. 10, 2003). Thus, a parolee has a lower expectation of privacy for Fourth Amendment purposes than does an ordinary citizen. *See Samson,* 547 U.S. at 852 (noting that "parolees ... have severely diminished expectations of privacy by virtue of their status alone"); *United States v. Grimes,* 225 F.3d 254, 258 (2d Cir.2000) ("[W]e hold that, like probation, parole justifies some departure from traditional Fourth Amendment standards."). Moreover, "[a] parolee's diminished expectation of privacy would necessarily be further diminished while he is in his parole officer's office." *United States v. Thomas,* 729 F.2d 120, 123–24 (2d Cir.1984).

**\*5** The Fourth Amendment still provides some degree of protection for parolees, however. *See United States v. Newton,* 369 F.3d 659, 665 (2d Cir.2004) ("Although probationers and parolees are subject to 'a degree of impingement upon privacy that would not be constitutional if applied to the public at large,' the law requires that such greater intrusions occur pursuant to a rule or regulation 'that itself satisfies the Fourth Amendment's reasonableness requirement.' " (quoting *Griffin v. Wisconsin,* 483 U.S. 868, 873, 875, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987)) While "parolees possess diminished Fourth Amendment protections, and the precise scope of the protections they retain is uncertain," a parolee still enjoys a level of Fourth Amendment protection that is greater than the "the *de minimis* Fourth Amendment protection that incarcerated inmates retain." *Hope v. Goines,* No. 00 CV 3476(JG), 2002 WL 2003201, at *3 (E.D.N.Y. Aug.8, 2002); *see also Diaz v. Ward,* 437 F.Supp. 678, 682 (S.D.N.Y.1977) (noting that "the law is settled in this Circuit that a parolee's Fourth Amendment rights are reduced, but not eliminated").

Under New York law, the issue of whether a warrantless parole search is "unreasonable and thus prohibited by constitutional proscription ... turn[s] on whether the conduct of the parole officer was rationally and reasonably related to the performance of the parole officer's duty." *People v. Huntley,* 43 N.Y.2d 175, 181, 401 N.Y.S.2d 31, 371 N.E.2d 794 (1977). The Second Circuit has held that "the New York rule [articulated in *Huntley* ] is coextensive with the requirements of the Fourth Amendment":

> A rule indicating that a search of a parolee is permissible so long as it is reasonably related to the parole officer's duties is identical to a rule that parole officers may conduct searches so long as they comport with the Fourth Amendment. This is because the doctrine of "special needs" permits those searches that are reasonably related to the special needs animated by management of a parole system.

*Grimes,* 225 F.3d at 259 n. 4. Accordingly, where a parolee challenges a parole officer's search as violative of the Fourth Amendment, "the central issue ... is 'whether the conduct of the parole officer was rationally and reasonably related to the performance of the parole officer's duty.' " *United States v. Barner,* 666 F.3d 79, 85 (2d Cir.2012) (quoting *Huntley,* 43 N.Y.2d at 181, 401 N.Y.S.2d 31, 371 N.E.2d 794)). In this regard, the Second Circuit has repeatedly acknowledged that when parole officers have received information that a parolee may have violated parole conditions, the "[p]arole officers have a duty 'to investigate....' " *Id.* (quoting *United States v. Reyes,* 283 F.3d 446, 459 (2d Cir.2002)); *see also Newton,* 369 F.3d at 666 (holding that a search for firearms in a parolee's residence satisfied *Huntley* because "the obligation to detect and prevent parole violations so as to protect the public from the commission of further crimes is part of a parole officer's duty").

**B. Analysis**

**1. The Body Cavity Search Was Reasonable**

**\*6** A body cavity search is "by its very nature a 'highly intrusive invasion' [of privacy]." *Rivera v. United States,* 928 F.2d 592, 607 (2d Cir.1991) (quoting *M.M. v. Anker,* 607 F.2d 588, 589 (2d Cir.1979)); *see also Hartline v. Gallo,* 546 F.3d 95, 102 (2d Cir.2008) (noting "the uniquely intrusive nature of strip searches ... in [a] society that takes privacy and bodily integrity seriously"). However, the undisputed facts indicate that Defendants were justified in conducting the search, especially in light of Rivera's "severely diminished expectation[ ] of privacy" as a parolee. *Samson,* 547 U.S. at 852.

First, Rivera consented to his person being searched by his parole officer as one of his parole conditions. (Def. R. 56.1 Stmt. ¶ 1; Def. R. 56.1. App., Ex. A (Rivera's conditions of release), at Parole 16/1/11, Condition 4 (Rivera agreed to "permit the search and inspection of my person" as a condition of parole)); *see also United States v. Lifshitz,* 369 F.3d 173, 180 (2d Cir.2004) ("[T]he imposition of a search condition as part of probation creates a diminished expectation of privacy."). In addition, it is undisputed that Officer Madan had received specific information from Rivera's girlfriend that he had left her apartment on his way to Bronx IV carrying small bags of crack cocaine. (Def. R. 56.1 Stmt. ¶ 4; Pltf. R. 56.1 App., Ex. 5 (Confidential 17)) It is also undisputed that Rivera's girlfriend had told Officer Madan that Rivera had told her that if his parole was revoked, he was either going to swallow the drugs or insert them in his rectum in order to smuggle them into Rikers Island. (*Id.*) She further reported to Officer Madan that Rivera was planning on swallowing a razor or inserting it in his rectum. (Def. R. 56.1 Stmt. ¶ 4; Madan Dep. at 83) Finally, it is undisputed that Rivera was "squirming" in his seat while seated in Officer Madan's office. (Def. R. 56.1 Stmt. ¶ 8)

Construing these facts in the light most favorable to Plaintiff, Defendants' search of Rivera's body cavity was " 'rationally and reasonably related to the performance of the parole officer's duty.' " *Barner,* 666 F.3d at 85 (quoting *Huntley,* 43 N.Y.2d at 181, 401 N.Y.S.2d 31, 371 N.E.2d 794)). As parole officers, Defendants "have a duty to 'investigate whether a parolee is violating the conditions of his parole.' " *Id.* (quoting *Reyes,* 283 F.3d at 459). One of those conditions is a prohibition against possessing controlled substances. (Def. R. 56.1 App., Ex. A (Rivera's conditions of release), at Parole 16/1/11, Condition 11 (prohibiting Rivera from "possessing any controlled substance"))

Here, Defendants had been told by Rivera's girlfriend that he might have crack cocaine and a razor blade secreted in his rectum. This report was entirely plausible, both because Rivera had admitted to Officer Madan that he was using drugs, and because Rivera had good reason to fear that his parole would be revoked and that he would be returned to Rikers Island.[4] "Once [Officer Madan] had this information, it was clearly reasonable for [him] to investigate the accusations further." *Barner,* 666 F.3d at 85. While Defendants' body cavity search of Rivera was "intrusive," *Hartline,* 546 F.3d at 102, "[the] search satisfied the reasonable relationship requirement of *Huntley* because it was performed in direct response to information that

[Defendants] obtained and that [they] had a duty to investigate further...." *Barner,* 666 F.3d at 85.

4        Rivera had failed to appear for his regularly scheduled report the previous day, a clear parole violation. (Def. R. 56.1 App., Ex. A (Rivera's conditions of release))) He also had used heroin the previous day, knew that he would be subjected to a drug test, and knew that he would test positive for illegal drug use—another clear violation of his parole conditions. *Id.*

*7 Rivera argues, however, that the search was not justified because Officer Madan had reason to doubt the girlfriend's credibility. (Pltf. Opp. Br. at 12) Plaintiff notes that Officer Madan believed that the girlfriend "was a bad influence on Plaintiff" and knew that she had a motive for wanting him sent back to jail—she "didn't want [Rivera] in the house."[5] (Madan Dep. at 83) In sum, Rivera argues that the information the girlfriend provided did not "carr[y] enough indicia of reliability to justify" the search. (Pltf. Opp. Br. at 12 (quoting *Adams v. Williams,* 407 U.S. 143, 147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)))

5        Rivera does not explain why it is reasonable to assume that the girlfriend may have believed that falsely accusing Rivera of having crack cocaine in his rectum would likely lead to his incarceration.

To search a parolee, a parole officer needs only "reasonable suspicion (or potentially a lesser standard." *See Lifshitz,* 369 F.3d at 179.[6] " '[R]easonable suspicion' constitutes a less stringent standard than 'probable cause,' " *id. at 188,* and "falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu,* 534 U.S. 266, 273–74, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). It merely requires "more than an 'inchoate and unparticularized suspicion or hunch.' " *United States v. Elmore,* 482 F.3d 172, 178 (2d Cir.2007) (quoting *Alabama v. White,* 496 U.S. 325, 329–30, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990)). Notwithstanding the credibility issues cited by Rivera, his girlfriend's tip was sufficient to establish reasonable suspicion to search Rivera given all the circumstances discussed above.

6        While *Lifshitz* involved the search of a probationer instead of a parolee, " '[p]arole is meted out in addition to, not in lieu of, incarceration[,] ... ergo, parolees enjoy even less of the average citizen's absolute liberty than do probationers.' " *Grimes,*

225 F.3d at 258 (quoting *United States v. Cardona,* 903 F.2d 60, 63 (1st Cir.1990).

**2. *The Body Cavity Search Was Not More Intrusive Than Necessary***

The physical contact that Defendants had with Rivera in connection with performing the body cavity search was reasonable in light of the information provided to them. Officer Madan had been told that Rivera intended to insert crack cocaine, and possibly a razor, in his rectum. In this context and in light of the other circumstances discussed above—and given the undisputed evidence that Rivera was "belligerent," was "cursing" and "screaming" and refusing to cooperate with the officers' efforts to conduct the search (Def. R. 56.1 Stmt. ¶ 25; (Pltf. Opp. Br. at 5 (citing Cheeley Dep. at 116–118))—it was not unreasonable for officers to touch Rivera's buttocks and spread them open in order to conduct a visual inspection. (*See* Kilcoyne Dep. at 51 (stating that "someone grabbed [Rivera's] butt cheeks and spread them open"; Pltf. R. 56.1 App., Ex. 6 (May 8, 2009 Memo from Officer Peart) ("[Rivera's] cheeks spread by the officer wearing latex gloves")).

Rivera does not allege that the search amounted to excessive force under the Fourth Amendment, nor could he credibly do so. In analyzing an officer's use of force under the Fourth Amendment, courts consider whether "the amount of force used was objectively reasonable at the time" by balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake. *Amnesty Am. v. Town of West Hartford,* 361 F.3d 113, 123 (2d Cir.2004). Here, there is also no allegation that Rivera suffered any physical injuries or pain as a result of the body cavity search. It is likewise undisputed that was not struck by the officers, and that the search did not involve the insertion of anything into his body or the touching of his genitals. (Def. R. 56.1 Stmt. ¶ 19; Pltf.2011 Dep. at 71, 74–75) This is not a case in which "a reasonable jury could ... find that the officers gratuitously inflicted pain in a manner that was not a reasonable response to the circumstances...." *Amnesty Am.,* 361 F.3d at 124.

**\*8** Given all the circumstances—including the nature of the information provided to the parole officers, Rivera's diminished expectation of privacy as a parolee, Rivera's resistance to the search, and the manner in which the search was conducted—this Court concludes that the parole officers' body cavity search did not violate the Fourth Amendment

and that Defendants are entitled to summary judgment on this claim. [7]

[7]  Relying on an email, Rivera argues that the search was improper under internal parole guidelines. (Pltf. Opp. Br. 16; Pltf. R. 56.1 App., Ex. 13 (April 10, 2012 email) at Confidential 2) Neither side has submitted any formal policy issued by the Division of Parole or DOCCS. In any event, the issue here is not whether Defendants violated a DOCCS policy, but rather whether conducting the body cavity search violated Rivera's constitutional rights. A violation of internal policies and procedures does not by itself give rise to liability under Section 1983. *See Young v. County of Fulton,* 160 F.3d 899, 902 (2d Cir.1998) ("Without more, the fact that defendants violated New York procedural requirements does not support liability under § 1983."); *Robinson v. Via,* 821 F.2d 913, 922 (2d Cir.1987) ("[A] violation of state law neither gives [a plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim."); *Madera v. Goord,* 103 F.Supp.2d 536, 541 (N.D.N.Y.2000) ("[T]he violation of state regulations alone does not rise to the level of a constitutional violation.").

**C. *The Bellevue Hospital Incident***

Plaintiff also alleges that Defendants Madan, Roberson, and Kilcoyne subjected him to excessive force while at Bellevue in violation of the Fourth Amendment. (Am. Cmplt., Second Claim for Relief) Defendants argue that this Court should hold as a matter of law that the level of force they used was appropriate under the circumstances, and that any injuries Plaintiff suffered were *de minimis.* (Def.Br.15)

**1. *Applicable Law***

The Fourth Amendment applies to an excessive force claim brought by a parolee in connection with "some new offense or violation [parole officers] believed had been committed." *Turner v. White,* 443 F.Supp.2d 288, 294 (E.D.N.Y.2005); *Towsley v. Frank,* No. 09 Civ. 23, 2010 WL 5394837, at \*5–6 (D.Vt. Dec. 28, 2010) (analyzing excessive force claim under Fourth Amendment, because "[Plaintiff's] arrest was justified not by his prior conviction or his status as a parolee, but by the separate violation of his parole conditions").

In order to establish that an officer used excessive force in violation of the Fourth Amendment, a plaintiff must demonstrate, "in light of the totality of the circumstances faced by the arresting officer, [that] the amount of force used was objectively [un]reasonable at the time." *Amnesty Am.,* 361 F.3d at 123 (citing *Graham,* 490 U.S. at 397). *See also Batson–Kirk v. City of New York,* No. 07–CV–1950, 2009 WL 1505707(KAM)(JMA), at *11 (E.D.N.Y. May 28, 2009); *Mickle v. Morin,* 297 F.3d 114, 120 (2d Cir.2002).

Because "[t]he Fourth Amendment test of reasonableness 'is one of objective reasonableness,' " *Bryant v. City of New York,* 404 F.3d 128, 136 (2d Cir.2005) (quoting *Graham,* 490 U.S. at 399), the inquiry is necessarily "factspecific" and requires a plaintiff to "establish that the government interests at stake [are] outweighed by 'the nature and quality of the intrusion on [plaintiff's] Fourth Amendment interests.' " *Amnesty Am.,* 361 F.3d at 123 (quoting *Graham,* 490 U.S.at 396). In balancing these interests, a court must consider, *inter alia,* "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quoting *Graham,* 490 U.S. at 396); *see also Jones v. Parmley,* 465 F.3d 46, 61 (2d Cir.2006). A court must consider the evidence " 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' " *Tracey v. Freshwater,* 623 F.3d 90, 96 (2d Cir.2010) (quoting *Jones,* 465 F.3d at 61). Moreover, courts must "make 'allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.' " *Id.* (quoting *Graham,* 490 U.S. at 397). Nonetheless, the Second Circuit has cautioned that, "[g]iven the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." *Amnesty Am.,* 361 F.3d at 123 (citing *O'Bert v. Vargo,* 331 F.3d 29, 37 (2d Cir.2003)).

### 2. *Analysis*

**\*9** There are material issues of fact concerning the extent to which Plaintiff resisted efforts by Officers Kilcoyne and Madan to escort him from Bellevue to Rikers Island, the degree of force that was used by the officers, and whether Plaintiff posed a threat to anyone's safety.

While it is undisputed that Plaintiff was resisting efforts to lead him out of Bellevue (Def. R. 56.1 Stmt. ¶ 30), he was unarmed and was in handcuffs, leg restraints, and a waist restraint at the time. (Madan Dep. 136–137) Plaintiff argues that his resistance was therefore minimal and that, in any event, the officers' response was disproportionate to his level of resistance. (Pltf.Opp.Br.21–22)

The degree of force that was used is very much in dispute. Defendants contend that Plaintiff was merely "placed against a wall to prevent him from moving and was brought to the floor when he continued to resist." (Def. Br. at 16 (citing Madan Dep. at 136, 140)) Plaintiff asserts that Officer Madan shoved him violently into the wall and then picked him up and slammed his head to the floor, causing "the left side of [Rivera's] scalp [to] bust[ ] open and [to] start[ ] bleeding." (Pltf. R. 56.1 Stmt. ¶ 30; Pltf.2011 Dep. at 89) Given the disputed issues of fact about the level of resistance and amount of force used, Defendants have not demonstrated that the force they used is objectively reasonable as a matter of law.

Moreover, while a plaintiff who suffers only *de minimis* injuries may not be able to survive summary judgment on an excessive force claim, the alleged injuries here are sufficient to trigger potential liability for excessive force. It is undisputed that Rivera suffered a scalp abrasion that caused his head to bleed, and that required emergency medical treatment. (Def. R. 56.1 Stmt.¶ 34; Pltf. R. 56.1 Stmt. ¶ 34; *see also* Pltf. R. 56.1 App., Ex. 18 (Bellevue Hospital Record)) Rivera also claims that he experienced pain for months after the incident. (*See* Pltf. R. 56.1 App., Ex. 19 (March 10, 2009 Consultation Request) (noting that on March 10, 2009, Rivera was still complaining about a "headache post trauma 1–13–09")) These injuries are sufficient to support an excessive force claim. *See, e.g., Robison,* 821 F.2d at 923–24 (summary judgment denied where officer twisted plaintiff's arm and she suffered a bruise of unspecified extent and degree; no evidence that bruise persisted or required medical treatment); *Davis v. City of New York,* No. 04–CV–3299 (JFB)(RLM), 2007 WL 755190, at *12–13 (E.D.N.Y. Feb. 15, 2007) (denying summary judgment where plaintiff alleged redness and soreness in shoulder after officer kicked her); *see also Blair v. City of New York,* No. 03 CV 1485(SLT)(CLP), 2009 WL 959547, at *10–11 (E.D.N.Y. Mar. 31, 2009) (excessive force plaintiff need not show continuing or long-term injury or medical treatment); *Sforza v. City of N.Y.,* No. 07 Civ. 6122(DLC), 2009 WL 857496, at *15 (S.D.N.Y. Mar.31, 2009) ("[P]laintiff need not demonstrate

Rivera v. Madan, Not Reported in F.Supp.2d (2013)

2013 WL 4860116

serious injury to prevail in an excessive force claim; bruising and other nonpermanent injuries are sufficient.").

**\*10** Accordingly, Defendants Madan, Roberson and Kilcoyne are not entitled to summary judgment on the Amended Complaint's Second Claim for Relief.

### III. *PERSONAL INVOLVEMENT*

Officer Roberson argues that she is entitled to summary judgment on the Amended Complaint's Second Claim for Relief because there is insufficient evidence of her personal involvement in the Bellevue incident. (Def. Br. at 19) Plaintiff does not respond to this argument in his opposition brief.

"In this Circuit, personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *De Michele v. City of New York,* 09 Civ. 9334(PGG), 2012 WL 4354763, at \*16 (S.D.N.Y. Sept. 24, 2012) (citations omitted). "To survive a motion for summary judgment, there must be some evidence of the personal involvement of each defendant in the alleged constitutional deprivation." *Ricks v. O' Hanlon,* No. 07 Civ. 9849(WHP), 2010 WL 245550, at \*4 (S.D.N.Y. Jan.19, 2010) (citing *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986). " 'Personal involvement' is a question of fact, governed by the general rule that summary judgment may be granted only if no issues of material fact exist." *Shankle v. Andreone,* No. 06– CV–487 (NG)(LB), 2009 WL 3111761, at \*5 (E.D.N.Y. Sept. 25, 2009) (citing *Williams,* 781 F.2d at 323).

Here, it is undisputed that Officer Roberson did not use force against Plaintiff during the Bellevue incident, but there is evidence that she was present when Officer Madan allegedly slammed Plaintiff's head into the floor, and did not intervene. (Pltf.2012 Dep. at 53) Construing this evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Officer Roberson violated her duty to intervene to prevent other officers from violating Rivera's constitutional rights. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994) ("It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.").

Plaintiff has demonstrated sufficient personal involvement on the part of Officer Roberson to survive summary judgment. [8]

[8] Defendants' reliance on *Minter v. County of Westchester,* No. 08 Civ. 7726(WHP), 2011 WL 856269 (S.D.N.Y. Jan.20, 2011) is misplaced. In *Minter,* the court dismissed claims against certain members of a SWAT team for lack of personal involvement. These defendants were stationed outside Plaintiff's residence but were not present for his arrest inside the home. *Id.* at \*7. Here, by contrast, Rivera has alleged that Officer Roberson observed other officers allegedly violating Plaintiff's constitutional rights but failed to intervene.

### IV. *QUALIFIED IMMUNITY*

Defendants argue that even if they violated Plaintiff's rights, they are entitled to qualified immunity. (Def.Br.19–25) As a general matter, parole officers who violate a plaintiff's constitutional rights are nevertheless entitled to qualified immunity if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stephenson v. Doe,* 332 F.3d 68, 77 (2d Cir.2003) (citation omitted). It is well established that "use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." *Saucier v. Katz,* 533 U.S. 194, 201–02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), *overruled in part on other grounds by Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2001) (citing *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). However, identifying the generalized constitutional protection is not enough; the law must be "clearly established in a more particularized sense," *Kerman v. City of New York,* 261 F.3d 229, 236 (2d Cir.2001) (citing *Anderson v. Creighton,* 488 U.S. 635, 640 (1986)), that is, "in ... the specific context of the case." *Saucier,* 533 U.S. at 201. The Supreme Court has made clear that officers who have used excessive force may be entitled—under the qualified immunity doctrine—to an extra layer of protection "from the sometimes hazy border between excessive and acceptable force." *Id.* at 206. The relevant inquiry "is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted ." *Id.* at 202; *see Loria v. Gorman,* 306 F.3d 1271, 1286 (2d Cir.2002) ("Said differently, ... we analyze the objective reasonableness of the officer's belief in the lawfulness of his actions.").

**\*11** Here, there are material issues of fact that preclude summary judgment on Defendants' qualified immunity defense as it pertains to the Bellevue incident. If, as Rivera claims, he was subjected to an unprovoked violent assault at

Bellevue, the officers could not have reasonably believed that their actions were lawful. Resolution of Rivera's excessive force claim and Defendants' qualified immunity defense requires credibility determinations that are the province of a jury. *See Azrielli v. Cohen Law Offices,* 21 F.3d 512, 517 (2d Cir.1994); *see also Hartline v. Gallo,* 546 F.3d 95, 103 (2d Cir.2008) ("[If] a reasonable jury might determine that Defendants were acting in a fashion that clearly violated [Plaintiff's] Fourth Amendment rights [,] ... Defendants are ... not entitled to summary judgment on the issue of qualified immunity.").

### CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED as to the Amended Complaint's First Claim for Relief but DENIED as to the Second Claim for Relief. The Clerk of the Court is directed to terminate the motion (Dkt. No. 49).

The parties are directed to comply with this Court's Individual Rules concerning the preparation of a pre-trial order. The joint pre-trial order will be filed on October 14, 2013. Motions *in limine, voir dire* requests, and requests to charge are due on October 14, 2013. Responsive papers, if any, are due on October 23, 2013. Trial will commence on November 11, 2013, at 9:00 a.m., in Courtroom 705 of the Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, New York.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 4860116

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2002 WL 2003201
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Chesterfield HOPE, Plaintiff,

v.

Phyllis GOINES, Bill McCarthy, Frank
Larke, Craig Gaddy, Robert Dennison,
Frank Cuccinelo, and Lou Cali, Defendants.

No. 00 CV 3476(JG).
|
Aug. 8, 2002.

**Synopsis**
Parolee brought § 1983 action against parole officers, alleging that they conducted illegal search of his person during parole office visit. Parole officers moved for summary judgment. The District Court, Gleeson, J., held that: (1) search did not violate parolee's Fourth Amendment rights, and (2) officers were entitled to qualified immunity.

Motion granted.

West Headnotes (2)

**[1]** **Pardon and Parole** Supervision of Parolee; Search

Pat-down search of parolee's person and bag conducted by parole officer during routine parole office visit, pursuant to state parole division's practice, did not violate parolee's Fourth Amendment rights, for purposes of parolee's § 1983 claim; even though officers lacked individualized suspicion of parolee's involvement in any criminal activity, parolees were identifiable group who possessed reduced Fourth Amendment rights, such routine searches at parole office furthered specific goals of state parole program, including need to ensure compliance with terms and conditions of parole, need to protect parole officers and public, and need to facilitate parolee's re-integration into community by discouraging illegal behavior, and parolee signed written acknowledgement that he could be searched by parole officer as condition

of parole. U.S.C.A. Const.Amend. 4; 42 U.S.C.A § 1983.

3 Cases that cite this headnote

**[2]** **Pardon and Parole** Supervision of Parolee; Search

Parole officers, who conducted pat-down search of parolee's person during routine parole office visit without individualized suspicion, pursuant to practice of state parole division to conduct such routine searches, were entitled to qualified immunity from liability in parolee's § 1983 claim for alleged violation of his Fourth Amendment rights; right of parolee reporting to his parole office to be free from search absent individualized suspicion was not clearly established, and parole division's practice was reasonable. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

4 Cases that cite this headnote

**Attorneys and Law Firms**

Eugene B. Nathanson, New York, New York, for Plaintiff.

Eliot Spitzer, Attorney General of the State of New York, New York, NY, By: Michael E. Peeples, Assistant Attorney General, for Defendants.

*MEMORANDUM AND ORDER*

GLEESON, J.

**\*1** Plaintiff Chesterfield Hope brings this civil rights action pursuant to 42 U.S.C. § 1983 against the defendant parole officers, alleging that they conducted an illegal search of his person during a parole office visit. Defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the following reasons, the defendants' motion is granted.

*Facts*

On November 13, 1997, Hope was released from prison to the New York State Division of Parole. As a condition of his release, Hope signed a "certificate of release," which set forth the terms and conditions of his parole and recorded his consent to these conditions. One passage of the certificate stated as follows:

> I, Chesterfield Hope, voluntarily accept Parole supervision. I fully understand that my person, residence and property are subject to search and inspection. I understand that parole supervision is defined by these Conditions of Release and all other conditions that may be imposed upon me by the [Parole] Board or its representatives.

Defendants' Statement of Material Facts, ¶ 3. The certificate listed as conditions, *inter alia,* that (1) "I will permit my Parole Officer to visit me at my residence and/or place of employment and I will permit the search and inspection of my person, residence and property," and (2) "I will not own, possess or purchase any deadly weapon as defined in the Penal Law or any dangerous knife, dirk,[1] razor, stiletto, or imitation pistol." *Id.* Hope was placed under the supervision of defendant Parole Officer Phyllis Goines, and was required to make regular office visits to the Division's offices at 340 Livingston Street in Brooklyn.

[1]    "Dirk" is an archaic word of Scottish origin meaning "a long, straight-bladed dagger." *Webster's Ninth New Collegiate Dictionary* 358 (1984).

On June 14, 1999, Hope reported to those offices for a regularly scheduled meeting with Parole Officer Goines. That day happened to be a "safety check day." Pursuant to Parole Division practice since the early 1990s, on a safety check day every parolee is searched as he or she reports to the office. These searches involve a "pat down" and a search of a parolee's pockets and bags.

Hope was directed to a room where unidentified parole officers patted him down and searched him. During the search, a razor blade was discovered in Hope's knapsack. Goines was notified of the search and its results, and she determined that carrying a razor blade violated a condition of Hope's parole. She issued a parole violation warrant, and Hope was arrested and incarcerated. On November 12, 1999, Hope was released from prison and his parole violation was dismissed pursuant to a writ of habeas corpus issued by the New York State Supreme Court.

Hope commenced this action on June 6, 2000, alleging that defendants violated his Fourth Amendment rights by subjecting him to an illegal search. At first, Hope alleged that he was searched selectively, claiming that a parole officer approached him on the street in front of the parole office, ascertained that he was a parolee, and ordered him inside to be searched. He has since withdrawn that allegation, and now contends only that the safety check day practice—the pat-down of all parolees and the search of their pockets and bags—violates the Fourth Amendment. He seeks compensatory and punitive damages.

**\*2** While the instant motion was pending, plaintiff consented to the dismissal of Phyllis Goines and Bill McCarthy. I dismissed them in an order dated April 4, 2002. At oral argument, plaintiff's counsel informed me that defendant Frank Cuccinelo was never served and thus is not before the court.

*Discussion*

A. *The Summary Judgment Standard*

Under Rule 56 of the Federal Rules of Civil Procedure, the moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The substantive law governing the case identifies the facts that are material, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is warranted only if "the evidence is such that a reasonable jury could not return a verdict for the nonmoving party." *Id.*

Moreover, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Electric Industrial*

Hope v. Goines, Not Reported in F.Supp.2d (2002)
Case 6:24-cv-01169-DNH-MJK   Document 5   Filed 10/30/24   Page 81 of 141
2002 WL 2003201

*Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 586–87 (quoting Fed.R.Civ.P. 56(e)).

B. *The Alleged Fourth Amendment Violation*

In order to prevail, a plaintiff in a § 1983 action must prove: (1) a deprivation of a federally protected right; and (2) that the deprivation occurred under color of state law. *See American Mfgs. Mutual Ins. Co. v. Sullivan,* 526 U.S. 40, 49–50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999); *Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994). Only the first of these elements is at issue here.

Hope alleges a violation of his Fourth Amendment right to be free of unreasonable searches. Since the Supreme Court has said that the Fourth Amendment protects only against "unreasonable government intrusions into ... legitimate expectations of privacy," *United States v. Chadwick,* 433 U.S. 1, 7, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), I must examine both the reasonableness of the search and Hope's expectations of privacy.

1. *The Reasonableness of the Search*

The reasonableness of a search is determined by balancing the degree of the intrusion upon an individual's privacy against "the degree to which it is needed for the promotion of legitimate governmental interests." *Wyoming v. Houghton,* 526 U.S. 295, 300, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999).

As to the degree of intrusion, the evidence is undisputed that the searches in question consist of "pat downs" and searches of bags and baggage. A pat down, or frisk, involves touching the body, and thus is more invasive than some other search measures, such as metal detectors or drug-sniffing dogs. At the same time, the state may choose not to spend limited public resources on purchasing, installing, and operating technologically advanced equipment like metal detectors; absent such an investment, pat frisks are likely the least intrusive means of detecting weapons or drugs in this context. The Supreme Court has "repeatedly refused to declare that only the 'least intrusive' search practicable can be reasonable under the Fourth Amendment." *Veronia School Dist. 47J v. Acton,* 515 U.S. 646, 663, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (quoting *Skinner v. Railway Labor*

*Executives' Association,* 489 U.S. 602, 629 n. 9, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989)). On balance, I conclude that the intrusiveness of the search here is relatively minor, and must be weighed against other factors.

**\*3** **[1]** Plaintiff relies on *New York v. Huntley,* 43 N.Y.2d 175, 181, 401 N.Y.S.2d 31, 371 N.E.2d 794 (1977), for the proposition that a parolee is not stripped of all Fourth Amendment rights. *See id.* at 180–81, 401 N.Y.S.2d 31, 371 N.E.2d 794. As plaintiff concedes, however, parolees possess diminished Fourth Amendment protections, and the precise scope of the protections they retain is uncertain. New York considers parolees to be still serving their prison sentences, only outside of jail. *See, e.g., Menechino v. Division of Parole,* 32 A.D.2d 761, 301 N.Y.S.2d 350, 352 (1st Dep't 1969), *aff'd* 26 N.Y.2d 837, 309 N.Y.S.2d 585, 258 N.E.2d 84 (1970) ("While on parole, the petitioner remained constructively in legal custody subject at all times to the control of the Board of Parole."). This conception does not mean that parolees have only the *de minimis* Fourth Amendment protection that incarcerated inmates retain, but it explains (and justifies) a significant limitation on parolees' rights. Even as the New York Court of Appeals affirmed the rights of parolees in *Huntley,* it held that a Fourth Amendment plaintiff's status as a parolee "is always relevant and may be critical," because "what may be unreasonable with respect to an individual who is not on parole may be reasonable with respect to one who is." *Huntley,* 43 N.Y.2d at 181, 401 N.Y.S.2d 31, 371 N.E.2d 794. Similarly, the federal courts, like the state courts, have consistently found that parolees possess a reduced level of Fourth Amendment protection, *see United States ex rel. Santos v. New York State Board of Parole,* 441 F.2d 1216, 1218 (2d Cir.1971) (what is unreasonable for a person not on parole may be reasonable for a parolee), and have linked the reasonableness of those searches to the needs of parole supervision. *See Griffin v. Wisconsin,* 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987) (parole creates "special needs" which justify departure from normal standards). The similarity between federal and New York law extends to the test for determining the validity of a search of a parolee. In *Huntley,* the New York Court of Appeals stated the test as "whether the conduct of the parole officer was reasonably and rationally related to the performance of the parole officer's duty." *Huntley,* 43 N.Y.2d at 181, 401 N.Y.S.2d 31, 371 N.E.2d 794. The Second Circuit has held that such searches are justified as long as they are " 'reasonably related to the performance of the parole officer's duty.' " *United States v. Grimes,* 225 F.3d 254, 258 (2d Cir.2000) (quoting *Huntley,* 43 N.Y.2d at 181, 401 N.Y.S.2d 31, 371 N.E.2d 794).

(a) *The Legal Principles Governing Searches in the Absence of Individualized Suspicion*

The Court has explained that there is a "longstanding principle that neither a warrant, nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance." *Nat'l Treasury Employee's Union v. Van Raab,* 489 U.S. 656, 664, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). Rather, the "ultimate measure of the constitutionality of a government search is 'reasonableness," " *Veronia School Dist. 47J,* 515 U.S. at 652, and courts have generally engaged in a fact-specific inquiry to determine whether suspicionless searches are permissible. *See City of Indianapolis v. Edmond,* 531 U.S. 32, 37–40, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000) (citing cases).

**\*4** In *United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), the Court upheld a checkpoint search designed to discover illegal immigrants traveling on a major highway in California. It reasoned that the government had a legitimate interest in controlling illegal immigration. Since the burden of requiring individualized suspicion for each stop would be too great, the "special need" of controlling the nation's borders was sufficient to place the search outside of the usual requirement of individualized suspicion. *Id.* at 562. Since then, the Court has upheld other "special needs" searches, *see, e.g., Veronia School Dist. 47J,* 515 U.S. at 664–65 (random drug tests for student-athletes); *Treasury Employees v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (drug tests for Federal Customs Service employees seeking transfer to certain positions), as well as suspicionless "administrative searches" for particular regulatory purposes, *see, e.g., New York v. Burger,* 482 U.S. 691, 708–12, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) (inspection of automobile junkyard, a "closely regulated business"); *Michigan v. Tyler,* 436 U.S. 399, 507–12 (1978) (suspicionless inspection of fire-damaged buildings). I note that during the pendency of this motion, the Court issued its most recent opinion on the subject, reaffirming the validity of the "special needs" exception and expanding its reach in the school drug-testing context. *See Board of Ed. of Ind. School Dist. No. 92 of Pottawatomie v. Earls.* No. 01–332, slip op. at 5, (U.S. Sup.Ct. June 27, 2002).

*Skinner v. Railway Labor Executives' Association,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), is particularly instructive. In that case, the Court upheld regulations mandating drug and alcohol testing of all railroad employees involved in serious accidents on the job. According to the regulations at issue, after certain railroad accidents the railroad was required to transport all covered employees to an independent medical facility, where blood and urine samples would be taken and tested for the presence of alcohol or illegal drugs. *See id.* at 609–10. The Court held that these searches were constitutionally permissible because of the Government's compelling interest in regulating the safety of the railroads, *see id.* at 628–30, and the difficulty of protecting that interest if the railroad were required to make an individualized showing of suspicion to justify such seizures whenever there had been an accident. *See id.* at 631. The Court wrote:

> The Government's interest in regulating the conduct of railroad employees to ensure safety, *like its supervision of probationers* or regulated industries, or its operation of a government office, school, or prison, "likewise presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements."

*Skinner,* 498 U.S. at 620 (quoting *Griffin,* 483 U.S. at 873–74) (emphasis added).

(b) *The Application of These Principles to the "Safety Check Day"*

**\*5** I conclude that the facts of this case fit easily into the exceptions to the individualized suspicion requirement that are outlined in *Edmond.* Unlike the search challenged in *Edmond,* the persons affected by search at issue here were not members of the general public on a public road, but rather parolees in a parole office. The intrusion therefore falls only on a readily identified subset of the population that undisputedly possesses reduced Fourth Amendment protections, and occurs in a location in which the government's interest is especially strong. Moreover, the Court noted in *Edmond* that the explicit and sole purpose of the roadblock in question was to uncover evidence of ordinary criminal activity. *See id.* at 41–42. The parolee search, however, is not a general crime control measure. Rather, it furthers the specific goals of New York's parole program, which include the need to (1) ensure compliance with terms and conditions of parole; (2) protect parole officers, staff, other parolees, and the public; and (3) facilitate re-integration into the community by discouraging illegal behavior.

As in *Skinner,* the government search at issue here was conducted pursuant to a broad policy that is no more invasive

2002 WL 2003201

than necessary to achieve the desired goal. In both cases, those subjected to the blanket search were not random members of the general public, but rather an identifiable group that had been put on notice that a search is possible. Finally, in *Skinner,* only employees working on trains that were recently involved in significant accidents were subject to search. Although those searches occurred without individualized suspicion, the government nonetheless had reason to believe, based on prior experience, that employees involved in accidents were disproportionately likely to have been under the influence of alcohol or illegal drugs. *See Skinner,* 489 U.S. at 607–08. Similarly, the Probation Department searches only individuals who have been convicted of felonies, and the search policy was implemented after weapons were found in the probation offices. *See* Defendants' Statement of Undisputed Facts, ¶¶ 11–15.

(c) *Defendants' Proffered Reasons*

Defendants seek to justify the searches in question by reference to the goals of the parole program, which are described above. As factual support for the connection between the policy and these proffered reasons, they offer evidence in the form of deposition testimony and affidavits attesting to the following facts: (1) 250–350 parolees report to parole offices in Brooklyn on a reporting day; (2) the average parole officer has between 50–60 parolees to monitor at any given time; (3) many of the parolees supervised in Brooklyn have been convicted of violent crimes; (4) weapons and illegal drugs have been found in parole offices in circumstances that lead inescapably to the conclusion that they were discarded by parolees who feared that they would be found in possession of them; and (5) arguments and fights have broken out between parolees inside parole offices.

**\*6** Plaintiff does not dispute these facts. *See* Plaintiff's Counter–Statement of Undisputed Facts. Nor does he claim that they would not provide factual support for a search policy like the one he challenges, implemented for the reasons proffered by the defendants. Rather, plaintiff argues that the defendants in fact had other (presumably law enforcement) purposes in mind when they implemented the search policy, and that summary judgment is inappropriate here because there is a factual dispute about to the true purpose of the policy. I am not persuaded by this argument.

Plaintiff implies that *Edmond, supra,* requires defendants to prove that the primary purpose of the search policy was the protection of others within the parole offices. *See* Plaintiff's Memorandum in Opposition, at 4 ("Defendants ...

have hardly established as a matter of undisputed fact that this is even a true purpose ... let alone a primary purpose, as required by *Edmond.*" ) (hereinafter "Pl.'s Mem."). This contention is a misreading of *Edmond. Edmond* does not require the defendants to prove that an asserted purpose is the primary purpose. Instead, it holds that a reviewing court may "examine the available evidence to determine the primary purpose," and where a court finds that the primary purpose was impermissible, it may find the search unconstitutional on that basis. *Edmond,* 531 U.S. at 46–47. In *Edmond,* the parties had stipulated in the district court that general law enforcement was the primary purpose of the checkpoint. *See Edmond v. Goldsmith,* 38 F.Supp.2d 1016, 1018 (S.D.Ind.1998), *rev'd* 183 F.3d 659 (7th Cir.1999), *aff'd sub nom. City of Indianapolis v. Edmond,* 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000). The discussion of purpose in the majority opinion in *Edmond* was in response to Chief Justice Rehnquist's dissenting opinion, which argued that courts should not take the purpose of a generalized search into account. *See Edmond,* 531 U.S. at 52–53 (Rehnquist, C.J., dissenting). Plaintiff is attempting to import a burden-shifting mechanism where none exists; it is he who has the burden of proving that defendants' purpose was an illegitimate one.

As to the facts, plaintiff's counsel conceded at oral argument that he offered no additional evidence of defendants' purpose, but instead would attempt to raise an inference in the minds of the jurors that the reasons offered were not sincere. Plaintiff implies that if the safety of other persons in the parole offices were truly a matter of concern, defendants would be able to testify to more incidents of violence in the offices. *See* Pl.'s Mem. at 4–5. But public officials have an affirmative duty to ensure the safety of public employees, members of the public, and the parolees themselves. They know that convicted felons have been bringing weapons and illegal drugs into the parole offices. They are not required to wait until someone is killed in their offices before they act to prevent such an act.

**\*7** Finally, plaintiff relies on an excerpt from the Division of Parole's Policy and Procedures Manual to suggest that the Division itself recognizes the requirement of individualized suspicion before any search of a parolee. *See* Pl.'s Mem. at 6. This reliance is misplaced. The manual does not address the question of whether an individualized suspicion is required before a parolee may be searched in a parole office. *See* February 28, 2002, Sworn Statement of Eugene B. Nathanson, Exhibit 1 ("[A] releasee may be searched when there is an articulable reason relative to the responsible supervision of the case"). As plaintiff

acknowledges, an "articulable reason" is not the same thing as an "individualized suspicion." Pl.'s Mem. at 7. Neither does the language of the manual support plaintiff's interpretation that this passage establishes the only circumstances in which a parolee may be permissibly searched. Even if it did, it would not be binding as law. *See Hall v. New York State Div. of Parole,* No. 99–11317, 2000 U.S. Dist. LEXIS 11027, at *10 (S.D.N.Y. July 13, 2000)(parole manual provision cannot be enforced through litigation); *People ex rel. Allah v. New York State Board of Parole,* 158 A.D.2d 328, 551 N.Y.S.2d 16, 17 (1st Dep't 1990)("policy item does not have the force of law, and therefore is not properly enforceable by this court"). Therefore, the manual sheds little light on the questions raised by this motion.

On these facts, I conclude that the search policy is reasonably related to the performance of the duties of the parole officers. I further conclude that the policy furthers "special needs" that go beyond ordinary law enforcement, is reasonably related to the performance of a parole officer's duties, and has not been adopted for the purpose of general crime control.

### 2. *Hope's Reasonable Expectation of Privacy*
To establish a legitimate expectation of privacy, Hope must show (1) that he held an actual [subjective] expectation of privacy," and (2) this expectation is "one that society is prepared to recognize as 'reasonable.' " *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring).

Hope cannot satisfy either prong of this test. He cannot establish a subjective expectation of privacy, as he acknowledged in writing his understanding of the conditions of his release, which explicitly included being subject to searches by his parole officer. As to the second prong, Hope's legally cognizable expectation of privacy was greatly reduced. As the Second Circuit has stated in a similar case, "[t]he expectation of a parolee in a parole officer's office would be at its lowest ebb." *United States v. Thomas,* 729 F.2d 120, 123–24 (2d Cir.1984).

Considering both the reasonableness of the search and plaintiff's lack of a legitimate expectation of privacy, I conclude that there are no material facts in dispute and defendants are entitled to summary judgment as a matter of law.

### C. *Qualified Immunity*

**\*8** **[2]** Government officers are entitled to qualified immunity if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). To determine whether a particular right was clearly established at the time defendants acted, the Second Circuit "has considered three factors: (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the [Second Circuit] support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citing *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989)), *cert. denied,* 503 U.S. 962 (1992). Also, even where the law is clearly established, officers are entitled to qualified immunity if it was "objectively reasonable" for them to believe that their actions were lawful at the time of the challenged acts. *See Soares v. Connecticut,* 8 F.3d 917, 920 (2d Cir.1993).

The right asserted by Goines here, the right of a parolee reporting to his parole office to be free from search absent individualized suspicion, has not been clearly established by the decisional law of the Supreme Court or of the Second Circuit. [2] Furthermore, since I find that the search policy is constitutional, I also find that it was objectively reasonable for defendants to believe that their actions were constitutional. Accordingly, on either basis defendants are entitled to qualified immunity. This conclusion provides an alternate ground for granting summary judgment.

[2]     The law of a specific circuit can clearly establish a right, but the Supreme Court has not decided whether a right may be "clearly established" by decisions of other circuit courts. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818 n. 32, 102 S.Ct. 2727, 73 L.Ed.2d 396 (citing *Procunier v. Navarette,* 434 U.S. 555, 565, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978)); *Poe v. Leonard,* 282 F.3d 123, 141 n. 15 (2d Cir.2002) (noting that Second Circuit precedent unclear as to whether decisions of other circuits can establish right and collecting cases). In this instance, no other circuit has decided this question either, so I need not decide whether such a decision could be the basis to defeat a qualified immunity claim.

2002 WL 2003201

*Conclusion*

Plaintiff's counsel suggested at oral argument that if the Parole Divisions's safety check day were permissible, it would indicate that parolees had no Fourth Amendment rights at all. My decision in this case indicates nothing of the sort. I merely find that on this limited set of facts the search of Hope was not unreasonable. Accordingly, defendants' motion for summary judgment is granted, and the complaint is dismissed. The Clerk is directed to close the case.

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 2003201

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Horace v. Gibbs, Not Reported in Fed. Supp. (2017)

Case 6:24-cv-01169-DNH-MJK    Document 5    Filed 10/30/24    Page 86 of 141

2017 WL 4344435

2017 WL 4344435
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

John L. HORACE, Plaintiff,

v.

Kevin GIBBS, Field Parole Officer, and Dawn
Anderson, Senior Parole Officer, Defendants.

14-CV-655S
|
Signed 09/29/2017

**Attorneys and Law Firms**

John L. Horace, Albion, NY, pro se.

Kim S. Murphy, NYS Attorney General's Office, Buffalo,
NY, for Defendants.

**DECISION AND ORDER**

WILLIAM M. SKRETNY, United States District Judge

**I. INTRODUCTION**

*1 In this action, *pro se* Plaintiff John L. Horace alleges
under 42 U.S.C. § 1983 that Defendants Kevin Gibbs and
Dawn Anderson, two state parole officers employed by the
New York State Department of Corrections and Community
Supervision, violated his Eighth and Fourteenth Amendment
rights when they used excessive force and were deliberately
indifferent to his medical needs while arresting him for a
parole violation on December 3, 2013.

Now before this Court is Defendants' motion to dismiss
Horace's claims. (Docket No. 27.) For the reasons that follow,
Defendants' motion is granted in part and denied in part.

**II. BACKGOUND**

The following facts, drawn from Horace's complaint, are
assumed true for purposes of assessing Defendants' motion to
dismiss. See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493
F.3d 87, 98 (2d Cir. 2007).

At 12:30 p.m. on December 3, 2013, Defendants and other
officers arrived at Horace's house to arrest him for violating
the conditions of his parole and to search his residence.
(Complaint ("Compl."), Docket No. 1, Section VI ¶ 14.) Upon
entering the house, Gibbs informed Horace that he violated
parole by driving a car without Gibb's permission. (Compl.
Section VI ¶ 14.) Gibbs then handcuffed Horace behind
his back "so tightly there w[as] hardly any space between
[P]laintiff's wrist and the handcuffs" and ordered him to sit in
a chair. (Compl. Section VI ¶ 14.)

At 12:40 p.m., Horace complained to Gibbs that his handcuffs
were too tight and were causing him pain. (Compl. Section
VI ¶ 14.) He asked Gibbs to loosen the handcuffs because his
hands were swelling and the pain was getting worse. (Compl.
Section VI ¶ 14.) Gibbs refused to loosen the handcuffs,
and then he and Anderson searched Horace's residence while
Horace waited in the chair. (Compl. Section VI ¶ 15.)
During the search, Horace "call[ed] out" and told Gibbs and
Anderson that he was diabetic, that he felt dizzy, and that his
handcuffs were hurting his wrists. (Compl. Section VI ¶ 16.)
Defendants ignored Horace until approximately 1:00 p.m.,
when they told him they would be downstairs shortly. (Compl.
Section VI ¶¶ 16, 17.) Horace was upset and worried that the
tight handcuffs were causing him to have low blood sugar,
that he could fall off his chair, and that he could pass out from
high blood pressure. (Compl. Section VI ¶ 17.)

At 1:15 p.m., Defendants escorted Horace to their squad car
and put him in the back seat. (Compl. Section VI ¶ 19.) Horace
claims that front seat of the car was pushed back so that it
was close to the back seat, which forced him into a position
that put pressure on his herniated disks in his lower back and
caused pain in his right knee. (Compl. Section VI ¶¶ 19, 20.)
Defendants then took Horace to their offices. (Compl. Section
VI ¶ 20.)

At about 2:05 p.m., Gibbs transported Horace from the
Division of Parole offices to the Monroe County jail. (Compl.
Section VI ¶ 21.) By this time, Horace's wrists were swollen,
his fingers were numb, he was unable to move his wrists
and fingers, and the handcuffs were embedded into his skin,
causing a permanent mark on his left hand. (Compl. Section
VI ¶ 21.)

*2 At about 2:25 p.m., Gibbs and Horace arrived at
the Monroe County jail, where a Monroe County Sheriff
Deputy "had a hard time removing the handcuffs" because of
Horace's swollen wrists. (Compl. Section VI ¶ 21.)

Horace v. Gibbs, Not Reported in Fed. Supp. (2017)

2017 WL 4344435

Later that evening, medical staff at Monroe County jail kept Horace under observation and gave him insulin for low blood sugar. (Compl. Section VI ¶ 22.)

Horace alleges that he sustained several injuries during the course of his arrest. He claims that the handcuffs "cut into his skin," embedded themselves into his wrists, and caused his wrists to swell to twice their normal size. (Compl. Section III at 2; VI ¶ 21.) He further contends that the handcuffs left "deep indentation[s] ... on both wrists" and a "permanent scar" on his left wrist. (Compl. Section III at 2.)

Horace also claims that Gibbs aggravated his pre-existing conditions in his back (herniated discs) and knee (previous surgery) when he forced him to sit in "an uncomfortable position" in the squad car while being transported, which put "tremendous pressure" on his back and right knee. (Compl. Section III at 2, VI ¶ 20.)

Finally, Horace alleges emotional anguish and distress due to his fear that his blood sugar was getting low and his circulation was being cut-off, which could aggravate his diabetes. (Compl. Section III at 2.)

### III. DISCUSSION

Cognizant of the distinct disadvantage that *pro se* litigants face, federal courts routinely read their submissions liberally, and interpret them to raise the strongest arguments that they suggest. See Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 596, 30 L.Ed. 2d 652 (1972); Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994). This is especially important when reviewing pro se complaints alleging civil rights violations. See Weinstein v. Albright, 261 F.3d 127, 132 (2d Cir. 2001). Because Plaintiff is proceeding *pro se*, this Court has considered his submissions and arguments accordingly.

Horace asserts that Defendants used excessive force against him and were deliberately indifferent to his serious medical needs, in violation of his Fourth [1] and Fourteenth Amendment rights. (Compl., Section II ¶ 7.) Defendants seek dismissal of both claims for failure to state a claim upon which relief can be granted under Rule 12 (b)(6) of the Federal Rules of Civil Procedure. (Docket No. 27.)

[1] As noted, Horace identifies the Eighth Amendment as the source of his excessive force claim. In fact, Horace's claim properly arises under the Fourth Amendment, because the excessive force is alleged to have occurred during a parolee's arrest for a parole violation. See Cox v. Fischer, No. 14-CV-1862 (RA), 2017 WL 1215091, at *4 (S.D.N.Y. Mar. 31, 2017) (noting that "a parolee's claim that he was subjected to excessive force in the course of an arrest for a violation arises under the Fourth Amendment, not the Eighth Amendment"). This Court will therefore consider Horace's excessive force claim under the Fourth Amendment.

#### A. Rule 12 (b)(6)

Rule 12 (b)(6) allows dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12 (b)(6). Federal pleading standards are generally not stringent: Rule 8 requires only a short and plain statement of a claim. Fed. R. Civ. P. 8 (a)(2). But the plain statement must "possess enough heft to show that the pleader is entitled to relief." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557, 127 S. Ct. 1955, 167 L.Ed. 2d 929 (2007).

**\*3** When determining whether a complaint states a claim, the court must construe it liberally, accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor. ATSI Commc'ns, 493 F.3d at 98. Legal conclusions, however, are not afforded the same presumption of truthfulness. See Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L.Ed. 2d 868 (2009) ("the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions").

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570). Labels, conclusions, or "a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555. Facial plausibility exists when the facts alleged allow for a reasonable inference that the defendant is liable for the misconduct charged. Iqbal, 556 U.S. at 678. The plausibility standard is not, however, a probability requirement: the pleading must show, not merely allege, that the pleader is entitled to relief. Id. at 1950; Fed. R. Civ. P. 8 (a)(2). Well-pleaded allegations in the complaint must nudge the claim "across the line from conceivable to plausible." Twombly, 550 U.S. at 570.

Horace v. Gibbs, Not Reported in Fed. Supp. (2017)

2017 WL 4344435

A two-pronged approach is thus used to examine the sufficiency of a complaint, which includes "any documents that are either incorporated into the complaint by reference or attached to the complaint as exhibits." Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004). This examination is context specific and requires that the court draw on its judicial experience and common sense. Iqbal, 556 U.S. at 679. First, statements that are not entitled to the presumption of truth, such as conclusory allegations, labels, and legal conclusions, are identified and stripped away. See id. Second, well-pleaded, non-conclusory factual allegations are presumed true and examined to determine whether they "plausibly give rise to an entitlement to relief." Id. "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint fails to state a claim. Id.

## B. 42 U.S.C. § 1983

Civil liability is imposed under 42 U.S.C. § 1983 only upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws. See 42 U.S.C. § 1983. To properly plead a cause of action under § 1983, a plaintiff's complaint must include allegations that the challenged conduct "(1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." Whalen v. County of Fulton, 126 F.3d 400, 405 (2d Cir. 1997); Hubbard v. J.C. Penney Dep't Store, 05-CV-6042, 2005 WL 1490304, at *1 (W.D.N.Y. June 14, 2005).

Personal involvement in the deprivation of a federal constitutional right is the *sine qua non* of liability under § 1983. See Haygood v. City of New York, 64 F. Supp. 2d 275, 280 (S.D.N.Y. 1999). Thus, personal involvement by defendants in cases alleging constitutional deprivations is a prerequisite to an award of damages under § 1983. See McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977); Richardson v. Coughlin, 101 F. Supp. 2d 127, 129 (W.D.N.Y. 2000); Pritchett v. Artuz, No. 99 Civ. 3957 (SAS), 2000 WL 4157, at *5 (S.D.N.Y. Jan. 3, 2000).

*4 The Second Circuit construes personal involvement in this context to mean "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates." Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996); see also Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994). Personal

involvement need not be active participation. It can be found "when an official has actual or constructive notice of unconstitutional practices and demonstrates gross negligence or deliberate indifference by failing to act." See Meriwether v. Coughlin, 879 F.2d 1037, 1048 (2d Cir. 1989). Thus, personal involvement can be established by showing that

> (1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited deliberate indifference to others' rights by failing to act on information indicating that constitutional acts were occurring.

Liner v. Goord, 582 F. Supp. 2d 431, 433 (W.D.N.Y. 2008) (citing Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)); Hayut v. State Univ. of New York, 352 F.3d 733, 753 (2d Cir. 2003).

On its own, § 1983 does not provide a source of substantive rights, but rather, a method for vindicating federal rights conferred elsewhere in the federal statutes and Constitution. See Graham v. Connor, 490 U.S. 386, 393-94,109 S. Ct. 1865, 104 L.Ed. 2d 443 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 145 n.3, 99 S. Ct. 2689, 61 L.Ed. 2d 433 (1979)). Accordingly, as a threshold matter in reviewing claims brought pursuant to § 1983, it is necessary to precisely identify the constitutional violations alleged. See Baker, 443 U.S. at 140. Here, Horace asserts claims under the Fourth and Fourteenth Amendments.

## C. Fourth Amendment Excessive Force Claim

Although Horace identifies the Eighth Amendment as the source of his excessive force claim, it in fact arises under the

Horace v. Gibbs, Not Reported in Fed. Supp. (2017)

2017 WL 4344435

Fourth Amendment, because the excessive force is alleged to have occurred during a parolee's arrest for a parole violation. See Cox v. Fischer, No. 14-CV-1862 (RA), 2017 WL 1215091, at *4 (S.D.N.Y. Mar. 31, 2017) (noting that "a parolee's claim that he was subjected to excessive force in the course of an arrest for a violation arises under the Fourth Amendment, not the Eighth Amendment"); see also Rushion v. NYS Div. of Parole, No. 13-CV-4277 (RRM), 2016 WL 5255812, at *4 (E.D.N.Y. Sept. 21, 2016) ("Allegations by a parolee that he was subjected to excessive force while being arrested by his parole officer for a parole violation are analyzed under the Fourth Amendment."); Rivera v. Madan, No. 10-CV-4136 (PGG), 2013 WL 4860116, at *8 (S.D.N.Y. Sept. 12, 2013).

The Fourth Amendment is applicable to the States by way of the Fourteenth Amendment. Minnesota v. Dickerson, 508 U.S. 366, 372, 113 S. Ct. 2130, 2135, 124 L.Ed. 2d 334 (1993). The Fourth Amendment protects "[t]he right of the people to be secure in their persons ... against unreasonable ... seizures." U.S. Const. amend. IV. Fourth Amendment excessive force claims are analyzed under a standard of objective reasonableness. Graham, 490 U.S. at 394. Law enforcement officers' application of force is excessive, and thus in violation of the Fourth Amendment, if it is objectively unreasonable "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Roberites v. Huff, No. 11-CV-521S, 2013 WL 5416943, at *3 (W.D.N.Y. Sept. 26, 2013) (quoting Graham, 490 U.S. at 397). In determining whether an officer's actions were reasonable, the actions "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight ... 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers' ... violates the Fourth Amendment." Graham, 490 U.S. at 396 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).

*5 "Law enforcement officers' use of force in an arrest is excessive in violation of the Fourth Amendment if it is 'objectively unreasonable in light of the facts and circumstances confronting them, without regard to the officers' underlying intent or motivation.' " Mayes v. Vill. of Hoosick Falls, 162 F. Supp. 3d 67, 88 (N.D.N.Y. 2016) (quoting Papineau v. Parmley, 465 F.3d 46, 61 (2d Cir. 2006)). When the use of handcuffs gives rise to a Fourth Amendment claim, the reasonableness of force is measured in light of (1) whether the handcuffs were unreasonably tight; (2) whether

the defendants ignored pleas that the handcuffs were too tight; and (3) the degree of injury to the wrists. Roberites, 2013 WL 5416943, at *3; Mayes, 162 F. Supp. 3d at 88 (collecting case). This standard reflects the balance between overly tight handcuffing and the need to use some degree of physical coercion to maintain custody and prevent an arrestee's hands from slipping out of the handcuffs. Usavage v. Port Auth. of New York & New Jersey, 932 F. Supp. 2d 575, 592 (S.D.N.Y. 2013); Esmont v. City of New York, 371 F. Supp. 2d 202, 214–15 (E.D.N.Y. 2005). "This inquiry must reflect the totality of the circumstances, including any facts that bear on whether use of an unusual degree of force may have been justified." Roberites, 2013 WL 5416943, at *3.

The injury requirement is "particularly important." Sachs v. Cantwell, No. 10 Civ. 1663 (JPO), 2012 WL 3822220, at *14 (S.D.N.Y. Sept. 4, 2012). "Courts have found that handcuffing can give rise to a § 1983 excessive force claim where plaintiff suffers an injury as a result." Gonzalez v. City of New York, No. 98 Civ. 3084, 2000 WL 516682, at *4 (E.D.N.Y. Mar. 7, 2000); Sachs, 2012 WL 3822220, at *14 ("While the application of tight handcuffs alone can give rise to a cause of action under § 1983, 'the plaintiffs must suffer some form of injury from the tight handcuffs in order for such a claim to be actionable.' ") (quoting Vogeler v. Colbath, No. 04 Civ. 6071, 2005 WL 2482549, at *9 (S.D.N.Y. Oct. 6, 2005)). "[I]f the application of handcuffs was merely uncomfortable or caused pain, that is generally insufficient to constitute excessive force." Gonzalez, 2000 WL 516682, at *4. The injuries need not be "severe or permanent," Vogeler v. Colbath, No. 04 Civ. 6071, 2005 WL 2482549, at *9 (S.D.N.Y. Oct. 6, 2005), but must be more than merely "de minimis," Washpon v. Parr, 561 F. Supp. 2d 394, 407 (S.D.N.Y. 2008). See also Mesa v. City of New York, No. 09 Civ. 10464 (JPO), 2013 WL 31002, at *18 (S.D.N.Y. Jan. 3, 2013) ("[W]hile a sustained injury that requires doctors' visits is not a necessary element of a successful excessive force claim, where a plaintiff suffers from de minimis injury, it is more difficult to establish that the force used was excessive in nature." (citations omitted)). The most common injuries found to satisfy the injury requirement in handcuff cases are scarring and nerve damage. Roberites, 2013 WL 5416943, at *4; see, e.g., Washpon, 561 F. Supp. 2d at 407 (scarring); Esmont, 371 F. Supp. 2d at 214–15 (nerve damage); Simpson v. Saroff, 741 F. Supp. 1073, 1078 (S.D.N.Y. 1990) (scarring).

Here, assuming the truth of Horace's allegations, as required at this stage, this Court finds that he sufficiently states a Fourth Amendment excessive force claim.

2017 WL 4344435

First, he alleges that his handcuffs were unreasonably tight. He alleges that Gibbs applied the handcuffs "so tightly there w[as] hardly any space between [P]laintiff's wrist and the handcuffs." (Compl. Section VI ¶ 14.) He further alleges that the handcuffs were so tight that they caused indentations in his wrists, caused his wrists and fingers to go numb, and caused his wrists to swell to twice their normal size. (Compl. Section VI ¶¶ 14, 21.)

Second, Horace alleges that Defendants ignored his pleas that the handcuffs were too tight. He alleges that he asked Gibbs to loosen the handcuffs because his hands were swelling and because the pain was getting worse, but Gibbs refused. (Compl. Section VI ¶¶ 14, 15.) He further alleges that during the search of his residence, he "call[ed] out" and told Gibbs and Anderson that he was diabetic, that he felt dizzy, and that his handcuffs were hurting his wrists. (Compl. Section VI ¶ 16.) Defendants ignored that plea as well. (Compl. Section VI ¶¶ 16, 17.)

**\*6** Finally, Horace alleges that he suffered more than discomfort or *de minimis* injuries. He alleges that the handcuffs "cut into his skin," embedded themselves into his wrists, and left "deep indentation[s] ... on both wrists" and a "permanent scar" on his left wrist. (Compl. Section III at 2; VI ¶ 21; Compl. Section III at 2.)

Accordingly, because Horace adequately alleges that his handcuffs were unreasonably tight, that his pleas were ignored, and that he suffered permanent injury, Defendants' motion to dismiss Horace's Fourth Amendment excessive force claim is denied.

### D. Fourteenth Amendment Deliberate Indifference Claim

A pre-trial detainee's claim of deliberate indifference to serious medical needs is governed by the Due Process Clause of the Fourteenth Amendment, not the Eighth Amendment, which is the source of the same right for convicted prisoners. Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017); Thomas v. Nassau County Corr. Ctr., 288 F. Supp. 2d 333, 337 (E.D.N.Y. 2003). This is because "pretrial detainees have not been convicted of a crime and thus may not be punished in any manner—neither cruelly and unusually nor otherwise." Darnell, 849 F.3d at 29 (citation and internal quotation marks omitted).

To sustain a Fourteenth Amendment deliberate indifference claim, a plaintiff must allege deliberate indifference to a "sufficiently serious" medical need. Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L.Ed. 2d 811 (1994). A medical need is "serious" if "the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." Harrison v. Barkley, 219 F.3d 132, 136–37 (2d Cir. 2000) (quoting Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)). Chance sets forth several factors relevant to this inquiry, including whether the plaintiff has "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." 143 F.3d at 702.

Here, Horace fails to allege a plausible claim for deliberate indifference to a serious medical need. Horace's distress related to his diabetes, low blood sugar, and high blood pressure is not a sufficiently serious medical condition, and in any case, Horace concedes that he was given insulin at the Monroe County jail. (Compl. Section VI ¶ 22.) Similarly, Horace's claims that he was seated in an uncomfortable position that aggravated his pre-existing back and knee conditions are not actionable. (Compl. Section III at 2, VI ¶ 20.) Finally, the temporary injuries Horace allegedly received from the handcuffs—pain, swelling, cuts—are likewise not sufficiently serious because they lack permanence and do not amount to conditions that may produce death, degeneration, or lasting extreme pain. See White v. Schriro, 16 Civ. 6769 (PAE)(JCF), 2017 WL 3268202, at \*3 (S.D.N.Y. July 31, 2017) (quoting Johnson v. Wright, 412 F.3d 398, 403 (2d Cir. 2005), in turn quoting, Hemmings v. Gorczyk, 134 F.3d 104, 108 (2d Cir. 1998)).

Accordingly, Defendants' motion to dismiss Horace's Fourteenth Amendment deliberate indifference claim is granted.

### IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part. Horace's Fourth Amendment excessive force claim will proceed, but his Fourteenth Amendment deliberate indifference claim is dismissed.

2017 WL 4344435

### V. ORDERS

**\*7**  IT HEREBY IS ORDERED, that Defendants' Motion to Dismiss (Docket No. 27) is GRANTED in part and DENIED in part, consistent with the foregoing decision.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4344435

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Sforza v. City of New York, Not Reported in F.Supp.2d (2009)

2009 WL 857496

KeyCite Yellow Flag - Negative Treatment

Distinguished by   Zimpfer v. Hilbert College,   W.D.N.Y.,   December 2, 2021

2009 WL 857496
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Chris SFORZA, Plaintiff,
v.
CITY OF NEW YORK, et al., Defendants.

No. 07 Civ. 6122(DLC).
|
March 31, 2009.

West KeySummary

1    **Civil Rights** 🔑 Criminal law enforcement; prisons

**Summary Judgment** 🔑 Law enforcement activities

Genuine issues of material fact as to the use of force used precluded summary judgment in an arrestee's § 1983 claim for municipal liability based on the use of excessive force during an arrest. The arrestee, a transgender woman, alleged that she was arrested after being attacked by a restaurant employee with a pipe in the restroom. The arrestee claimed that she was handcuffed too tightly, creating ongoing numbness in her hands, and that the police deliberately slammed her head twice into the roof of a police vehicle, causing bruises that remained for two months. The city was not entitled to summary judgment based on medical records that reflected injury only to the arrestee's arm, because bruising and other non-permanent injuries can be sufficient to prevail in an excessive force claim. 42 U.S.C.A. § 1983.

51 Cases that cite this headnote

**Attorneys and Law Firms**

Rose M. Weber, Rose M. Weber Law Office, New York, NY, for Plaintiff.

Susan P. Scharfstein, New York City Law Department, New York, NY, for Defendants City of New York and individual City Defendants.

*OPINION AND ORDER*

DENISE COTE, District Judge.

**\*1** This lawsuit concerns allegations of civil rights violations stemming from plaintiff's arrest at a McDonald's restaurant and her treatment by the New York City Police following the arrest. Defendants the City of New York (the "City"), Officers Joseph Bonner, Dennis Morgano, Bryan Hanson, and Jordan Bistany, and Sergeants Liz Salinas, Michael McGovern, Christopher Newsom, Ralph Perfetto, John Adriano, and Luigi Pagano (collectively, the "City Defendants") have moved to dismiss plaintiff Chris Sforza's Third Amended Complaint under Rules 8(a), 12(b)(1), 12(b)(6), and 56, Fed.R.Civ.P. The motion is granted with the exception of the motion to dismiss the excessive force claim brought against the City.

BACKGROUND

Before addressing the parties' legal arguments, the plaintiff's allegations will be summarized and the relevant procedural history of this litigation will be set forth in some detail. The procedural history underlies the defendants' motion to dismiss all claims against the individual City Defendants.

1. July 11, 2006 Arrest
Plaintiff, a transgender female, alleges that she was attacked by a McDonald's employee wielding a metal pipe on July 11, 2006, while injecting herself with insulin in a bathroom at a Manhattan branch of the restaurant to treat her diabetes. Police officers soon arrived on the scene and allegedly arrested plaintiff without probable cause, telling the McDonald's employee that "I got you covered" and allowing him to hide the pipe in a back room at the restaurant. While taking Sforza into custody, the officers allegedly slammed

her head onto the roof of a patrol car and handcuffed her too tightly, causing injuries that persist to the present day. [1]

[1]    At a December 17, 2007 initial conference, plaintiff's counsel explained that the plaintiff suffered no permanent physical injuries but remained traumatized by these events.

Sforza also claims that the officers refused to take her to the hospital for treatment, bringing her first to Manhattan South Precinct instead. She was later transported to the hospital and then returned to the precinct. There, plaintiff alleges, she was strip-searched in full view of male police officers and held in police custody for 24 hours. Sforza was subsequently prosecuted on two counts of assault in the third degree, one count of attempted assault in the third degree, and one count of harassment in the second degree. The charges were dismissed on October 26, 2006.

Sforza alleges that no probable cause for the prosecution existed and that defendants withheld exculpatory evidence and falsified evidence before the District Attorney. She also alleges that, following her release from custody, officers at the precinct refused to allow her to file charges against the McDonald's employee who she maintains assaulted her, despite repeated requests.

2. Delays in Initiating the Lawsuit

Sforza filed a complaint against the City, McDonald's Corporation, and unidentified employees of the New York City Police Department and McDonald's on June 29, 2007, bringing claims under 42 U.S.C. §§ 1983 (" § 1983") and 1985 (" § 1985") for deprivation of civil rights, false arrest, malicious prosecution, abuse of process, excessive force, conspiracy, violation of equal protection, and municipal liability against the City Defendants. [2] She also brought pendent state claims for false arrest, assault, battery, malicious prosecution, abuse of process, intentional or negligent infliction, prima facie tort, negligent hiring, training, supervision, and retention against McDonald's Corporation and its employees, as well as claims under the state and city Human Rights Laws against all defendants.

[2]    Sforza's conspiracy claims are brought against McDonald's and its employees as well.

**\*2**  On July 19, defendant the City of New York requested and received a sixty-day extension, from July 23 to September 24, 2007, to respond to the complaint. The City, with

plaintiff's consent, sought the extension because the plaintiff had named no individual defendants in the action, and the records of the incident, including police records, may have been sealed pursuant to New York Criminal Procedure Law § 160.50. [3] The City needed to review the records of the matter in order to respond to the complaint in compliance with its obligations under Rule 11, Fed.R.Civ.P., and it could not do so until plaintiff executed a consent and authorization releasing the records (the "release"). The City represented that it had forwarded to plaintiff the consent and authorization.

[3]    § 160.50 provides, in part, that
    [u]pon the termination of a criminal action or proceeding against a person in favor of such person ... unless ... such person or his or her attorney demonstrates to the satisfaction of the court that the interests of justice require otherwise ... the record of such action or proceeding shall be sealed ....

It took more than two months, three more letters to the Court from the City, and a Court Order to obtain the necessary release from the plaintiff so that the litigation could begin. The City wrote on September 7, 2007 to request, with plaintiff's and co-defendant McDonald's consent, an additional forty-five days to respond to the allegations of the complaint. The City stated that it had forwarded the release to plaintiff on July 24, 2007 and again on August 14, 2007, and that plaintiff's counsel, Rose Weber ("Weber"), had recently promised to produce the release by September 14. A September 11 endorsement granted the City's request for an extension to respond to the complaint until October 31, and adjourned the initial conference, which had been scheduled for October 5, to October 26.

By September 24, plaintiff had still not produced the release, and the City wrote to request a further adjournment of the initial conference and an Order requiring plaintiff to produce the release and warning plaintiff that she risked dismissal for failure to prosecute. Without the release, the City stated, it was unable to learn the identities of any of the police officers allegedly involved in the incident, as plaintiff had not named any in the complaint.

Plaintiff proceeded to file her first amended complaint two days later, substituting a different McDonald's entity, McDonald's Restaurants of New York, Inc. ("McDonald's"), as defendant. She also hand-delivered the release to the City. That same day, Weber wrote to the Court to apologize

2009 WL 857496

for the delay in providing the release. In her letter, Weber explained that she is a solo practitioner and was one of the lead attorneys in litigation arising from arrests during the 2004 Republican National Convention ("RNC"). Noting that "[t]hese cases have required a super-human effort on my part over the past several months," Weber admitted that "[i]t has, consequently, been difficult for me to pay proper attention to my non-RNC cases." Weber's letter was docketed and filed with an endorsement warning her that "further similar failures to comply diligently with discovery obligations in this case may result in dismissal." The endorsement also adjourned the initial conference to November 30, 2007.

**\*3** The City wrote again on September 28 to complain about plaintiff's September 26 letter, which it deemed "misleading and unfair." The release produced by plaintiff on September 26, the City explained, was not properly completed (it did not include docket or indictment numbers) and might not allow the City to access the necessary records.[4] As a result, the City would not have sufficient time to obtain the documents needed to respond to the amended complaint. In addition to a further 45–day extension of its time to respond to the complaint, the City requested that plaintiff be ordered to produce a properly completed release by a date certain.

[4]    The release form, attached by the City to its September 28 letter, requires little investment of effort on plaintiff's behalf. She needed only to provide the name of the criminal action terminated in her favor, its docket or indictment number, and her signature, and have the form notarized.

A telephone conference was held with the parties on October 5. The plaintiff was reminded of her responsibility to be diligent in the prosecution of the case. Following the conference, an Order of October 9 required plaintiff to provide a compliant release pursuant to New York Criminal Procedure Law § 160.50 by October 19 or submit a letter explaining why her efforts had been unsuccessful. The initial conference was rescheduled for December 7, and defendants were directed to answer the amended complaint by that date. The plaintiff finally produced the required release.

3. Delays in Conducting Discovery
At the initial conference on December 7, a schedule for the balance of the litigation was established, including a December 21, 2007 deadline for plaintiff to provide her medical releases to the defendants. Fact discovery was to close on June 27, 2008. Following expert discovery, a pretrial

order or summary judgment motion was due on October 3, 2008.

About a month after the close of fact discovery, plaintiff's counsel wrote the Court on July 24, 2008 to request a 120–day extension (running from the date of the letter) of the fact discovery deadline.[5] She noted that defendant McDonald's consented to the extension, but that the City wanted the 120 days to run from the end of future settlement discussions, hoping to avoid the costs of discovery. Plaintiff also requested a conference to discuss outstanding discovery disputes and stated that the resolution of one of the disputes, involving the identities of officers at a New York City Police Department precinct, was likely to create the need for amendments to the complaint. Plaintiff explained that she had not yet amended her complaint to name any police officers because "[i]n order to avoid piecemeal, sequential amendments to the complaint, plaintiff has held off on amending the complaint until she can add all of the police officer defendants." The letter revealed that no depositions had been taken and that the plaintiff wanted to depose "several" police officers and some other witnesses, including an unknown number of McDonald's employees.

[5]    Weber had written a substantially similar letter on July 7, 2008 to the Magistrate Judge to whom the parties had been referred for settlement discussions.

A telephone conference with the parties was held on the record on July 31, 2008. At the conference, the delays and lack of diligence, especially on plaintiff's part, were noted. Plaintiff had been warned about the possibility of dismissal for failure to prosecute ten months earlier, and the schedule set at the initial conference in December 2007 had been set to accommodate her needs. The parties had failed to have any settlement discussions before Magistrate Judge Dolinger, had not begun depositions, and did not mention any existing discovery disputes or request any extension of fact discovery until a month after they were supposed to have completed the process.

**\*4** The City noted that plaintiff had given only vague information regarding the visits to the precinct she made to attempt to file a complaint against the McDonald's employee. While the plaintiff had identified six or seven dates of visits to the precinct, she had given no names for the officers with whom she had spoken or even a general physical description of them, such as their gender, race, or height. The City

2009 WL 857496

explained that the assigned desk officer might not have been at the desk when plaintiff appeared at the precinct and that the plaintiff could not have a good-faith basis for naming an assigned desk officer as a defendant. Without descriptions from the plaintiff, the City was still not able to identify the officers with whom plaintiff may have interacted. Weber insisted that she was entitled to the names of the assigned desk officers in discovery and that their names were all she wanted to know.

Following the telephone conference, an Order of July 31, 2008 gave plaintiff five days to file an amended complaint "naming each of the police officers present at McDonald's restaurant on the date of the incident alleged." The Order also required the City to "identify the desk officers assigned at the times and dates specified by plaintiff" by August 29. Plaintiff was directed to amend her complaint further by September 5 to include any additional police officers, but warned that the complaint must be amended "consistent with [Weber's] obligations under Rule 11" and that "[t]here shall be no further amendment or joinder of additional parties after September 5, 2008." Additionally, the Order extended fact discovery to December 19 and set a March 27, 2009 due date for either a summary judgment motion or pretrial order.

4. The Second and Third Amended Complaints

Plaintiff amended her complaint for the second time on August 6, 2008, naming Officers Joseph Bonner, Dennis Morgano, Bryan Hanson, Jordan Bistany, and Sergeant Liz Salinas as defendants. She filed a Third Amended Complaint on September 5, adding Sergeants Michael McGovern, Christopher Newsom, Ralph Perfetto, John Adriano and Luigi Pagano. Neither the Second nor the Third Amended Complaints ties any of the ten officers to either the incident at McDonald's or the precinct where plaintiff alleges she was strip-searched and repeatedly denied the opportunity to file a complaint. The Third Amended Complaint lists all of the above individuals together in one paragraph and alleges that they were police officers. The allegations of wrongdoing found elsewhere in the complaint refer only to "defendant police officers," failing to identify any individual officer or even a group of officers, despite the fact that these officers were identified to plaintiff as present at either McDonald's or the precinct.

The filing of the Third Amended Complaint did not put an end to the disputes and delays. On August 18, the City wrote a letter stating that, while plaintiff had filed her Second Amended Complaint on August 6, she had not yet served the

five individual defendants it named. The plaintiff was directed to serve the defendants named in the amended complaint by September 19, 2008.

**\*5** The City wrote again on September 23, representing that plaintiff had not properly served the defendants in compliance with Rule 4, Fed.R.Civ.P., because the delivered papers did not include a summons directed to each defendant. Instead, plaintiff had listed all of the individual City Defendants together on the summons and highlighted the name of the particular individual being served. Plaintiff refused to correct the defects in service and wrote a letter on September 24 contesting whether the Federal Rules require inserting each defendant's name into the "To:" section of a summons.

A telephone conference was held on the record on September 25 to discuss the parties' submissions. The conference opened with the Court noting the numerous delays that had thus far occurred. Both parties were heard on the summons issue. Following the conference, an Order of September 26 directed plaintiff to serve the individual City Defendants by October 3 in accordance with Rule 4(a)(1)(B), Fed.R.Civ.P., which requires that a summons be "directed to" each defendant. Defendants were ordered to answer or otherwise respond by November 3. [6]

[6]     Orders of October 24 and December 10 addressed the parties' disputes regarding access to the plaintiff's medical providers. *See Sforza v. City of New York,* No. 07 Civ. 6122(DLC), 2008 WL 4701313, at \*3 (S.D.N.Y. Oct.24, 2008).

5. City Defendants' Motion to Dismiss or for Summary Judgment

On November 3, the City Defendants moved to dismiss or for summary judgment. A November 5 Order required plaintiff to oppose the motion by November 21 and the City Defendants to reply by December 5. Plaintiff wrote a letter on November 5, stating that she had "not yet had the opportunity to conduct any depositions whatsoever" and noting that "much of the paper discovery is still outstanding." She asked that the City be directed to withdraw its motion without prejudice for refiling at the close of discovery or that plaintiff be permitted to file her opposition papers at the close of discovery. In the alternative, she requested until December 5 to submit her opposition, stating that "[f]our weeks is the norm for opposition papers, and, as a solo practitioner with a very busy practice, I will need every minute of those four weeks." [7] City

Sforza v. City of New York, Not Reported in F.Supp.2d (2009)

2009 WL 857496

Defendants submitted a letter opposing plaintiff's requests. An Order of November 13 authorized plaintiff to file her opposition to the motion to dismiss by December 5, with City Defendants' reply due on December 19.

7      In fact, Local Civil Rule 6.1(b) states that parties have ten business days to file opposition papers to most motions.

The parties next submitted a series of letters concerning various discovery disputes. On November 12, a letter was received from Weber listing ten discovery disputes and requesting a conference to address them. The requests concerned, *inter alia,* the City's refusal to provide information regarding whether the officers involved in the incident were using steroids, its insistence that any information regarding the individuals who had placed 911 calls regarding the incident at McDonald's must be accompanied by an attorneys'-eyes-only stipulation, as well as its refusal to provide various records and training documents relevant to the issue of municipal liability until after motion practice. Besides opposing the plaintiff's positions on these issues, the City requested a stay of depositions until its November 3 motion was resolved. At a December 2 conference held on the record, neither party objected to a stay of depositions pending resolution of City Defendants' motion. The parties were ordered to complete document discovery by December 19.

**\*6** Plaintiff submitted her opposition to the motion to dismiss or for summary judgment on December 5. That opposition included plaintiff's own declaration, which did not specifically identify any police officers. The motion was fully submitted on December 19.

### DISCUSSION

The City Defendants' arguments that the Third Amended Complaint must be dismissed with respect to the claims brought against individual City Defendants will first be addressed, followed by analysis of claims against the City. A trial court considering a Rule 12(b)(6) motion must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir.2007). At the same time, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Achtman v. Kirby,*

*McInerney & Squire, LLP,* 464 F.3d 328, 337 (2d Cir.2006) (citation omitted).

A court considering a Rule 12(b)(6) motion applies a "flexible plausibility standard, which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Boykin v. KeyCorp,* 521 F.3d 202, 213 (2d Cir.2008) (citation omitted). "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (citation omitted).

Under the pleading standard set forth in Rule 8(a)(2), complaints must include a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). "[A] plaintiff is required only to give a defendant fair notice of what the claim is and the grounds upon which it rests." *Leibowitz v. Cornell Univ.,* 445 F.3d 586, 591 (2d Cir.2006). Rule 8 is fashioned in the interest of fair and reasonable notice, not technicality, and therefore is "not meant to impose a great burden upon a plaintiff." *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 347, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). No heightened or more specific pleading standard applies to claims brought under § 1983. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *Iqbal v. Hasty,* 490 F.3d 143, 153 (2d Cir.2007). § 1983 claims need not be plead with particularity, but may be averred generally. *Leatherman,* 507 U.S. at 168.

In *Wynder v. McMahon,* 360 F.3d 73 (2d Cir.2004), an employment discrimination claim also brought under § 1983, the court noted that "Rule 8 does not necessarily require ... that the complaint separate out claims against individual defendants." *Id .* at 80. Deciding that Wynder's complaint satisfied Rule 8, however, the court also noted that "each of the named defendants-appellees is explicitly tied to one or more of Wynder's allegations." *Id.* "[R]eading the complaint carefully, the individual defendants can discern which claims concern them and which do not." *Id.* The court ultimately found that plaintiff's complaint, which was "a model of neither clarity nor brevity," *id.* at 79, met the standard of Rule 8(a). The *Wynder* court noted, however, that a complaint which passed muster under Rule 8 might nonetheless be dismissed under Rule 12(b)(6) for failure to state a claim. Where "the complaint accuses *all* of the defendants of having violated *all* of the listed constitutional and statutory

2009 WL 857496

provisions," defendant may move to dismiss "those causes of action as to which no set of facts has been identified that support a claim against him." *Id.*

1. Claims Against Individual City Defendants

**\*7** 42 U.S.C. § 1983 provides in part that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

It is "well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (citation omitted).

Sforza's pleading fails to allege personal involvement of any defendant in any of the actions which allegedly violated her rights. It does not attribute any of the actions giving rise to Sforza's allegations to any of the specific officers named, or to any group of the officers. Sforza offers no arguments explaining why she fails to identify any specific police officers or suggesting that the City failed to identify officers as present at either McDonald's or the precinct. Nor is it possible to infer from the list of police officers which ones were personally involved in which deprivations of Sforza's rights, whether it is the excessive use of force, an unlawful arrest, an abusive strip search, or a refusal to take a complaint.[8]

[8]   Plaintiff's response in her opposition papers that the identity of the officers "is obvious" is not sufficient. It is not at all obvious from the statement in the complaint that "police officers" took certain actions against her which officers, and how many

officers, should be held responsible for any of the enumerated violations of her rights.

The individual City Defendants have therefore not received fair notice regarding which of their actions gave rise to the claims upon which the complaint is based, because it is impossible to discern from the Third Amended Complaint why Sforza has named any of the police officers she lists as defendants. As such, the Third Amended Complaint fails to state a claim against any individual City Defendant and will be dismissed pursuant to Rules 8 and 12(b)(6), Fed.R.Civ.P.

Sforza has requested leave to amend her complaint to allege personal involvement in the event that the City Defendants' motion is granted on these grounds. The July 31, 2008 Order stated that Sforza would not be granted further leave to amend following her submission of the Third Amended Complaint.

Rule 16, Fed.R.Civ.P., governs leave to amend after a scheduling order has been entered. Rule 16 provides that a district court may enter a scheduling order that limits the time to amend the pleadings, and that "[a] schedule shall not be modified except upon a showing of good cause and by leave of the district judge." Fed.R.Civ.P. 16(b). Rule 16 "is designed to offer a measure of certainty in pretrial proceedings, ensuring that at some point both the parties and the pleadings will be fixed." *Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 340 (2d Cir.2000) (citation omitted). Disregarding the instructions of a scheduling order "would undermine the court's ability to control its docket, disrupt the agreed-upon course of the litigation, and reward the indolent and the cavalier. Rule 16 was drafted to prevent this situation." *Id.* (citation omitted).

**\*8** "[A] district court does not abuse its discretion in denying leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause." *Id.* In determining whether a party has shown good cause, "the primary consideration" is whether the movant has been diligent. *Kassner v. 2nd Avenue Delicatessen Inc.,* 496 F.3d 229, 244 (2d Cir.2007). Another relevant factor is prejudice to the defendants.[9] *Id.* The Second Circuit has upheld the denial of a request seeking leave to amend under Rule 15 when the district court judge had earlier "expressly admonished the plaintiff, before the limitations period had expired, to discover the names of the individual officers and to amend his complaint to add them as defendants." *Soto v. Brooklyn Correctional Facility,* 80 F.3d 34, 37 (2d Cir.1996).

9      In addition to the burden placed on them
       by the plaintiff's neglect of her obligations
       to prosecute her claims diligently, the individual City
       Defendants contend that they have been prejudiced
       by the failure of the Third Amended Complaint to
       link them to specific unlawful acts. Specifically,
       they point out that they have been unable to craft the
       argument that they are entitled to receive qualified
       immunity from claims pressed in this lawsuit and
       to be dismissed as defendants. Given the plaintiff's
       lack of diligence it is unnecessary to reach this
       additional factor supporting dismissal.

Sforza has made no showing of diligence, nor has she attempted to do so. The City's correspondence, the conferences with the Court, and the Order of July 31, 2008 fully alerted her to the deficiencies in her pleading. Further, she had over a year from the initial filing of the complaint until the deadline set by the July 31 Order to craft an adequate pleading. *See Parker,* 204 F.3d at 340. The time for amendment having closed, further leave to amend shall not be granted. [10]

10     It is noteworthy that the plaintiff did not submit a
       proposed amended pleading with her opposition to
       the motion to dismiss demonstrating that she could
       cure the defects in her pleading while complying
       with the mandates of Rule 11, Fed.R.Civ.P.

Lest this seem an overly harsh result, it is worth pausing to note several examples of plaintiff's lack of diligence in pursuing amendment of the pleadings and discovery in this case. Plaintiff took over two months to return the release to the City, which required the barest of information and without which individual defendants could not be named, an answer could not be filed, and discovery could not begin. Plaintiff's counsel acknowledged in her September 26, 2007 letter that she had neglected to attend to Sforza's case properly, and her actions following the letter show similar signs of neglect.

The City included the identities of five police officers with its initial disclosures on December 7, 2007. Plaintiff did not attempt to amend her complaint for over eight months, until the Order of July 31, 2008 directed her to do so. Meanwhile, she conducted little, if any, fact discovery to attempt to learn information that would help her to meet her burden of proof, and did not contact Chambers to request an extension until a month after fact discovery should have been completed. Finally, after the extension of fact discovery was granted, plaintiff waited over three months before noticing the

depositions of the ten individual City Defendants, attempting to compress those ten depositions into a four-week timeframe (plaintiff was unavailable for one week of the remaining discovery period) that included the Thanksgiving holiday.

It is unfortunate that plaintiff's claims against the individual City Defendants will be dismissed before consideration of their merits. Plaintiff, however, had over a year to amend her pleading to state a claim against the individual City Defendants, was specifically directed to do so by the July 31 Order, and the issue was discussed with plaintiff's counsel in conferences before the Court on multiple occasions. She had an additional four months between the July 31 Order and the submission of her affidavit accompanying the opposition to the motion to dismiss, and still did not take that opportunity to identify any specific police officers. The pleading deficiencies were not the result of a single oversight, but rather the regrettable manifestation of a pattern of delay and neglect.

2. Municipal Liability

**\*9** Having dismissed Sforza's claims against the individual City Defendants, it is still necessary to consider defendants' arguments that claims against the City should be dismissed. Defendants assert that, because plaintiff cannot show that any individual City Defendant violated a constitutional right, her federal claims against the City must fail. City Defendants also state that Sforza's claims do not meet the municipal liability standards established in *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), because she does not identify any policy, custom, or practice that violated her rights and impermissibly attempts to establish liability based on a single incident. Finally, the City argues that it is entitled to summary judgment on each of the claims. The City has shown that it is entitled to summary judgment on each of the plaintiff's claims except the claim for excessive force.

A municipality can be held liable pursuant to § 1983 only if its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell,* 436 U.S. at 694; *Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 128 (2d Cir.2004). A finding of municipal liability without finding a violation of constitutional rights by an individual is not permitted where 1) the municipal liability arises from the authorization of or a policy leading to the individual's alleged violation and 2) there is a finding that no individual

violation occurred. [11] "[N]either *Monell v. New York City Dept. of Social Services,* nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm." *City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986). In *Heller,* a jury found that a police officer had not used excessive force (and therefore had not violated § 1983). *Id.* at 798. The Supreme Court held that the city could not be held liable under an alleged unconstitutional municipal policy of using excessive force during arrests. *Id.* at 799. The Court observed that "[i]f a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point." *Id.* (emphasis removed).

[11]   Despite the City's argument, "municipal liability for constitutional injuries may be found to exist even in the absence of individual liability, at least so long as the injuries complained of are not solely attributable to the actions of named individual defendants." *Barrett v. Orange County Human Rights Comm'n,* 194 F.3d 341, 350 (2d Cir.1999). In *Barrett,* the Second Circuit held that the Human Rights Commission could be liable for infringing Barrett's constitutional rights even though the most prominent members of the Commission, who were named as individual defendants, were found not to be liable. *Id.* The court reasoned that the Commission was a multi-member body whose decisions were made by a vote of all the members; therefore, its acts could be independent of two of its members and Barrett's alleged injuries were not solely attributable to the actions of the named defendants. *Id.*

Applying *Heller,* the Second Circuit has recognized that "a municipality cannot be liable for inadequate training or supervision when the officers involved in making an arrest did not violate the plaintiff's constitutional rights." *Curley v. Village of Suffern,* 268 F.3d 65, 71 (2d Cir.2001). *Curley,* like *Heller,* involved allegations that the conduct of specific individual police officers injured plaintiff, the complaint named all of those police officers as defendants, and there was "no question with respect to whether another officer violated plaintiff's rights for which the village might be liable." *Id.* The liability of the municipality for failure to train or properly

supervise was therefore tied to the liability of the individual defendants. *Id.* As the jury had found no deprivation of plaintiff's rights with respect to the officers' alleged use of excessive force, the municipality could not be held liable, because it was "implicated in plaintiff's amended complaint only by way of the individual defendants' conduct." *Id.*

**\*10**   More recently, the Second Circuit, citing *Heller,* declined to hold the City of New York liable under § 1983 because it found at the summary judgment stage that the individual police officer defendants had not violated the constitutional rights of a confidential informant whom they allegedly failed to protect from being assaulted by a drug dealer. *Matican v. City of New York,* 524 F.3d 151, 154 (2d Cir.2008). The police officers named as defendants were the three officers in whose sting operation plaintiff had assisted. *Id.* at 153. As in *Curley,* they were the entire group of officers who could have been responsible for the alleged violation of Matican's rights. Before finding that the individual officers had not violated plaintiff's right to substantive due process, the court framed the issue as follows, citing *Heller:* "[d]id the officers' actions violate Matican's constitutional rights? If they did not, then the City cannot be liable to Matican under § 1983, regardless of whether the officers acted pursuant to a municipal policy or custom." *Id.* (citation omitted).

Where claims against individual municipal defendants are dismissed without a finding on the merits, however, the *Monell* claim survives. For instance, the Second Circuit has held that granting an individual officer qualified immunity [12] does not dispose of the issue of municipal liability. *See Curley,* 268 F.3d at 71; *Prue v. City of Syracuse,* 26 F.3d 14, 19 (2d Cir.1994). The same is true here: where claims against the individual officers have been dismissed without reaching their merits, it is still possible for a jury to find a constitutional violation for which a municipality may, though its policies, practices, or customs, be liable.

[12]   The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* ——U.S. ——, ——, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (citation omitted).

Alternatively, the City argues that plaintiff has not stated a claim for *Monell* liability because she has not identified any

2009 WL 857496

policy, custom, or practice resulting in a violation of her rights, and her factual allegations describe only one incident purportedly involving wrongdoing, which is insufficient to support a *Monell* claim. The City relies on *Dwares v. City of New York,* 985 F.2d 94 (2d Cir.1993), which states that "[a] single incident alleged in a complaint, especially if it involved only actors below the policymaking level, generally will not suffice to raise an inference of the existence of a custom or policy." *Id.* at 100.

The plaintiff has adequately identified a municipal policy and practice for at least some of her claims. The Third Amended Complaint alleges that the

> customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department included, but were not limited to, *arresting and prosecuting individuals solely because they are transgender,* manufacturing false charges against such individuals, *using excessive force against such individuals, and allowing members of the opposite sex to search such individuals.*

**\*11**  (Emphasis supplied.)

The City's argument that plaintiff alleges only one incident in support of her *Monell* claim, and that one incident is insufficient evidence of a City policy, is similarly unpersuasive. *Monell* liability may spring from a single violation, as long as the conduct causing the violation was undertaken pursuant to a City-wide custom, practice, or procedure. *See, e.g., DiSorbo v. Hoy,* 343 F.3d 172, 180–81 (2d Cir.2003) (city liable under *Monell* for excessive force in simultaneous arrest of two sisters); *Mandell v. County of Suffolk,* 316 F.3d 368, 385 (2d Cir.2003) (county held liable under *Monell* following the retaliatory discharge of an employee). *Dwares,* cited by the City, involved a complaint containing insufficient allegations of a custom or practice. *Dwares,* 985 F.2d at 97, 101. Plaintiff's *Monell* claim will therefore not be dismissed in its entirety on grounds that it either fails to allege a policy or is based entirely on single incidents.

A prerequisite to a *Monell* claim, of course, is a violation of plaintiff's constitutional rights. *Hartline v. Gallo,* 546 F.3d 95, 99–100 (2d Cir.2008). To address the City's motion, it is necessary to determine whether each of the § 1983 and § 1985 claims in the Third Amended Complaint 1) pleads a cause of action and 2) survives the summary judgment motion.

Sforza's opposition and November 5, 2008 letter to the court, discussed above, are peppered with assertions that a summary judgment motion is premature because discovery is not yet complete. Sforza has not, however, filed an affidavit pursuant to Rule 56(f) to explain that she cannot present facts in support of her opposition because of inadequate discovery.

"The nonmoving party must have had the opportunity to discover information that is essential to his opposition to the motion for summary judgment." *Hellstrom v. U.S. Dept. of Veterans Affairs,* 201 F.3d 94, 97 (2d Cir.2000) (citation omitted). "[S]ummary judgment is generally disfavored when the party opposing the motion has not obtained discovery." *Cable Science Corp. v. Rochdale Village, Inc.,* 920 F.2d 147, 152 (2d Cir.1990) (dicta). Rule 56(f), Fed.R.Civ.P., "sets forth a specific procedure by which a party lacking information necessary to oppose a summary judgment motion may seek further discovery." *Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc.,* 404 F.3d 566, 573 (2d Cir.2005) (per curiam).

> To request discovery under Rule 56(f), a party must file an affidavit describing: (1) what facts are sought and how they are to be obtained; (2) how these facts are reasonably expected to raise a genuine issue of material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful.

*Gualandi v. Adams,* 385 F.3d 236, 244 (2d Cir.2004). "The failure to file an affidavit under Rule 56(f) is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." *Di Benedetto v. Pan Am World Service, Inc.,* 359 F.3d 627, 630 (2d Cir.2004) (citation omitted). "A reference to Rule 56(f) and to the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for a Rule 56(f) affidavit." *Paddington Partners v. Bouchard,* 34

F.3d 1132, 1137 (2d Cir.1994). *See generally National Union Fire Ins. Co. of Pittsburgh, PA. v. Stroh Companies, Inc.,* 265 F.3d 97, 117 (2d Cir.2001) (requiring Rule 56(f) affidavit and denying request for additional discovery when party had several months to pursue discovery).

 **\*12** Sforza may not, therefore, defeat the City's summary judgment motion by simply arguing that she requires more discovery. Even if it were appropriate to consider arguments presented solely in a memorandum, with a single possible exception, her memorandum has not focused her request for more discovery on the specific facts she needs, how she seeks to obtain them, and why they would make a difference.[13] Given that Sforza has had nearly a year for discovery, it would be especially important for her to indicate which arguments she can support with the discovery that has already occurred and which arguments will require depositions or other currently incomplete discovery for their support. To the extent, therefore, that a claim states a cause of action and the City has moved for summary judgment, the summary judgment motion shall be considered.

[13]    The single exception relates to her equal protection claim and her explanation that she needs to depose individual plaintiffs to discover their discriminatory motives.

Summary judgment may not be granted, however, unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the court must view all facts in the light most favorable to the non-moving party. *Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 169 (2d Cir.2006). When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" contained in the pleadings. Fed.R.Civ.P. 56(e); accord *Sista,* 445 F.3d at 169. That is, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Only disputes over material facts—facts that might affect the outcome of the suit under the governing law—will properly preclude the entry of summary judgment. *Anderson*

*v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Sforza asserts that the following claims constitute deprivations of her rights in violation of § 1983: false arrest, malicious prosecution, malicious abuse of process (in connection with her arrest); excessive force; failure to permit her to file charges against the McDonald's employee; violation of equal protection; and conspiracy to deprive Sforza of her constitutional rights (also brought under § 1985).[14] Her first claim, though, is for a general "Deprivation of Federal Civil Rights Under § 1983."

[14]    Sforza makes no explicit allegation of deliberate indifference to her medical needs, although the City's motion papers address this claim. Sforza notes in her opposition that her complaint does not include a cause of action for deprivation of medical care. Given this acknowledgment, the City's arguments on the issue of indifference to medical needs will not be considered.

3. "Deprivation of Federal Civil Rights"

Sforza's claim for "deprivation of federal civil rights" does not state of which rights she was deprived—only that the First, Fourth, Fifth, Eighth, and Fourteenth Amendments were involved—or provide any information on the deprivation she allegedly experienced. Defendants interpret this claim as possibly including claims for violations of procedural or substantive due process. Without any factual illumination of this claim, though, Sforza has failed to meet the Rule 12(b)(6) standard requiring her to "provide the grounds upon which [her] claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *ATSI Commc'ns, Inc.,* 493 F.3d at 98. While plaintiff incorporates all of her factual allegations by reference into her "deprivation of civil rights" claim, the results of combining the myriad factual events described in the entirety of the complaint with the range of constitutional rights contained in this claim is that defendants do not have "fair notice of what the claim is and the grounds upon which it rests." *Leibowitz,* 445 F.3d at 591. Sforza's "deprivation of federal civil rights" claim will therefore be dismissed on Rule 8(a)(2) grounds.

4. False Arrest

 **\*13** Sforza alleges that, when the police officers arrived on the scene at McDonald's, they refused to allow her to describe her confrontation with the manager and, relying on

false statements given by a McDonald's employee that Sforza had attacked him, they falsely arrested and imprisoned her. The City moves for summary judgment on this claim, arguing that probable cause for Sforza's arrest existed, because the arresting officer was entitled to rely on the statements of the complaining witness, and that, in any event, the manager's statement was corroborated. In support of its argument, the City has submitted the complaint taken at McDonald's, in which the manager of McDonald's stated that Sforza did "strike [him] several times with a closed fist and kicked [him] in the legs," causing "bruising [and] swelling to [his] legs," as well as the arrest worksheet documenting the same. Plaintiff concedes that the McDonald's manager reported to police that plaintiff had assaulted him.

Allegations of unconstitutional false arrest are analyzed by "look[ing] to the law of the state in which the arrest occurred." *Jaegly v. Couch,* 439 F.3d 149, 151 (2d Cir.2006) (citation omitted). The elements of a claim for false arrest under New York law are that

> (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.

*Curry v. City of Syracuse,* 316 F.3d 324, 335 (2d Cir.2003) (citation omitted). A claim for false arrest or false imprisonment fails when the arresting officer had probable cause to make the arrest. *Jenkins v. City of New York,* 478 F.3d 76, 84 (2d Cir.2007).

The requirement of probable cause does not create a high bar for law enforcement. It exists where "the arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *United States v. Delossantos,* 536 F.3d 155, 158 (2d Cir.2008) (citation omitted). "When information is received from a putative victim or an eyewitness, probable cause exists, unless the circumstances raise doubt as to the person's veracity." *Curley,* 268 F.3d at 70. Probable cause does not inquire into the arresting officers' subjective motivations, but rather asks "whether the officers' actions are 'objectively reasonable'

in light of the facts and circumstances confronting them .'" *Bryant v. City of New York,* 404 F.3d 128, 136 (2d Cir.2005) (citation omitted). "[ S] ummary judgment dismissing a plaintiff's false arrest claim is appropriate if the undisputed facts indicate that the arresting officer's probable cause determination was objectively reasonable." *Jenkins,* 478 F.3d at 88. A court deciding whether an arrest is reasonable "must examine the totality of the circumstances of a given arrest." *Delossantos,* 536 F.3d at 159. An officer is not "required to explore and eliminate every plausible claim of innocence before making an arrest." *Jaegly,* 439 F.3d at 153. "[A]n officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause." *Panetta v. Crowley,* 460 F.3d 388, 395–96 (2d Cir.2006).

**\*14** Plaintiff was arrested on suspicion of misdemeanor (third-degree) assault. A person is "guilty of assault in the third degree when: (1) with intent to cause physical injury to another person, he causes such injury to such person or to a third person ...." N.Y. Penal Law § 120.00. The statements of the McDonald's manager establish probable cause to arrest Sforza for assault, and Sforza has not offered evidence to raise a question of fact regarding that finding.

Sforza argues that the manager's statement was insufficient to establish probable cause for several reasons. Sforza first asserts that the manager's lack of injuries, contrasted with Sforza's condition ("bruised, bloodied, and missing teeth") contradicted the McDonald's employee's account of a fight instigated by Sforza. By not comparing the two parties' injuries, she argues, the police disregarded exculpatory evidence, negating a finding of probable cause. The possibility that both parties were injured may indicate the existence of probable cause to arrest the manager as well, but the manager's lack of severe injury does not indicate that no fight occurred or that the manager was not punched or kicked, and misdemeanor assault does not require serious physical injury. N.Y. Penal Law § 120.00. While Sforza contests whether the manager had any visible injuries at all, the arrest report and complaint show that the officers had the impression that he did. In any event, Sforza's own injuries and her belief that the manager was not injured do not constitute "plainly exculpatory evidence."

The Second Circuit case Sforza cites for the "plainly exculpatory evidence" exception to the establishment of probable cause by a complainant's statement is based on an Eighth Circuit case that listed "DNA evidence and a videotaped account of the crime that conclusively establish

the suspect's innocence" as the kind of "plainly exculpatory" evidence negating a finding of probable cause. *Kuehl v. Burtis,* 173 F.3d 646, 650 (8th Cir.1999) (cited in *Panetta,* 460 F.3d at 395). That one participant in a fight is injured less than the other does not approach the "plainly exculpatory" level contemplated by *Kuehl.* Neither is the involvement of a witness in a confrontation enough to cast doubt on that witness's veracity and negate probable cause. *See Curley,* 268 F.3d at 69–70 (probable cause for plaintiff's arrest supported by testimony of witnesses involved in fight with plaintiff); *Ricciuti v. N.Y.C. Transit Authority,* 124 F.3d 123, 128 (2d Cir.1997) (probable cause supported by statement of witness identifying plaintiff as his assailant and witness's visible injuries, despite plaintiff's claims that he had acted in self-defense).

In addition, Sforza argues that on a motion for summary judgment "the Court must accept plaintiff's statement that she did not assault the manager in any way." The deference that her declaration of innocence receives at the summary judgment stage does not demonstrate a lack of probable cause for her arrest. Probable cause does not speak to the arrestee's ultimate guilt or innocence. While probable cause requires more than a "mere suspicion" of wrongdoing, its focus is on "probabilities," not "hard certainties." *Walcyk v. Rio,* 496 F.3d 139, 156 (2d Cir.2007) (citation omitted). The arresting officer need not be certain that the arrestee will be successfully prosecuted. *Curley,* 268 F.3d at 70; *see also Panetta,* 460 F.3d at 395 ("the fact that an innocent explanation may be consistent with the facts alleged does not negate probable cause"). Adopting Sforza's standard for false arrest, in which the innocence of the arrestee negates probable cause, would allow any person acquitted of a crime to bring charges for false arrest. Summary judgment is granted to the City on the false arrest claim.

### 5. Excessive Force

**\*15** Sforza has alleged excessive use of force during her arrest and detention. She claims that she was handcuffed too tightly, creating ongoing numbness in her hands, and that the police deliberately slammed her head twice into the roof of a police vehicle, causing bruises that remained for two months. Defendants assert that they are entitled to summary judgment because the medical records reflect injury only to plaintiff's left arm. They note that Sforza complained of pain to her arm and neck and did not report any head or wrist injuries or pain.

"[E]xcessive force claims must be analyzed under the rubric of the constitutional right that is most directly implicated by the facts giving rise to the claim." *Nimely v. City of New York,* 414 F.3d 381, 390 n. 7 (2d Cir.2005). Claims that law enforcement officers have used excessive force in the course of an arrest are analyzed "under the Fourth Amendment and its 'reasonableness' standard." *Kerman v. City of New York,* 261 F.3d 229, 238–39 (2d Cir.2001) (citation omitted). Police officers' application of force is excessive, in violation of the Fourth Amendment, if it is "objectively unreasonable in light of the facts and circumstances confronting them, without regard to the officers' underlying intent or motivation." *Jones v. Parmley,* 465 F.3d 46, 61 (2d Cir.2006) (citation omitted). Determining whether excessive force has occurred requires a court to weigh the "facts and circumstances of each particular case, including the crime committed, its severity, the threat of danger to the officer and society, and whether the suspect is resisting or attempting to evade arrest." *Id.* (citation omitted). A plaintiff need not demonstrate serious injury to prevail in an excessive force claim; bruising and other nonpermanent injuries are sufficient. *Maxwell v. City of New York,* 380 F.3d 106, 108 (2d Cir.2004); *Robison v. Via,* 821 F.2d 913, 924 (2d Cir.1987) ("If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe").

The conflicting accounts of the amount of force used preclude entry of summary judgment. Granting summary judgment based on the hospital records would require that inferences be inappropriately drawn in the City's favor.

### 6. Malicious Prosecution

Defendants also seek summary judgment on the malicious prosecution claim. "To sustain a § 1983 claim of malicious prosecution, a plaintiff must demonstrate conduct by the defendant that is tortious under state law and that results in a constitutionally cognizable deprivation of liberty." *Kinzer v. Jackson,* 316 F.3d 139, 143 (2d Cir.2003). Put otherwise, a plaintiff must establish the elements of malicious prosecution under state law, and then show that her Fourth Amendment rights were violated after legal proceedings were initiated. *See Fulton v. Robinson,* 289 F.3d 188, 195 (2d Cir.2002) (citation omitted).

**\*16** In New York, a plaintiff bringing a malicious prosecution claim must show that a prosecution was initiated without probable cause to believe that it could succeed, that the prosecution was brought with malice, and that the prosecution terminated in plaintiff's favor. *Boyd v. City of New York,* 336 F.3d 72, 76 (2d Cir.2003). The existence of probable

Case 6:24-cv-01169-DNH-MJK   Document 5   Filed 10/30/24   Page 104 of 141
Sforza v. City of New York, Not Reported in F.Supp.2d (2009)
2009 WL 857496

cause at the time of arrest may not be sufficient to provide probable cause for a prosecution, as

> even when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause. In order for probable cause to dissipate, the groundless nature of the charge must be made apparent by the discovery of some intervening fact.

*Kinzer,* 316 F.3d at 144.

To show that her legal rights were violated after legal proceedings were initiated, plaintiff must show a seizure or other "perversion of proper legal procedures" implicating her rights under the Fourth Amendment. *Washington v. County of Rockland,* 373 F.3d 310, 316 (2d Cir.2004) (citation omitted). That deprivation must be "pursuant to legal process," as "[t]he essence of malicious prosecution is the perversion of proper legal procedures." *Singer v. Fulton County Sheriff,* 63 F.3d 110, 117 (2d Cir.1995) (citation omitted). Where the arrest was effected without a warrant, any post-arraignment deprivation of liberty constitutes the unlawful seizure. *See id.*

Sforza has offered no evidence that the probable cause that existed at the time of the arrest dissipated between the arrest and her prosecution. Without any evidence supporting the vitiation of probable cause, Sforza has raised no material issue of fact in support of her claim of malicious prosecution. Sforza has also submitted no evidence demonstrating malice or any post-arraignment deprivation of liberty. Summary judgment will be granted in the City's favor on this claim.

### 7. Malicious Abuse of Process

Defendants argue that Sforza has failed to present evidence supporting her claim for abuse of process. As with malicious prosecution, courts look to state law for the elements of a [§ 1983](#) claim based on the malicious abuse of process claim. *Cook v. Sheldon,* 41 F.3d 73, 80 (2d Cir.1994). New York recognizes a malicious abuse of process claim against "a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the

legitimate ends of the process." [15](#) *Savino v. City of New York,* 331 F.3d 63, 76 (2d Cir.2003) (citation omitted). In addition, a plaintiff bringing an abuse of process claim must allege actual or special damages. *Bd. of Educ. v. Farmingdale Classroom Teachers Ass'n,* 38 N.Y.2d 397, 405, 380 N.Y.S.2d 635, 343 N.E.2d 278 (1975). "[L]egal process means that a court issued the process, and the plaintiff will be penalized if he violates it," such as an arraignment. *Cook,* 41 F.3d at 80 (citation omitted). *See also Shain v. Ellison,* 273 F.3d 56, 68 (2d Cir.2001).

[15] The City states that "it is unsettled in this Circuit whether abuse of process under state law is even the basis for a [§ 1983](#) claim," citing a civil commitment case, *Olivier v. Robert L. Yeager Mental Health Ctr.,* 398 F.3d 184, 189 n. 4 (2d Cir.2005). Numerous decisions in this Circuit have addressed [§ 1983](#) claims premised on abuse of *criminal* process. *See, e.g., Savino v. City of New York,* 331 F.3d 63, 76 (2d Cir.2003); *Shain v. Ellison,* 273 F.3d 56, 68 (2d Cir.2001).

**\*17** While a lack of probable cause is not explicitly an element of an abuse of process claim, the presence of probable cause negates a claim for abuse of process, particularly the second element. *See Rosen v. Hanrahan,* 2 A.D.3d 352, 768 N.Y.S.2d 818, 819 (1st Dep't 2003); *Berman v. Silver, Forrester & Schisano,* 156 A.D.2d 624, 549 N.Y.S.2d 125, 127 (2d Dep't 1989). Conversely, the lack of probable cause gives rise to an inference of malice, supporting a finding of "intent to harm." *Id.* at 126.

The "collateral objective" requirement, in turn, means that defendants must have an improper purpose or objective in instigating the action beyond the plaintiff's criminal prosecution; that defendants had an improper motive is not enough. *Savino,* 331 F.3d at 77. "A malicious motive alone does not give rise to a cause of action for abuse of process." *Id.* (citing *Curiano v. Suozzi,* 63 N.Y.2d 113, 117, 480 N.Y.S.2d 466, 469 N.E.2d 1324 (1984)). "[T]he basis of the tort lies in the use of the process to gain a collateral objective, the accomplishment of which the process in question was not intended to secure." *Pagliarulo v. Pagliarulo,* 30 A.D.2d 840, 293 N.Y.S.2d 13, 15 (2d Dep't 1968).

Sforza's abuse-of-process claim fails on multiple grounds. Her opposition to the City's motion does not attempt to address the point that her claim, based on a warrantless arrest, does not involve legal process. Moreover, Sforza has not

demonstrated a collateral objective. [16] Summary judgment is therefore granted for defendants on the abuse of process claim.

[16]     Sforza argues that improper motive satisfies the collateral objective requirement. *Savino* clearly states the opposite. *Savino,* 331 F.3d at 77.

### 8. Violation of Equal Protection

The City submits that Sforza has failed to allege facts that would state a claim for a violation of the Equal Protection Clause of the Fourteenth Amendment to the Constitution, and moves dismissal of, rather than summary judgment on, the equal protection claim. [17] "The Equal Protection Clause requires that the government treat all similarly situated people alike." *Neilson v. D'Angelis,* 409 F.3d 100, 104 (2d Cir.2005) (citation omitted) (overruled on other grounds, *Appel v. Spiridon,* 531 F.3d 138, 140 (2d Cir.2008)). To prove a violation of the Equal Protection Clause, a plaintiff must demonstrate that she was treated differently "than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (citation omitted). As the claims against the individual City Defendants shall be dismissed, Sforza's § 1983 claims are being considered here only to the extent that they give rise to *Monell* liability against the City, which requires that the conduct causing Sforza's injury be pursuant to "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell,* 436 U.S. at 694.

[17]     In its reply memorandum, the City shifts its focus to argue as if it has sought summary judgment on Sforza's equal protection claim, stating that Sforza has not demonstrated or proven differential treatment. Summary judgment arguments with regard to the equal protection claim will not be considered.

Sforza alleges that her right to equal protection of the laws was violated because, while individuals who are not transgender are permitted to file criminal complaints after they have been attacked, officers at the precinct did not allow Sforza to file a complaint against the McDonald's manager after her release from custody. [18] Her allegations concerning "policy or custom," meanwhile, identify "arresting and prosecuting individuals solely because they are transgender, manufacturing false charges against such individuals, using

excessive force against such individuals, and allowing members of the opposite sex to search such individuals."

[18]     Sforza makes other allegations elsewhere in the complaint that implicate differential treatment based on her transgender status, but limits her equal protection claim to her attempts to file a complaint at the precinct. Her failure to name any of the officers with whom she interacted during her arrest, strip-search, detention, precinct visits, and prosecution makes it impossible to say whether these allegations concern any of the same officers. Sforza's opposition also disingenuously represents additional facts not in the complaint as facts alleged in support of her equal protection claim. These additional allegations will not be considered.

**\*18** Sforza has not alleged any policy or custom encouraging officers to reject transgender individuals' attempts to file complaints. Because her equal protection claim is premised on the precinct officers' rejection of her complaints, and she does not allege that the rejections occurred pursuant to municipal policy or custom, she has failed to state a claim against the City for violation of her right to equal protection.

### 9. Conspiracy

Sforza's final basis for § 1983 liability is a claim that all defendants conspired to deprive her of her constitutional rights and participated in overt acts in furtherance of the conspiracy by falsely arresting and maliciously prosecuting her. Among other arguments, defendants urge that plaintiff's conspiracy claims be rejected (ostensibly on summary judgment grounds) because she has not proven any underlying violations of § 1983 that were the object of the conspiracy. Characterizing Sforza's conspiracy allegations as conclusory, they also seek to have them dismissed on this ground. Sforza also brings conspiracy claims against all defendants under § 1985, alleging the same facts.

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culberson,* 200 F.3d 65, 72 (2d Cir.1999). A conspiracy claim under § 1985, meanwhile, requires a showing of

Case 6:24-cv-01169-DNH-MJK    Document 5    Filed 10/30/24    Page 106 of 141
Sforza v. City of New York, Not Reported in F.Supp.2d (2009)

2009 WL 857496

(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. A § 1985(3) conspiracy must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.

*Cine SK8, Inc. v. Town of Henrietta,* 507 F.3d 778, 791 (2d Cir.2007) (citation omitted). A municipality may be held liable under § 1985 if it is involved in the conspiracy or if the aim of the conspiracy is to "influence the activity of" the municipality. *LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 427 (2d Cir.1997).

Sforza alleges malicious prosecution and false arrest as the underlying conspiratorial acts. As explained earlier in this Opinion, she has not raised an issue of fact with regard to either. She consequently fails to raise a genuine issue regarding the existence of any overt acts conducted in furtherance of the alleged conspiracies. Summary judgment is therefore granted in the City's favor on both conspiracy claims.

### 10. State Law Claims

Sforza's remaining claims thus include one federal claim for municipal liability based on the alleged use of excessive force against Sforza and twelve state-law claims. Two of those claims, alleging violations of New York's Human Rights Law, N.Y. Exec. L. §§ 292 and 296, and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8–107(1)(a) and 8–603(a), are brought against all defendants (the "Human Rights Claims"). Sforza brings her remaining ten state-law

claims against McDonald's and its employees only. The City Defendants ask that the Court dismiss the Human Rights Claims brought against the City, or, in the alternative, that it decline to exercise supplemental jurisdiction over these claims.

**\*19** The Human Rights Claims accuse all defendants of violating provisions forbidding discrimination in public accommodations based on sexual orientation, as well as harassment and violence motivated by a victim's gender or sexual orientation. Sforza incorporates all of her factual allegations into each claim, which otherwise include only a recitation of the legal standard. Assuming that the public accommodation is the McDonald's Restaurant, it is impossible to discern which acts allegedly constituted the illegal discrimination, harassment, or violence, and whether each act in question was committed by McDonald's employees, individual City Defendants, or both. These conclusory allegations do not give the City fair notice of the basis for these two claims, and fail to meet the Rule 8(a) (2) pleading standard. They are therefore dismissed.

### CONCLUSION

The City Defendants' November 3, 2008 motion to dismiss and for summary judgment against plaintiff's § 1983 and § 1985 claims is granted, except that it is denied with regard to plaintiff's claim for municipal liability based on the use of excessive force in violation of § 1983. Plaintiff's state law claims for relief under the New York Human Rights Law and New York Administrative Code are dismissed against the City Defendants.

A conference will be held with the parties to disucss the schedule for the remainder of the litigation and the issue of supplemental jurisdiction over the remaining state-law claims.

SO ORDERED:

### All Citations

Not Reported in F.Supp.2d, 2009 WL 857496

---

End of Document    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 2720589
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Rohan CAMPBELL, Plaintiff,
v.
The CITY OF NEW YORK, the New York City
Police Department, P.O. Dwayne Ortiz, Det. Thomas
Butterworth, Det. Claude O'Shea, Det. Morales Hale,
Martin F. Horn and John Doe # 1–6, Defendants.

No. 06 CV 5743(HB).
|
June 30, 2010.

West KeySummary

1    **Civil Rights**    🔑    **Criminal law enforcement;
     prisons**

     **Summary Judgment**    🔑    **Law enforcement
     activities**

     Genuine issues of material fact existed
     regarding whether the officers who arrested and
     interrogated arrestee used excessive force when
     they allegedly kicked him while he was on the
     ground, hit him during an interview, and burned
     him with a cigarette. Thus, these factual issues
     precluded summary judgment in favor of the
     officers. The arrestee was in a parked car when
     the officers approached him, and he drove away
     before hitting another vehicle. The arrestee fled
     from the officers on foot until they tackled him
     and arrested him, and the arrestee contended
     that some of them also kicked him while he
     was in handcuffs. During interviews, one of the
     arresting officers allegedly slapped the arrestee
     across the face, and a detective allegedly used a
     lit cigarette to burn the arrestee's hand or arm.
     U.S.C.A. Const.Amend. 4.

     17 Cases that cite this headnote

**OPINION & ORDER**

Hon. HAROLD BAER, JR., District Judge.

 **\*1**  Plaintiff Rohan Campbell ("Plaintiff" or "Campbell"),
appearing *pro se,* brings suit pursuant to 42 U.S.C. § 1983
against various individual defendants, the New York City
Police Department, and the City of New York (collectively
"Defendants"), for excessive force, an improper strip search,
false arrest, and malicious prosecution. The alleged violation
arose out of Plaintiff's arrest and detention in 2004. This
action was stayed in December 2008, pending the resolution
of Plaintiff s state court appeal of his criminal conviction.
The appeal now resolved and Plaintiff's conviction sustained,
Defendants now move for summary judgment on a variety of
grounds. For the reasons that follow, Defendants' motion is
GRANTED as to the false arrest and malicious prosecution
claims, and any claims against the City of New York, the
New York City Police Department, and Detective Thomas
Butterworth. The motion is otherwise DENIED,

**I. FACTUAL BACKGROUND** [1]

[1]    The facts in this decision are drawn from
       undisputed facts submitted by the parties, and
       any disputes are noted. Plaintiff did not submit a
       statement of undisputed facts pursuant to Local
       Rule 56 .1. However, because a *pro se* plaintiff's
       pleadings are to be read liberally, the Court will
       consider his submissions in opposition and will not
       deem contrary, disputed facts in Defendants' 56.1
       Statement to be admitted. *See McAllister v. New
       York City Police Dept.,* 49 F.Supp.2d 688, 693 n.
       2 (S.D.N.Y.,1999); *see also United States v. Pugh,*
       No. 07 Civ. 2456, 2010 WL 2266069, at \*3 n. 4
       (E.D.N.Y. June 1, 2010) (collecting cases where
       courts in this district have considered the merits of
       a *pro se* plaintiff's claim despite failure to submit a
       56.1 statement).

Campbell was arrested on August 10, 2004, on or around
East 215th Street, Bronx, New York, based on allegations
that Plaintiff approached a couple, displayed a handgun,
abducted the woman, and sexually assaulted her. *See* Defs.'
Local Rule 56.1 Stmt. ("Defs.' 56.1") ¶ 1; Cohen Decl.,
Ex. C (N.Y.PD Omniform System Arrest). Plaintiff claims

Campbell v. City of New York, Not Reported in F.Supp.2d (2010)

2010 WL 2720589

that on the night of the arrest, he was out with friends, drinking beer and smoking marijuana. Deposition of Rohan Campbell ("Campbell Dep.") 18:4–9. Shortly thereafter, he claims to have discovered a vehicle with keys in the ignition, got inside, and drove off. Campbell says he picked up a woman from the sidewalk whom he vaguely knew, drove around the neighborhood, and eventually parked, smoked more marijuana and listened to music. Campbell Dep. 18:4–9, 19:20–23. At some point thereafter, a police van pulled up behind the car and police officers approached the vehicle. Defs.' 56.1 ¶ 3. According to Campbell, one of the individual defendants, Police Officer Dwayne Ortiz, attempted to get inside the vehicle by breaking the driver-side window. Campbell Dep. at 29:1–18. In response, Plaintiff attempted to drive away, with Officer Ortiz hanging onto the side of the window, and a chase ensued. Defs.' 56.1 ¶¶ 4–5. Campbell collided with a parked car after a short distance, got out of the car, and continued on foot with two to three police officers chasing after him. Defs.' 56.1 ¶¶ 6–7; Campbell Dep. 20:3–8, 32:9–10.

After about a block, the officers caught up to Plaintiff, subdued him, took him to the ground, and handcuffed him. Defs.' 56.1 ¶ 8. Campbell claims that he was assaulted by the police officers that arrested him after the car and foot chase. Defs.' 56.1 ¶ 11. According to Plaintiff, he was tackled from behind, "strangled to the ground," and had his arms twisted to be handcuffed. Campbell Dep. 20:7–9, 32:15, 43:4–11. He claims he was kicked on the ground while surrounded by officers, which hurt his rib cage and back. Campbell Dep. 35:17–18. He cannot specifically identify the officers who actually arrested him, except for one non-defendant, nor which officer or officers allegedly struck him. Defs.' 56.1 ¶ 10; Campbell Dep. 33:1–19, 35:1–6. After the arrest, Plaintiff was placed in a police vehicle by an officer that he cannot identify. Campbell Dep. 35:24–36:3. Other than Officer Ortiz, none of the other individual defendants are alleged to have any involvement in this part of the incident. Defs.' 56.1 ¶ 12. At some point-whether it was during the arrest or at some later point in time is unclear—Campbell sustained a one-inch abrasion to his left elbow. Defs.' 56.1 ¶ 16.

**\*2** Subsequent to his arrest, Campbell was transported to the 47th Precinct. Defs.' 56.1 ¶ 13. At some point, Campbell was brought into an "interrogation room" with Officer Ortiz and Detective Thomas Butterworth. Campbell Dep. 20:12–13. According to Campbell, Ortiz verbally abused him, choked him for a short time, and smacked him in the face. *Id.* at 20:12–21:4,37:19–25,47:11–3. Campbell states that he was

never hit by Detective Butterworth. *Id.* at 48:1–3. After this incident, Plaintiff was brought back to the "holding pen," and after a period of time, Officer Ortiz and another police officer came by and requested Plaintiff's clothing. *Id.* at 21:9–16. According to Campbell, they took all of his clothing except for a tank top, and left him naked from the waist-down in the holding pen for an extended period of time and in full view of all other individuals similarly detained. *Id.* at 22:16–23:10. After his clothes were taken, Emergency Medical Services (EMS) came to the precinct and treated Campbell for the abrasion to his elbow; he was not taken to a hospital and there is no indication of treatment for any other injuries. Defs.' 56.1 ¶¶ 16, 19–23. Plaintiff received "scrubs" from the EMS providers, the typically blue garments worn by doctors and other health providers, but Campbell states that it was only a "scrub top" that did not cover up his still-nude lower body. Defs.' 56.1 ¶ 17; Campbell Dep. 21:18–20.

Campbell was at some point [2] taken to another building by Detectives Morales Hale and Claude O'Shea. Campbell Dep. 23:20–24:1. Campbell claims he was escorted out the front of the building and into the public with nothing covering his lower body, and only the tank top and scrub top on his upper body. *Id.* Campbell was again allegedly interrogated at this new location, this time by Detective O'Shea. According to Plaintiff, he was burned on the hand or left arm by Detective O'Shea with a cigarette, which he claims left two scars on his arm. *Id.* at 24:7–8, 48:16–18, 49:14–19. Campbell says that he was never struck by Detective Hale. Defs.' 56.1 ¶ 35; Campbell Dep. 51:6–7. At some point after these events, Campbell contacted his mother to bring clothing for him. Campbell Dep. 24:14–25:4.

[2]     The precise timing and order of all of the events subsequent to Campbell's arrest are unclear.

Plaintiff was arraigned on August 11, 2004 and was admitted to the custody of the New York Department of Corrections ("DOC"). Defs.' 56.1 ¶¶ 26–27. The DOC medical intake form shows treatment for a left elbow abrasion, but there is no indication of treatment for any other injuries from the alleged beatings or cigarette burns. Defs.' 56.1 ff 29–34. Campbell claims that he was also given a cream and pain killers for his injuries, and provides medical records from August 22, 2004, which show that he received ibuprofen and an antibiotic ointment for an abrasion to his right elbow. [3] Campbell Dep. 50:4–11; Campbell Affirm. in Opp. to Mot. ("Campbell Affirm."), Ex. 9 (Bellevue Hospital Center medical records). On August 30, 2004, Plaintiff was indicted by a grand jury,

2010 WL 2720589

and on October 30, 2006, Campbell was convicted by a New York Supreme Court, Bronx County, for a criminal sexual act in the first degree, a Class B felony. Defs.' 56.1 ¶¶ 1, 37–38.

3    Plaintiff claims that the indication of treatment for his right, rather than left, elbow is an error in the medical records.

**\*3** Plaintiff filed suit in the present action on July 28, 2006. Defs.' 56.1 ¶ 39. Plaintiff alleges false arrest, malicious prosecution, excessive force, and an improper strip search in violation of his constitutional rights. The City of New York and New York Police Department defendants were served on August 24, 2006, Detective Hale was served on November 25, 2007, while Detective O'Shea and Officer Ortiz were served on December 12, 2007. *Id.* ¶¶ 40, 43–45. Detective Butterworth was never served by Plaintiff. *Id.* ¶ 46. On September 25, 2008, Defendants filed a motion for summary judgment to dismiss Plaintiff's claims. Specifically, Defendants argue that dismissal is warranted because (1) the individual defendants were not served within 120 days and the statute of limitations now bars claims against them; (2) Plaintiff has failed to establish *Monell* liability against the City of New York; (3) the New York City Police Department is a not a suable entity; (4) the false arrest, malicious prosecution, and unreasonable search claims are barred by *Heck v. Humphrey,* and (5) the excessive force and unreasonable search claims must be dismissed as a matter of law. On December 9, 2008, a month prior to the expected trial date, this case was stayed and put on the Court's suspense docket while Plaintiff pursued an appeal of his state conviction. The case was taken off suspense on or around April 13, 2010, after Plaintiff's appeal concluded unsuccessfully. Counsel for Defendants thereafter stated that they would rely on the papers previously filed in support of their summary judgment motion, and Campbell likewise chose not to submit any further substantive pleadings. [4]

4    Plaintiff submitted a three-page letter to this Court on or around May 26, 2010, six days after the deadline I imposed for any further briefing. The document provides no new facts or allegations to support his case.

## II. DISCUSSION

### A. Legal Standard

A court will not grant a motion for summary judgment pursuant to Rule 56 unless it determines that there is no genuine issue of material fact and the undisputed facts are sufficient to warrant judgment as a matter of law. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A material fact is one that will affect the outcome of the suit, and a dispute about a material fact occurs where there is sufficient evidence for a reasonable fact finder to return a verdict for the nonmoving party. *See Sista v. CDC Ixis North America, Inc.,* 445 F.3d 161, 169 (2d Cir.2006). The Court must construe the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor. *Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Id.* at 554–55 (quoting *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996)). However, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007), Where the party opposing summary judgment is proceeding *pro se,* the Court must "read the pleadings ... liberally and interpret them to raise the strongest arguments that they suggest." *Corcoran v. New York Power Auth.,* 202 F.3d 530, 536 (2d Cir.1999); *see also Jacobs v. Ramirez,* 400 F.3d 105, 106 (2d Cir.2005) (noting that *pro se* claims should be read liberally "particularly when they allege civil rights violations").

### B. Service & Statute of Limitations

**\*4** Defendants argue that this case should be dismissed against all individual defendants because Plaintiff failed to timely serve any of them, and because the statute of limitations has now run on his claims. Pursuant to Rule 4(m) of the Federal Rules of Civil Procedure, "[i]f a defendant is not served within 120 days after the complaint is filed, the court ... must dismiss the action without prejudice ... or order that service be made within a specified time." Fed.R.Civ.P. 4(m); *see also Zapata v. City of New York,* 502 F.3d 192, 195 (2d Cir.2007). A district court is required under Rule 4 to grant an extension to the plaintiff if "good cause" is shown. *See id.* Moreover, district courts have discretion to enlarge the time for service even in the absence of good cause. *See Murray v. Pataki,* No. 09–1657–pr, 2010 WL 2025613, at *2 (2d Cir. May 24, 2010); *Zapata* 502 F.3d at 197.

As is frequently the case in actions brought by *pro se* litigants who are incarcerated and have little access or control over legal resources, the plaintiff here had a difficult time serving the individual defendants. The City of New York and New York Police Department were served shortly after filing, on August 24, 2006. To effectuate service on the individual defendants, this Court issued a *Valentin* order for the City to assist Plaintiff in locating and effectuating service on the police officers. After seeking an enlargement of time to locate these individuals, Corporation Counsel provided Plaintiff with the addresses for Officer Ortiz, and Detectives O'Shea, and Hale in late October 2006, and again in October 2007; counsel did not provide the address for Detective Butterworth, who was by then retired from the police force, until June 2008. At the same time, Campbell demonstrated a largely good faith effort to comply with the necessary mechanics of service. In September 2006, April 2007, and October 2007, Plaintiff sent letters to this Court where he stated that he had sent the necessary service information, as well as a service fee, to the U.S. Marshall Service. Campbell eventually included documentation of his attempted service, which appeared to show that he had incorrectly sent the service materials to the New York Sheriff's Office, rather than the U.S. Marshall Service. Ultimately, through this Court's ministrations, the Southern District Pro Se Office and Marshall Service were provided the necessary materials, and Detective Hale was served on November 25, 2007 while Officer Ortiz and Detective O'Shea were served on December 12, 2007. To date, Detective Butterworth has not been served with process. While this process took longer than the typical 120 days outlined by Rule 4, the City itself took approximately 90 days to notify Campbell of most of the defendants' service information, and Campbell believed he had properly sent the service materials to the U.S. Marshalls. Regardless, this Court used its discretionary power under Rule 4 to grant further time to complete service, and Campbell ultimately did so for three of the individual defendants. Defendants suffered no significant prejudice from this delay, particularly since this case was stayed and they have now had over two and a half years since they were served to retain counsel and prepare their defense.

**\*5** Defendants' also argue that claims against the individual defendants must be dismissed because the statute of limitations had run when service was finally accomplished. The statute of limitations in New York for a § 1983 action is three year, and begins to run when the plaintiff knows or has reason to know of the alleged injury. *See Lynch v. Suffolk County Police Dept., Inc.,* 348 Fed. Appx. 672, 674

(2d Cir.2009) (quoting *Pearl v. City of Long Beach,* 296 F.3d 76, 80 (2d Cir.2002)); *Jewell v. County of Nassau,* 917 F.2d 738, 740 (2d Cir.1990). The statutory time is tolled when the complaint is filed, and for the duration of Rule 4's 120–day service period. *See Zapata,* 502 F.3d at 194, n. 4 (citing *Frasca v. United States,* 921 F.2d 450, 453 (2d Cir.1990)). The arrest at the heart of this action occurred on August 10, 2004, and the individuals were not served until November and December 2007. Defendants claim that, since Campbell took longer than 120 days to serve the individual defendants, claims against the individual defendants are barred.

However, Campbell was given the opportunity to serve the parties rather than dismiss the case, and thus the claims are not time-barred. *See Zapata,* 502 F.3d at 194, n. 4 ("if the plaintiff's action *is dismissed* for a failure to serve within 120 days, the governing statute of limitations again becomes applicable, and the plaintiff must refile prior to its termination.") (internal quotations omitted, emphasis added); *see also Ocasio v. Fashion Institute of Technology,* 86 F.Supp.2d 371, 376 (S.D.N.Y.2000). Indeed, avoiding a dismissal without prejudice under Rule 4 because it would create a statute of limitations issue is one way that a district court may extend the service time absent good cause. As the Second Circuit held in *Zapata,* "[w]here, as here, good cause is lacking, but the dismissal without prejudice in combination with the statute of limitations would result in a dismissal *with* prejudice, we will not find an abuse of discretion in the procedure used by the district court, so long as there are sufficient indications on the record that the district court weighed the impact that a dismissal or extension would have on the parties." 502 F.3d at 197. Campbell was granted extensions of time to effect service, completed service on Officer Ortiz, Detective Hale, and Detective O'Shea, and the impact of dismissal would be far greater on Campbell than the impact that late notice of this lawsuit had on these individual defendants.

Unlike the three individual defendants that were ultimately served, Campbell's claims against the lone unserved defendant, Detective Butterworth, must be dismissed. Plaintiff was made aware Butterworth's address in June 2008 and yet never provided adequate service of process. Given the length of time that has passed, and the significant assistance already provided to Plaintiff by both this Court and counsel for Defendants, there is no justification to further extend the service period some four years after the case was filed. Detective Butterworth would be far more prejudiced than Campbell by this service, and claims against him are

2010 WL 2720589

dismissed without prejudice, pursuant to Rule 4(m), and likely barred by the statute of limitations.

### C. Section 1983 Claims

**\*6** Defendants next argue that each of Plaintiff's § 1983 claims fails as a matter of law. Section 1983 provides relief for a plaintiff deprived of "rights, privileges, or immunities secured by the Constitution and its laws." 42 U.S.C. § 1983. The statute is not itself a source of substantive rights, but rather a method for vindicating federal rights elsewhere conferred by the Constitution and federal statutes. *See Fredericks v. City of New York,* No. 07 Civ. 3659(LAK) (JCF), 2008 WL 506326, at \*3 (S.D.N.Y. Feb. 25, 2008) (quoting *Baker v. McCollan,* 443 U.S. 137, 145 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). To state a claim under § 1983, a plaintiff must allege (1) the challenged conduct was attributable to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed by the U.S. Constitution. *See Smart v. City of New York,* No. 08 Civ. 2203(HB), 2009 WL 862281, at \*3 (S.D.N.Y. Apr.1, 2009) (quoting *Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir.1999)).

#### 1. *False Arrest and Malicious Prosecution*

Plaintiff's claims of false arrest and malicious prosecution must be dismissed because he was convicted of a crime he was arrested for, and that conviction was upheld on appeal. In *Heck v. Humphrey,* the Supreme Court held that

> "in order to recover damages for ... harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983."

512 U.S. 477, 486–87, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) (emphasis in original). Claims for both false arrest and malicious prosecution both call into question the validity of a conviction, because false arrest requires a lack of probable cause and malicious prosecution requires probable cause and a termination of the proceedings in the defendant's favor. *See, e.g., Smart,* 2009 WL 862281, at \*4 (citing *Jaegly v. Couch,* 439 F.3d 149, 152 (2d Cir.2006) and *Savino v. City of New York,* 331 F.3d 63, 75 (2d Cir.2003)). Courts in this circuit routinely dismiss these claims where the plaintiff's conviction has not been overturned or otherwise invalidated. *See, e.g., Lynch v. Suffolk County Police Dept., Inc.,* 348 Fed. Appx. 672, 674 (2d Cir.2009); *Fallen v. Connelly,* 36 Fed. Appx. 29, 31 (2d Cir.2002) ("To be sure, if a person were validly convicted of the crime for which he was arrested, he would be barred from bringing a claim for false arrest because one element of such a claim is the absence of probable cause ... and a valid conviction establishes the existence of probable cause."); *Younger v. City of New York,* 480 F.Supp.2d 723, 730 (S.D.N.Y.2007) (dismissing false arrest and malicious prosecution claims on summary judgment on *Heck* grounds). Here, Plaintiff was convicted for a criminal sexual act in the first degree, and the conviction was upheld on appeal. As such, the false arrest and malicious prosecution claims must be dismissed.

#### 2. *Unreasonable Strip Search*

**\*7** Though he treats it as a violation of his "right to privacy," construed broadly Plaintiff brings a claim for an unreasonable strip search in violation of his Fourth Amendment rights. Defendants first argue that, like the false arrest and malicious prosecution claims, this claim is also barred by *Heck v. Humphrey.* In *Heck,* however, the Supreme Court specifically noted that "a suit for damages attributable to an allegedly unreasonable search may lie even if the challenged search produced evidence that was introduced in a state criminal trial resulting in the § 1983 plaintiff's still-outstanding conviction. Because of doctrines like independent source and inevitable discovery ... and especially harmless error ... such a § 1983 action, even if successful, would not *necessarily* imply that the plaintiff's conviction was unlawful." *Heck,* 512 U.S. at 487 n. 7 (emphasis in original). Defendants in this action do nothing more than assert in conclusory fashion that a finding that the search was unreasonable would undermine his conviction. There is no factual support provided—for example that the clothing taken in the search was the sole evidence for his conviction or even used at all at Campbell's trial—to indicate that finding the strip search unreasonable

would imply the conviction was unlawful. [5] With no facts before the Court to suggest that Campbell's conviction would be undermined by his unreasonable search claim, it will not be barred by the *Heck* decision.

[5]  The *Heck* court also stated that "in order to recover compensatory damages, however, the § 1983 plaintiff must prove not only that the search was unlawful, but that it caused him actual, compensable injury ... which, we hold today, does *not* encompass the "injury" of being convicted and imprisoned (until his conviction has been overturned)." 512 U.S. at 487 n. 7. Damages are typically a factual question, and Campbell has provided sufficient evidence, in particular through his deposition testimony about the emotional toll of the forced nudity, that a rational juror could conclude that he was injured by this alleged treatment in a way other than his conviction and imprisonment.

A strip search is a term "used generally to describe any inspection of the naked body." *Kelsey v. County of Schoharie,* 567 F.3d 54, 62 (2d Cir.2009) (citing *N.G. v. Connecticut,* 382 F.3d 225, 228 n. 4 (2d Cir.2003)). The Supreme Court has determined that courts should apply a "test of reasonableness" for pretrial detainees like Campbell that challenge the propriety of a strip search, which balances "the need for the particular search against the invasion of personal rights that the search entails." *See Bell v. Wolfish,* 441 U.S. 520, 558–59, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Murcia v. County of Orange,* 226 F.Supp.2d 489, 498 (S.D.N.Y.2002). Specifically, "Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell,* 441 U.S. at 559; *Moore v. Hearle,* 639 F.Supp.2d 352, 357 (S.D.N.Y.2009).

Campbell's claim focuses primarily on the place in which the search was conducted. As described in detail, *supra,* Campbell testified in his deposition that Officer Ortiz and another officer made him remove all of his clothing, save a tank top and eventually a "scrub" top provided by EMS, and left him completely naked from the waste down in both the holding pen with other detainees and while in transit between buildings. As a result, he claims he has suffered serious mental distress that has led to depression and anxiety. Defendants' argue that this testimony is insufficient as a matter of law, and that there is no indication that he was left naked for an unreasonable amount of time. But they do not provide any explanation as to why the search was reasonable or, perhaps more importantly, why it was necessary to be conducted in the first place and why the defendant was left in a state of nudity in view of others. Though there may have been some forensic need for the clothing, given the suspicion of rape and sexual assault, Campbell's largely-unchallenged sworn deposition testimony is sufficient to raise a material factual dispute to allow for a jury to determine whether the scope, manner, and place of the search was reasonable, particularly since a strip search "is by its very nature a highly intrusive invasion, and, as such, requires particular justification." *Moore,* 639 F.Supp.2d at 357 (quoting *Wilson v. Aquino,* 233 Fed. Appx. 73 (2d Cir.2007)). In an analogous situation in the Eastern District, a plaintiff testified at his deposition that he was arrested while sitting in his car for smoking marijuana, and that the arresting police officers pulled his pants and underwear down in view of the public to search for further hidden drugs. *See Jean–Laurent v. Hennessy,* No. 05 Civ. 1155(JFB)(LB), 2008 WL 3049875, at *2–4 (E.D.N.Y. Aug. 1, 2008). There, the court likewise determined on summary judgment that the plaintiff's testimony was itself sufficient to create a material issue of fact for a jury determination. *Id.* at *14. Similarly, if Campbell's version of events is credited, a reasonable juror could conclude he was subjected to an unreasonable strip search. *See also Moore,* 639 F.Supp.2d at 357 ("reasonable jurors could find that the officers acted unreasonably by conducting the search in an overly intrusive manner and in an improper location when they requested Moore to pull down his pants, spread his buttocks, and jump in a public area where observers and pedestrians could see his exposed lower body"); *Campbell v.iFernandez,* 54 F.Supp.2d 195, 198 (S.D.N.Y.1999) (reasonableness of strip search in public store "must be decided by a jury").

### 3. *Excessive Force*

**\*8** Plaintiff also claims that the police used excessive force against him at the time of arrest, by kicking, punching, and tackling him to the ground, and again later when they interrogated him at the police station, where he claims he was choked, slapped in the face, and burned with a lit cigarette. "All claims that law enforcement officers have used excessive force ... in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment 'reasonableness' standard." *Rincon v. City of New York,* No. 03 Civ. 8276(LAP), 2005 WL 646080, at *4 (S.D.N.Y. Mar.21, 2005) (quoting *Graham v. Conner,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)); *see also Smart,* 2009 WL 862281, at *7 (quoting *Scott v. Harris,*

550 U.S. 372, 381, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)). This encompasses both Campbell's claims of excessive force upon arrest and later at the police station, because "the Fourth Amendment standard probably should be applied at least to the period prior to the time when the person arrested is arraigned or formally charged, and remains in the custody (sole or joint) of the arresting officer." *Powell v. Gardner,* 891 F.2d 1039, 1044 (2d Cir.1989); *see also Perez v. City of New York,* No. 07 Civ. 10319(RJS)(KNF), 2009 WL 1616374, at *7 (S.D.N.Y. June 8, 2009). "[F]orce is excessive, in violation of the Fourth Amendment, if it is objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.' " *Maxwell v. City of New York,* 380 F.3d 106, 108 (2d Cir.2004) (quoting *Graham,* 490 U.S. at 397). This analysis must entail consideration of the totality of circumstances faced by officers on the scene, and it must be objectively sufficiently serious or harmful enough to be actionable. *See Rincon,* 2005 WL 646080, at *4 (quoting *Lennon v. Miller,* 66 F.3d 416, 425 (2d Cir.1995) and *United States v. Walsh,* 194 F.3d 37, 50 (2d Cir.1999)). "The force used by the officer must be reasonably related to the nature of the resistance and the force used, threatened, or reasonably perceived to be threatened, against the officer." *Sullivan v. Gagnier,* 225 F.3d 161, 166 (2d Cir.2000). "Not every push or shove" is excessive force, *Graham,* 490 U.S. at 397, and a court may grant summary judgment where the force used was *de minimis. See Yang Feng Zhao v. City of New York,* 656 F.Supp.2d 375, 391 (S.D.N.Y.2009).

Although the factual record is relatively weak, Campbell has raised a genuine issue of material fact as to whether or not the forced used against him was excessive. Plaintiff's testimony as to the alleged blows sustained when he was laying on the ground during his arrest and, more significantly, his testimony about being slapped and burnt with a cigarette while detained at the police station are sufficient to let a jury to decide whether or not these incidents actually occurred and, if so, whether the police used unreasonable force. *See Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) ("Although Scott's evidence may be thin, his own sworn statement is adequate to counter summary judgment in this case and must be weighed by a trier of fact."). That there is at best limited medical evidence in the record to corroborate his story is insufficient to dismiss his excessive force claim as a matter of law. *See Smith v. Fields,* No. 95 Civ. 8374(DAB), 2002 WL 342620, at *6 (S.D.N.Y. Mar., 4, 2002) ("Although the apparent lack of any indication in the medical records suggesting that Plaintiff was in fact slapped and kicked about the head casts some doubt

on his claim, it is for the fact finder to determine the veracity of the Plaintiff's account and whether his allegations, even if standing alone, amount to excessive force."). Contrary to Defendants' argument, the minimal evidence of injury does not render his claim *de minimis* and ripe for dismissal. It is the *force used,* not the injuries caused, which must be determined to be *de minimis* as a matter of law. *See Yang Feng Zhao,* 656 F.Supp.2d at 391. The alleged force used on Campbell when he was being interrogated at the police station, slapping and cigarette burns, in particular cannot conceivably be deemed a *de minimis* use of force if it in fact occurred. *See id.* (Determining that no "quantum of physical injury is required," and no force justified, in an "interrogation of an unresisting previously-arrested individual.").

**\*9** Defendants also argue that Plaintiff's claim must be dismissed because he failed to show any personal involvement by the various individual defendants. A § 1983 claim against an individual defendant requires some personal involvement, which is typically a question of fact. *See Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986); *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003). "A police officer is personally involved in the use of excessive force if he either: (1) directly participates in an assault; or (2) was present during the assault, yet failed to intercede on behalf of the victim even though he has a reasonable opportunity to do so." *Rossi,* 275 F.Supp.2d at 474 (citing *Ricciuti v. New York City Transit Auth.,* 124 F.3d 123, 129 (2d Cir.1997)). Relatedly, a supervisory official is personally involved if he "(1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created a custom or policy fostering the violation or allowed the custom or policy to continue after learning of it; or (4) was grossly negligent in supervising subordinates who caused the violation." *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997); *Smart,* 2009 WL 862281, at *11. Here, Campbell's testimony is sufficient to raise a material factual dispute over the involvement of each of the remaining individual defendants. Detective O'Shea allegedly directly participated because Plaintiff testified that he is the individual who actually burned him with a cigarette. Officer Ortiz was involved in both the arrest where Campbell claims he was punched and kicked, and it was he who allegedly slapped Plaintiff at the police station. Either action is sufficient to raise a factual question as to whether Ortiz directly participated in an unreasonable use of force or failed to intercede when other officers did so. Ortiz, as noted above, is also the officer that allegedly took Campbell's clothes and left him naked from the waist down in the holding pen. Finally, Detective Hale's

involvement is the most tenuous, as Plaintiff only testified that Hale transported him with O'Shea to a second building where O'Shea interrogated and burned him. Although admittedly a thin factual reed, the testimony is sufficient to allow a jury to determine whether or not Hale either failed to intercede when O'Shea allegedly burned Campbell or was personally involved in some other fashion. *See Smart,* 2009 WL 862281, at *11 (desk sergeants may be personally involved by failing to remedy violations once they learned of them). While Plaintiff may not have brought a particularly strong case, his sworn testimony about his treatment by these officers is mostly uncontradicted and sufficient to raise triable issues of fact for a jury.

### D. *Monell* Liability

Defendant also brings suit against the City of New York. To establish the liability of a municipality, like New York City, a "plaintiff must show that the violation of his constitutional rights resulted from a municipal custom or policy." *Ricciuti,* 941 F.2d 119, 122 (2d Cir.1991) (citing, *inter alia, Monell v. Department of Social Services,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)); *see also Patterson v. County of Oneida, N.Y.,* 375 F.3d 206, 226 (2d Cir.2004). Here, Campbell provides no evidence whatsoever of a custom or policy that led to any of the alleged constitutional violations, nor any evidence that the City failed to properly train the individual defendant police officers. "A single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy ." *Ricciuti,* 941 F.2d at 123; *see also Okin v. Village of Cornwall–On–Hudson Police Dept.,* 577 F.3d 415, 440–41 (2d Cir.2009) (For failure to train claim, "[t]he plaintiff must offer evidence to support the conclusion that the training program was inadequate, not that a particular officer may be unsatisfactorily trained or that an otherwise sound program has occasionally been negligently administered,

and that a hypothetically well-trained officer would have avoided the constitutional violation.") (internal citations and quotations omitted). Claims against the City of New York must be dismissed.

### E. New York City Police Department Liability

**\*10** Campbell also brings suit against the New York City Police Department. However, as courts in this district have previously explained, the New York City Police Department is not a suable entity. *See, e.g., East Coast Novelty Co., Inc. v. City of New York,* 781 F.Supp. 999, 1010 (S.D.N.Y.1992); *Fredericks,* 2008 WL 506326, at *6. As such, Plaintiff's claims against the Police Department are dismissed.

### III. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in part and DENIED in part. Claims against Detective Butterworth, the City of New York, and the New York Police Department, as well as claims for false arrest and malicious prosecution, are dismissed. Claims against Detective O'Shea, Detective Hale, and Officer Ortiz for excessive force and an unreasonable strip search remain. Per the notification recently sent to both parties, the trial for this matter is scheduled to begin on August 10, 2010 at 9:30 AM.

The Clerk of the Court is instructed to close the relevant motions and remove them from my docket.

### SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 2720589

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by Lindsey v. Butler, S.D.N.Y., August 29, 2014

2010 WL 935383
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Kerry PULLIAM, Plaintiff,

v.

Suffolk County Police Department Detectives James
LILLY, Tulio Serrata and "John Does" No. 3 and 4, all
in their individual and/or official capacities, Defendants.

No. 07–CV–1243 (SJF)(AKT).
|
March 11, 2010.

**Attorneys and Law Firms**

Kerry Pulliam, Attica, NY, pro se.

Richard T. Dunne, Susan A. Flynn, Suffolk County Attorney's
Office, Hauppauge, NY, for Defendant.

**OPINION & ORDER**

FEUERSTEIN, District Judge.

I. *Introduction and Procedural History*
 **\*1**  On March 21, 2007, *pro se* plaintiff Kerry Pulliam
("plaintiff") filed a complaint against the Suffolk County
Police Department ("SCPD") pursuant to 42 U.S.C. § 1983.
By order dated April 19, 2007, I granted plaintiff's application
to proceed *in forma pauperis* and *sua sponte* dismissed the
complaint for failure to state a claim against the SCPD,
with leave to file an amended complaint within thirty (30)
days. On May 10, 2007, plaintiff timely filed an amended
complaint against four (4) "John Doe" SCPD Detectives [1], in
their individual and/or official capacities, alleging, *inter alia,*
that on or about January 20, 2007, those four (4) detectives
assaulted him during a custodial interrogation, in violation
of his constitutional rights. (Amended Complaint [Compl., ¶
5). Defendants now move pursuant to Rule 56 of the Federal
Rules of Civil Procedure for summary judgment dismissing
the amended complaint.

[1]   By order dated August 1, 2007, I granted plaintiff's
application to amend the caption to substitute
Detectives James Lilly ("Lilly") and Tulio Serrata
("Serrata") for "John Does" 1 and 2.

II. *Factual Background*
In his amended complaint, plaintiff alleges, *inter alia,* the
following: "On or about January 20, 2007 ... I was Assaulted
by 4 separate detectives in violation of my constitutional
rights during an interrogation. When I refused to sign an
incriminating statement against myself SCPD detective John
Doe# 1 [Lilly] Strangled me and said I was "lying".... SCPD
detective John Doe# 2 [Serrata] came in and tried to get me
to sign a statement as well. When I refused to sign for him,
SCPD detective John Doe# 2 [Serrata] pulled my arm behind
my back in an upwards motion while he had me in a choke
hold and he slapped [sic] in the face.... SCPD detective John
Doe# 3 came in and immediately started to slap me several
times ... SCPD detective John Doe # 4 came in and grabbed
me in a choke hold and punched me in my back several
times.... During the entire time I was being beaten I was hand
cuffed."

Plaintiff has failed to submit any evidence in support of those
allegations and does not contest the following statements or
exhibits submitted by defendants in support of their motion
for summary judgment:

On January 20, 2007, 911 calls were made by Jodi Isolano
and Maureen DeMatteo reporting that Joseph DeMatteo
("DeMatteo") was being attacked outside his home, located
at 3 Surfside Cove, West Islip, New York, by a black male.
(Defendants' Statement Pursuant to Local Rule 56.1 [Def.
56.1], ¶ 2, Exhibit [Ex.] 1). In an affidavit, DeMatteo detailed
the robbery attempt committed by plaintiff and the ensuing
struggle. (Def. 56.1 ¶ 3, Ex. 3). According to DeMatteo,
during the struggle, he and plaintiff fell to the ground and were
hitting each other. (*Id.*). Additional affidavits of DeMatteo's
wife and neighbors detail their observations of the struggle
between Mr. DeMatteo and plaintiff. (Def. 56.1 ¶ 4, Exhibit
4). In addition, one of those witnesses reported that he, too,
wrestled plaintiff to the ground. (*Id.*)

On January 20, 2007, plaintiff was arrested on the charge
of robbery in the second degree and was taken to the Third
Precinct to be processed on his arrest. (Def. 56.1 ¶¶ 1 and 5). A
SCPD police activity log indicates that upon plaintiff's arrival
at the precinct, officers observed a "small cut on face/forehead
area" on plaintiff and that plaintiff complained that his "face

hurts from an altercation with another subject prior to the police arrival." (Def. 56.1 ¶ 5, Ex. 5). Photographs taken of plaintiff during the arrest process depict superficial abrasions consistent with the abrasion noted upon plaintiff's arrival at the precinct five (5) hours earlier. (Def. 56.1 ¶ 6, Ex. 6).

**\*2** On January 21, 2007, plaintiff was turned over to the Suffolk County's Sheriff's Office. (Def. 56.1 ¶ 8). A jail intake form notes that plaintiff had a "cut on head/swollen L eye" and refused medical treatment. (*Id.,* Ex. 8). During a physical examination of plaintiff upon his admission to the jail, plaintiff only complained of "neck stiffness." (Def. 56.1 ¶ 10, Ex. 9). Moreover, a screening sheet from the jail medical unit notes that two (2) days prior, plaintiff was hit in his left eye and the side of his head and that a reddened area was observed on plaintiff's eye. (Def. 56.1 Ex. 9). None of those documents indicate that plaintiff ever claimed any physical contact with investigating officers.

During a taped telephone interview on February 22, 2008, plaintiff claimed that he had been the victim of excessive force, but admitted: (1) that he had been in a fight with DeMatteo, during which he rolled around on the ground; (2) that he was uncertain whether he already had a cut on his head when he entered the precinct; (3) that he never received medical treatment for his eye, which healed itself; (4) that he could not be certain what injuries he may have incurred during his struggle with DeMatteo; and (5) that he probably did have the cut on his head prior to arriving at the precinct. (Def. 56.1 ¶ 12, Ex. 11).

Following a jury trial, plaintiff was convicted of robbery in the second degree, a class C violent felony, for which he was sentenced to a determinate term of imprisonment of seven (7) years. (Def. 56.1 ¶ 9)

III. *Discussion*

A. *Summary Judgment Standard*

Summary judgment should not be granted unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In ruling on a summary judgment motion, the district court must first "determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 202 (2d Cir.2007) (internal quotations and citations omitted); *see Ricci v. DeStefano,* —— U.S. ——, ——, 129

S.Ct. 2658, 2677, 174 L.Ed.2d 490 (2009) (holding that "[o]n a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." (Emphasis added) (internal quotations and citation omitted)). "A fact is material if it 'might affect the outcome of the suit under governing law.' " *Spinelli v. City of New York,* 579 F.3d 160, 166 (2d Cir.2009) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci,* 129 S.Ct. at 2677 (quoting *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

**\*3** If the district court determines that there is a genuine dispute as to a material fact, the court must then "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Spinelli,* 579 F.3d at 166 (internal quotations and citation omitted), to determine whether there is a genuine issue for trial. *See Ricci,* 129 S.Ct. at 2677. A genuine issue exists for summary judgment purposes "where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. County of Nassau,* 524 F.3d 160, 163 (2d Cir.2008) (citing *Guilbert v. Gardner,* 480 F.3d 140, 145 (2d Cir.2007)). The moving party bears the initial burden of establishing the absence of any genuine issue of material fact, after which the burden shifts to the nonmoving party to "come forth with evidence sufficient to allow a reasonable jury to find in [its] favor." *Spinelli,* 579 F.3d at 166 (internal quotations and citation omitted). Thus, the nonmoving party can only defeat summary judgment "by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in [its] favor, to establish the existence of" a factual question that must be resolved at trial. *Id.* (internal quotations and citations omitted); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Summary judgment is appropriate when the non-moving party has no evidentiary support for an essential element for which it bears the burden of proof. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265. "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of N.Y.,* 352 F.3d 733, 743 (2d Cir.2003) (alterations in original).

It is well established that "the submissions of a pro se litigant must be construed liberally and interpreted to raise the strongest arguments that they support." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006) (internal quotations and citations omitted). Nevertheless, a pro se litigant cannot oppose a summary judgment motion by solely relying on "conclusory allegations or denials"; instead, he must produce "some affirmative indication that his version of relevant events is not fanciful." *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980).

   B. *Plaintiff's Section 1983 Claim*

Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (internal quotations and citation omitted). To state a claim under Section 1983, a complaint must contain factual allegations plausibly suggesting (1) that the challenged conduct was attributable at least in part to a person acting under color of state law, and (2) that such conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *Velez v. Levy,* 401 F.3d 75, 84 (2d Cir.2005). As it is assumed that the defendants were acting under color of state law, I need determine only whether plaintiff suffered a violation of his constitutional rights under Section 1983.

 **\*4**  The source of the constitutional right against physically abusive government conduct occurring during the course of a criminal proceeding depends on the context in which it occurred. "Where * * * the excessive force claim arises in the context of an arrest * * *, it is most properly characterized as one invoking the protections of the Fourth Amendment." *Graham,* 490 U.S. at 394, 109 S.Ct. 1865, 104 L.Ed.2d 443. Where the excessive force claim arises in the context of pre-trial detention, it invokes the protections of the Due Process Clause. *Id.* at 395 n. 10, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443. Where the excessive force claim arises after conviction, "the Eighth Amendment 'serves as the primary source of substantive protection ... in cases ... where the deliberate use of force is challenged as excessive and unjustified.' " *Id.* (quoting *Whitley v. Albers,* 475 U.S. 312, 327, 106 S.Ct. 1078, 1088, 89 L.Ed.2d 251 (1986)). Since plaintiff's excessive force claim arises from the custodial interrogation that occurred during the arrest process, the constitutional right invoked is the Fourth Amendment. *See,*

*e.g. Yang Feng Zhao v. City of New York,* 656 F.Supp.2d 375, 389 (S.D.N.Y.2009); *Swift v. Rinella,* No. 07–cv–0748, 2008 WL 4792700, at * 2 (S.D.Ill. Oct.31, 2008).

Under the Fourth Amendment, the relevant inquiry is whether the amount and nature of the force used was "objectively reasonable" under the totality of the circumstances faced by the officer on the scene. *Graham,* 490 U.S. at 396–397, 109 S.Ct. 1865, 104 L.Ed.2d 443. The determinative issue is the nature of the force used, as opposed to the nature of the injury, since a plaintiff may recover if the force used was unreasonable and excessive, notwithstanding that the injuries inflicted were not permanent or severe. *See Robison v. Via,* 821 F.2d 913, 924 (2d Cir.1987). "[W]hile 'the extent of the injury suffered ... is one factor to be considered when determining whether the use of force was excessive, an injury need not be serious in order to give rise to a constitutional claim." *Sash v. U.S.,* 674 F.Supp.2d 531, 2009 WL 4824669, at * 6 (S.D.N.Y. Dec.15, 2009) (quoting *Ortiz v. Pearson,* 88 F.Supp.2d 151, 160 (S.D.N.Y.2000)). "Just as reasonable force is not unconstitutional even if it causes serious injury, neither does unreasonable force become immunized from challenge because it causes only minor injury." *Sash,* 2009 WL 4824669, at *6. However, the extent and nature of the injury is probative of the amount and type of force actually used by the officer, which is relevant to a determination of the reasonableness of the force used. *See, Zhao,* 656 F.Supp.2d at 390.

Here, the alleged excessive force did not occur at the time of plaintiff's arrest, but rather while he was being questioned at the precinct following his arrest. Moreover, the record is devoid of any evidence reflecting a reason for the use of any force during the interrogation, i.e., that plaintiff was acting aggressively or otherwise posed a threat to the officers during the interrogation. Accordingly, the use of more than *de minimis* force, if even that, under the circumstances presented here, would not be objectively reasonable. *See, e.g. Zhao,* 656 F.Supp.2d at 391 (finding that no use of force was justified during an interrogation of an unresisting previously-arrested individual).

 **\*5**  Nonetheless, the only injuries alleged by the plaintiff are a cut or abrasion in the facial area, a swollen eye and neck stiffness, which are wholly consistent with the statements of DeMatteo describing his struggle with plaintiff, the other witnesses to the scuffle between DeMatteo and plaintiff and plaintiff himself when he was asked about these injuries upon arrival at the precinct and in later statements.

To the contrary, those injuries are mostly inconsistent with plaintiff's excessive force claims against defendants, i.e., he was strangled, his arm was pulled back, he was placed in a choke hold, he was slapped, and he was punched in the back. Moreover, there is no evidence in the record that plaintiff ever notified the county or defendants of his complaints of excessive force prior to the initiation of this lawsuit, several months after his arrest. Although credibility assessments are improper on a motion for summary judgment, *see McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006), plaintiff's version of the events is in such discord with the record evidence as to be "wholly fanciful." *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) ("At the summary judgment stage, a non-moving party must offer some hard evidence that its version of the events is not wholly fanciful."). "[I]ssues of credibility sufficient to defeat a motion for summary judgment are not created if the * * * evidence is too incredible to be believed by reasonable minds." *Schmidt v. Tremmel,* No. 93 Civ. 8588, 1995 WL 6250 (S.D.N.Y. Jan.6, 1995) (quoting *Price v. Worldvision Enterprises, Inc.,* 455 F.Supp. 252, 266 n. 25 (S.D.N.Y.1978)). "[W]hen the facts alleged are so contradictory that doubt is cast upon their plausibility, [the court] [is] authorized to 'pierce the veil of the complaint's factual allegations,' dispose of '[the] improbable allegations'", and dismiss the claim." *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 470–471 (S.D.N.Y.1998) (quoting *Denton v.*

*Hernandez,* 504 U.S. 25, 32, 33, 112 S.Ct. 1728, 118 L.Ed.2d 340 (1992)).

In light of the undisputed evidence and the fact that plaintiff's belated and unsubstantiated claims are replete with inconsistencies and improbabilities, "[n]o reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made in [plaintiff's] complaint or in [his] subsequent missives to the court." *Schmidt,* 1995 WL 6250, at * 4. Since plaintiff has failed to raise a genuine dispute of material fact which could lead a rational trier of fact to find in his favor on his excessive force claim, there is no genuine issue for trial. Accordingly, defendants' motion for summary judgment is granted.

## IV. *Conclusion*

For the foregoing reaso ns, defendants' motion for summary judgment is granted and the amended complaint is dismissed in its entirety. The Clerk of the Court is directed to enter judgment in favor of defendants and to close this case.

 **\*6** SO ORDERED.

## All Citations

Not Reported in F.Supp.2d, 2010 WL 935383

---

End of Document          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Ficklin v. Rusinko, Not Reported in Fed. Supp. (2020)

2020 WL 5513812

2020 WL 5513812
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Terrick FICKLIN, Plaintiff,

v.

Douglas RUSINKO and Carl Jason, Defendants.

6:18-CV-06310 EAW
|
Signed 09/14/2020

**Attorneys and Law Firms**

Michael Jos. Witmer, Rochester, NY, for Plaintiff.

Gary M. Levine, New York State Office of the Attorney General, Rochester, NY, for Defendants.

**DECISION AND ORDER**

ELIZABETH A. WOLFORD, United States District Judge

**INTRODUCTION**

**\*1** Plaintiff Terrick Ficklin ("Plaintiff") commenced this action against Parole Officers Douglas Rusinko ("P.O. Rusinko"), Carl Jason ("P.O. Jason"), and Kathryn VanDusen ("P.O. VanDusen"), asserting several claims. (Dkt. 1 at 7-17). By Decision and Order dated January 8, 2019, the Court granted in part and denied in part the defendants' Motion to Dismiss, and dismissed P.O. VanDusen from the action. (Dkt. 8). Plaintiff's remaining claims are § 1983 claims for abuse of process and a Fourth Amendment violation in connection with Plaintiff's body cavity search, against defendants P.O. Rusinko and P.O. Jason (collectively "Defendants").

Presently before the Court are the parties' motions for summary judgment. (Dkt. 17 (Defendants' motion); Dkt. 19 (Plaintiff's motion)). For the reasons that follow, Defendants' motion is granted with respect to the abuse of process claim, but the motions are otherwise denied.

**STATE OF THE RECORD BEFORE THE COURT**

The Court notes at the outset that the submissions of the parties are far from robust. Defendants filed their motion for

summary judgment on January 30, 2020, in accordance with the Court's scheduling order (Dkt. 15), and supported that motion by a four-page statement of undisputed facts (Dkt. 17-1) with citations to Plaintiff's deposition transcript [1] that is attached as an exhibit (Dkt. 17-2) and to deposition exhibits that are not included in the record (*see, e.g.,* Dkt. 17-1 at ¶¶ 1, 2, 8). *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials....").

[1]     Plaintiff states in his notice of motion in support of summary judgment that he also "moves to seal a portion of Defendants [sic] motion" (Dkt. 19 at 1), and then in the final paragraph of his Rule 56 statement he states: "Move to seal pp. 20-32, 52, 60, 100-101, 133-134 (T17-35, 49, 57, 97-98, 130-131)" (Dkt. 19-1 at ¶ 22). There is a presumption of public access to judicial documents and this presumption "can be overcome only by specific, on-the-record findings that higher values necessitate a narrowly tailored sealing." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 126 (2d Cir. 2006). Plaintiff has wholly failed to meet this standard, offering no explanation or justification for his request to seal. Moreover, it is not entirely clear to the Court which portions of his deposition transcript he is seeking to seal. Accordingly, Plaintiff's motion to seal is denied without prejudice.

The Court issued a Text Order the same day Defendants filed their motion, setting February 27, 2020, as the deadline to submit a response to the summary judgment motion, and March 12, 2020, as the deadline for any reply. (Dkt. 18). After the deadline for submitting a response, Plaintiff filed his own separate motion for summary judgment, wherein instead of submitting "a response to each numbered paragraph" in Defendants' statement of undisputed facts as required by this Court's Local Rules, *see* L. R. Civ. P. 56(a)(2), Plaintiff submitted his own four-page statement of undisputed facts that also refers to deposition exhibits that are not part of the record before the Court (*see, e.g.,* Dkt. 19-1 at ¶¶ 1, 20).

**\*2** Defendants never submitted a reply in support of their summary judgment motion nor an opposition to the separately

Ficklin v. Rusinko, Not Reported in Fed. Supp. (2020)

2020 WL 5513812

filed (and untimely) motion filed by Plaintiff. [2] Specifically, this Court's Text Order set a deadline for reply papers in support of Defendants' summary judgment motion as March 12, 2020 (Dkt. 18), and this Court's Local Rules otherwise required a response within 28 days after service of Plaintiff's separately-filed summary judgment motion (*see* Loc. R. Civ. P. 7(b)(2)(A) (requiring responses to motions for summary judgment and cross-motions for summary judgment to be filed 28 days after service, in the absence of a Court order setting forth other deadlines)).

[2]     Plaintiff's motion is untimely because to the extent it was intended to be a response to Defendants' motion for summary judgment, it was submitted a day late (*see* Dkt. 18), and to the extent it was intended to represent a separately-filed motion for summary judgment, it was submitted 29 days late (*see* Dkt. 15 at ¶ 5 (requiring dispositive motions to be filed by January 30, 2020)). Court deadlines should not be so cavalierly disregarded by counsel. Nonetheless, because Defendants have not raised any objection to the late filing by Plaintiff, and because Defendants themselves never bothered to respond to Plaintiff's motion for summary judgement, the Court will exercise its discretion and consider the untimely filings. However, counsel is forewarned that the Court may not be so inclined with respect to future untimely filings that disregard the Court's scheduling deadlines.

According to this Court's Local Rules: "Each numbered paragraph in the moving party's statement of material facts may be deemed admitted for purposes of the motion unless it is specifically controverted by a correspondingly numbered paragraph in the opposing statement." L. R. Civ. P. 56(a)(2). Thus, arguably each party's Rule 56 statement should be deemed true if properly supported by the record evidence. Nonetheless, the Court has endeavored to compare the parties' Rule 56 statements to glean which facts, based upon the statements in both, are truly undisputed.

## FACTUAL BACKGROUND

At all times relevant to this action, Plaintiff was a parolee in the custody of New York State Parole. (Dkt. 17-1 at ¶ 1; Dkt. 19-1 at ¶ 1). According to Plaintiff, at some point prior to April 22, 2015, P.O. Jason asked Plaintiff whether

he knew an individual who went by the street name "Green Eyes." (Dkt. 17-2 at 52). On the evening of April 21, 2015, Plaintiff witnessed the murder of "[his] man," Moe, on Pardee Street. (*Id.* at 62). According to Plaintiff, on the morning of April 22, 2015, P.O Rusinko called regarding the murder and requested that Plaintiff come to the parole office. (*Id.* at 63).

Plaintiff's girlfriend picked him up to take him to the parole office, and the two stopped at the Brooklyn Express Convenience store on North Clinton Avenue in Rochester, New York. (Dkt. 17-1 at ¶ 4; Dkt. 17-2 at 65; Dkt. 19-1 at ¶ 2). After exiting the store, Plaintiff received a call from P.O. Jason who asked, "where Green Eyes at." (Dkt. 17-2 at 68). Plaintiff did not answer the question and hung up the phone. (*Id.*). Plaintiff then entered the driver's seat of his girlfriend's vehicle. (Dkt. 17-1 at ¶ 5; Dkt. 17-2 at 66). P.O. Rusinko drove by and observed Plaintiff seated in the driver's seat (Dkt. 17-1 at ¶ 6), and arrested Plaintiff for violating a condition of his parole restricting his ability to drive (Dkt. 17-1 at ¶ 7; Dkt. 19-1 at ¶ 5).

After arresting Plaintiff, Defendants transported him by car to the parole office. (Dkt. 17-1 at ¶ 10; Dkt. 19-1 at ¶¶ 6-7). During the car ride, Plaintiff told Defendants that he needed to use the bathroom. (Dkt. 17-1 at ¶ 10). After arriving at the parole office, Defendants escorted Plaintiff to the bathroom. (Dkt. 17-1 at ¶ 11; Dkt. 19-1 at ¶ 7). Plaintiff claims that Defendants then slammed him to the floor, pulled his pants down, and that P.O. Rusinko stated that a confidential informant had indicated Plaintiff had drugs in his rectum. (Dkt. 17-1 at ¶¶ 14-16; Dkt. 19-1 at ¶ 7). P.O. Rusinko put on a glove and stuck his fingers in Plaintiff's rectum but did not find any drugs. (Dkt. 17-1 at ¶ 17; Dkt. 19-1 at ¶¶ 9-11). According to Plaintiff, Defendants implied that the search was done because he would not provide information about Green Eyes. (Dkt. 19-1 at ¶ 15 ("Rusinko told Jason watch him. He said, yo, everything going to be all right. I am going to try and get you an ankle bracelet ... you could have just given up[ ]. We could have worked this out. It wouldn't have been like this.")).

**\*3** As a result of the body cavity search, Plaintiff claims that he suffered intense pain, making it difficult for him to sit on a toilet. (Dkt. 19-1 at ¶ 19). Plaintiff also states that he lost his appetite, developed hemorrhoids, and bled while having a bowel movement. (*Id.*). Plaintiff also testified that he suffered from depression, experienced flashbacks, and had difficulty sleeping as he "was fucked up in the head" and "traumatized." (*Id.* at ¶ 20).

Case 6:24-cv-01169-DNH-MJK    Document 5    Filed 10/30/24    Page 121 of 141

Ficklin v. Rusinko, Not Reported in Fed. Supp. (2020)

2020 WL 5513812

## DISCUSSION

### I. Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the Court finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact[.]" *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014). "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)). Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358. Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

### II. § 1983 Fourth Amendment Claim

#### A. There are disputed issues of fact as to whether the body cavity search was reasonable under the circumstances.

The Fourth Amendment recognizes the "right of the people to be secure in their persons ... against unreasonable searches...."

U.S. Const. amend. IV. "Whether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate government interests.' " *United States v. Massey*, 461 F.3d 177, 178 (2d Cir. 2006) (quoting *Samson v. California*, 547 U.S. 843, 848 (2006)). "Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979) (citations omitted).

"Courts must 'examin[e] the totality of the circumstances' surrounding the search, which includes Plaintiff's status as a parolee," *Rivera v. Madan*, No. 10 Civ. 4136 (PGG), 2013 WL 4860116, at *4 (S.D.N.Y. Sept. 12, 2013) (citations omitted), as parolees "have severely diminished expectations of privacy by virtue of their status alone," *Samson*, 547 U.S. at 852. *See also Massey*, 461 U.S. at 179 ("A parolee's reasonable expectations of privacy are less than those of ordinary citizens" (citations omitted)). "While parolees possess diminished Fourth Amendment protections, and the precise scope of the protections they retain is uncertain, a parolee still enjoys a level of Fourth Amendment protection that is greater than the *de minimis* Fourth Amendment protection that incarcerated inmates retain." *Rivera*, 2013 WL 4860116, at *5 (citing *Hope v. Goines*, No. 00 CV 3476(JG), 2002 WL 2003201, at *3 (E.D.N.Y. Aug. 8, 2002)) (internal quotation marks omitted).

**\*4** Courts in this Circuit have traditionally applied the standard set forth in *People v. Huntley*, 43 N.Y.2d 175 (1977), to assess whether a search of a parolee was unreasonable and thus unconstitutional. The *Huntley* standard looks at "whether the conduct of the parole officer was rationally and reasonably related to the performance of the parole officer's duty." *United States v. Grimes*, 225 F.3d 254, 258-59 (2d Cir. 2000) (quoting *Huntley*, 43 N.Y.2d at 181). The Second Circuit has held that the *Huntley* standard is "coextensive with the requirements of the Fourth Amendment." *Id.* at 259 n.4 ("A rule indicating that a search of a parolee is permissible so long as it is reasonably related to the parole officer's duties is identical to a rule that parole officers may conduct searches so long as they comport with the Fourth Amendment."). "Accordingly, where a parolee challenges a parole officer's search as violative of the Fourth Amendment, 'the central issue is whether the conduct of the parole officer was rationally and reasonably related to the performance of the parole officer's duty.' "

Case 6:24-cv-01169-DNH-MJK   Document 5   Filed 10/30/24   Page 122 of 141

Ficklin v. Rusinko, Not Reported in Fed. Supp. (2020)

2020 WL 5513812

*Rivera*, 2013 WL 4860116, at *5 (quoting *United States v. Barner*, 666 F.3d 79, 85 (2d Cir. 2012)).

However, since the Supreme Court's decision in *Samson v. California*, it is an open question whether *Samson* supplants prior cases in which the reasonableness of a search of a parolee was assessed under the *Huntley* standard. In *Samson*, the Supreme Court held that a "suspicionless" search of a parolee did not violate the Fourth Amendment where the parolee had consented to being searched "at any time of the day or night, with or without a search warrant and with or without cause" as a condition of parole. 547 U.S. at 846. The Supreme Court reasoned that the California statute's "clear and unambiguous search condition" "significantly diminished [the parolee's] reasonable expectation of privacy." *Id.* at 852.

Examining *Samson*, the Second Circuit has held that a parolee's consent to be searched under the New York statute is "narrower than" and "factually distinct from" a parolee's consent to be searched under the California statute at issue in *Samson*, because the New York statute "[does] not explicitly authorize 'anytime, anywhere' searches and as New York law requires searches be 'rationally and substantially related' to the performance of the parole officer's duty." *United States v. Watts*, 301 F. App'x 39, 42 n.2 (2d Cir. 2008) (citing N.Y. Comp. Codes R. & Regs. Tit. 9, § 8003.2(d)). The Second Circuit has opined on several occasions that it is an open question whether *Samson* supplants past precedent applying the *Huntley* standard and has consistently declined to answer that question. *See Black v. Petitinato*, 761 F. App'x 18, 21 (2d Cir. 2019) ("We agree with the district court that the law is unclear whether the *Huntley* standard has been superseded by *Samson*.... We therefore conclude that there was no clearly settled law telling the parole officers that their [suspicionless] search of Black's residence violated the standards of the Fourth Amendment.") (citing *Barner*, 666 F.3d at 86 (declining to decide whether search could have been justified under *Samson* without applying the *Huntley* standard); *United States v. Viserto*, 391 F. App'x 932, 934 (2d Cir. 2010) (declining to decide whether "*Samson* supplants ... past precedent assessing the reasonableness of a parole search by reference to its relationship to parole duties"); *Watts*, 301 F. App'x at 42 n.2 (declining to decide whether *Samson* "supplants our prior cases in which we assessed the 'reasonableness' of a parole search under" the *Huntley* standard)).

Here, applying the *Huntley* standard, the Court easily finds that there are questions of fact as to whether the body cavity search was rationally and reasonably related to Defendants' performance of their duties as parole officers under the particular facts of this case. Notably, Plaintiff was arrested and brought to the parole office for violating a condition of parole in connection with driving, not possessing drugs. While being transported to the parole office, Plaintiff asked to use the bathroom. However, Defendants did not submit any evidence, nor do they argue, that they believed Plaintiff secreted drugs in his rectum based on Plaintiff's request to use the bathroom. Plaintiff testified that before he was searched, Defendants stated that a confidential informant told them that Plaintiff had drugs in his rectum. Although Defendants acknowledge this testimony (Dkt. 17-1 at ¶ 15), they have not submitted any evidence to demonstrate the search was in response to the information obtained from a confidential informant. On this limited record, the Court cannot conclude that the search was either objectively reasonable or unreasonable as a matter of law. *See Black v. Petitinato*, No. 16-cv-2320 (BMC) (RLM), 2018 WL 1115692, at *4 (E.D.N.Y. Feb. 27, 2018) (finding questions of fact where no evidence regarding "precisely what plaintiff did during [the parole officer's earlier visits to plaintiff's residence] and whether whatever it was amounted to reasonable suspicion for the later visit [to plaintiff's residence]," but granting summary judgment on basis of qualified immunity), *aff'd*, 761 F. App'x 18 (2d Cir. 2019); *Gerena v. Pezdek*, No. 9:13-CV-953 (DNH/ATB), 2015 WL 513145, at *4 (N.D.N.Y. Feb. 6, 2015) (denying summary judgment where defendants submitted no evidence as to whether search of parolee's home was "rationally and substantially related" to the performance of parole officers' duties and instead made a "generalized comment" that search of parolee was "related to their supervision responsibilities, *i.e.*, to insure that plaintiff was adhering to the strict terms of his release").

**\*5** In support of their request for summary judgment, Defendants cite *Rivera*, 2013 WL 4860116, at *4 to support their argument that the search was objectively reasonable as a matter of law. (Dkt. 17-3 at 4-5). However, *Rivera* actually demonstrates why there are issues of fact in the instant case. Applying the *Huntley* standard, the *Rivera* court found that the search was objectively reasonable based on the following undisputed facts: the plaintiff consented to his person being searched as one of his parole conditions; the parole officer had specific information from the plaintiff's girlfriend that the plaintiff was carrying cocaine; plaintiff's girlfriend had told parole officers that the plaintiff planned to either swallow the

Case 6:24-cv-01169-DNH-MJK    Document 5    Filed 10/30/24    Page 123 of 141

Ficklin v. Rusinko, Not Reported in Fed. Supp. (2020)

2020 WL 5513812

drugs or insert them into his rectum to smuggle them into Rikers Island and that the plaintiff planned on swallowing a razor or inserting it in his rectum; the plaintiff was squirming in his seat while seated in the parole officer's office; and he admitted that a drug test would be positive. *Id.* at *6. Those facts are plainly distinguishable from the present case, where the record is devoid of any evidence supporting a suspicion that Plaintiff had secreted drugs in his rectum—other than the statement that Plaintiff attributes to P.O. Rusinko stating that a confidential informant had purportedly indicated that Plaintiff had drugs in his rectum.

Moreover, even under the broader standard endorsed by *Samson* which concluded that the Fourth Amendment did not prohibit a suspicionless search of a parolee, issues of fact remain necessitating denial of summary judgment. The Supreme Court made it clear that California's statute withstood constitutional scrutiny, in part, because it prohibited "arbitrary, capricious or harassing" searches. 547 U.S. at 856. Here, the essence of Plaintiff's claim—about which the facts are disputed—is that Defendants conducted the body cavity search as a means of harassment and retribution because Plaintiff refused to provide information about "Green Eyes." If the body cavity search was conducted as retribution for Plaintiff's refusal to provide information to Defendants, then a reasonable jury could find that the search was unreasonable even under the more generous standard set forth in *Samson*.

### B. Defendants are not entitled to qualified immunity as a matter of law on Plaintiff's Fourth Amendment claim related to the body cavity search.

Turning to Defendants' argument that they are entitled to qualified immunity even if disputed issues of fact exist with respect to the reasonableness of the search, the Court concludes on the present record that Defendants are not entitled to qualified immunity as a matter of law. "The qualified-immunity doctrine shields 'government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *X-Men Sec., Inc. v. Pataki,* 196 F.3d 56, 65 (2d Cir. 1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). "The doctrine of qualified immunity protects government officials from liability for civil damages 'unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.' "

*McGowan v. United States,* 825 F.3d 118, 124 (2d Cir. 2016) (quoting *Wood v. Moss,* 572 U.S. 744, 759 (2014)).

" 'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear' that every 'reasonable official would understand that what he is doing' is unlawful." *District of Columbia v. Wesby,* 138 S. Ct. 577, 589 (2018). "This demanding standard protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (citation and quotations omitted). "The rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." *Id.* at 589-90 (citation and quotations omitted). "It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id.* at 590.

As discussed above, the Second Circuit has expressly declined to answer the question of whether *Samson* supplants the Circuit's prior cases requiring application of the *Huntley* standard in assessing the lawfulness of a search of a parolee. *See Petitinato,* 761 F. App'x at 21; *Barner,* 666 F.3d at 86; *Viserto,* 391 F. App'x at 934; *Watts,* 301 F. App'x at 42 n.2. Thus, if the issue before the Court was simply whether Defendants were entitled to qualified immunity because they conducted a search of a parolee without suspicion, the Court might be compelled to find in favor of Defendants. *See Petitinato,* 761 F. App'x at 21 (affirming grant of summary judgment in favor of parole officer defendants on the basis of qualified immunity because "the law is unclear whether the *Huntley* standard has been superseded by *Samson*"); *Foster v. McCabe,* No. 1:19-cv-843, 2020 WL 2840060, at *5 (W.D.N.Y. June 1, 2020) (dismissing claim on basis of qualified immunity "[s]ince Mr. Foster was a parolee and the law is unsettled as to whether *Samson* superseded the *Huntley* standard, no clearly established law told the officers that they could not search the residence").

 **\*6** However, Plaintiff complains about far more than a search being conducted without reasonable suspicion. Plaintiff contends that the search was conducted in a harassing, demeaning, and intrusive manner as retribution for his refusal to provide information to Defendants about Green Eyes. As noted above, even under *Samson,* the Supreme Court recognized that suspicionless searches may not be conducted for reasons that are arbitrary, capricious, or harassing. 547 U.S. at 856. Moreover, the alleged search conducted here was not a pat down search of Plaintiff's person or search

Ficklin v. Rusinko, Not Reported in Fed. Supp. (2020)

2020 WL 5513812

of his residence, but rather a highly intrusive manual body cavity search implicating significant privacy interests. *See Sloley v. VanBramer*, 945 F.3d 30, 38 (2d Cir. 2019) (reversing grant of summary judgment in § 1983 claim involving visual body cavity strip search incident to felony arrest, noting that these searches are "invasive and degrading" and "even more intrusive" than strip searches); *cf. Foster v. McCabe*, 2020 WL 2840060, at \*5 (dismissing § 1983 unlawful-search claims based on qualified immunity where law was unsettled concerning warrantless search of apartment where parolee resided); *Reed v. Sheppard*, 321 F. Supp. 3d 429, 449 (W.D.N.Y. 2018), *appeal dismissed sub nom. Reed v. Cashman*, No. 18-2733, 2019 WL 4527680 (2d Cir. Feb. 26, 2019) (granting summary judgment on qualified immunity grounds where officers conducted warrantless search of what was believed to be parolee's residence, because even if reasonable suspicion was lacking, the "uncertainty in the caselaw means that a reasonable parole officer conducting the search at issue here without reasonable suspicion would not necessarily have understood [his] actions to be unlawful"). In other words, a reasonable officer in Defendants' position would have known that it was unlawful to perform an invasive body cavity search for no legitimate purpose, but instead solely to retaliate against and humiliate Plaintiff. Indeed, it is well-established that such a search is unlawful even in the prison setting, where the Fourth Amendment's protections are less robust. *See Davila v. Messier*, No. 3:13-cv-81 (SRU), 2014 WL 4638854, at \*6 (D. Conn. Sept. 17, 2014) ("[A] strip search or body cavity search that is unrelated to a legitimate penological purpose or is designed to intimidate, harass or punish the inmate violates the Fourth Amendment's proscription against unreasonable searches."); *Lashley v. Wakefield*, 367 F. Supp. 2d 461, 470 (W.D.N.Y. 2005) (explaining that inmates may not be subjected to "searches that lack any legitimate penological interest and are intended solely to harass").

Accordingly, based on the present record, the Court concludes that it would be error to grant summary judgment in favor of Defendants based upon qualified immunity. The Court finds Defendants' reliance upon *Torres v. City of New York*, No. 17 Civ. 6604 (GBD) (DCF), 2019 WL 4784756 (S.D.N.Y. Sept. 30, 2019) inapposite. In *Torres*, the record established that the body cavity search of the plaintiff inmate was conducted based on reasonable suspicion that arose from the plaintiff's movements upon entering his cell to conduct an initial search. *Id.* at \*1. Here, by contrast, there are disputed issue of fact as to the existence of reasonable suspicion, and even if reasonable suspicion was not required in accordance with

*Samson*, there are disputed issues of fact as to the nature and scope of the search and the motivation for it, thus preventing the Court from concluding that the law addressing the search conducted by Defendants was unsettled at the time of the search so as to justify a finding of qualified immunity.

### C. **Plaintiff's request to reinstate his Eighth Amendment claim is denied.**

Plaintiff's memorandum of law in support of his motion for summary judgment contains a paragraph arguing that his claim related to the body cavity search should be evaluated under the Eighth Amendment, because based on the New York Court of Appeals decision in *People v. Bratton*, 8 N.Y.3d 637 (2007), Defendants did not have the authority to arrest Plaintiff without a warrant. (Dkt. 19-3 at 2). Plaintiff's argument is not well developed, and moreover, to the extent that Plaintiff is seeking reconsideration of the Court's prior Decision and Order dated January 8, 2019, he has not properly supported any such motion in accordance with the standard set forth by the Second Circuit. *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995) ("The standard for granting [a motion for reconsideration] ... is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court.").

In any event, for the reasons set forth in the Court's prior Decision and Order, it "joins with the district court decisions in this Circuit that have concluded that a parolee's excessive force claims against his parole officers for conduct taking place during his period of parole are analyzed under the Fourth Amendment, not the Eighth Amendment." *Ficklin v. Rusinko*, 351 F. Supp. 3d 436, 455 (W.D.N.Y. 2019). Whether Defendants were authorized to arrest Plaintiff without a parole warrant does not change that analysis and conclusion.

### III. **§ 1983 Abuse of Process Claim**

\*7  "When a plaintiff asserts an abuse-of-process claim under Section 1983, '[the Second Circuit has] turn[ed] to state law to find the elements'—in this case, New York State law." *Mangino v. Inc. Vill. of Patchogue*, 808 F.3d 951, 958 n.5 (2d Cir. 2015) (quoting *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994)); *see Savino v. City of New York*, 331 F.3d 63, 76-77 (2d Cir. 2003) (citing New York State decisional law in analyzing a § 1983 claim for abuse of process).

Case 6:24-cv-01169-DNH-MJK   Document 5   Filed 10/30/24   Page 125 of 141

Ficklin v. Rusinko, Not Reported in Fed. Supp. (2020)

2020 WL 5513812

Under New York law, "a malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process."

*Folk v. City of New York*, 243 F. Supp. 3d 363, 375 (E.D.N.Y. 2017) (quoting *Cook*, 41 F.3d at 80). In evaluating the third prong, the Second Circuit has distinguished between an "improper motive" and an "improper purpose." *See Savino*, 331 F.3d at 77 ("In order to state a claim for abuse of process, a plaintiff must establish that the defendants had an improper *purpose* in instigating the action.... '[I]mproper motive is not enough.' " (quoting *Dean v. Kochendorfer*, 237 N.Y. 384, 390 (1924))); *see also Roeder v. Rogers*, 206 F. Supp. 2d 406, 414 (W.D.N.Y. 2002) (granting summary judgment on abuse of process claim where plaintiff's affidavit did not "describe any coercive overtures initiated by defendants *after* the filing of the notice of pendency" because the plaintiff's "allegation that the notice was filed for the sole purpose of harassing her" showed malicious motive, not improper purpose (emphasis added)).

Defendants argue that Plaintiff's abuse of process claim should be dismissed because: (1) the claim is barred by *Heck v. Humphrey*, 512 U.S. 477 (1994), which held that a § 1983 action seeking money damages is not cognizable if a decision in the plaintiff's favor would necessarily invalidate a criminal conviction; (2) the existence of probable cause for Plaintiff's arrest bars any abuse of process claim; and (3) there is insufficient evidence in the record to support the conclusion that Defendants acted with an improper purpose in arresting Plaintiff. (*See* Dkt. 17-3). For the reasons discussed below, the Court disagrees that the abuse of process claim is barred by *Heck* or the existence of probable cause, but finds that summary judgment is proper because no rational fact finder could find in favor of Plaintiff.

Defendants contend that "Plaintiff's claim that the parole officers' arrest was an unlawful abuse of process would contradict the parole violation convictions" and thus Plaintiff's claims are barred by *Heck*. (*Id.* at 11). The record appears undisputed that Plaintiff pleaded guilty to operating a motor vehicle on April 22, 2015, in violation of his parole conditions (Dkt. 17-1 at ¶ 8; Dkt. 19-1 at ¶ 16), and that he also pleaded guilty to using cocaine before that date in violation of his parole conditions (Dkt. 17-2 at 69). However, Plaintiff's abuse of process claim does not undermine the

factual premise of either conviction. (*See* Dkt. 19-3 at 1-2). Instead, Plaintiff argues that the arrest was a part of a "continuing effort to threaten, intimidate, coerce, and extort Plaintiff into giving [Defendants] information on an unrelated parolee." (*Id.*). A finding in favor of Plaintiff as to his abuse of process claim would not necessarily undermine the validity of Plaintiff's parole violation convictions, because it is possible both that Plaintiff violated his parole and that Defendants would not have arrested him for those violations absent additional information. In other words, Plaintiff's convictions for driving and using cocaine do "not necessarily dispel the possibility that [Plaintiff] was the victim of unconstitutional abuse of process in the events leading up to the conviction[s]." *Hadid v. City of New York*, 730 F. App'x 68, 71 (2d Cir. 2018) (finding abuse of process claim not barred by *Heck* as the claim was not inconsistent with the plaintiff's perjury conviction).

**\*8** Defendants also argue that Plaintiff's guilty pleas bar his abuse of process claim because "[a] guilty plea establishes probable cause for the arrest as a matter of law." (Dkt. 17-3 at 10). Some courts in this Circuit have concluded that "probable cause—a type of legal justification—is a defense to a malicious abuse of process claim." *Rao v. City of New York*, No. 14-CV-7422 (RRM) (LB), 2018 WL 1582289, at \*9 (E.D.N.Y. Mar. 29, 2018) (collecting cases). Others have found that probable cause is not a complete defense to an abuse of process claim. *See id.* (collecting cases); *VanZandt v. Fish & Wildlife Serv.*, 524 F. Supp. 2d 239, 247 (W.D.N.Y. 2007) ("[P]rocess properly issued on probable cause can nonetheless be abused."); *see also Allen v. Leonard*, No. CV 18-7163 (SJF) (AKT), 2020 WL 4587752, at \*8 n.8 (E.D.N.Y. Mar. 3, 2020) (noting that there is a "split within this Circuit as to whether probable cause is a complete defense to malicious abuse of process"), *report and recommendation adopted*, 2020 WL 2537280 (E.D.N.Y. May 19, 2020). The Second Circuit has declined to weigh in on the issue as recently as 2015, *see Mangino*, 808 F.3d at 959, but noted in *Tuccillo v. Cnty. of Nassau*, 723 F. App'x 81 (2d Cir. 2018), that after its decision in *Mangino*, "New York state courts have subsequently held that probable cause will defeat an abuse of process claim under at least some circumstances," *id.* at 82.

Defendants fail to address this split of authority at all in their papers, and thus have failed to demonstrate their entitlement to summary judgment on this basis. In particular, Defendants have failed to address why or how the circumstances of this case are such that the Court should conclude the existence of probable cause bars Plaintiff's abuse of process claim. On the

record before it, the Court cannot grant summary judgment to Defendants due to the existence of probable cause.

However, the Court is persuaded that Plaintiff cannot, on the instant record, demonstrate that Defendants acted with an improper purpose so as to support an abuse process claim. The essence of Plaintiff's claim is that his arrest was a part of a "continuing effort to threaten, intimidate, coerce and extort Plaintiff into giving [Defendants] information on an unrelated parolee." (Dkt. 19-3 at 2). In its prior Decision and Order dated January 8, 2019, the Court permitted Plaintiff's abuse of process claim to proceed on this theory at the motion to dismiss stage, noting that it was "admittedly a close call." (Dkt. 8 at 21). However, at the summary judgment stage, Plaintiff has failed to come forward with any evidence that would allow a reasonable jury to adopt his theory that Defendants arrested Plaintiff in order to force him to provide information regarding Green Eyes. The sole evidence in the record related to this assertion is Plaintiff's testimony that after the arrest and body cavity search, "Rusinko ... said, yo, everything going to be all right. I am going to try and get you an ankle bracelet ... you could have just given up[ ]. We could have worked this out. It wouldn't have been like this." (Dkt. 17-2 at 99). This testimony, on its face, does not support the conclusion that Defendants were still seeking information about Green Eyes—to the contrary, the statements that "we could have worked this out" and that "[i]t wouldn't have been like this" had Plaintiff "just given up" indicate that the window for cooperation had closed. Notably, Plaintiff did not testify (or come forward with any other evidence) that Defendants attempted to force him to provide information regarding Green Eyes during the course of the arrest and body cavity search, or that Defendants subsequently attempted to leverage Plaintiff's arrest in exchange for such information.

At most, the record before the Court supports the conclusion that Plaintiff's arrest and the subsequent body cavity search were undertaken for the purpose of punishing Plaintiff for his previous failure to cooperate. As such, Plaintiff has failed to demonstrate that Defendants arrested him to obtain a collateral objective beyond the arrest. *See Arrington v. City of New York*, 628 F. App'x 46, 49-50 (2d Cir. 2015) (allegation

that defendant commenced prosecution to punish the plaintiff for exercising his right to bear arms is an allegation of retaliatory motive, not collateral objective); *Coleman v. City of New York*, 585 F. App'x 787, 788 (2d Cir. 2014) (affirming grant of summary judgment on abuse of process claim where the plaintiff claimed that the defendant police officers had arrested him in order to punish him because "retaliation for some offense will not suffice as a collateral motive for the purposes of an abuse of process claim"); *Savino*, 331 F.3d at 77-78 (affirming grant of summary judgment where the plaintiff alleged that "in instigating the criminal investigation that led to his indictment, defendants were retaliating against him for the embarrassment caused by the media reports of his allegedly exorbitant overtime pay" because even if "defendants acted with an improper *motive*," the plaintiff had presented no evidence that Defendants "had an *ulterior purpose* or *objective* in facilitating his prosecution"); *Aouatif v. City of New York*, No. 07-CV-1302 RRMJO, 2019 WL 2410450, at *12 (E.D.N.Y. May 31, 2019) (granting summary judgment on abuse of process claim where the plaintiff claimed her psychiatrist had maliciously caused her to be involuntarily committed in retaliation for her having accused him of misconduct because "a retaliatory motive cannot sustain an abuse of process claim"), *aff'd*, 811 F. App'x 711 (2d Cir. 2020). No reasonable jury could find for Plaintiff on his abuse of process claim, and Defendants are entitled to summary judgment thereon.

## CONCLUSION

**\*9** For the foregoing reasons, Defendants' motion for summary judgment (Dkt. 17) is granted as to Plaintiff's abuse of process claim and otherwise denied. Plaintiff's motion for summary judgment (Dkt. 19) is denied in its entirety.

SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2020 WL 5513812

---

© 2024 Thomson Reuters. No claim to original U.S. Government Works.



**User Name:** Chaim Jaffe
**Date and Time:** Wednesday, October 30, 2024 11:30:00□AM EDT
**Job Number:** 237359287

## Document (1)

1. _Miller v. Loughren_
   **Client/Matter:** -None-
   **Search Terms:**
   **Search Type:** Natural Language
   **Narrowed by:**

   | Content Type | Narrowed by |
   | --- | --- |
   | | -None- |

 Warning
As of: October 30, 2024 3:30 PM Z

### *Miller v. Loughren*

United States District Court for the Northern District of New York

January 21, 2003, Decided ; January 21, 2003, Filed

9:99-CV-2068 (HGM)(RFT)

**Reporter**
2003 U.S. Dist. LEXIS 7093 *

DONAHUE A. MILLER, JR., Plaintiff, vs. THOMAS LOUGHREN, Sheriff, Chenango County; LT. CUTTING, Chenango County Sheriff's Department; SGT. ROBERTSON, Chenango County Sheriff's Department, Defendants.

**Subsequent History:** Accepted by, in part, Rejected by, in part, Summary judgment granted by, Complaint dismissed at *Miller v. Loughren, 258 F. Supp. 2d 61, 2003 U.S. Dist. LEXIS 6954 (N.D.N.Y, Apr. 23, 2003)*

**Prior History:** *Miller v. Loughren, 2001 U.S. Dist. LEXIS 25180 (N.D.N.Y, Mar. 28, 2001)*

**Disposition:** **[*1]** Magistrate recommended that defendants' motion for summary judgment be granted in part and denied in part. Magistrate recommended that plaintiff's motion for summary judgment be denied.

## Core Terms

alleges, inmates, retaliation, courts, summary judgment motion, material fact, defendants', grievance, constitutional right, retaliation claim, cellblock, recommend, privacy, law library, pro se, typewriter, dorm, summary judgment, adverse action, legal advice, requests, protected activity, photocopies, complains

## Case Summary

### Procedural Posture

Plaintiff inmate filed a complaint under *42 U.S.C.S. § 1983*, alleging defendant county sheriffs violated his constitutional rights, by providing inadequate law library facilities, not allowing him unlimited access to a typewriter, violated his right to privacy, and retaliated against him for filing a grievance in violation of the *First* and *Fourteenth Amendments*. Cross motions for summary judgment were referred to a magistrate judge.

### Overview

Requests for a typewriter were granted or denied due to a stated reason why the room could not be accessed on a particular day. A majority of the materials requested from the law library were granted. Requests for notary services and photocopies were honored. There were no allegations as to one sheriff and the allegations of another sheriff ignoring a letter from the inmate were insufficient. Any inability to pursue civil actions did not state a claim for denial of access to the courts. There were no allegations that

the inmate was unable to assist his assigned counsel on his criminal matter because of procedures to access the library. Having to have nonconfidential documents copied by prison officials was not an invasion of privacy. There was no constitutional right to give other inmates legal advice; a retaliation claim based upon such activities failed. Conclusory allegations as to a denial of access to the grievance forms were insufficient. But, there was insufficient proof as to why the inmate was moved on the same day he filed a grievance, leaving issues of fact as to whether retaliation for a grievance was a substantial factor in the decision to move the inmate.

**Outcome**

It was recommended that the sheriffs' motion for summary judgment be granted as to all claims except as to the retaliation claim based upon the inmate's filing of a grievance against one officer and the inmate's subsequent move to the cell block. It was recommended that the inmate's motion for summary judgment be denied.

## LexisNexis® Headnotes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > General Overview

Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

*HN1*[⬇] **Entitlement as Matter of Law, Appropriateness**

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. *Fed. R. Civ. P. 56*. Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion. However, when the moving party has met its burden, the nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts. At that point, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.

Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > General Overview

Civil Procedure > Parties > Pro Se Litigants > General Overview

Civil Procedure > Parties > Pro Se Litigants > Pleading Standards

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

## *HN2*[⤓]  **Summary Judgment, Motions for Summary Judgment**

A non-moving party cannot survive a motion for summary judgment merely by relying on the allegations contained in its pleadings. Although a pro se plaintiff is entitled to special latitude when defending against summary judgment, he or she must establish more than merely metaphysical doubt as to the materials facts.

Civil Procedure > ... > Summary Judgment > Supporting Materials > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

## *HN3*[⤓]  **Summary Judgment, Supporting Materials**

See U.S. Dist. Ct., N.D.N.Y., R. 7.1(a)(3).

Civil Rights Law > ... > Immunity From Liability > Local Officials > Customs & Policies

Civil Rights Law > Protection of Rights > Immunity From Liability > Respondeat Superior Distinguished

Civil Rights Law > Protection of Rights > Section 1983 Actions > Scope

## *HN4*[⤓]  **Local Officials, Customs & Policies**

As a prerequisite to an award of damages under *42 U.S.C.S. § 1983*, a plaintiff must demonstrate the personal involvement of each named defendant. In essence, there is no respondeat superior liability in *§ 1983* actions. Therefore, a supervisory official may be personally involved only where the official (1) directly participated in the alleged violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) either created or continued an unconstitutional policy, custom, or practice; or (4) was grossly negligent in managing the subordinates who caused the violation.

Civil Rights Law > ... > Immunity From Liability > Local Officials > Customs & Policies

Civil Rights Law > Protection of Rights > Section 1983 Actions > Scope

## *HN5*[⤓]  **Local Officials, Customs & Policies**

Where the civil rights complaint names a defendant in the caption but contains no allegation indicating how the defendant violated the law or injured the plaintiff, there is no personal involvement.

Civil Rights Law > ... > Scope > Law Enforcement Officials > Prison Officials

_HN6_[⬇]  **Law Enforcement Officials, Prison Officials**

An allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.

Civil Procedure > Preliminary Considerations > Justiciability > General Overview

Civil Rights Law > Protection of Rights > Prisoner Rights > Access to Courts

Criminal Law & Procedure > Postconviction Proceedings > Imprisonment

Civil Rights Law > Protection of Rights > Prisoner Rights > General Overview

Civil Rights Law > ... > Scope > Law Enforcement Officials > Prison Officials

_HN7_[⬇]  **Preliminary Considerations, Justiciability**

Prisoners have a constitutional right to access to the courts. To establish standing for a claim for denial of right of access to courts, an inmate must show that he has suffered an actual injury traceable to the challenged conduct of prison officials--that is, that a nonfrivolous legal claim had been frustrated or was being impeded due to the actions of prison officials. To state a claim that his constitutional right to access the court was violated, a plaintiff must allege facts demonstrating that the defendants deliberately and maliciously interfered with his access to the courts, and that such conduct materially prejudiced a legal action he sought to pursue.

Civil Rights Law > Protection of Rights > Prisoner Rights > Access to Courts

Criminal Law & Procedure > Postconviction Proceedings > Imprisonment

_HN8_[⬇]  **Prisoner Rights, Access to Courts**

The right of access to the courts does not require that inmates be provided with typewriters.

Civil Rights Law > Protection of Rights > Prisoner Rights > General Overview

_HN9_[⬇]  **Protection of Rights, Prisoner Rights**

Where the threshold of an infringement upon an inmate's constitutional rights is not crossed, justification need not be addressed.

Civil Rights Law > Protection of Rights > Prisoner Rights > General Overview

*HN10*[⬇] **Protection of Rights, Prisoner Rights**

In the prison setting the constitutional right to privacy may be restricted to the extent necessary to further the penal institution's legitimate goals or policies.

   Civil Procedure > Pleading & Practice > Pleadings > General Overview

*HN11*[⬇] **Pleading & Practice, Pleadings**

Carbon paper or handwritten documents are accepted in the courts in New York.

   Civil Rights Law > Protection of Rights > Prisoner Rights > Access to Courts

   Criminal Law & Procedure > Postconviction Proceedings > Imprisonment

*HN12*[⬇] **Prisoner Rights, Access to Courts**

There is no requirement that an inmate receive free or unlimited access to photocopying machines. Requiring inmates to pay for the cost of photocopies is not tantamount to the denial of access to the courts.

   Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

   Civil Rights Law > Protection of Rights > Prisoner Rights > Discipline

*HN13*[⬇] **Summary Judgment, Burdens of Proof**

Retaliation is a viable claim when an inmate plaintiff alleges that adverse actions are taken in retaliation for the exercise of a constitutional right. Courts must approach claims of retaliation with skepticism and particular care. In order to survive dismissal, the plaintiff must advance "non-conclusory" allegations establishing: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech or conduct and the adverse action. In considering these claims, courts are mindful that because retaliation claims can be fabricated easily, plaintiffs bear a somewhat heightened burden of proof, and summary judgment can be granted if the claim appears insubstantial. If the plaintiff satisfies his burden, the defendants must then prove that they would have taken the action even in the absence of plaintiff's protected conduct -- that is, even if they had not been improperly motivated.

   Civil Rights Law > Protection of Rights > Prisoner Rights > Discipline

   Civil Rights Law > Protection of Rights > Prisoner Rights > Transfers

*HN14*[⬇] **Prisoner Rights, Discipline**

A plaintiff inmate does not have a constitutional right to remain in preferred housing. However, any action done in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim.

Civil Rights Law > Protection of Rights > Prisoner Rights > Access to Courts

Criminal Law & Procedure > Postconviction Proceedings > Imprisonment

Civil Rights Law > Protection of Rights > Prisoner Rights > General Overview

Civil Rights Law > Protection of Rights > Prisoner Rights > Discipline

Criminal Law & Procedure > ... > Defendant's Rights > Right to Counsel > Potential Imprisonment

*HN15*[⬇] **Prisoner Rights, Access to Courts**

While prisoners have a constitutional right of access to the courts, they do not have a constitutional right to assist other inmates in petitioning the courts. While there is no independent right to provide legal assistance to other inmates, prison officials may not prevent such assistance or retaliate for providing such assistance where no reasonable alternatives are available.

Civil Rights Law > Protection of Rights > Prisoner Rights > Discipline

Criminal Law & Procedure > Postconviction Proceedings > Imprisonment

*HN16*[⬇] **Prisoner Rights, Discipline**

A plaintiff inmate has a right to free and uninhibited access to both administrative and judicial forums for the purposes of seeking redress of grievances against state officers.

Civil Rights Law > Protection of Rights > Prisoner Rights > Discipline

Criminal Law & Procedure > Postconviction Proceedings > Imprisonment

*HN17*[⬇] **Prisoner Rights, Discipline**

A plaintiff inmate must establish that there is a causal connection between the protected activity and the adverse action taken by prison officials. A number of facts are to be considered in determining whether a causal connection exists between a plaintiff's protected activity and the defendants' actions in the context of a retaliation claim: (1) the temporal proximity between the protected activity and the adverse action; (2) the inmate's prior disciplinary record; (3) the outcome of any hearing concerning the charges alleged to be retaliatory; and, (4) any statements of the defendants concerning their motivation.

**Counsel:** DONAHUE A. MILLER, JR., Plaintiff, Pro se, McDonough, NY.

MICHAEL R. VACCARO, Esq., MELVIN, MELVIN LAW FIRM, Syracuse, NY, for Defendants.

**Judges:** Randolph F. Treece, U.S. MAGISTRATE JUDGE.

**Opinion by:** Randolph F. Treece

## Opinion

### REPORT-RECOMMENDATION

1

Plaintiff Donahue Miller ("plaintiff" or "Miller") brings this pro se complaint pursuant to *42 U.S.C. § 1983*, **[*2]** alleging defendants violated his constitutional rights while he was incarcerated at the Chenango County Jail ("Jail"). Specifically, Miller alleges that defendants provided inadequate law library facilities, did not allow him unlimited access to a typewriter, violated his right to privacy, and retaliated against him for filing a grievance in violation of the *First* and *Fourteenth Amendments.* 2 Presently pending are cross motions for summary judgment pursuant to *Fed. R. Civ. P. 56*. Docket Nos. 19 and 32.

For the reasons that follow, it is recommended that plaintiff's motion **[*3]** for summary judgment be denied and defendants' motion for summary judgment be granted in part and denied in part.

### I. Facts

Plaintiff was placed in the Jail on June 19, 1999. Originally, he was housed in a cell block, but was moved to a dorm after about one month. 3 During plaintiff's incarceration he had a divorce action and an unspecified state court civil action pending. Plaintiff alleges he was pursuing both of these civil actions pro se. It is also evident from the record that plaintiff was also defending against criminal charges with the assistance of appointed counsel.

Plaintiff alleges that the law library facilities at the Jail were inadequate to allow him to prosecute his civil actions or to assist his appointed counsel on the criminal **[*4]** matter. Plaintiff complains that a number of his requests to have books or materials brought from the county library were not granted, 4 and that his access to the typewriter was curtailed if there were others who needed to use the room where it was kept.

---

1 This matter was referred to the undersigned pursuant to *28 U.S.C. § 636(b)* and *N.D.N.Y.L.R. 72.3(c)*.

2 Plaintiff's motion papers also address alleged freezing of his inmate account. However, that claim was not included in the complaint in this action. In addition, plaintiff's motion papers address a number of events and alleged violations occurring after the November 29, 1999 filing of this action which were never added to this action by way of an amended pleading. Therefore, these issues are not properly before the Court in this action.

3 Plaintiff alleges that the inmates in the dormitory have freer movement, more access to showers, and physical access to the law library. Inmates in the cell block must request specific materials from the law library and only three books are allowed per request.

4 Plaintiff identifies four dates when his requests were not granted: August 25, October 4, October 6, and November 12, 1999.

2003 U.S. Dist. LEXIS 7093, *4

With respect to the typewriter, the exhibits annexed to defendants' motion reveal that many of plaintiff's requests were granted and that each denial stated a reason why the room could not be accessed on a particular day (e.g., use for provision of mental health services, probation interviews, inmate visitation days, attorney visits). With respect to access to legal materials, the exhibits also reveal that a majority of the materials requested by plaintiff from the law library were granted. The exhibits in the record also reveal that plaintiff's requests for notary services and photocopies were recorded and honored. Plaintiff alleges that not being able to go to the law library, having to request specific legal materials, and not being able to get officers to make more than one trip per day to the library for him, required him to "spread his research out over a period of days" and caused him mental distress. Plaintiff does not allege **[*5]** that he suffered any harm or legal prejudice in any of his ongoing cases as a result of the alleged inadequacies of the law library facilities.

Plaintiff alleges that in September and early October of 1999, he was providing legal advice to other inmates and that he was admonished not to do so by Sergeant Robertson. Plaintiff alleges that Sergeant Robertson promised to allow plaintiff to stay in the dorm provided he ceased giving legal advice to other inmates.

On October 14, 1999, plaintiff filed a letter of complaint against Officer Biviano regarding delivery of laundry. Plaintiff alleges that he was moved from the dorm to the cell block immediately after filing the complaint. On October 21, 1999, plaintiff wrote a letter to Officer Biviano stating that "I now realize there was ample rhyme and/or reason to your actions … if my complaint was filed, please let me know how I can go about **[*6]** withdrawing it …." (Docket No. 32, Exhibit L). Further, plaintiff wrote to Sergeant Robertson on October 22, 1999, and stated "… I have come to the conclusion that I am at the loosing end of the stick … if my complaint was filed, I will withdraw it … I don't have time to help anyone else with legal work and therefore, I shouldn't be giving legal advice. I'm not going to ask to be moved back to the dorm, as I'm sure that will never happen but, if allowed to physically go to the law library, I am willing to accept a 'write-up' for any advice I give without express permission. (Inmate Rules & Regulations, pg 24, sect. (7)(B) …. I ask that you consider this and, note that I am ready to do what ever necessary to re-gain my rights." *(Id.)*.

Plaintiff alleges that the defendants retaliated against him for giving legal advice to other inmates, and for filing the October complaint against Officer Biviano. This alleged retaliation included removing him from the dorm, placing him in a cell block and refusing to return him to the dorm, and denying him access to the facility grievance forms.

## II. Discussion

### A. Summary Judgment Standard

*HN1*[⬆] Summary judgment may be granted when **[*7]** the moving party carries its burden of showing the absence of a genuine issue of material fact. *Fed. R. Civ. P. 56*; *Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir. 1990)*(citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that

there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-86, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* At that point, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.*

Given these principles, *HN2*[↑] a non-moving party cannot survive a motion for summary judgment merely by relying on the allegations contained in its pleadings. *Corselli v. Coughlin, 842 F.2d 23, 25 (2d Cir. 198).* Although a *pro se* plaintiff is entitled to **[*8]** special latitude when defending against summary judgment, he or she must establish more than merely "metaphysical doubt as to the materials facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986); Vital v. Interfaith Medical Ctr., 168 F.3d 615, 620-21 (2d Cir. 1999)* (noting obligation of court to consider whether *pro se* plaintiff understood the nature of summary judgment process); *Flores v. Graphtex, 1999 U.S. Dist. LEXIS 4236, No. 96-CV-820, 1999 WL 185260, at *1 (N.D.N.Y. Mar. 31, 1999)*(Munson, S.J.) (*pro se* party's motions should be liberally construed).


## B. Local Rules

The Local Rules of the Northern District of New York ("Local Rules") include the following provision:

> *HN3*[↑] Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, **[*9]** answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits. <u>Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.</u>

*N.D.N.Y.L.R. 7.1(a)(3)* (emphasis in original).

Defendants have wholly failed to comply with the requirements of the Local Rules by failing to annex to their motion for summary judgment a Statement of Material Facts, and failing to respond to pro se plaintiff's Statement of Material Facts. The District's requirements are not empty formalities. Rules such as *Local Rule 7.1(a)(3)* "serve to notify the parties of the factual support for their opponent's arguments, but more importantly inform the court of the evidence and arguments in an organized way--thus facilitating its judgment of the necessity for trial." *Little v. Cox's Supermarkets, 71 F.3d 637, 641 (7th Cir.1995).* Each of these functions is vital. When a party fails to comply with these provisions it is unfair to his or her adversary, which has a right to know the factual bases of his or her opponent's case and the specific foundations for those assertions of fact; and **[*10]** such conduct is adverse to the conservation of judicial resources, which are most efficiently deployed when the parties fulfill their adversarial functions in a rigorously organized, coherent fashion. *Jackson v. Broome County Correctional Facility, 194 F.R.D. 436, 437 (N.D.N.Y. 2000) (Kahn, J.); Grassi v. Lockheed Martin Fed. Sys., 186 F.R.D. 277, 278 (N.D.N.Y. 1999)* (McAvoy, C.J.) (summary judgment motion dismissed for failure to file Statement of Material Facts); *F.D.I.C. v. Rizzo,* No. 95-CV-183, 1997 WL 727551, at *1 (N.D.N.Y. Aug. 4, 1997) (McAvoy, C.J.) (same).

While defendants' failure is grounds for dismissing their motion per se, the Court notes that much of plaintiff's Statement of Material Facts is devoted to events occurring after the filing of this action. Therefore, the Court lacks jurisdiction to consider such events. Furthermore, even if deemed admitted, many of plaintiff's claims fail as a matter of law. Therefore, judicial economy is best served by determining the pending motions. However, counsel is advised that any future motion before this Court must comply fully with the Local Rules and failure to comply **[*11]**  will result in dismissal of the motion.


## C. Personal Involvement

*HN4*[⬆️] As a prerequisite to an award of damages under *section 1983*, a plaintiff must demonstrate the personal involvement of each named defendant. *Moffit v. Town of Brookfield, 950 F.2d 880, 886 (2d Cir. 1991)*. In essence, there is no *respondeat superior* liability in *section 1983* actions. *See Dumpson v. Rourke, 1997 U.S. Dist. LEXIS 15226, No. 96 CV 621, 1997 WL 610652, at *7 (N.D.N.Y. Sept. 26, 1997)* (Pooler, J.) (citing *Polk County v. Dodson, 454 U.S. 312, 325, 70 L. Ed. 2d 509, 102 S. Ct. 445 (1981)*; *Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973))*. Therefore, a supervisory official may be personally involved only where the official (1) directly participated in the alleged violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) either created or continued an unconstitutional policy, custom or practice; or (4) was grossly negligent in managing the subordinates who caused the violation. *Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)*, *accord*, *Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)* **[*12]**  (citations omitted).

Here, plaintiff named as defendants Loughren and Cutting. However, the complaint is devoid of any factual allegations pertaining to Loughren. It is well settled that *HN5*[⬆️] "'where the complaint names a defendant in the caption but contains no allegation indicating how the defendant violated the law or injured the plaintiff ….'" there is no personal involvement. *Hyde v. Arresting Officer Caputo, 2001 U.S. Dist. LEXIS 6253, No. 98 CV 6722, 2001 WL 521699, at *2 (E.D.N.Y. May 11, 2001)* (quoting *Morabito v. Blum, 528 F. Supp. 252, 262 (S.D.N.Y. 1981))*. Similarly, the allegations against Cutting are limited to his allegedly ignoring a letter from plaintiff, on an unspecified topic, at an unspecified time. "'It is well-established that *HN6*[⬆️] an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.'" *Higgins v. Artuz, 1997 U.S. Dist. LEXIS 12034, No. 94 CIV 4810, 1997 WL 466505, at *7 (S.D.N.Y. Aug. 14, 1997)* (quoting *Greenwaldt v. Coughlin, 1995 U.S. Dist. LEXIS 5144, No. 93 Civ. 6551, 1995 WL 232736 at *3 (S.D.N.Y. April 19, 1995)* and collecting cases).

 **[*13]**  Accordingly, it is recommended that Loughren and Cutting be dismissed as defendants.


## D. Access to Courts Claims

It is well established that *HN7*[⬆️] "prisoners have a constitutional right to access to the courts." *Bounds v. Smith, 430 U.S. 817, 821, 52 L. Ed. 2d 72, 97 S. Ct. 1491 (1977)*, *holding limited on other grounds by Lewis v. Casey, 518 U.S. 343, 135 L. Ed. 2d 606, 116 S. Ct. 2174 (1996)*. To establish standing for a claim for denial of right of access to courts, an inmate must show that he has suffered an actual injury traceable to the challenged conduct of prison officials--that is, that a nonfrivolous legal claim had been frustrated or was being impeded due to the actions of prison officials. *Lewis v. Casey, 518 U.S. 343, 350, 135 L. Ed. 2d*

_606, 116 S. Ct. 2174 (1996)_. "To state a claim that his constitutional right to access the court was violated, plaintiff must allege facts demonstrating that defendants deliberately and maliciously interfered with his access to the courts, and that such conduct materially prejudiced a legal action he sought to pursue." _Smith v. O'Connor, 901 F. Supp. 644, 649 (S.D.N.Y.1995)_; [*14]  _see Morello v. James, 810 F.2d 344, 347 (2d Cir.1987)_.

In this action plaintiff did not allege in the complaint, nor produce any evidence with this motion, that he was in any way prejudiced or harmed by the alleged deficiencies in the facility's law library. At best, plaintiff's research was slowed by the procedures in place that required that legal materials be delivered to him in his cell. It is also evident from the record before the Court that the procedure utilized with plaintiff to enable his access to legal materials was applied to all prisoners who were housed in the cell blocks. The record further reveals that plaintiff's pro se litigation efforts were focused on the civil and divorce actions he had pending, not on attacking his sentence or challenging the conditions of his confinement. Such underlying actions do not state a claim for denial of access to the courts. _See Lewis, 518 U.S. at 354-55_ (underlying action must be direct appeal of conviction, habeas corpus or civil rights action). Moreover, the record reveals that plaintiff had assigned counsel on his criminal matter and plaintiff has failed to even allege that he was unable to participate [*15]  in his defense because of the Jail's procedures.

With respect to the alleged deprivation of access to the facility typewriter, the Court notes that **_HN8_**[↑] the right of access to the courts does not require that inmates be provided with typewriters. _Taylor v. Coughlin, 29 F.3d 39, 40 (2d Cir.1994)_. Moreover, plaintiff was not denied all access to the typewriter. Rather, plaintiff's access was limited when there were other individuals or groups who needed to use the room in which the typewriter was available. Plaintiff has never alleged or proven that theses sporadic denials were not based upon the legitimate needs of the facility. However, because **_HN9_**[↑] "the threshold of an infringement upon constitutional rights is not crossed …. justification need not be addressed." _Taylor, 29 F.3d at 40_.

Accordingly, it is recommend that defendants' motion for summary judgment be granted on plaintiff's access to the courts claim.

## E. Violation of Right to Privacy

Plaintiff contends that his right to privacy was violated because he was forced to send his legal paperwork to an officer who did the photocopying and because he was forced to send his _in forma pauperis_ [*16] application to the Commissary Officer fully completed before she would complete it. **_HN10_**[↑] In the prison setting the constitutional right to privacy may be restricted to the extent necessary to further the penal institution's legitimate goals or policies. _Bell v. Wolfish, 441 U.S. 520, 546, 60 L. Ed. 2d 447, 99 S. Ct. 1861 (1979)_.

With respect to the _in forma pauperis_ application, it is not a document that plaintiff is entitled to maintain confidential. Rather, it is information that must be disclosed to the Court in order to determine whether plaintiff qualifies for such status. Moreover, it is a form that requires a prison official to complete and certify the financial data contained therein. _See_ N.D.N.Y.L.R. 5.4. As a practical matter, in order for a commissary officer to complete such a form on behalf of an inmate they must know what inmate it pertains to. Otherwise, it could not be accurately completed. Thus, this Court finds that there is no

expectation of privacy regarding the *in forma pauperis* application, and no constitutional violation arising from the conduct plaintiff complains of.

With respect to the access to photocopies, the Court first notes [*17] that plaintiff was not required to utilize the facility photocopier. Rather, as other decisions have noted, *HN11*[⬆] carbon paper or handwritten documents are accepted in the courts in this state. *Cf. Gittens v. Sullivan, 670 F. Supp 119 (1987)*, *aff'd 848 F.2d 389 (2d Cir. 1988)*. Moreover, from the record before the Court, it is clear that the facility kept records of the legal copying requests and the facility's compliance with those requests, and kept records of the number of copies requested by an inmate for payment purposes. [5] Plaintiff has not alleged, nor offered this Court any proof that the procedures about which he complains were not necessary to further the institution's legitimate goals or policies of securing payment and ensuring that photocopying requests were honored, or that he sustained any injury or prejudice as a result of the procedures about which he complains. Accordingly, this Court finds that the procedures about which plaintiff complains neither denied him access to the courts or violated any constitutionally protected right to privacy and the Court recommends that defendants' motion for summary judgment on the privacy claim be granted. [*18]

## F. Retaliation Claim

*HN13*[⬆] Retaliation is a viable claim when plaintiff alleges that adverse actions are taken in retaliation for the exercise of a constitutional right. *See Franco v. Kelly, 854 F.2d 584, 588-90 (2d Cir. 1988)*. The Second Circuit has recently revisited the issue of retaliation claims. *See Dawes v. Walker, 239 F.3d 489, 491-93 (2d Cir. 2001)*. In *Dawes,* the Court stated that courts must approach claims of retaliation "with skepticism and particular care." *Id. at 481* (citing *Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983))*. In order to survive dismissal, the plaintiff must advance "non-conclusory" allegations establishing:

> (1) that the speech [*19] or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech [or conduct] and the adverse action.

*Id. at 492* (citations omitted). In considering these claims, the Court is mindful that because "retaliation claims can be fabricated easily, plaintiffs bear a somewhat heightened burden of proof, and summary judgment can be granted if the claim appears insubstantial." *Justice v. Coughlin, 941 F. Supp. 1312, 1317 (N.D.N.Y. 1996)* (Pooler, J.); *Gill v. PACT Org., 1997 U.S. Dist. LEXIS 13063, 1997 WL 539948, *12 (S.D.N.Y. Aug. 28, 1997)* (citations omitted). If the plaintiff satisfies his burden, the defendants must then prove that they would have taken the action even in the absence of plaintiff's protected conduct -- that is, "even if they had not been improperly motivated." *Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996)*.

Plaintiff alleges that the defendants moved him to the cell block, denied him the right to return to the dorm setting, and denied him access to the facility grievance forms and grievance procedures, in retaliation for exercise [*20] of his constitutional rights. [6] Plaintiff alleges that the acts of retaliation were due to

---

[5] *HN12*[⬆] There is no requirement that an inmate receive "free or unlimited access to photocopying machines." *Johnson v. Parke, 642 F.2d 377, 380 (10th Cir. 1981)*. Requiring inmates to pay for the cost of photocopies is not tantamount to the denial of access to the courts. *Id.*

plaintiff's filing of the complaint against Officer Biviano on or about October 14, 1999, and due to plaintiff providing legal advice to other inmates.

With respect to the claim that plaintiff was retaliated against because he provide legal advice to other inmates, *HN15*[↑] while prisoners have a constitutional right of access to the courts, they do not have a constitutional right to assist other inmates in petitioning the courts. *Shaw v. Murphy, 532 U.S. 223, 231, 149 L. Ed. 2d 420, 121 S. Ct. 1475 (2001)* (a prisoner possesses no *First Amendment* right to provide legal assistance **[*21]** to other prisoners); *see also Smith v. Maschner, 899 F.2d 940, 950 (10th Cir. 1990)* (no constitutional right to assist other inmates with legal claims); *Gassler v. Rayl, 862 F.2d 706, 707-08 (8th Cir. 1988)*. While there is no independent right to provide legal assistance to other inmates, "prison officials may not prevent such assistance or retaliate for providing such assistance where no reasonable alternatives are available." *See Gibbs v. Hopkins, 10 F.3d 373, 378 (6th Cir. 1993)*. In this case, Miller has not alleged that there was no other reasonable alternative available or that other inmates were denied legal assistance. He has only alleged a violation of his constitutional rights in retaliation for his engaging in this conduct. Since the conduct at issue is not protected, it is recommended that defendants' motion for summary judgment be granted on Miller's retaliation claim based upon his legal advisory activities.

Turning to the claim that plaintiff was retaliated against due to his filing of a complaint against officer Biviano, Miller's allegations that adverse action was taken against him for exercising a constitutionally **[*22]** protected right, such as filing a grievance, satisfied the first two elements of a retaliation claim. Clearly, *HN16*[↑] plaintiff has a right to "free and uninhibited access … to both administrative and judicial forums for the purposes of seeking redress of grievances against state officers." *Franco v. Kelly, 854 F.2d at 589*. Defendants have not controverted plaintiff's assertion that he was moved to the cell block on the day he filed his complaint, other than the general denial in their answer. Rather, defendants submitted an affidavit by counsel suggesting that the action by the defendants was justified. Defense counsel, however, does not have personal knowledge of the underlying facts; therefore, his affidavit on this issue is not considered.

*HN17*[↑] Plaintiff must also establish that there is a causal connection between the protected activity and the adverse action. A number of facts are to be considered in determining whether a causal connection exists between plaintiff's protected activity and defendants' actions in the context of a retaliation claim: (1) the temporal proximity between the protected activity and the adverse action; (2) the inmate's prior disciplinary record; **[*23]** (3) the outcome of any hearing concerning the charges alleged to be retaliatory; and, (4) any statements of the defendants concerning their motivation. *Colon v. Coughlin, 58 F.3d 865, 872-73 (2d Cir. 1995)*; *Walker v. Goord, 2000 U.S. Dist. LEXIS 3501, 2000 WL 297249, at *5 (S.D.N.Y. Mar. 22, 2000)*.

In this case, Miller has alleged that he was moved from the dormitory to the cell block on the same day that the that he filed his complaint. This, "temporal proximity" serves as circumstantial evidence of retaliatory action. *See Gayle v. Gonyea, 313 F.3d 677, ___, 2002 WL 31757056, at *5 (2d. Cir. Dec. 10, 2002)*. As to the three other factors this Court could consider in this determination, there has been no

---

6 The Court acknowledges that *HN14*[↑] plaintiff does not have a constitutional right to remain in preferred housing. However, any action done in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Franco v. Kelly, 854 F.2d 584, 588-90 (2d Cir. 1988)*.

proof offered that would allow this Court to draw any inferences as to any of those factors. Finally, although defendants could have provided the Court with evidence of that the movement of Miller would have occurred despite the protected activity, they did not.

With respect to the allegations that plaintiff was denied access to grievance forms in retaliation for his filing of the complaint, plaintiff has offered this Court no allegations or information **[*24]** as to when those denials allegedly occurred. In light of the pleading requirements for a retaliation claim, plaintiff's conclusory allegations are insufficient. Furthermore, plaintiff has failed to establish a temporal relationship or any of the other factors that would permit this Court to draw inferences with respect to a causal connection between the protected activity and the alleged adverse consequences.

Accordingly, this Court finds that there is a genuine issue of material fact as to whether retaliation for the grievance was a substantial factor in the defendants' decision to move plaintiff to the cell block, and the Court will recommend that summary judgment on this claim be denied. The Court finds that plaintiff has failed to allege a nonconclusory claim with respect to the denial of access to the grievance forms and thus it is recommend that defendants' motion on that claim be granted.

WHEREFORE, based on the above, it is hereby

**RECOMMENDED** that defendants' motion for summary judgment (Docket No. 32) be **GRANTED** with respect to the access to the courts claim, the privacy claim, and the retaliation claims based upon plaintiff's legal advisory activities and based **[*25]** upon alleged denial of access to grievance forms, but **DENIED** as to the retaliation claim based upon plaintiff's filing of the grievance against Officer Biviano and plaintiff's subsequent move to the cell block, and it is further,

**RECOMMENDED** that plaintiff's motion for summary judgment (Docket No. 19) be **DENIED.**

Pursuant to *28 U.S.C. § 636(b)(1)*, the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT TO THE ASSIGNED DISTRICT JUDGE WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette, 984 F.2d 85 (2d Cir. 1993)*(citing *Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir. 1989))*; *28 U.S.C. § 636(b)(1)*; *Fed. R. Civ. P. 72, 6(a), 6(e)*.

Dated: January 21, 2003

Randolph F. Treece

U.S. MAGISTRATE JUDGE

---

**End of Document**